*"...a mere pretext to implementing adverse employment action against me, whether by the form of a formal adverse action or unwarranted rejection from probation."*

**- Chris Wadsworth, in an email sent to Monthei/Deems on 05/21/2014**

# Response to Notice of Rejection During Probation (NRDP)

**Employment History**......................................................................................**3**
    **[Item A-i]:**...............................................................................3

**Causes for Rejection** ...................................................................**4**
  ITEM IV................................................................................4
    **[Item C-i]:**...........................................................................**4**
    **[Item C-ii]:**..........................................................................**5**
    **[Item C-iii]:**.........................................................................**6**
    **[Item C-iv]:**.........................................................................**8**
    **[Item C-v]:**..........................................................................**9**
    **[Item C-vi]:**.......................................................................**10**
    **[Item C-vii]:**.......................................................................**10**

**Willful Disobedience** ............................................................... **11**
  ITEM IV - 1a ...........................................................................11
    **[Item 1a-i]:**.........................................................................**11**
    **[Item 1a-ii]:**........................................................................**11**
    **[Item 1a-iii]:** ......................................................................**12**
    **[Item 1a-iv]:**.......................................................................**13**
    **[Item 1a-v]:**........................................................................**14**
    **[Item 1a-vi]:**.......................................................................**14**
    **[Item 1a-vii]:**......................................................................**14**
  ITEM IV - 1b ...........................................................................15
    **[Item 1b-i]:**.........................................................................**15**
    **[Item 1b-ii]:**........................................................................**15**
    **[Item 1b-iii]:**.......................................................................**16**
    **[Item 1b-iv]:**.......................................................................**17**

**Failure to Understand/Follow Directions and Complete Assignments**..................... **17**
  ITEM IV - 2 ............................................................................17
    **[Item 2]:** ............................................................................**17**
  ITEM IV - 2a ...........................................................................18
    **[Item 2a]:** ..........................................................................**18**
  ITEM IV - 2b ...........................................................................19
    **[Item 2b-i]:** ........................................................................**19**
    **[Item 2b-ii]:** .......................................................................**21**
    **[Item 2b-iii]:** ......................................................................**22**
    **[Item 2b-iv]:** ......................................................................**23**
  ITEM IV - 2c ...........................................................................23
    **[Item 2c-i]:** ........................................................................**23**
    **[Item 2c-ii]:** .......................................................................**24**

**[Item 2c-iii]:** ............................................................... **25**
**[Item 2c-iv]:** ............................................................... **26**
**[Item 2c-v]:** ............................................................... **26**
ITEM IV - 2d ............................................................... 27
ITEM IV - 2e ............................................................... 28
**[Item 2e-i]:** ............................................................... **28**
**[Item 2e-ii]:** ............................................................... **29**
**[Item 2e-iii]:** ............................................................... **29**
ITEM IV - 2f ............................................................... 30
**[Item 2f-i]:** ............................................................... **30**
**[Item 2f-ii]:** ............................................................... **30**
ITEM IV - 2g ............................................................... 31
**[Item 2g]:** ............................................................... **31**
ITEM IV - 2h ............................................................... 32
**[Item 2h-i]:** ............................................................... **32**
ITEM IV - 2h ............................................................... 33
**[Item 2h-ii]:** ............................................................... **33**
ITEM IV - 2i ............................................................... 34
**[Item 2i]:** ............................................................... **34**
ITEM IV - 2j ............................................................... 35
**[Item 2j-i]:** ............................................................... **35**
**[Item 2j-ii]:** ............................................................... **35**
**[Item 2j-iii]:** ............................................................... **36**
**[Item 2j-iv]:** ............................................................... **36**
**[Item 2j-v]:** ............................................................... **37**
**[Item 2j-vi]:** ............................................................... **37**
ITEM IV - 2k ............................................................... 38

**Unprofessional or Rude and Discourteous Behavior** ............................................................... **38**
ITEM IV - 3a ............................................................... 38
**[Item 3a]:** ............................................................... **38**
ITEM IV - 3b ............................................................... 39
**[Item 3b-i]:** ............................................................... **39**
**[Item 3b-ii]:** ............................................................... **39**
**[Item 3b-iii]:** ............................................................... **40**
**[Item 3c, 3d, 3e, 3f, 3g, 3h, 3i]** ............................................................... **40**
**[Item 3d-i]:** ............................................................... **47**
**[Item 3d-ii]:** ............................................................... **50**
**[Item 3d-iii]:** ............................................................... **50**
**[Item 3d-iv]:** ............................................................... **51**
**[Item 3e]:** ............................................................... **51**
**[Item 3f]:** ............................................................... **51**
**[Item 3g-i]** ............................................................... **51**
**[Item 3h-i]** ............................................................... **52**
**[Item 3h-ii]** ............................................................... **53**
**[Item 3h-iii]** ............................................................... **54**

**Preparation Failures** ............................................................... **54**
ITEM IV - 4 ............................................................... 54

[Item 4a] ....................................................................................................... **54**
[Item 4b]: ..................................................................................................... **56**
[Item 4c]: ..................................................................................................... **56**
[Item 4e]: ..................................................................................................... **56**
[Item 4f]: ...................................................................................................... **57**

**Notice & Progressive Discipline** ............................................................. **58**
ITEM V ............................................................................................................ 58
[Item V - 1] ............................................................................................. **58**
[Item V - 2] ............................................................................................. **58**
[Item V - 3] ............................................................................................. **59**
[Item V - 4] ............................................................................................. **59**

**Reinstatement Rights** ............................................................................... **60**
ITEM VI ........................................................................................................... 60

**Appendix 1 - Admission Problems & Patient Harm** ............................. **62**

**Appendix 2a - 2014 MHCB Referral Increase** ...................................... **62**

**Appendix 2b - MHCB Need** ...................................................................... **62**

**Appendix 3 - Monthei pre-03-23-2014** ................................................... **62**

**Appendix 4 - Weekend Presence Prior to 3-23** ..................................... **62**

**Appendix 5 - Intent - UOF Assignment** ................................................. **62**

**Appendix 6 - Unethical Management** ...................................................... **62**

**Appendix 7 - Board of Psychology** .......................................................... **62**

**Appendix 8 - Performance Recognition** .................................................. **62**

**Appendix 9a - Past is Prologue (Tarasoff)** ............................................ **62**

**Appendix 9b - Past is Prologue (Chapman)** .......................................... **62**

**Appendix 10 - Probationary Reports Due (February 2014)** ................ **63**

**Appendix 11 - Intentional Conflicts with Explicit Instruction** ............ **63**

**Appendix 12 - Return to Staff Psychiatrist Position** ............................. **63**

**Appendix 13 - Evidence of Inpatient Restriction** ................................... **63**

# *Employment History*

*[Item A-i]:*

> *…You began working at SQ on or about September 1, 2011, a Staff Psychiatrist (sic). You were promoted to Chief Psychiatrist, on or about September 20, 2013, and this is your current position.*

Notably, Andrew Deems and Eric Monthei had appointed me to serve as the Medical Director of San Quentin's inpatient unit in the Fall of 2012. In addition, I was assigned to serve as San Quentin's Acting Chief Psychiatrist from January 15, 2013 until my official (non-Acting) appointment began on September 20, 2013. And thus, at the time that I authored the memorandum on 03/23/2014, I had been functioning as SQ's Chief Psychiatrist for over 14 months. At the time that I was served the NRDP on 09/12/2014, I had been in this role for 20 consecutive months.

See attached document:

*2014-09-05 Grievance granted.pdf*



## *Causes for Rejection*

### *ITEM IV*

***[Item C-i]:***

***…By January 2014, the decision as to how the Department would move forward was clearly explained to you…***

The attached email sequence (*2014-03 Unclear Plans.pdf*) confirms that, as late as mid-March, a final "decision regarding bed utilization" had not been made. In addition, the email sequence clarifies that, throughout the month of March, Monthei delivered inconsistent instruction regarding the bedspace allocation for San Quentin's CTC. From March 5th to March 18th, the number of beds that SQ would have allocated for the new, non-acute inpatients had expanded from 11, to 12, and then to 13. In contrast to

Monthei's explanation that "prior to March 2013" a decision regarding bed utilization had been made, such a decision had not been shared with me prior to 03/19/2014.

The NRDP's assertion that a plan had been finalized prior to March 2014 is not supported by the following:

      i)   Senior psychiatrist Paul Burton's email on 03/18/2014;

      ii)  Monthei's direct supervisor, Andy Deems, was unaware a finalized plan, as clearly indicated by his 03/19/2014 email;

      iii)  Deems' request that I prepare the memorandum dated 03/23/2014;

      iv) the presentations that I gave to the Medical and MH departments on 03/13/2014 and 03/18/2014.

Monthei and Deems knew, at the time that I received the NRDP on 09/12/2014, that a decision regarding bed utilization had not been shared with me prior to 03/19/2014. On 03/19/2014, Deems asked me to document my clinical opinion regarding bedspace allocation at San Quentin State Prison. Despite knowing that neither Deems nor I, on 03/19/2014, were aware of a departmental decision about San Quentin's allocation of bedspace, Deems elected to include this item as a cause of my rejection from probation.

See attached documents:

    *2014-03 Unclear Plans - woa.pdf*
    *2014-03-13 & 18 NAMH Presentation.pdf*
    *2014-03-18 Burton Confirms No Plan - woa.pdf*


**[Item C-ii]:**

> **However, you took it upon yourself to conduct extensive research on such matters including, but not limited to: national executions, Supreme Court rulings on condemned prisoners, and the history of the death penalty…**

This research was consistent with my role as Chief Psychiatrist of San Quentin State Prison. My familiarity with these topics was a relevant addition to my testimony in federal district court, testimony that was well received by the Court. Judge Karlton acknowledged his appreciation in his 12/10/2013 court order (*2013-10-31 Coleman Excerpts & Feedback.pdf).*

My "extensive research" on these items was initially commissioned by SQ's MHSDS Management Team in the Summer and Fall of 2012. I was asked to travel to CDCR HQ in Elk Grove to share my findings, conclusions, and departmental plan (in anticipation of a possible voter-initiative to overturn the death penalty) to CCHCS leaders in October 2012. (*2012-10-09 Overturning Capital Punishment.pdf)*  This presentation was received favorably by HQ leadership. Deputy Director (A) Tim Belavich had advocated for me to present it as a statewide course for Continuing Medical Education credit (*2012-10-17 HQ Feedback.pdf*). .

*Updated March 14, 2015*

The ten power-point slides that were attached to the 09/12/2014 NRDP had originally been included in those October 2012 presentation regarding Proposition 34. In January 2014 Monthei requested that I included these slides ten, previously-generated slides into my 01/22/2014 presentation (*2014-01-22 Wadsworth Presentation.pdf*).

| **Condemned Audit Presentation Assignments** | | LPT Rounding (Mr. Lippincott) |
|---|---|---|
| Purpose: | Collect objective data available specific to the Condemned Population | • Training |
| | | • Frequency |
| Timeframe: | Most data 2013 Calendar year; other data varies depending on item | • Trainings |
| | | • Information Sharing |

| | | • Treatment Hours |
|---|---|---|
| Condemned Screenings | | • Refusals |
| • Proposition 34 (Wadsworth) | | |
| • Clinical Needs Assessment (Whyte) | | Structural Changes (Monthei) |
| | | • Teams, Locations, Focus |

My January 2014 presentation was highly regarded by the meeting's attendees. I had spent considerable effort during the preceding week, with Monthei's approval, conducting the requisite research for this presentation (*2014-01-14 Email Condemned Placement.pdf*). On 01/22/2014, while meetings were still on-going, Dr. Belavich (who was in attendance) sent Monthei a text-message to acknowledge the high quality of my work/participation on 01/22/2014.

In addition, see the attached document (*2014-03-03 Monthei & SCOTUS.pdf*), in which Monthei distributed findings about "*national executions, Supreme Court rulings on condemned prisoners, and the history of the death penalty…*" to members of his management team. In addition, as SQ's Chief of Mental Health, he authorizes the topics covered at each weekly Departmental meeting. The topic that he authorized for June 30, 2014 was related to "*national executions, Supreme Court rulings on condemned prisoners, and the history of the death penalty*" (see attached document, *2014-06-30 Departmental Mtg - Hall v Florida.pdf*). To list this item as a cause for rejection from probation

See attached documents:

> *2012-10-09 Overturning Capital Punishment - woa.pdf*
> *2012-10-17 HQ Feedback - woa.pdf*
> *2013-10-31 Coleman Excerpts & Feedback - woa.pdf*
> *2013-11-19 HQ Email - woa.pdf*
> *2014-01-14 Mngmt Mtg Agenda.pdf*
> *2014-01-22 Wadsworth Presentation - woa.pdf*
> *2014-03-03 Monthei & SCOTUS - woa.pdf*
> *2014-06-01 JAAPL Article.pdf*
> *2014-06-30 Departmental Mtg - Hall v Florida.pdf*

***[Item C-iii]:***

*Updated March 14, 2015*

***…You then submitted a lengthy memorandum, disputing the Department's analysis and recommendation, in an effort to undermine the decision and bring opposition to the Department's efforts to comply with the Order.***

The Psychiatry Inpatient Program (the P.I.P.), which was scheduled to open in October 2014, was the product to satisfy the court's Order and the Department's "analysis and recommendation." My 03/23/2014 memorandum did not dispute the clinical indication of the P.I.P. My efforts were aimed at responsibly allocating a limited healthcare resource. If the Department had conducted an analysis or provided a recommendation prior to my 03/23/2014 memorandum as the NRDP alleges, then Monthei was the only member of San Quentin's staff who was aware of this direction.

The Non-Acute Mental Health (NAMH) project was a temporary solution that was established in mid-March 2014. The NAMH is decidedly different than the PIP. I was not opposed to the NAMH or hospitalization of low-acuity patients. In fact, I substantially contributed to the policies and procedures for this novel program (*2014-03-12 NAMH Edits.pdf*, my edits made on the evening of 03/12/2014 are marked in red were made in the attached document).

Nevertheless, the NAMH program is not compliant with the agreements that were established to comply with Judge Karlton's 12/10/2013 court order and the NAMH was never presented or discussed as the remedy to answer the court's order. Judge Karlton ordered that the CDCR would, in conjunction with the Special Master, determine whether SQ's Psychiatry Inpatient Program (PIP) would need to be licensed (see attached document, *2013-12-10 Coleman Court Order.pdf*, page 27, lines 27-28). Before the end of January 2014, all parties had agreed that the unit would need to be dually licensed by CDPH and the Joint Commission.

SQ's Psychiatry Inpatient Program (PIP), which opened in October 2014, is the remedy for the 12/10/2013 order from Judge Karlton. My memorandum, a statement of my professional opinion about withdrawing inpatient services for those who have the greatest need, has nothing to do with the Department's efforts to comply with the 12/10/2013 order. My memorandum was not "an effort to undermine" the Psychiatry Inpatient Program or to undermine the NAMH. My memorandum was an expression of my clinical opinion that, by disregarding the needs of the highest acuity patient population (i.e., MHCB), we would unnecessarily expose the patients to harm.

My 03/23/2014 memorandum was consistent with my responsibility as a physician, as the unit's Medical Director, and as the Chief Psychiatrist. In addition, the 03/23/2014 memorandum is consistent with the Chief Psychiatrist's Duty Statement provided as Attachment A in the NRDP-packet. Finally, Monthei's direct supervisor (Andrew Deems) asked me, on 03/19/2014, to produce this memorandum. On the morning of 03/23/2014, I notified Deems of the memorandum's content and he authorized me to proceed with its production.

These documents discredit the NRDP's claims that my memorandum was "an effort to undermine the decision and bring opposition to the Department's efforts to comply with the Order." Monthei and Deems were aware that these statements were inaccurate at the time that I was served with the Notice of Rejection During Probation. Furthermore, Deems was aware that, on 03/19/2014, he had requested me to produce the memorandum and that, on 03/23/2014, he provided his final authorization to proceed with the document's production. And yet, despite knowing that my memorandum was a commissioned report that objectively considered a crucial decision regarding patient care, they elected to publish a bogus allegation

*Updated March 14, 2015*

that I had undermined a federal court order within a document that was designed to unjustifiably damage my reputation and my career.


See attached document:

>    *2013-12-10 Coleman Court Order.pdf*
>    *2014-01-10 Email - SQ Mtg Agenda - woa.pdf*
>    *2014-03-12 NAMH Edits.pdf*
>    *2014-03-23 Pre-Memorandum Communication.pdf*
>    *2014-03-23 Communication.pdf*
>    *CTC Floorplan2 Feb 2013 - Mar 2014.pdf*
>    *CTC Floorplan3 Mar 2014 - July 2014.pdf*
>    *Relevant AMA Code of Ethics.pdf*


## *[Item C-iv]:*

### *Prior to March 2013, it was explained to you that the Department's decision regarding bed utilization was final…*

The attached email sequence (*2014-03 Unclear Plans.pdf*) confirms that, as late as 03/23/2014, a final "decision regarding bed utilization" had not been made.  In addition, the email sequence clarifies that, throughout the month of March, Monthei delivered multiple different instructions regarding the bedspace allocation for SQ's inpatient unit.  From March 5th to March 18th, the number of beds that SQ would have allocated for the new, non-acute inpatients had expanded from 11, to 12, and then to 13.

In additions, the NRDP's assertion that a plan had been finalized prior to March 2014 is not supported by the items listed in Item C-i.

These documents clarify that, prior to 03/19/2014, Monthei and Deems knew that a firm decision regarding bedspace allocation had not yet been made.  And yet, despite knowing that a firm decision had not been made prior to March, they knowingly produced contrary statements within a document that was designed to unjustifiably damage my reputation and my career.


See attached documents:

>    *2014-03 Unclear Plans - woa.pdf*
>    *2014-03-13 & 18 NAMH Presentation.pdf*
>    *2014-03-18 Burton Confirms No Plan - woa.pdf*



**[Item C-v]:**

*…Prior to March 2013, it was explained to you that the Department's decision regarding bed utilization was final and you were expected to support this decision:*

I am responding to this item as if it intended to refer to March 2014, not March 2013.

My licensure as a physician is a prerequisite of my position with the CDCR. If administrative decisions about the allocation of a healthcare resource generated my concerns about safely delivering care, I am required to state this opinion in the interest of patient care. To remain silent would have been incompatible with the expectations that accompany my training, medical licensure, and my role as the unit's Medical Director. In addition, expecting a physician to support clinical decisions with which he does not agree is at odds with the ethical obligations of a physician.

As the supervisors of numerous physicians, Monthei and Deems were should have known that physicians must adhere to ethical codes that would prevent the type of expectation that they claim to have issued prior to March. And yet, despite knowing the obligations of a physician, they elected to allege that they had issued explicit instruction to the inpatient unit's Medical Director to "support this decision."

See attached document:

*Relevant AMA Code of Ethics.pdf*

*Updated March 14, 2015*

*[Item C-vi]:*

*Your insubordination became even more apparent after you expressed your opinion and "concern" of the Department's recommendation and decision to allocate a certain number of inpatient beds for the Condemned Treatment Population (CTP), and your opinion was not accepted. Your fixation on this issue resulted in your inability to complete work assignment timely.*

1) Leading up to the weekend of 03/21/2014, I had a feeling that keeping 4 inpatient beds for the acute care needs of our patients would be inadequate. However, I didn't have objective data upon which to base this feeling. Once I received authorization from Deems to research this matter, I carefully evaluated the available data/information regarding San Quentin's historical needs. Contrary to Monthei's statements, I had never expressed an objective opinion prior to 03/23/2014 and, thus, my opinion could not have been "not accepted."

2) During the weekend of 03/21/2014, I spent 25+ hours analyzing the available, objective data *that could not have been* a part of the "Department's recommendation" that was developed prior to March 2014 since this information included several weeks of data that was only available *after* Monthei claims that the Department had reached a conclusion. My research of this topic did not interfere with other responsibilities to which I had been assigned.

3) My opinion could not have been, prior to 03/23/2013, "not accepted" since I had not even formulated an opinion. I did not objectively review our recent needs until I conducted the research during the weekend of 03/21/2014.

*[Item C-vii]:*

*…Your fixation on this issue resulted in your inability to complete work assignment timely.*

Dedicating my efforts during the weekend of 03/21/2014 to carefully considering this data/information was done *on my own time*, when I was not compromising my typical duties. However, as a physician, as Medical Director and as Chief Psychiatrist, meaningfully considering the bedspace needs of the inpatient unit was my highest priority/obligation. Monthei and Deems knew that my opinion, which had not been formally outlined until the evening of 03/23/2014 was never "not accepted" prior to its finalization. In addition, see Item IV-2 below.

See attached document:

*Relevant AMA Code of Ethics.pdf*

# *Willful Disobedience*

## *ITEM IV - 1a*

### *[Item 1a-i]:*

*In a series of meetings you attended, the issue concerning CTP, including bed utilization was discussed at length, resulting in consensus about the approach that management intended to support.  The meetings were held on or about February 4, 6, 11, 13, 18, 20, 25, and 27…These plans were further discussed on March 4, 6, 11, and 13, 2014.  You were instructed what Mental Health management's direction on this issue was…*

Although the general topic of the inpatient unit for the condemned was likely an item listed on the management meeting agendas for the dates listed above, these agendas do not record the meeting minutes.  As evidenced in numerous locations throughout this document, a concrete plan for bedspace allocation had not been established by mid-March (*2014-03 Unclear Plans.pdf*).

The idea that a "*consensus*" about bedspace allocation was reached over the course of the twelve meetings in February/March is inconsistent with the assertion that, on page 4 of the 09/12/2014 NRDP, "*By January 2014*, [emphasis added] the decision as to how the Department would move forward was clearly explained to [me]."

The NRDP's assertion that a consensus about bedspace allocation had been reached prior to March 2014 is not supported by the items listed in Item C-i, above.

Furthermore no other member of the SQ's MH Management Team was, on the dates listed above, assigned to the inpatient unit.

Monthei and Deems know that, even if a consensus decision regarding bedspace allocation had been made prior to 03/19/2014, this consensus decision had not been shared with me or with Deems.  And yet, despite knowing that statements of my awareness were false, they elected to publish their inaccuracies within a document that was designed to unjustifiably damage my reputation and my career.

See attached documents:

> *2014-01-22 Deems Memo re CTC Bedspace Concerns.pdf*
> *2014-03-18 Burton Confirms No Plan - woa.pdf*
> *2014-03-13 & 18 NAMH Presentation.pdf*

### *[Item 1a-ii]:*

*…Despite this clear instruction, on or about March 20, 2014, you informed your supervisor, Chief of Mental Health, Eric Monthei, of an, "…unplanned and informal discussion" with Chief Executive Officer (CEO), Andrew Deems.  You shared your concerns with CEO Deems relating to management's plan associated with the allocation of bed space.*

I sent an email to Monthei on 03/18/2014 explaining my rationale.  My email stated, in part:

*I understand the motivation to eliminate the outpatient SCCP by April 1st, but it can't come at the expense of compromising clinical care to a known need at our institution.*

*We'll have more beds eventually, but I would strongly oppose the MHCB, at this juncture, being less than 6 beds…for the last month, I don't believe we've had less than 6 MHCB patients, and at times we've had as many as 10 on the CTC. To assign less than six, at this point, could be a real danger.*

Monthei's response confirmed that he was making decisions about the institution's allocation of a critical health resource based upon the upcoming, on-site presence of plaintiffs' counsel and court experts. Upon learning of his plans, it was my responsibility as a physician Medical Director, to communicate my concerns with the leader of the unit's Local Governing Body, Andrew Deems.

See attached document:

*2014-03 Unclear Plans - woa.pdf*

## [Item 1a-iii]:

**Chief Monthei instructed you not to engage in further discussions or communications on this issue until such time as Chief Monthei had an opportunity to brief CEO Deems on the details of bed space specific to the CTP.**

Prior to 03/24/2014, I was not provided with instruction, verbal or otherwise, not to engage in "*further discussions or communications on this issue until such time as Chief Monthei had an opportunity to brief CEO Deems."* The following items support my decision to document my clinical concern regarding inpatient bedspace allocation, in my memorandum dated 03/23/2014:

- Deems is Eric's supervisor. My supervisor's supervisor asked me to produce an opinion. Deems' direction would have superseded Eric's, instruction he provided one.

- As a physician and Medical Director, I had developed a reasonable concern about the safety of our patient population. As a physician, I am obligated to act on this concern. Instructing/ordering a physician to remain silent about clinical concerns regarding patient safety conflicts with my ethical responsibilities as a physician and with the CDCR's Code of Silence.

The following items outline that Monthei's disproportionate reaction to the chief psychiatrist's opinion was not consistent with responsible healthcare administration:

- Ordering a physician not to discuss his reasonable clinical concerns of threatened patient safety is a transgression of the limits of my supervisor's licensure.

- Ordering a physician medical director not to discuss reasonable clinical concerns that the physician had developed about patient safety violates the ethical principles that govern the practices of psychology and psychiatry.

- Retaliating against a physician for voicing his reasonable concerns about patient safety is not supported by law.

These items clarify that Monthei and Deems claim to have ordered a CDCR physician to violate ethical codes that govern a physician's practice. And yet, despite knowing that this order would be at odds with these governing codes, they elected to identify their alleged instruction as a cause of my rejection from probation.

See attached document:

*2014-01-22 Deems Memo re CTC Bedspace Concerns.pdf*
*2014-03-13 & 18 NAMH Presentation.pdf*
*2014-03-18 Burton Confirms No Plan - woa.pdf*

### *[Item 1a-iv]:*

***...Your failure to abide by Chief Monthei's directions to you undermined your manager's ability to present the background and status of a sensitive issue to CEO Deems, as he had planned.***

My obligations to promote patient safety and to voice my clinical opinion about concerns that jeopardize the patient population supersede Monthei's failure to, by March 23, 2014, notify his supervisor about a critical decision had allegedly been made in January and/or February.

Monthei supported my decision to provide the Primary Care Physicians with a presentation on 03/13/2014. He also attended the department-wide MHSDS meeting on 03/18/2014 where Dr. Burton, CSW Laura Whyte, and myself co-presented these same slides (*2014-03-13 & 18 NAMH Presentation.pdf*).

Consistent with all instruction that had been provided up to that point, we provided the only instruction we had ever entertained about the CTC's bedspace allocation:

The plan would be to admit one NAMH patient per weekday and to continuously reevaluate our local need for inpatient beds (please reference the second-to-last slide in the attached document, *2014-03-13 & 18 NAMH Presentation.pdf*).

Following this presentation, Monthei approached Burton and me to provide very positive feedback about the presentation's content. In particular, he commented on his appreciation of our ability to "tie it all together," our calm demeanor, and instructive tone. He did not mention a concern with the plan-for-bedspace allocation that was openly discussed during the presentation.

See attached document:

*2014-03-13 & 18 NAMH Presentation.pdf*

*[Item 1a-v]:*

*…On or about March 23, 2014, you ignored your supervisor's instruction, and sent CEO Deems and Chief Monthei an email that acknowledged this instruction…*

I did not "ignore [my] supervisor's instruction," as there hadn't been such instruction. Nor did my email on 03/23/2014 "acknowledge" such instruction regarding communication about the bedspace needs on the unit over which I was Medical Director.

Although Monthei never issued an order on 03/20/2014, "*not to engage in further discussions or communications on this issue,*" I was nevertheless specifically asked by his Supervisor to produce this opinion. In addition, my obligations as a physician forbid me from remaining silent about an item that directly impacts patient care.

Deems was aware that, on 03/19/2014, he specifically requested that I provide my clinical opinion regarding bedspace allocation. Furthermore, he was aware that, on the morning of 03/23/2014, he authorized completion of the memorandum after receiving a preview of my findings by telephone. Despite this knowledge, Deems has elected to use his inaccurate revision of March 2014 to unjustifiably harm my reputation and career.

*[Item 1a-vi]:*

*…Later that same day, you sent Chief Monthei another email that acknowledged his instructions to you, and then purported to explain your rationale for deviating from this instruction…*

My email sent at 6:15pm on 03/23/2014 states, "It was a struggle for me to voice a professional disagreement with you…"

However, I was clearly referring to my newly developed, objective findings and their disagreement with Eric's most recent (03/21/2014) indication that we would only retain 4 inpatient beds for patients suffering an acute, psychiatric crisis at SQ. I was not, in any way, referring to instructions "not to engage in further discussions or communications on this issue…"

Prior to 03/24/2014, he had never provided such instruction. Nevertheless, if Monthei/Deems would like to stand by this claim that I, as a physician medical director, was instructed not to discuss his concerns impacting patient care and to, instead, simply follow "the Department's plan," this would be an example of a non-physician's explicit instructions violating the ethical obligations to which a physician must adhere. As noted above, a baseline requirement of my job as a psychiatrist in the CDCR is that I am a licensed physician.

*[Item 1a-vii]:*

*…Your failure to abide by Chief Monthei's directions to you undermined your manager's ability to present the background and status of a sensitive issue to CEO Deems, as he had planned. Your actions usurped Chief Monthei's presentation and jeopardized how the presentation would be received…*

As a physician, once I know about a medical issue that impacts the clinical care of the patient population I am expected to serve, I am obliged act on behalf of my patients. A prerequisite of my job-function is that I am a licensed physician. By disregarding the concern I had about patient safety, I would have jeopardized my licensure as a physician in order to "*abide by Chief Monthei's directions.*" This would have been an unacceptable dereliction of my clinical obligations as a physician.

I was specifically asked to investigate this matter by Monthei's supervisor, CEO Deems. Deems and Monthei, as the supervisors of numerous physicians, should be aware of the ethical and fiduciary responsibilities of physicians.

See attached documents:

*2014-01-22 Deems Memo re CTC Bedspace Concerns.pdf*

## ITEM IV - 1b

### [Item 1b-i]:

*On or about March 24, 2014, you were provided with further and final direction by Chief Monthei to cease-and-desist from engaging in further communication specific to the allocation of inpatient beds related to the CTP…*

This statement plainly demonstrates his disregard for governing Health/Safety codes and ethical obligations that necessarily protect a clinical provider's advocacy of patient safety. In addition, his statement is a profound disregard for the Patient Safety Culture that is espoused by CCHCS and the Patient Safety Committee, which authorize providers to voice their concerns about patient care. Deems and Monthei are aware that the "further and final direction" to cease and desist from discussing decisions that jeopardize patient care are in violation of numerous governing codes, policies, and regulations. And yet, they elected to include this item as a cause of my rejection during probation.

See attached documents:

*CCHCS Patient Safety Program Policy.pdf*
*Performance Improvement Culture.pdf*

### [Item 1b-ii]:

*…and in conjunction with relevant court orders and/or agreements.*

1) SQ's temporary NAMH-program placed 13 low-acuity patients into 13 of SQ's 17 MHCB beds. Compare *CTC Floorplan2 Feb 2013 - Mar 2014.pdf* to *CTC Floorplan3 Mar 2014 - July 2014.pdf*. The concern outlined in the 03/23/2014 memorandum was that SQ would be effectively "closing" over 75% of its acute MHCB beds and depriving higher-acuity patients of a recognized need. In my memorandum, I advised a more considerate balance of the concerns of acute and non-acute psychiatric patients.

2) SQ's NAMH-program is not compliant with the agreements that were established to comply with Judge Karlton's 12/10/2013 court order. Judge Karlton ordered that the CDCR would, in conjunction with the Special Master, determine whether SQ's Psychiatry Inpatient Program (PIP) would need to be licensed (see attached document, *2013-12-10 Coleman Court Order.pdf*, page 27, lines 27-28). Before the end of January 2014, all parties had agreed that the unit would need to be dually licensed by CDPH and the Joint Commission. This item was specifically discussed at San Quentin during a two-day meeting on 01/22/2014 and 01/23/2014 (*2014-01-10 Email - SQ Mtg Agenda.pdf*).

This dual licensure would be consistent with the PIP that had been previously established at the California Institution for Women (CIW). In addition, a dually licensed inpatient program was consistent with CDCR's mission to provide Department of State Hospital (DSH) services within CDCR-facilities.

3) If "agreements" about bed-space allocation for a temporary NAMH-unit, I don't know why the unit's medical director, Deems (the institution's CEO), or the institution's senior psychiatrist were unaware of these agreements by 03/19/2014.

See attached documents:

*2013-12-10 Coleman Court Order.pdf*
*2014-01-10 Email - SQ Mtg Agenda - woa.pdf*
*2014-01-22 Deems Memo re CTC Bedspace Concerns.pdf*
*CTC Floorplan2 Feb 2013 - Mar 2014.pdf*
*CTC Floorplan3 Mar 2014 - July 2014.pdf*

**[Item 1b-iii]:**

**Approximately one hour after receiving this instruction, you sent an email to executive staff at headquarters attempting to explain your rationale for deviating from Chief Monthei's previous direction:**

On 03/24/2014, I recognized that my genuine clinical concern that was being disregarded as an allegedly insubordinate action that disrespected the chain of command. I had an obligation to appropriately communicate my concerns about patient safety and to clarify that my actions were prioritizing my medical responsibility to my patients. On the morning of 03/24/2014, Monthei demonstrated that he was unable to discern my genuine clinical concerns from his misperception of insubordination. In my communications with executive staff on 03/24/2014, I clearly announced the sincerity of my intentions (*2014-03-24 Communications to Executive Staff.pdf*).

Contacting executive staff is consistent with the specific instruction that Deputy Director (A) Tim Belavich provided me by telephone on 03/25/2014. Dr. Belavich indicated that if I had a concern regarding patient care that was not given the proper attention by a supervisor, I should contact my supervisor's supervisor. He further stated that, if my supervisor's supervisor disregarded my reasonable concern, he advised that I should proceed to the next supervisor. Dr. Belavich explained that this was not only possible, but it was expected…

…Monthei's belief that his explicit direction and/or chain of command should usurp a physician's proper discharge of his concerns about patient care is at odds with the expectations of all healthcare providers.

And again, this is also at odds with CCHCS' own Patient Safety Culture (*CCHCS Patient Safety Program Policy.pdf*, *Performance Improvement Culture.pdf*, *Relevant AMA Code of Ethics.pdf*).

See attached documents:

> *2014-03-24 Communications to Executive Staff - woa.pdf*
> *CCHCS Patient Safety Program Policy.pdf*
> *Performance Improvement Culture.pdf*
> *Relevant AMA Code of Ethics.pdf*

### [Item 1b-iv]:

*You were once again provided with further direction from Chief Monthei to cease-and-desist from engaging in further communication specific to the allocation…and/or agreements. Despite this clear direction, you sent Chief Monthei another e-mail one-half hour later stating, "you'll be included in all emails I send moving forward," or words to that effect. This response clearly demonstrates your failure to follow clear instructions given to you by your supervisor.*

I think (?) Monthei is trying to point-out that:

> 1) despite ordering me to restrict my communication about the bedspace allocation, but that

> 2) since I allegedly cannot follow instruction, I misinterpreted his very specific direction, and broadly applied it to *all* communication.

However, the EPIP dated 05/12/2014 adds that, on 03/24/2014, Monthei "returned to [his] office and sent [me] an email stating, "*Please direct any and all communications moving forward to my attention alone* (page 3 of 10, *05/12/2014 EPIP.pdf*). And thus, Monthei had, in fact, ordered me to direct all communication to "[his] attention alone."

Please see attached document:

> *2014-05-12 EPIP.pdf*

# Failure to Understand/Follow Directions and Complete Assignments

## ITEM IV - 2

### [Item 2]:

*You have placed your values, thoughts, and ideas above the explicit directions of your supervisor and management at SQ…*

My supervisors are not physicians. I should never be placed in a situation where my supervisors provide explicit instructions that would cause me to derelict my responsibilities of patient care as outlined by a physician's ethical obligations.

Again, a prerequisite of my position as a psychiatrist in CDCR is that I am a licensed physician. If I were to prioritize "explicit directions" from a non-physician supervisor over my obligations to patient care, I would jeopardize my licensure and compromise patient safety.

See attached documents:

> *Appendix 11 - Intentional Conflicts with Explicit Instruction.pdf*
> *CCHCS Patient Safety Program Policy.pdf*
> *Performance Improvement Culture.pdf*
> *Relevant AMA Code of Ethics.pdf*

## ITEM IV - 2a

**[Item 2a]:**

**On or about January 6, 2014, Chief Monthei sent an email to the Mental Health Services Delivery System (MHSDS) management team regarding the upcoming Environmental Health Survey that was scheduled for fiscal year 2013-2014, during the week of January 13-17, 2014... This survey was a high visibility and important undertaking for SQ, CDCR, and CCHCS…**

The Health Survey had been delegated to Chad Hickerson (Chief Support Executive). Chad Hickerson assigned the task to Diana Martinez, the CTC's Standards & Compliance Coordinator (SCC). This assignment/delegation is consistent with the expectations of the SCC's position. See attached document, *Std Compliance Coordinator Position Detail.pdf*. The items listed on the EHS Survey are not directly related to supervisory patient care, clinical services, or physician responsibilities.

The MHPS Meeting Minutes demonstrate that, although the EHS Survey was mentioned as an "upcoming site visit" during the MHPS meetings held on 01/08/2014 and 01/15/2014, it disappeared from the MHPS agenda on January 29, 2014:

- Per the MHPS Statewide Policy (*MHPS Statewide Memo.pdf*), the MHPS "*identifies…local resource needs related to mental health services*." Clearly, an "important undertaking" would be mentioned in the MHPS, particularly if a "physical audit" identified any shortcomings or deficiencies.

- An MHPS "*action item*" (e.g., the EHS) is "*monitored until resolved.*" According to the Statewide Policy, this item would not have been removed from the MHPS Agenda if it had not been properly resolved.

The MHSDS Management Meeting Agendas demonstrate the following:

**01/14/2014:** The EHS CDPH Audit was listed on the Administrative Calendar to identify the dates (i.e., Januray 13 - 17) and in the Open Forum section. However, the section of the Agenda designated for me (i.e., Section 6) does not mention this EHS Survey/Audit. During this meeting, Monthei announced that this was being managed by Hickerson/Martinez.

**01/16/2014:** The EHS was not mentioned/reviewed.

Given the NRDP's assertion that the Health Survey was an "*important undertaking*" that would have a significant impact upon SQ, CDCR, and CCHCS, a responsible supervisor would have documented:

      a) delegation/assignment of this task to a member of his staff;
      b) record of the task's incompletion; and
      c) the results of any "physical audits" that demonstrated the impact of the assigned employee's dereliction.

The EHS Audit had never been reviewed/discussed within Psychiatry meetings, further demonstrating: 1) the contents of this item were not relevant to psychiatric duties/responsibilities and 2) the inaccuracy of the NRDP's claim. Of note, the Agenda from 01/07/2014 has a section dedicated to "CTC/4[th] Floor;" the Agenda from 01/14/2014 has a section titled, "Visits/Dates." And yet, neither of these agendas list the EHS Audit because the concerns of the audit, although important, were not relevant to psychiatric responsibiliites/function.

Monthei and Deems knew that I had not been assigned responsibility for the EHS Survey. They knew that the assignments listed on the EHS Survey had been appropriately assigned to another employee. Monthei knew that his indication that I had been assigned responsibility for the EHS Survey in MHSDS Management Meetings was untrue. And yet they chose to portray a fictitious past in order to intentionally harm my reputation and my career.

See attached documents:

      *2014-01-06 EHS Survey - woa.pdf*
      *2014-01-07 Psychiatry Mtg Agenda and IST.pdf*
      *2014-01-14 Psychiatry Mtg Agenda.pdf*
      *2014-01-14 Mngmt Mtg Agenda.pdf*
      *2014-01-16 Mngmt Mtg Agenda.pdf*
      *Environmental Health Survey - MHPS.pdf*
      *Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*
      *MHPS Statewide Memo.pdf*
      *Std Compliance Coordinator Position Detail.pdf*

## ITEM IV - 2b

**[Item 2b-i]:**

*Updated March 14, 2015*

**…[item 2b]…On or about January 6, 2014, Chief Monthei verbally instructed you to provide your recommendation to him in regards to the Psychiatry Medication Non-Compliance Referrals process.**

Monthei did not instruct me to provide recommendations about medication noncompliance.  In fact, although my heaviest involvement with this item took place in January and February, I did learn that my supervisor felt that my performance was allegedly unacceptable until I was issued the NRDP on 09/12/2014.  Despite having had nearly 8 subsequent months of opportunity to discuss these allegations, Monthei made no attempt to present me with this feedback prior to 09/12/2014.  For example, Monthei's allegations were not mentioned in the EPIP & LOE that were authored in May 2014.  See figure below.

As demonstrated in the below attachments, this item is not based upon a "legitimate factual basis" as required by the Supervisor's Handbook.

However, driven by my interest in proper patient care and the appropriate access to authorized treatment, I initiated efforts to understand the root cause of this problem and implement a durable remedy without Monthei's direction/input.  The management/oversight of medication prescription processes is firmly within the listed expectations for a chief psychiatrist.

To meaningfully remedy a flaw that impacted patient care, I invested substantial effort to collaborate and consult with SQ's pharmacists, nursing staff, Senior Psychiatrist, and Staff Psychiatrists.  My collaborative efforts, which resulted in meaningful change, were applauded by the other disciplines involved in SQ's medication administration process.

See attached documents:

*Medication Administration Issue - Wadsworth's Approach.pdf*
*Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*



(1) **March 23, 2014:** Dr. Wadsworth completes the Memorandum, as requested by Deems, and with Deems' authorization on the same morning that the Memorandum was sent.

(2) and (3) **May 16, 2014:** Eric Monthei and Andy Deems deliver multiple performance appraisals to Dr. Wadsworth. These documents allege that Dr. Wadsworth's suboptimal work performance began prior to the March 23, 2014 memorandum, though he was not notified of this appraisal until receiving these documents on 05/16/2014.

(4) **September 12, 2014:** The Notice of Rejection on Probation is issued to Dr. Wadsworth.

(5) **September 12, 2014:** The Notice of Rejection outlines novel criticisms that, although they had allegedly occurred at the time the EPIP, LOE, and Probationary Reports were issued in May 2014, were not reviewed with Dr. Wadsworth prior to his September 12th Notice of Rejection. As such, Dr. Wadsworth was not notified of these alleged events until more than 9 months had passed since they occurred.

**[Item 2b-ii]:**

*…However, you failed to follow through and Chief Monthei verbally reminded you, on or about January 9, 2014, that he still had not received your recommendations.*

See my email that I sent to Monthei and Burton on 01/09/2014 at 0927h (within attached document, *Medication Administration Issue - Wadsworth's Approach.pdf*). This email clarifies that I had invested considerable thought and effort into identifying the root cause of the problem. My email demonstrates that I had considered the scope of the problem and had offered methods to begin to reverse a culture that would potentially deprive our patients of clinically indicated treatment.

My 01/09/2014 email demonstrated, although a durable solution was my priority, I wanted to avoid drawing unjustified and/or premature conclusions. Throughout the month of January, I worked with multiple disciplines to identify common themes among individual occurrences of medication noncompliance and/or premature medication expirations to understand the root cause of the problem and implement a durable remedy. By early February, the nursing staff on the housing units was aware of the problem and had started to implement a reasonable solution.

Numerous staff-members contacted me to commend my attention to this problem and to implementing a solution.

See attached documents:

*Medication Administration Issue - Wadsworth's Approach.pdf*
*Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*

**[Item 2b-iii]:**

*…[item 2b]…During the Management Meeting, you determined that every other discipline was at fault and that it was not your issue. Your failure to complete the assignment caused an increased workload on Staff Psychiatrists because they had to rewrite active orders or risk inmate-patients not receiving their prescribed medication…*

My efforts focused on collaborating with the other disciplines, even if this was factually a primary nursing issue, secondarily a pharmacy issue, and a tertiary prescriber issue. However, since patient care was impacted, I prioritized finding a meaningful solution after conducting a careful evaluation of the scope/cause of the problem with the involved disciplines.

My involvement was hands-on, and included a physical inspection of packaged prescriptions that had been returned to the pharmacy, sorting through a bag of returned prescriptions with Meredee Crutcher and Dennis Debiase in Debiase's office in January 2014. I distributed emails asking our medication-distribution Nursing Staff to directly contact me if/when they discovered that a patient's medication-supply did not match the order that he provided.

Nevertheless, after several weeks of collaborative implementation of the identified solution, this issue had almost completely resolved by March. It required a "culture change" and thus couldn't be remedied overnight, as most prescriptions were authorized for 90 days.

Contrary to Monthei's methodology of intimidating his colleagues, my proactive solution did not involve prematurely or unnecessarily, blaming other disciplines. The implementation of my solution was to gather facts, identify the flawed process that impacting patient care, consistent with the CCHCS' Performance Improvement Culture. In contrast, Monthei proposed a solution to threaten Nursing Staff and subjecting our patient population to harm.

As demonstrated by numerous excerpts from SQ Meeting Minutes (MHPS and Psychiatry Meetings), this item was frequently reviewed and discussed from early January until its resolution in March (see attached document, *Medication Administration.pdf*). Monthei was aware of my collaborative, multidisciplinary approach, as he attended the MHPS meetings and signed/approved the MHPS meeting minutes. Despite his awareness that I had dutifully overseen a "culture change" of mediation administration, Monthei elected to present a fictitious revision of my involvement in this time-intensive process in order to attempt to inflict irreversible harm to my reputation, my health, and my career. Deems did nothing to appropriately intervene.

See attached documents:

*Medication Administration Issue - Monthei's Approach.pdf*
*Medication Administration Issue - Wadsworth's Approach.pdf*
*Medication Administration - Meeting Minutes.pdf*
*Performance Improvement Culture.pdf*

**[Item 2b-iv]:**

**Additionally, your failure of leadership on this issue required other subordinate and managerial staff to resolve a workload issue that you were unable to complete…**

I exhibited substantial leadership in my efforts to collaborate with our Nursing & Pharmacy colleagues for issues regarding medication distribution and administration. Numerous staff members contacted me to offer their appreciation for my efforts (see Item 2b-ii above). I asked my team of Psychiatrists to notify me anytime they were contacted about this issue.

My collaborative solution (and its progress) is captured in the attached MHPS Meeting Minutes. Each of the meetings (see attached, *Medication Administration - Meeting Minutes.pdf*) was attended by Monthei and his signature verifies that he has reviewed their content. Furthermore, he was included on numerous emails that provided regular updates about the progress regarding this multidisciplinary solution.

The MHPS Meeting Minutes from 03/12/2014 noted that, under the heading of Delayed Medication Order Processing, "*Issue has been resolved and is no longer needed on the agenda.*" On 03/19/2014 under the same heading, the MHPS minutes document, "*No current issues. May be taken off of the agenda.*"

These documents clarify that, aside from discrediting the NRDP's assertions of my "failure of leadership," Monthei and Deems were *actually aware* that these statements were inaccurate at the time that I was served with the Notice of Rejection During Probation. Despite their awareness that these statements were false, Monthei and Deems elected to publish their insulting, inaccurate conclusions within a document that was designed to unjustifiably damage my character, my reputation, and my career.

See attached documents:

*Medication Administration Issue - Wadsworth's Approach.pdf*
*Medication Administration - Meeting Minutes.pdf*
*MHPS Statewide Memo.pdf*
*Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*


## ITEM IV -  2c

**[Item 2c-i]:**

**…[item 2c]: On or about January 21, 2014, Chief Monthei gave you instructions to complete a Power Point presentation that captures current 7388B/MHARP data as of January 21, 2014…**

Prior to 01/21/2014, I had not been asked to prepare/review the 7388B/MHARP data or to integrate it into the presentation. This was an assignment Monthei had originally requested of Senior Psychologist Douglas Frank. During the 01/14/2014 MHSDS Management Meeting, this topic was re-assigned to other members of the team (i.e., Drs. Chu and Desmond). Of note, Dr. Frank reported directly to Monthei and would be retiring before the 01/21/2014 visit.

| **Condemned Audit Presentation Assignments** | | LPT Rounding (Mr. Lippincott) |
|---|---|---|
| Purpose: | Collect objective data available specific to the Condemned Population | • Training |
| | | • Frequency |
| Timeframe: | Most data 2013 Calendar year; other data varies depending on item | • Trainings |
| | | • Information Sharing |
| | | • Medication Compliance |
| Previous Coleman Visits / Audits (Dr. Chu / Dr. Desmond) | | |
| • MHARP, Rounding, Condemned | | Condemned Referrals (Dr. Van Burg) |
| • Condemned findings associated with each | | • Process |
| • Comparison between findings and current SCCP population | | • Frequency |
| | | • Disposition |

When the requested information was unavailable on the morning of 01/21/2014, Monthei asked me to assign it to Dana Ricciardi. As instructed, I emailed Ricciardi immediately after receiving Eric's email. Moments later, she walked over to my office and said she didn't know what Monthei needed or how to prepare it. Recognizing Ms. Ricciardi's fear (and being somewhat protective of her, since I had recently convinced her to join our Management Team), I told her that I would send Monthei an email to request clarification of this impromptu assignment.

> Although the events described within this item occurred in January 2014, I did learn that my supervisor felt that my performance was allegedly unacceptable until I was issued the NRDP on 09/12/2014. Despite having had nearly 8 subsequent months of opportunity to discuss these allegations, Monthei made no attempt to present me with this feedback prior to 09/12/2014. See attached document, *Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*.

See attached document:

> *2014-01-14 Mngmt Mtg Agenda.pdf*
> *Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*

## [Item 2c-ii]:

Of note, I completed my assigned presentation during the MLK weekend when I was out-of-town for a planned trip with my family. On Friday, 01/17/2014, I remained on-site until 7:00pm completing as much as I could before I left town on Saturday morning, 01/18/2014. On Friday evening, 01/17/2014, Monthei insisted that I leave SQ, assuring me that the ensuing week would be exhausting. He assured me that I wouldn't need to worry about getting the file to him on Saturday morning, specifying that he wouldn't be looking for the file before Tuesday, 01/21/2014. His assurance is captured in the attached file, *2014-01-22 Wadsworth Presentation - woa.pdf*

During the holiday weekend, I continued to work on this presentation using my laptop and remote access. I returned to Marin during the early afternoon of 01/20/2014 and continued my work on this project at San Quentin. I continued my work into Monday evening and stayed awake until after midnight on the night of 01/20/2014. I returned to work the 5:00-hour on the morning 01/21/2014. A portion of my efforts during that holiday weekend is verified by the attached image from my Personal Drive from my CDCR work-station (see attached, *2014 January Screen-shot.pdf*) which demonstrates the dates/times registered by the CDCR's computers.

As I had been instructed to do, I delivered the file of the slides I was requested to prepare on Tuesday morning. Five minutes after receiving my 6:44 email on 01/21/2014 and after spending most of the preceding weekend addressing the assignment I had been given, Monthei indicated additional information re: MHARP/7388B data. Monthei reiterated on 01/21/2014, that this had been assigned to Dr. Frank. I presented the PowerPoint slides that I assembled in front of the numerous, on-site visitors on 01/22/2014 (*2014-01-22 Wadsworth Presentation - woa.pdf*).

Based on the attached files, Monthei was aware that he had never assigned me to prepare 7388B/MHARP data. Furthermore, as the Hiring Authority and author of my NRDP, prior to including this item as a cause of my rejection from probation, Deems should have been aware that Monthei had never assigned me to prepare 7388B/MHARP data, as the NRDP alleges.

Despite knowing (or failing to appropriately investigate) the truth about this assignment, Monthei and Deems included their false accusation as a cause of my rejection during probation. This item demonstrates that they willfully acted to unjustifiably remove me from my position, harm my reputation, and permanently impact my career.

See attached files:

> *2014-01-21 Communication - woa.pdf*
> *2014-01-22 Wadsworth Presentation - woa.pdf*
> *Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*


**[Item 2c-iii]:**

**…[item 2c]…Despite Monthei's clear instruction, you failed to submit the assignment.**

See above. I submitted the assignment that was requested of me. I submitted it by the time/date upon which we had agreed. His obvious disregard for factually recounting past events demonstrate that Monthei and Deems purposely acted to unjustifiably remove me from my position, harm my reputation, and permanently impact my career. The 7388B/MHARP preparation had never been assigned to me.

Monthei's 01/23/2014 text-message that he sent to me is inconsistent with the thoughts of a disappointed supervisor whose employee had recently committed numerous actions to warrant rejection during probation. In the image below, Monthei's message is in the grey text-bubble:



See attached files:

>   *2014-01-21 Communication - woa.pdf*
>   *2014-01-22 Wadsworth Presentation - woa.pdf*
>   *Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*

**[Item 2c-iv]:**

**…*This caused an unnecessary hardship on your peers, as someone else had to be assigned to complete the assignment.***

The portion of the presentation that required Monthei's reassignment was the portion that had been previously assigned to Dr. Frank. This was not an assignment assigned to me. Dr. Frank was a senior psychologist who did not report to me. His direct supervisor was Eric Monthei. Monthei should have been aware, prior to the morning of 01/21/2014 that he had assigned a portion of the presentation to a member of his staff that had, during the prior week, retired.

See attached file:

>   *2014-01-21 Communication - woa.pdf*
>   *Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*

**[Item 2c-v]:**

Monthei's retrospective recollection of his discontent on 01/21/2014 is not consistent with the jovial/playful tone of an email that he sent me at 5:00pm on 01/21/2014.

See attached file:

*2014-01-21 Prop 34 talk slides are only add-on.pdf*
*Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*

### ITEM IV - 2d

**On or about February 3, 2014, at 1326 hours, Chief Monthei sent you an e-mail instructing you to walk the first floor with Associate Warden Joe Curzon, and Senior Psychologist, Dr. Christopher Roach, in order to determine if there was an easy solution by which to ducat inmate/patients to the first floor. You failed to complete this assignment as instructed. This caused an unnecessary hardship on your peers, as someone else had to be assigned to complete this assignment.**

The NRDP's conclusion that I "failed to complete this assignment" is completely false. In addition to completing this tour on 02/07/2014 with Dr. Roach and AW Curzon's designee (HCAU Captain Roland Soria), Monthei was also provided with an email summary of our findings and conclusions.



Monthei was attached to numerous emails that updated him about our plans and, after the tour was completed, our consensus findings.

I conducted a tour with senior Psychologist Christopher Roach and Captain Soria on the morning of 02/07/2014. The purpose of this walk-through was to determine the feasibility of arranging outpatient appointments (i.e., ducats) in San Quentin's Reception & Release area.

Our collaborative conclusions are represented in Dr. Roach's email. "An easy solution" was not accessible; however, several alternatives were presented in Dr. Roach's email dated 02/10/2014. Of note, Dr. Monthei is listed as a recipient of this email.

Of additional note: if Monthei (incorrectly) perceived that I had "failed to complete" his assignment, he never provided me with any supervisory feedback prior to my receipt of the NRDP on 09/12/2014. Monthei had, in the interceding 8 months, failed to provide me feedback of his alleged perception that of

my actions that would later warrant my rejection from probation.  (see attached document, *Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*)

Despite knowing that I had performed the requested investigation of available space and delivering my collaborative conclusions to him, Monthei elected to include this blatantly false accusation as a proposed cause of my rejection during probation.  This item demonstrates that Monthei abandoned his supervisory obligations and that he willfully intended to unjustifiably harm my position, reputation, health, and career.  Deems, in turn, did nothing to verify the accuracy of Monthei's disparaging accusations and allowed Monthei's deceit to be used as a cause of my rejection from probation.

See attached file:

> *Figure 4 - Timeline - Retroactive Allegations (September 2014).pdf*
> *R&R - Item 2d - Emails.pdf*


## ITEM IV - 2e

**[Item 2e-i]:**

***…[item 2e]…On or about March 21, 2014, you sent an email to Chief Monthei stating, "At the moment, , we cannot accommodate any further admissions, but it's unlikely that we'll have a NAMH admission today…" or words to that effect.  This decision was contrary to the discussed plans associated with the allocation of bed space specific to the condemned population and in conjunction with relevant court orders and/or agreements that took place, on or about February 4, 6, 11, 13, 18, 20, 25, and 27, 2014.  These plans were further discussed on March 4, 6, 11, and 13, 2014.***

Our inpatient unit was filled-to-capacity with 17 patients on 03/21/2014.  During the CTC morning meeting, it was determined that none of the 17 patients that were in our inpatient unit were fit to be discharged.  And thus, all 17 patients required an acute-care, inpatient bed.

Regardless of previously discussed plans, the clinical needs of 17 inpatients cannot predictably comply with administrative plans made during prior MHSDS management meetings.  Monthei's incorporation of my appropriate clinical care of 17 inpatients on 03/21/2014 as a "cause for rejection" demonstrates that he cannot provide clinical supervision of a physician.  I cannot be held accountable for reporting clinical facts that Monthei and Deems perceived as "contrary" to previously discussed administrative plans.

In addition, Monthei's misrepresentation that a plan had been previously outlined is inconsistent with the handling of a nearly identical scenario only one day prior.  On 03/20/2014, when the CTC was filled-to-capacity, in conjunction with other members of the MHSDS Management Team, our plan was to simply postpone admission of an NAMH patient until one of the inpatients met clinical criteria for discharge.

Monthei's asserts that MHCB-to-MHCB transfer had been clearly outlined weeks in advance as the protocol for accommodating admission of an NAMH patient if the CTC was at capacity.  However, this supposed plan was not mentioned despite the clear indication on 03/20/2014 that the CTC was filled to capacity.

See attached document:

*2014-03-20 Corrado Email - CTC at Capacity.pdf*

**[Item 2e-ii]:**

**…Following your email, Chief Monthei advised you to contact the Health Care Placement Oversight Program and make arrangements for a MHCB to MHCB transfer, as previously discussed.**

Contacting HCPOP to make arrangements had not been "previously discussed" as a plan for expanding our inpatient services to include the NAMH.

As evidence that being filled-to-capacity was not an event that was planned for in advance, please refer to the memorandum I generated on 03/23/2014:  at no point, during any of the preceding 50 days, had the CTC inpatient unit been filled to capacity (*2014-03-23 Memo to Deems.pdf*).  We were neither expecting nor anticipating the possibility that we would have been at-capacity and unable to accommodate the proposed one-admission-per-day.

See attached file:

*2014-03-23 Memo to Deems.pdf*

**[Item 2e-iii]:**

**You indicated that you needed to suddenly be off-site.  Chief Monthei had to direct a fellow supervisor to complete this assignment, as a result of your inability to complete the assignment.  Due to your failure to comply with directions, alternate supervisory staff had to be called in to efficiently and effectively implement Chief Monthei's direction associated with the allocation of bed space specific to the CTP…**

On 03/21/2014, I did, in fact, need to be unexpectedly off-site for 2 hours to tend to an unanticipated medical issue.  However, prior to leaving SQ (from approximately noon to 14:00h), I discussed Monthei's instruction with SQ senior psychologist and CTC clinical Director, Rachel Chen.  I reviewed what would be involved with contacting HCPOP and arranging for a patient transfer to another facility, even providing her the LOP which reviewed this protocol before my departure.

From time-to-time with any position, delegation of responsibility is absolutely necessary.  At that time, I had been working at SQ ~70-80 hours per week and, very rarely, needed to be able to leave to tend to certain items-of-priority.

Of note, I returned to SQ at ~2pm and completed all of my duties before leaving later that evening.

### *ITEM IV - 2f*

**[Item 2f-i]:**

*…[item 2f]…on or about March 23, 2014, you sent an email to Chief Monthei expressing your confusion about your role, responsibility, reporting relationship, etc., which are items which were explicitly discussed at MHSDS Management Meetings, on or about February 4, 6, 11, 13, 18, 20, 25, and 27, 2014, respectively.  The plans associated with the allocation of bed space specific to the condemned population and in conjunction with relevant court orders and/or agreements and your role were further discussed during MHSDS Management Meetings on March 4, 6, 11, and 13, 2014, specifically between you and Chief Monthei.  Despite the frequent discussions, you failed to grasp the information being shared.*

The existing CTC Org Chart indicated that the Medical Director reported directly to the Local Governing Body.  SQ's LGB was chaired by Deems.

The confusion was particularly apparent in my dual role as Chief Psychiatrist and Medical Director.  This confusion had been recognized by Deputy Director (A) Timothy Belavich when he authored a memorandum dated 01/23/2013 to Andrew Deems.  This document instructed Deems to clearly define roles/responsibilities on the CTC.  However, Deems chose to ignore Dr. Belavich's instruction.

Notwithstanding the objective reporting structures, my 03/23/2014 memorandum complied with Deems' explicit request.  In complying with this request, I copied Monthei on my communications about the memorandum's preparation and the memorandum's completion.

Despite knowing that the CTC Org Chart required revision and that he had been specifically directed to make such revisions, Deems elected to include this item as a cause of my rejection during probation.  If Deems had assumed his responsibility to clarify the CTC's Org Chart, this confusion would not have existed.

See attached documents:

> *2009-11 CTC Org Chart Screen Shot.pdf*
> *2013-01-23 Memo CTC Org.pdf*
> *2013 CTC Org Chart Confusion - woa.pdf*

-----------------------------------------

**[Item 2f-ii]:**

*…[item 2f]…on or about March 23, 2014, you sent an email to Chief Monthei expressing your confusion about your role, responsibility, reporting relationship, etc., which are items which were explicitly discussed at MHSDS Management Meetings, on or about February 4, 6, 11, 13, 18, 20, 25, and 27, 2014, respectively…Despite the frequent discussions, you failed to grasp the information being shared.*

The 2009 Org Chart listed the Medical Director with a direct reporting-line to the Governing Body. San Quentin's Local GB is chaired by Deems. Belavich had advised Deems, in his 01/2013 Memorandum, to clearly define reporting structures/relationships in SQ's CTC Org Chart. In an email dated 04/03/2013, Deems offered his assurance that he would prepare the updated Org Chart.

However, a revision of the SQ CTC's Org Chart from 2009 was never completed (*2009-11 CTC Org Screen Shot.pdf*). Prior to the May 2013 LGB meeting, I advised that, without his updated Org Chart, I would remove any references to the Org Chart in the finalized copy of the Policies and Procedures (which were ultimately approved by the LGB on 05/15/2013). At the time that I authored the memorandum on 03/23/2014, the most recent copy of a CTC Org Chart was from the original chart that was designed/finalized prior to Andy's tenure as SQ CEO.

On 03/19/2014, Deems, the chair of SQ's LGB, asked me to provide my opinion about the allocation of inpatient bedspace in the unit of which I was the Medical Director. Furthermore, on 03/23/2014, after my research produced findings were at odds with the bedspace plans of which I learned during the preceding week, I contacted Deems to provide him with a verbal report of my findings. Deems authorized my completion of the memorandum. I memorialized this authorization in an email I sent on 03/23/2014.

See attached documents:

> *2009-11 CTC Org Screen Shot.pdf*
> *2012-09-18 Med Director Change - woa.pdf*
> *2013 CTC Org Chart Confusion - woa.pdf*
> *2013-01-23 Memo CTC Org.pdf*
> *2014-03-23 Pre-Memo Email.pdf*

## ITEM IV - 2g

**[Item 2g]:**

***…[item 2g]…On June 3, 2014, you then effectively submitted a 'near miss sentinel event' report. Your "concern" was unwarranted and only served to undermine unnecessarily a colleague's competence.***

My submission of this report was clinically appropriate and consistent with statewide policies/protocols. My "concern," and the basis for my report, was not that the senior psychiatrist had overlooked the nonformulary medications…

…my concern was that, in the senior psychiatrist's absence, Chief Monthei had not assigned this task (i.e., the approval of a nonformulary medication request) to another physician and he had specifically forbidden me from filling this role.

This event was a legitimate near-miss, as outlined in CCHCS's Inmate Medical Services Policies & Procedures (Policy 3.7.1: Patient Safety Program Policy), which states that a near miss is *"an event or situation that could have resulted in an adverse/sentinel event but did not, either by chance or through timely intervention."* Aside from CCHCS Policy, it was my duty as a physician to report a flawed system that could have, without appropriate intervention, resulted in legitimate patient harm.

Monthei's incorrect conclusion that my concern was "unwarranted" draws attention to his unfamiliarity with a medication prescription process that is not within his scope of his licensure. His estimation that my "concern was unwarranted" demonstrates his unfamiliarity with CCHCS Patient Safety Program Policy.

Furthermore, Monthei had previously expressed his concern over the potentially harmful impact that a patient's non-receipt of his prescribed medications could have. In email sent to Chief Nurse Executive Tony Laureano dated 01/29/2014, Monthei wrote, "*However, I am also concerned for the potential contraindications associated with a patient not receiving his actively prescribed medication(s)…*"

See attached documents:

> *2014-06-03 Near-Miss SQ Nonformulary.pdf*
> *CCHCS Patient Safety Program Policy.pdf*
> *Medication Administration Issue - Monthei's Approach.pdf*
> *Performance Improvement Culture.pdf*
> *Sentinel Event Reporting FAQs.pdf*

## ITEM IV - 2h

*[Item 2h-i]:*

*…[item 2h]…On or about May 22, 2014, you addressed an email to Chief Monthei and the entire psychiatry team requesting clarification for your new role as the clinical manager and supervisor of UOF contacts. You stated that you had not been provided education regarding the policies, procedures, expectations, availability, specific items that are expected for what you would state on camera.*

I clearly stated, during a 05/22/2014 MH Management Meeting (and later memorialized by email), that I had never been trained for UOF events. I indicated that, before assuming these responsibilities, I wished to attend appropriate training. Monthei insisted, during the 05/22/2014 MH Management Meeting, that UOF responsibility would be "*no different that an acute care, crisis evaluation.*" He would later state, in an email dated 05/22/2014, *"The clinical role…is consistent with past practice."*

However, Judge Karlton had issued a 04/10/2014 court order that specifically noted that past CDCR practices/procedures of UOF were constitutionally inadequate. During the month of April, all custody and MH personnel were mandated to attend a 4-hour training to learn the updated procedures. However, Monthei and Deems elected not to send me to these trainings while I was on a "special project."

Monthei included this item in the NRDP despite his clear understanding that CDCR had implemented new statewide trainings/procedures re: UOF events and that I had not, as of the morning of 05/22/2014, attended the trainings which our entire department had previously completed in April 2014. See attached file, *2014-03-12 MHPS Minutes.pdf* (page 2).

Directing me to fulfill the role of San Quentin's UOF supervisor without providing me with any of the newly-mandated state-trainings or materials is dangerous for patients, for San Quentin staff, and for the institution's desire to remain compliant with federal court orders. Monthei and Deems knowingly assigned me to the role of San Quentin's UOF coordinator and knowingly deprived me from attending these crucial, court-ordered trainings before my first UOF events took place. This is yet another example of retaliation and poor management/oversight.

See attached documents:

> *2014-03-14 UOF Training - woa.pdf*
> *2014-03-12 MHPS Minutes.pdf* (page 2)
> *2014-03-19 MHPS Minutes.pdf* (page 1-2)
> *2014-04-02 Deems Memo Reassignment.pdf*
> *2014-04-02 MHPS Minutes.pdf* (page 1)
> *2014-04-09 MHPS Minutes.pdf* (page 1)
> *2014-04-16 MHPS Minutes.pdf* (page 1)
> *2014-04-23 MHPS Minutes.pdf* (page 2)
> *2014-05-21 MHPS Minutes.pdf* (page 1)
> *2014-05-21 Use of Force - woa.pdf*
> *Figure 2 - Calendar - UOF Events.pdf*

## ITEM IV - 2h

**[Item 2h-ii]:**

*…[item 2h]…You further asked Chief Monthei to direct/guide you to past practices as it relates to the expectations of UOF. Chief Monthei directed you to, and re-forwarded you an email that had been distributed to all CDCR staff statewide, including you, on or about May 6, 2014. You knew or should have known the policies, procedures, and expectations of UOF as you had received the email since you are part of the global network of CDCR.*

From the week of March 24th through May 16th, Monthei had instructed Mental Health staff to effectively remove my name/address from email distributions and communications regarding local operations at San Quentin State Prison. And thus, although I had received, as part of the statewide email distribution, a general notice about statewide changes to the Use of Force policies, I had been excluded from the statewide mandatory trainings that all members of the healthcare staff had been required to attend throughout the month of April, with a deadline of April 21, 2014.

Although I was available/on-site at San Quentin State Prison throughout the entirety of my assignment to "Special Projects," Monthei did not inform me of, nor ask me to attend, the mandatory statewide trainings that were announced via memorandum on March 28, 2014. These trainings had a deadline of April 21, 2014. *According to the 03/28/2014 memorandum from Dr. Belavich, all MH staff were expected to attend, and the responsibility of assuring this attendance was assigned to the Chief of Mental Health.*

Assigning me to serve as the institution's UOF supervisor, without requisite training, was dangerous for our patients, for my clinical practice, and for San Quentin's compliance with court orders.

In addition, my receipt of a single email on May 6, 2014 was not sufficient to adequately prepare me to perform as the UOF Clinical Manager at UOF events had been procedurally altered at San Quentin State Prison. In fact, a similar memorandum had been previously issued on March 14, 2014 mandating all MH staff to attend mandatory training on/before March 21, 2014. However, Monthei and Deems had conferred via email and agreed that San Quentin healthcare staff would not abide by this mandate.

Monthei has exhibited a pattern of knowingly excluding his staff from mandatory trainings, as evidenced by the training log that he included in my NRDP. In addition, his email dated 01/08/2014 captures his view that, if "consequences of not complying" with mandatory training are not substantial, he will forgo the requirement (see attached, *2014-01-08 Monthei Email Annual Block Training.pdf*).

See attached documents:

> *2014-01-08 Monthei Email Annual Block Training.pdf*
> *2014-03-14 No SQ UOF Training.pdf*
> *2014-03-27 Assignment to Special Projects.pdf*
> *2014-08-14 Survey on Supervisory Training.pdf*
> *Appendix 1 - Intent - UOF Assignment.pdf*
> *Calendar - UOF Events.pdf*


## ITEM IV - 2i

*[Item 2i]:*

*- you should not have needed additional training because you used to review and complete these audits and oversee the review/completion of these audits once Dr. Burton became a Senior Psychiatrist;*

*- senior psychologist Dr. Desmond has discussed the HQ performance reports on various occasions in the Management Meetings, as well as in MHSPS. She informed all of the managers that the reports are accessed through the "back-end reports," which you are familiar with. Previously, you used these exact reports to develop an assignment for the QM Team;*

*- As a Chief Psychiatrist, you should have a global understanding of departmental systems and operations;*

*- …you appeared familiar with these reports at the monthly presentations in MHSPS.*

For any of the items that I had, on some prior occasion, managed prior to assuming the role of Chief Psychiatrist, it would nevertheless be crucial/important to be trained on updates to the procedures that had been incorporated since I last managed these items.

As demonstrated by the UOF-assignment [item 2f], Monthei had established a pattern of assigning me to perform/complete tasks without appropriate training. I wanted to be sure that, for the safety of our patients and the good of the clinical service, I was aware of the expectations (and the steps involved) associated with each of these novel assignments.


## ITEM IV - 2j

### [Item 2j-i]:

*…[item 2j]…On or about July 6, 2014, you submitted what you perceived to be a "near-miss" sentinel event report…*

This event was factually a near-miss, as outlined in CCHCS's Inmate Medical Services Policies & Procedures (Policy 3.7.1: Patient Safety Program Policy), which states that a near miss is *"an event or situation that could have resulted in an adverse/sentinel event but did not, either by chance or through timely intervention."* The author of the NRDP is not familiar with the definition of a "near-miss."

By identifying my clinically appropriate report as one of the "Causes of Rejection" demonstrates that Monthei and Deems have subjected me to "unjust punitive investigation and penalties," in violation of the Performance Improvement Culture Statement (PICS) and as further evidence of retaliation against a healthcare provider for his patient advocacy.

See attached document:

> *CCHCS Patient Safety Program Policy.pdf*
> *Performance Improvement Culture.pdf*
> *Sentinel Event Reporting FAQs.pdf*


### [Item 2j-ii]:

*…[item 2j]… On or about July 6, 2014, you submitted what you perceived to be a "near-miss" sentinel event report suggesting that your incomplete assignments constituted a patient crisis.*

Much like a hospital or clinic whose responsibilities continue after-hours (and sometimes around-the-clock), my clinical "assignments" are never completed. The fact that my clinical obligations continue to exist regardless of the time needed to complete them is a challenge that I knowingly assumed when I accepted Monthei's offer to become SQ's Chief Psychiatrist.

Prior to 03/23/2014 and with rare exception, I had spent at least one weekend day at SQ in order to effectively oversee my responsibilities and effectively manage the psychiatric care delivered at SQ (see Appendix 4). And especially during a holiday week, the standard 40-hours of available time are reduced to 32-hours. However, this holiday-week does not diminish the responsibilities of a healthcare organization.

*[Item 2j-iii]:*

*…[item 2j]… On or about July 6, 2014, you submitted what you perceived to be a "near-miss" sentinel event report suggesting that your incomplete assignments constituted a patient crisis.*

My perception that the impacted patient had been unnecessarily harmed was based upon SQ Pharmacist Mark Gannon's email, sent on 07/09/2014. Mr. Gannon indicated that the patient had been observed to be "*decompensating significantly.*"

My perception of the patient's current clinical condition necessarily relied upon the impressions of others because Monthei had forbidden me, as of 03/24/2014, from seeing inpatients or condemned inmates. Nevertheless, Mr. Gannon's urgent notification demonstrated to me that, without Monthei's reckless denial of my ability to be on-site during the preceding weekend, I likely would have been able to foresee the kind of error that occurred.

See attached documents:

    *2014-07-06 Near Miss SQ - Denying Care.pdf*
    *2014-07-09 Harmful Outcome - woa.pdf*

*[Item 2j-iv]:*

*The statement that you complied with Chief Monthei's direction was dishonest in nature because you reported to CEO Deems that you were onsite that weekend, but you reported to Chief Monthei that you obliged his order…*

My statement of compliance with Monthei's request that I seek his approval was not dishonest. The 07/06/2014 Near-Miss report states:

This unprecedented requirement that, as chief psychiatrist, I must seek approval from Monthei to appropriately discharge my duties as a physician is a profound system weakness that exposes our patients to significant harm. Nevertheless, I complied with this direction.

Monthei directed me to seek his approval. I sought his approval. However, his denial of my request to provide patient care conflicted with my ethical obligations as a physician. I had identified a medical need and, despite my non-physician supervisor's explicit direction, I was obligated to prioritize the safe delivery of healthcare to my patient population.

I have already directly responded to Eric Monthei and Andrew Deems (see email dated 07/18/2014 @ 2:25pm) about his specific accusation contained within this item. He did not offer any further feedback about his perception that my comments had been dishonest, aside from writing, "*Your interpretation of events is noted,*" in his reply email sent on 07/18/2014 @ 2:52pm).

See attached documents:

    *2014-07-07 Deems only concern re Denial of Care - woa.pdf*
    *2014-07-20 MAPIP Completion - woa.pdf*
    *Relevant AMA Code of Ethics.pdf*

**[Item 2j-v]:**

*…[item 2j]…Your pre-diagnosis and/or assumption that this was a "near-miss" sentinel event, without first consulting with the treating physician was incorrect.  This is an example of your desire to develop a perception that is not in line with current medical practices and an overreaction.*

Regardless of the outcome of this patient's clinical condition, this event, inclusive of the medication error report that would be submitted by the pharmacist represents a "near-miss" that should have been reported to the Patient Safety Committee.  A near miss is defined *"an event or situation that could have resulted in an adverse/sentinel event but did not, either by chance or through timely intervention."*

As outlined in CCHCS's Performance Improvement Culture Statement (PICS), "*CCHCS staff at all reporting levels must be able to report care incidents without being subject to unjust punitive investigation and penalties."*   However, Monthei's opposition to my proper report of clinical concerns demonstrates that:

1)  Monthei disagrees with the CCHCS's Performance Improvement Culture Statement;
2)  Monthei's clinical supervision of a physician's clinical obligations is not appropriate; and
3)  Monthei's incorporation of my clinically appropriate report as one of the documented "Causes of Rejection" clearly demonstrates that he subjected me to "unjust punitive investigation and penalties," in violation of the PICS and as further evidence of retaliation against a healthcare provider for his patient advocacy.

See attached documents:

*Performance Improvement Culture.pdf*
*CCHCS Patient Safety Program Policy.pdf*
*Sentinel Event Reporting FAQs.pdf*

**[Item 2j-vi]:**

*…[item 2j]…This is an example of your desire to develop a perception that is not in line with current medical practices and an overreaction.*

Monthei is not medically trained.  His evaluation of what is "*in line with current medical practices*" is beyond the scope of his training, background, skills, or experience.  By contrast, his action to deny a physician access to patients when the physician has identified a reasonable medical need is not in line with current medical practices.  In addition, punishment of a physician for submitting a proper report of his concern regarding patient safety is not in line with current medical practices or with CCHCS Policy.

The submission of this near-miss report represented an appropriate discharge of my medical responsibility to SQ's patient population.  Monthei and Deems knew or should have known 1) the proper definition of "near-miss;" and 2) that including my report of a "near-miss" as a cause of my rejection during probation represented an "unjust punitive" penalty for having submitted an appropriate report of patient safety.

### ITEM IV - 2k

***On or about July 15, 2014, by close of business, you were supposed to submit your completed MAPIP Measures…***

On July 4, 2014, Monthei denied my request to be on-site. Consistent with my obligations as a physician, I disregarded these instructions for those items that would expose our patients to risks of harm if they were not complete. However, I deferred completion of administrative tasks (e.g., MAPIP), as I had determined that their incompletion on the weekend of 07/04/2014 would not have exposed patients to harm.

I was on vacation from 07/10/2014 to 07/17/2014. Prior to leaving, on 07/09/2014, I specifically notified Dr. Burton of those items that, as a result of Monthei's unwillingness to permit my presence during the preceding weekend, needed to be completed before my return. I notified Monthei on 07/09/2014 @ 15:36h by email of this coverage assignment, given my absence. Monthei and Burton were aware that this submission was due on 07/15/2014.

I was notified, upon my return from scheduled leave, on 07/18/2014, that MAPIP had not been completed. Monthei ordered me, at 12:52h, to complete the submissions before leaving on 07/18/2014. However, my day had already been dedicated to patient care.

I contacted the Supervising Registered Nurse, Michele Price, who is SQ's coordinator for submitting MAPIP to HQ. Ms. Price indicated that my submissions would not be needed before 1:45pm on 07/21/2014. I submitted the comprehensive files on 07/20/2014 at 11:10am. Ms. Price thanked me for my "dedicated" work.

See attached documents:

*2014-07-20 MAPIP Completion - woa.pdf*

# Unprofessional or Rude and Discourteous Behavior

### ITEM IV - 3a

**[Item 3a]:**

***…[item 3a]…the department-wide Suicide Prevention Committee meeting…***

This example, which occurred on 03/19/2014, demonstrates Monthei's unprofessional, demeaning mistreatment of six members of his supervisory staff that consistently exceeds expectations. The events of 03/19/2014 demonstrate that his staff appropriately prioritized patient care when SQ has short-staffed. However, despite their substantial efforts, Monthei elected to punish his dedicated staff.

Please see the attached file:

*2014-03-19 Reprimand for Everyone - woa.pdf*

----------------------------------

## ITEM IV - 3b

**[Item 3b-i]:**

*...[item 3b]…On or about May 22, 2014, you were directed by Chief Monthei to immediately meet with all of the inmate/patients that are on your caseload.  On or about July 2, 2014, at approximately 1644 hours, Senior Psychologist, Dr. Chera Van Burg, sent you an email….*

Prior to being issued my Notice of Rejection during Probation on 09/12/2014, I had already developed concerns that Monthei had willfully recruited members of the MHSDS Management Team to find fault with my actions. I prepared the attached summary (*2014-05-22 Transfer of Care.pdf*) of Monthei's disregard for clinically appropriate transfer of patient care between physicians.  The additional documents clarify that Monthei had instructed his subordinate staff to provide him with written appraisals about me. On 07/03/2014, he hinted at the idea that he was already in possession of "*feedback proffered by members of the Management Team.*"

See attached documents:

> *2014-05-22 Transfer of Care - woa.pdf*
> *2014-05-28 Exchange with Barone - woa.pdf*
> *2014-06-10 Inappropriate Staff Involvement - woa.pdf*
> *2014-07-03 Proffered Feedback.pdf*

**[Item 3b-ii]:**

*…[item 3b]…You sent a reply email to Dr. Gibbs, which left him in an uncomfortable position between supervisors.*

Van Burg's portrayal that Dr. Gibbs was "left in an uncomfortable position" is a mischaracterization of Dr. Gibbs' well-known demeanor and overall temperament.  Dr. Gibbs is a well-seasoned, veteran of military and correctional healthcare organizations whose approach is matter-of-fact and direct.  Dr. Gibbs frequently (and without hesitation) approached me in my office to directly voice his concerns about patient care (see attached, *2014 Email by Gibbs - Direct.pdf*).

In fact, in early January, Dr. Gibbs' concern regarding dwindling medication supplies prior to the medication-order's expiration that compelled my prioritization of conducting multidisciplinary, collaborative meetings with Nursing and Pharmacy to resolve the issues [please reference item 2b, above].

In addition, Dr. Gibbs often directly contacted staff-members to straightforwardly announce criticisms and complaints with his colleagues (see attached, *2014 Email by Gibbs - Direct.pdf*).  The notion that Dr. Gibbs would not have directly contacted Dr. Wadsworth about an alleged "uncomfortable position" is not

consistent with the attached documents or with Dr. Gibbs' indication that Dr. Van Burg's assertions are inaccurate.

In this particular item, Dr. Van Burg had grossly mischaracterized Dr. Gibbs' discomfort and neglects to consider that Dr. Gibbs and I had regularly communicated to establish clinically responsible transfers of care between providers.

Dr. Gibbs' confirmed via his 07/03/2014 email (see attached, *2014-06 Gibbs - Transfer Care.pdf*) that Dr. Van Burg's stated concerns were a "misunderstanding" that was generated during Dr. Van Burg's team meeting where she alleged that she first learned of Dr. Gibbs' discontent. Dr. Gibbs has reconfirmed, both via email and in-person, that Dr. Van Burg's recollection represented a "misunderstanding."

See attached documents:

> *2014-05-22 Transfer of Care - woa.pdf*
> *2014-06 Gibbs - Transfer Care.pdf*
> *2014 Email by Gibbs - Direct.pdf*


## [Item 3b-iii]:

*…[item 3b]…This behavior is what you continuously model to the MH Staff at SQ, and it continues to have a deleterious impact on the working relationships at SQ.*

Prior to my Notice of Rejection on 09/12/2014, I had been made aware of Monthei's past pattern of ridding the institution of psychiatrists that have fallen into his personal disfavor. I had, for several months, been regularly updating a record of Monthei's numerous attempts to mischaracterize my behavior as disruptive and to recruit multiple members of his supervisory staff to do the same.

Of note, please reference his email sent on 06/10/2014 @ 9:26h which confirms that he had instructed his supervisory staff to submit written appraisals of me directly to him.

See attached documents:

> *2014-05-22 Transfer of Care - woa.pdf*
> *2014-05-28 Exchange with Barone - woa.pdf*
> *2014-06-10 Inappropriate Staff Involvement - woa.pdf*
> *2014-07-23 False Claims of Insubordination.pdf*
> *2014-08-11 Mischaracterization of Disruption - woa.pdf*


## [Item 3b-iv]:

*In her email dated July 2, 2014 at 4:44 p.m., Dr. Van Burg wrote, "[Dr. Gibbs] indicated that he has already done farewell sessions with the patients he felt was necessary to do so with prior to them being transferred to [Dr. Wadsworth]."*

Dr. Van Burg's statement is not possible. Specifically, the Mainline Team (inclusive of Dr. Gibbs) was informed, during a team meeting on the afternoon of 05/21/2014, that Dr. Wadsworth would be joining

the team as a Staff Psychiatrist. Approximately 24 hours later, Monthei sent Dr. Wadsworth a list containing the names of 86 patients.

Monthei's message read, "*Effective immediately, and until further notice, please assume responsibility for the attached mainline caseload.*" Per scheduling protocol, even if Dr. Gibbs had identified the patients that would require a "*farewell visit*" immediately following the meeting on the afternoon of 05/21/2014, the San Quentin procedures of notifying custody officials of a non-urgent psychiatry appointment would not have allowed Dr. Gibbs to schedule an appointment sooner than 05/23/2014.

See attached documents:

*2014-05-22 Transfer of Care - woa.pdf*

## [Item 3c, 3d, 3e, 3f, 3g, 3h, 3i]

Each of these items is deserving of an individual response, which are outlined below. However, to point out common features that collectively limit the credibility of each of these claims:

A. I had not previously been notified of these concerns before I was served with a rejection notice on 09/12/2014. The six members of the management team submitted their concerns within one week of each other, over three months before I was served with the rejection notice. The first concern was submitted two days after Monthei provided me with "permission" to file my claims of harassment against him (*2014-05-19 Notify of Intent to File - woa.pdf*), and within two weeks of Monthei receiving notification of my intent to file claims of harassment against him.

B. However, if genuine, the concerns of hostility/fear captured alleged by the six individuals who directly report to Eric Monthei are characteristic of a hostile work environment. According to the date of these documents, the novel impressions of volatility or hostility were established after 1) submission of my memorandum on 03/23/2014 and 2) my announced intent to file a harassment complaint against Monthei and Deems on 05/19/2014. Prior to 03/23/2014, I had been well regarded by these same individuals.

C. On June 10, 2010, at 09:26 am, Monthei sent an email to his Management Team. In his email, he instructed his Management Team to tell Dr. Wadsworth that, if he approached them (as he had been instructed to do in the EPIP), they "*will provide your feedback in writing to me and then follow-up in that manner.*" This instruction demonstrates that Monthei had instructed his subordinate staff to submit written appraisals about Dr. Wadsworth.

D. Dr. Wadsworth had worked at San Quentin State Prison since 2011 and had been a part of the Management Team since September 2012. He had worked closely with many of these six members of the Management Team and yet, their alleged concerns about him had never been voiced before a synchronized 4-5 day stretch.

E. While not impossible, the chance that these six, newly established opinions were genuine is, at least, unlikely because of the following:

1. Six members of Monthei's Management Team had formed newly established conclusions about Dr. Wadsworth's behavior that represented remarkable departures from their prior appraisals (and/or non-documented, implied neutrality) of his character;

2. The likelihood that these newfound appraisals were genuine is further reduced by the near simultaneous development of these novel conclusions within the same 4-5 day span;

3. Finally, the chance that these assessments were sincere and non-compelled is further reduced by the formal presentation of their alleged concerns in composed emails and memoranda. Rather than informally/verbally mentioning his/her concerns to a supervisor, each of these six subordinate staff members memorialized/documented their concerns.

Monthei's email dated 06/10/2014 demonstrates that he was capable of instructing his subordinate staff to document their appraisals of Dr. Wadsworth "*in writing.*"



F.  At/around the end of May or beginning of June, Associate Warden John Curzon noted that he was approached by Chera Van Burg and asked to sign a memorandum, which characterized Dr. Wadsworth as disruptive, disrespectful, and incompetent.  AW Curzon refused to sign this document, noting that its contents were untrue.  This fact demonstrates that Monthei's subordinate staff was circulating untrue appraisals about Dr. Wadsworth and soliciting signatures from local, on-site leaders.

G.  These numerous emails/memoranda alleged very serious cognitive deficiencies, non-reality-based beliefs, and extreme interpersonal difficulty (e.g., violence risk).  Rather than ordering a fitness-for-duty evaluation or initiating a referral to the Professional Practice Executive Committee, Monthei instead responded to these concerns of Dr. Wadsworth's mental/cognitive impairments by assigning Dr. Wadsworth to assume responsibility for a new caseload of 86 patients on 05/22/2014.  Among the retaliatory actions that Monthei had implemented in the weeks following 03/23/2014, he had removed Dr. Wadsworth from nearly all administrative actions.  Monthei's decision to newly assign Dr. Wadsworth to manage a caseload of 86 patients, an activity reserved for Staff Psychiatrists, demonstrates that he was transitioning Dr. Wadsworth out of a supervisory role in the weeks following completion of the 03/23/2014 memorandum.

H.  However, if Monthei had legitimate concerns that Dr. Wadsworth was cognitively impaired, psychotic, or violent, Monthei (as a licensed, supervising psychologist) would not have assigned Dr. Wadsworth to assume medical/psychiatric responsibilities for these 86 patients.  The fact that Monthei authorized Dr. Wadsworth to assume medical/psychiatric responsibility of these patients demonstrates that Monthei did not have legitimate concerns that Dr. Wadsworth was mentally impaired, psychotic, or violent.

I.  The newly established concerns contained within the six email/memoranda prompted Monthei to limit the hours Dr. Wadsworth would be permitted to be on-site.  Monthei specified that Dr. Wadsworth would need to adhere to a rigid 7:00 am - 3:00 pm schedule.  Monthei denied each of Dr. Wadsworth's requests to work (i.e., to provide clinically indicated care to his patients) beyond those rigid hours.

However, if Monthei had genuine concerns that Dr. Wadsworth was at risk of committing actions of workplace violence and that Dr. Wadsworth had instilled fear in his co-workers, then he would not have allowed Dr. Wadsworth's current, post-Rejection assignment.

Dr. Wadsworth's Staff Psychiatrist assignment (which began on 09/30/2014 requires him to remain on-site until 9:00 p.m. and, at times, as late as midnight.  In Dr. Wadsworth's current capacity, on many days, he spends hours in an office with only a single coworker on the entire floor.  If Monthei were genuinely concerned about the risks associated with Dr. Wadsworth's on-site presence "with limited staff and support" he would not have jeopardized the safety of the limited staff who maintain the same, current schedule (and work in the same area) as Dr. Wadsworth.

J.  The allegations mentioned by these six staff members represent substantial concerns that, if genuine, would have placed all staff/patients at risk if the concerns had been allowed to persist without correction.  Despite having known about these alleged concerns as early as 05/29/2014, Monthei failed to identify/address the specific concerns before Dr. Wadsworth was served with a Notice of Rejection over three months later, on 09/12/2014.  The failure to mention these alleged

*Updated March 14, 2015*

concerns to Dr. Wadsworth prior to identifying them as causes for his rejection would have represented a substantial dereliction of Monthei's supervisory responsibility.

K.   Dr. Wadsworth had not previously been notified of these alleged concerns before he was served with a rejection notice on 09/12/2014.  This would indicate that, despite having known about these significant concerns/allegations, Monthei failed to inform Dr. Wadsworth of alleged problems or provide ample opportunity to correct them.  Assuming that Monthei understands his supervisory responsibility to allow an employee the opportunity to correct identified deficiencies, Monthei's 3-month silence about these issues is consistent with the idea that these appraisals were inaccurate.

See the attached documents:

> *2014-05-19 Notify of Intent to File - woa.pdf*
> *2014-05-22 Re-request to Deems - woa.pdf*
> *2014-05-23 Re-Request to Monthei - woa.pdf*
> *2014-05-23 3rd Request to Monthei - woa.pdf*
> *2014-05-27 4th Request to Monthei - woa.pdf*
> *2014-05-27 5th Request to Monthei - woa.pdf*
> *2014-06-10 Inappropriate Staff Involvement - woa.pdf*
> *2014-07-03 Proffered Feedback.pdf*

## [Item 3c]:

A.   Rachel Chen reports that, at the time that she sent her email on May 29, 2014, she had been concerned about Dr. Wadsworth's behaviors "in the last month or two."  However, Dr. Wadsworth had been assigned to "special projects" for approximately 2 months.  Monthei announced, via email on 05/16/2014, that Dr. Wadsworth's assignment to "special projects" ended on this date. Dr. Wadsworth had not attended MH Management meetings that occurred after the week of 03/16/2014 until May 20, 2014.  In contrast to Chen's comments, Dr. Wadsworth had only been reintegrated into Management meetings for 9 days at the time of her email.

B.   Chen notes that Dr. Wadsworth "has been emailing the entire management team with questions directed towards you, instead of just emailing you individually."  Of note, Dr. Wadsworth sent numerous emails to Chen on May 22, 2014 and May 23, 2014.  However, the content of these emails were relevant/appropriate for distribution to the Management Team.  These topics included:

- Coordination of a clinical response to a patient's suicide that occurred on the morning of May 22, 2014;
- A request for critical clarification about Dr. Wadsworth's newly assigned role as San Quentin's Use of Force Supervisor, even though he had never attended a single UOF event and even though Monthei failed to allow Dr. Wadsworth to attend statewide, mandatory training.  In this context, including the entire Management Team on this email was appropriate, given the two separate Use of Force extractions that would imminently occur on San Quentin's Adjustment Center;

- An appropriate request sent to the entire MH Management Team to assist with meeting Monthei's newly announced requirement that, to travel during weekends/RDOs, Dr. Wadsworth would need to have a co-supervisor provide their signature authorization for Dr. Wadsworth's established travel plans. Of note, at the time of Monthei's announcement, Dr. Wadsworth was scrambling to find "coverage" for his pre-planned travel plans that would begin in less than 48 hours.
- Dr. Wadsworth notifying his supervisory colleagues about the content of Judge Karlton's April 2014 court order

In contrast to Chen's claims that the emails were "loaded" or that they involved clarified issues, these topics were relevant/appropriate to distribute to all members of the MH Management Team. The emails sought and/or provided necessary information regarding the novel responsibilities to which Dr. Wadsworth had been assigned.

C. Aside from relevant emails that Dr. Wadsworth appropriately distributed, work-related emails sent to all members of the MH Management Team (see topics listed above) on May 23 and May 24, 2014, Rachel Chen received one email from Dr. Wadsworth's account between the dates of April 1, 2014 and May 29, 2014. These statistics do not support Rachel Chen's alleged "concerns about the recent strings of emails…by Dr. Wadsworth."

*(Note: these statistics are based on a search of Dr. Wadsworth's CDCR email account, for all items sent to "Chen." At the time that this search was performed, Dr. Wadsworth was not aware of any email messages that had been deleted or stored in an alternate folder.)*

D.  After having been re-integrated to his first Management Meeting in 2 months on May 20, 2014,
    Dr. Wadsworth was given numerous novel assignments on May 21st and May 22nd, 2014.  These
    novel assignments compelled necessary, work-related email communications with the MH
    Management Team.  During the two-day span from May 22 to May 23, 2014, Dr. Wadsworth
    sent the following emails that included Rachel Chen as a recipient:

**Number of emails sent from Dr. Wadsworth's account to (or copied to)
Rachel Chen on May 22nd and May 23rd, 2014**

| Topic | Received by all members of the MH Management Team | Received by Chen +/- 1-2 other recipients |
|---|---|---|
| Seeking supervisory coverage during scheduled weekend travel | 3 | 0 |
| Protocol for handling CEO & CMH conflicting instructions | 1 | 0 |
| Use of Force Court Order | 2 | 0 |
| Requested access to Policy/Procedures re: Imminent UOF events | 2 | 0 |
| Expression of gratitude for Chen's generosity | 0 | 3 |
| Coordination of departmental response to a patient suicide that occurred on the morning of May 22, 2014 | 0 | 2 |
| **Total Emails** | **13** | |

In the context of his reintegration into the MH Management Team meetings and the assignment
of novel responsibilities, sending a total of 13 emails to Chen to over a two-day stretch is far from
excessive.  The content of the emails was appropriately work-related.  Aside from these 13
emails, Dr. Wadsworth had sent a single email to Chen during the 8-week stretch preceding her
email on May 29, 2014.

E.  Chen's email also indicates that, during Subcommittee meetings, Dr. Wadsworth often "often ask[ed] questions that he should have known the answers to, and/or challenging the answers given to him."  However, the attached files demonstrate that, during the Subcommittee meeting on May 14, 2014 Dr. Wadsworth asked an appropriate question about how to be integrated into department-wide email distributions that contained crucial information.

Prior to the Subcommittee meeting, Dr. Wadsworth had repeatedly asked Monthei, Daye, Deems, and Belavich for assistance to be added to these distribution lists, but they failed to intervene.  Dr. Wadsworth had sent nine emails to Monthei, Deems, Daye, and Belavich from April 4, 2014 until the MH Subcommittee Meeting on May 7, 2014.  Following the Subcommittee meeting, Dr. Wadsworth sent three additional emails to Monthei, Deems, and Burton requesting reintegration to these email distributions.

Of note, after his emails had remained unanswered/unaddressed for several weeks, Monthei directed MH Management staff to reintegrate Dr. Wadsworth to the email distributions from which Monthei had previously removed him during the week following this Subcommittee Meeting.  Dr. Wadsworth "challeng[ed]" unlawful, retaliatory restrictions of Dr. Wadsworth's access to necessary information that would aid him in his responsibilities as Chief Psychiatrst.  If Dr. Wadsworth's actions to obtain necessary information made Monthei's MH Management Staff uncomfortable, the solution should be to avoid implementing unlawful, retaliatory actions, rather than penalizing the victim who advocates to undo them.

See attached: *Requests for Reintegration.pdf*
*2014-05-16 Email re Distribution lists.pdf*


## [Item 3d-i]:

A.  In her email dated July 2, 2014 at 4:44 p.m., Dr. Van Burg wrote, "[Dr. Gibbs] indicated that he has already done farewell sessions with the patients he felt was necessary to do so with prior to them being transferred to [Dr. Wadsworth]."  However, Dr. Van Burg's statement is not possible. Specifically, the Mainline Team (inclusive of Dr. Gibbs) was informed, during a team meeting on the afternoon of 05/21/2014, that Dr. Wadsworth would be joining the team as a Staff Psychiatrist. Approximately 24 hours later, Monthei sent Dr. Wadsworth a list containing the names of 86 patients.

Monthei's message read, "Effective immediately, and until further notice, please assume responsibility for the attached mainline caseload."  Per scheduling protocol, even if Dr. Gibbs had identified the patients that would require a "farewell visit" immediately following the meeting on the afternoon of 05/21/2014, the San Quentin procedures of notifying custody officials of a non-urgent psychiatry appointment would not have allowed Dr. Gibbs to schedule an appointment sooner than 05/23/2014.

B.  In Monthei's emails to:

Van Burg (no additional recipients are identified) on 07/02/2014 at 10:57 p.m., Monthei referred to "Dr. Wadsworth's continued insubordination."  He previewed for Van Burg , "I will send him an email directing him to comply with previous instruction first thing in the

morning.  I apologize that you…are having to experience the worst of Dr. Wadsworth on an ongoing basis."

Van Burg (copied to Deems) on 07/03/2014 at 6:18 p.m., Monthei referenced "Dr. Wadsworth's inappropriate and/or insubordinate actions."

These communications from Monthei to Van Burg (his subordinate employee) about Wadsworth (another subordinate employee) violate the State of California's Guide to Employee Conduct and Discipline, which mandates that supervisors "discuss infractions by a single employee only with that employee."

C. Chera Van Burg's email to Monthei on 05/30/2014 at 6:43 pm indicates that she found that Dr. Wadsworth's email was "yet another example of Dr. Wadsworth airing supervisory issues in a manner that is uncomfortable for me in this case…"  Of note, Dr. Wadsworth had been notified that NP Nelson had requested a psychiatric consultation to evaluate her patient's capacity to refuse HIV medications.  Dr. Wadsworth's 05/30/2014 email was sent appropriately notify NP Nelson of the conclusions Dr. Wadsworth had reached, as they would possibly impact healthcare decisions regarding the patient's refusal of antiretroviral medication.

D. Van Burg's 05/30/2014 email (6:43 p.m.) concluded that appropriate communication between healthcare providers is "particularly concerning," then she is likely not well-suited to supervise physician consultants who will be expected to conduct communications (e.g., Dr. Wadsworth's 05/30/2014 email).

E. In her 05/30/2014 email sent at 6:43 p.m., Van Burg documents that "airing of these issues in this manner will no doubt undermine the perspective of other disciplines towards mental health." However, Dr. Wadsworth's "agenda" was to provide the consultant with an update about his findings, as this particular case required timely communication of relevant details.  It is unclear which "issues" Van Burg feels will undermine the perspectives of other disciplines.  In fact, contrary to the vague, nonspecific allegations voiced by Van Burg, Dr. Wadsworth's email represented a courtesy, initial follow-up with a Primary Care colleague who had requested a psychiatric consultation.  NP Nelson expressed her appreciation for the quality of Dr. Wadsworth's efforts in her follow-up email dated 06/10/2014, which clearly indicated that her perspective of mental health had not been undermined:

> *"I just wanted to thank you for your thoughtful and thorough evaluation of this patient. I am in agreement with your assessment of the current situation… People with a CD4 count of zero, who are not on antiretrovirals, generally have a life expectancy of a year or less… Anyway, thank you again…"*

F. In her 05/30/2014 email sent at 6:43 p.m., Van Burg noted that Dr. Wadsworth's "perception" is "intentionally skewed to serve his personal agenda, which is apparently to present you in an unfavorable or questionable light."  However, this vague email provides no indication of which of Dr. Wadsworth's perceptions were "intentionally skewed."  Although the incorrect conclusions

drawn by Van Burg would have been harmful to Dr. Wadsworth's reputation if they had been accurate, her comments are not consistent with an objective review of the referenced emails.

G.  Chera Van Burg's email dated 05/30/2014 at 6:43 p.m. notes that Dr. Wadsworth's decision to address Eric Monthei as "Eric" represents "an attempt to undermine [Monthei's] authority and seems condescending…The management team also address each other as 'Dr.' with our last name…"  She adds that addressing Monthei by his first name in meetings and in emails is "quite uncomfortable given its passive aggressive nature and tone."  Van Burg's assertion that members of the management team "address each other as 'Dr.'" is inconsistent with her own prior emails.

Nevertheless, the Hiring Authority, not Van Burg, elected to include this item as a cause for rejecting Dr. Wadsworth during his probation as Chief Psychiatrist. Deems has consistently and frequently authored communications to Dr. Wadsworth that address him as "Chris."  Deems' choice to address a member of the MH Management Team by his first name clearly demonstrates that this allegation does not represent a "cause for rejection during probation."

H.  Van Burg's 05/30/2014 email (6:43 p.m.), which draws fictitious conclusions about Dr. Wadsworth's intentions, motivations, and perceptions of reality, are based upon two objectively-identified behaviors:

> 1) the appropriate email that Dr. Wadsworth sent to NP Ingrid Nelson on 05/30/2014; and
> 2) Dr. Wadsworth addressing Eric Monthei as "Eric."

No reasonable person would have been able to draw, based upon objectively benign actions, the fictitious conclusions offered by Van Burg.  In addition, her impressions of Dr. Wadsworth are inconsistent with the reciprocal, professional regard that they shared prior to 03/23/2014.

I.  In Van Burg's email to Monthei dated 05/30/2014 at 6:43 p.m.: "*...I must add that Dr. Wadsworth's underlying anger, distorted thinking, and hostile behavior is not inconsistent with some of the characteristics of individuals who have imploded an resorted to violence.*"

Van Burg is a trained psychologist who is familiar with the standards expected by her profession when making determinations about a client's risk of future violence.  In fact, she is the supervisor of the Psychology Training/Assessment Team, which oversees the administration of assessment instruments to patients.  Van Burg knew or should have known that the accepted standard for performing violence risk assessments involve a requisite combination of:

> 1) a focused, in-depth interview;
> 2) a review of legal records and health records; and
> 3) an applicable, standardized violence assessment instrument/battery.

Van Burg knew or should have known that, even when these three components are appropriately employed, the predictive value of the resulting violence risk appraisal is often inaccurate.  Van Burg "determined" that Dr. Wadsworth was a high risk of future violence despite not having performed an interview, a review of legal/health records, or employing an appropriate assessment instrument.

Her transparently inaccurate conclusions about Dr. Wadsworth's risk of violent behavior are careless and inconsistent with the expectations that accompany her training and background.  Her

production of these gross mischaracterizations are more consistent with a subordinate employee adhering to the unlawful instructions of her direct supervisor to knowingly cause harm to Dr. Wadsworth's reputation and career.

See the attached documents:

*2014-06-01 Redacted Progress Note.pdf*
*2014-06-10 Reply from Ingrid Nelson.pdf*
2014-07-02 Gibbs & Stress.docx
2014-05-30 Van Burg.pdf
2014-05-30 Email from Wadsworth.pdf
2013 - 2014 Emails to Chris from Deems.pdf
2014 Emails from Van Burg without Doctor.pdf

## [Item 3d-ii]:

Chera Van Burg's email dated 05/30/2014 notes that my decision to address Eric Monthei as "*Eric*" represents "*an attempt to undermine your authority and seems condescending…The management team also address each other as 'Dr.' with our last name…*"

She adds that addressing him by his first name in meetings and in emails is "*quite uncomfortable given its passive aggressive nature and tone.*" Van Burg's assertion that members of the management team "address each other as 'Dr.'" is inconsistent with her own prior emails.

Nevertheless, the Hiring Authority, not Van Burg, elected to include this item as a cause for rejecting Dr. Wadsworth during his probation as Chief Psychiatrist. Deems has consistently and frequently authored communications to Dr. Wadsworth that address him as "*Chris.*" Deems' choice to address a member of the MH Management Team by his first name clearly demonstrates that this allegation does not represent a "*cause for rejection during probation.*"

See the attached documents:

*2013 - 2014 Emails to Chris from Deems.pdf*
*2014 Emails from Van Burg without Doctor.pdf*

## [Item 3d-iii]:

Van Burg's 05/30/2014 email, which draws fictitious conclusions about my intentions, motivations, and perceptions of reality are based upon two objectively-identified behaviors:

1) the appropriate email that I sent to NP Ingrid Nelson on 05/30/2014; and
2) addressing Eric Monthei as "*Eric.*"

No reasonable person would have been able to draw, based upon objectively benign actions, the fictitious conclusions offered by Van Burg.  In addition, her impressions of me are inconsistent with the reciprocal, professional regard that we shared prior to 03/23/2014.

See the attached documents:

*2014 Emails from Van Burg without Doctor.pdf*

**[Item 3d-iv]:**

***...I must add that Dr. Wadsworth's underlying anger, distorted thinking, and hostile behavior is not inconsistent with some of the characteristics of individuals who have imploded an resorted to violence.***

Van Burg is a trained psychologist who is familiar with the standards expected by her profession when making determinations about a client's risk of future violence.  Her transparently inaccurate conclusions about my risk of violent behavior are careless and inconsistent with the expectations that accompany her training and background.  These statements were generated to adhere to the instructions of her direct supervisor and to knowingly cause harm to my reputation and my career.

**[Item 3e]:**

During the weekend of May 31, 2014, I was on-site at San Quentin for several hours to complete a complicated capacity-to-consent evaluation for a newly-arrived HIV+ patient who was refusing his antiretroviral medications.

See the attached document:

*2014-06-01 Redacted Progress Note.pdf*

**[Item 3f]:**

Robert Lippincott's memorandum is not based upon any objectively verifiable item or event.  His memorandum was submitted within several days of other members of the MH Management Team, and four days after Monthei provided his "permission" for me to file a harassment claim against him.

**[Item 3g-i]**

***...SSW Whyte wrote an email and verbally reported that you asked Psychologist, Dr. Angelina Enos, to amend mental health program subcommittee minutes via email and requested that she inform the meeting participants of your amendment in your absence.  This left the staff member uncomfortable and expressed discomfort and fear related to your request.***

See attached File, *2014-05-14 MHSPS Meeting - woa.pdf,* which demonstrates Monthei's mischaracterization of what occurred. In contrast to the version presented within the NRDP, the emails identified below demonstrate the following:

> 1) Angelina Enos was the acting senior psychologist overseeing the Quality Management division. Her responsibilities included distribution of the meeting minutes for approval by those who had attended, per statewide policy;

> 2) I was in Elk Grove on the morning of 05/14/2014, and unable to attend the MHPS meeting in order to propose my suggested changes, which factually recount what occurred during the meeting on 05/07/2014.

After attending SQ's MHPS meeting on 05/07/2014, I was sent a draft of the meeting minutes "for review and revision," per MHPS Statewide Policy. My suggested revisions are consistent with:

> 1) the expectations outlined in the Statewide Policy;

> 2) my past participation in reviewing/revising MHPS agendas and meeting-minutes.

In addition, SSW Whyte was instructed to conduct a 1:1 meeting with Enos to review what occurred. However, Enos made it very clear that, although she didn't like the apparent conflict between Monthei and me, she was not, in any way, afraid of me.

Current senior psychologist Emily Hollander can corroborate that Enos was interviewed by Whyte (whom Hollander termed, "Monthei's henchman") and that Enos did not appreciate Whyte's transparent tactic. *(…interesting that these interview-notes aren't referenced by Monthei…I suppose they didn't reveal what he hopes to misrepresent…)*

See the attached document:

> *2014-02-11 Amending MHPS Minutes.pdf*
> *2014-05-14 MHSPS Meeting - woa.pdf*
> *MHPS Statewide Memo.pdf*


*[Item 3g-ii]*


Whyte's newly-established concerns that I was "*unprofessional…deceitful…perseverat[ing]…unwilling or unable to understand…malicious…[un]stable…disrupting*" are a remarkable departure from her communications with me prior to March 23, 2014. In the weeks preceding March 23, 2014, she had addressed me as "*Lucky*" and "*Buddy*" and punctuated some of her messages with *"lol."*

See the attached document:

> *Communications with Whyte prior to March 23.pdf*

*[Item 3g-iii]*

Whyte's initial email to Monthei on 05/31/2014 at 11:49 a.m. contains a single sentence: "Wadsworth is onsite." She does not, within this initial email, state her alleged safety concerns. Instead, she continued to work several doors down from my office on an open during the 55 minutes after her initial email.

During this hour, Whyte walked by my open office door on at least two separate occasions, inclusive of when she left the institution. She greeted me upon arrival and said goodbye upon her departure. If Whyte was generally fearful of me and if these feelings were "*heightened with limited staff and support around*," she would have chosen one of several different available exit routes instead of selecting the only route that would have compelled her to walk by my office.

If Monthei had received credible concerns that I was at risk of committing actions of workplace violence and that I instilled fear in my co-workers, then he would not have allowed my current assignment. In my current assignment, I am scheduled to be on-site until 9:00 p.m. and sometimes stay as late as midnight. On many days, I spend hours in an office with only a single coworker on the entire floor. If Monthei was genuinely concerned about my presence on-site "with limited staff and support" he would not have jeopardized the safety of the limited staff who maintain the same schedule (and work in the same area) as me.

*[Item 3h-i]*

*… June 4, 2014, at approximately 1301 hours, Senior Psychologist, Courtney Corrado, authored a memorandum…*

Included among the attachments to the Notice of Rejection During Probation was a copy of an email sent by Corrado to Monthei on June 03, 2014 (not "a memorandum" on June 04, 2014). My assumption is that these differently-reported dates represent a clerical oversight and I'll focus my reply to the June 03, 2014 email.

*[Item 3h-ii]*

*… Senior Psychologist, Courtney Corrado, authored a memorandum regarding your strange and inappropriate behavior…*

Corrado's untrue, disparaging commentary represented an abrupt change from the perceptions she had developed during nearly two years that preceded May 2014. Our mutual, pre-existing, positive regard is evident in our communications that occurred prior to Monthei abruptly ordering me to leave San Quentin on the morning of 03/24/2014.

See the attached document:

*Corrado Emails - Pre-Memo.pdf*

*[Item 3h-iii]*

*…Your behavior, as described by Dr. Corrado, was unprofessional, inappropriate, disruptive, and strange.  This behavior has affected her ability to be productive and has hindered the work environment.*

Dr. Corrado made numerous incorrect allegations about my professional capabilities.  However, her allegations that I was unable to responsibly, professionally, or reliably perform are inconsistent with her interactions with me since my post-Rejection return to San Quentin State Prison (see attached document, *Corrado - Post-Rejection.pdf*).  For example on 10/09/2014, Dr. Corrado asked me to serve as the psychiatric representative at the Institutional Classification Committee (ICC) for inmates in Administrative Segregation.

These interdisciplinary Committees, chaired by the Warden or Chief Deputy Warden, entail substantial collaboration between multiple disciplines.  CDCR's Department Operations Manual defines the ICC as "the institution's highest level of committee" (see attached document, *Institutional Classification Committee - Function & Purpose.pdf*).  In addition, numerous memorandums and court orders have reiterated the importance of psychiatric presence at ICC (see attached documents, *Statewide Memos Re: ICC*).

San Quentin's MH Management Team would not have selected a representative who was "increasingly bizarre," "strange," or  displaying "inappropriate behavior at work," as Dr. Corrado's 06/03/2014 email suggests.  By selecting me to represent the MH Department at San Quentin's Institutional Classification Committee, Dr. Corrado acted in a manner that contradicts the damaging allegations made within her 06/03/2014 email.  Her contradictions supports my contention that Eric Monthei, her direct supervisor, enlisted Dr. Corrado's disingenuous remarks that she authored about my professional capabilities on 06/03/2014.

See the attached documents:

> *Corrado - Post-Rejection.pdf*
> *Institutional Classification Committee - Function & Purpose.pdf*
> *Statewide Memo Re: ICC (1997-09-04).pdf*
> *Statewide Memo Re: ICC (1998-04-06).pdf*
> *Statewide Memo Re: ICC (1998-08-14).pdf*
> *Statewide Memo Re: ICC (2000-08-17).pdf*

# Preparation Failures

## ITEM IV - 4

*[Item 4a]*

***…On or about March 11, 2014, you arrived late to the standing MHSDS Management Meeting, were unprepared to discuss agenda items, and spent the majority of the meeting distracted by your portable electronic devices…***

Aside from the item listed above from the NRDP, Monthei and Deems also claimed (in the EPIP provided to me on 05/16/2014) the following:

> *…[on March 11, 2014]…  Following that meeting, we met and I provided you with a verbal warning that you are to arrive to scheduled meetings no later than the start time and that you prepare for the content of the meetings beforehand.*

- Monthei was not at SQ on 03/11/2014; he was in Galt attending a training;

- The attached documentation (*2014-03-11 Wadsworth Activity - woa.pdf*) clarifies that, on 03/11/2014, my performance exceeded those listed within my Duty Statement;

- Monthei knows that he assigned me to represent him at the 03/11/2014 entrance meeting of the Regional Mental Health visitors;

- Monthei demonstrated his trust in my representation of him on 03/11/2014 when he said, "*I defer to your judgement (sic)*" [see email dated 03/06/2014 @ 1937h].  His deference is incompatible with the unfocused negligence that he allegedly perceived in his EPIP dated 05/16/2014.

- I was punctual/prompt in my duties/activities on 03/11/2014.

- On 03/11/2014, I proactively organized, without instruction to do so, the MHSDS Management meeting on 03/11/2014.  Monthei received my emailed invitation to this MHSDS Management Meeting which I sent on 03/11/2014 @ 0956h.

- I did not meet with him on 03/11/2014.  By the time of my departure from SQSP on 03/11/2014 at approximately 18:30h, Monthei had not been on-site for the day's entirety.  In fact, Monthei sent me an email at approximately 1751h to report that his meetings in Galt had just concluded.  According to the driving directions outlined in the attached file, this journey would have lasted, at least, more than 90 minutes.

Despite knowing that he was not at San Quentin State Prison on 03/11/2014, Monthei elected to include these transparently false allegations as a proposed cause of my rejection during probation.  Inclusion of this item within the NRDP serves no other purpose aside from inflicting unjustifiable harm upon my reputation, my health, my career, and me.  Deems, in turn, did nothing to verify the accuracy of Monthei's disparaging accusations.

See the attached document:

> *2014-03-11 Wadsworth Activity - woa.pdf*
> *Driving Directions - Galt to SQ.pdf*

*Updated March 14, 2015*

*[Item 4b]:*

*…On or about March 13, 2014, you arrived late to the standing MHSDS Management Meeting.*

The NRDP correctly states that I arrived late for the MHSDS Management Meeting on 03/13/2014. However, at that time, I was attending the simultaneously-scheduled Local Governing Body (LGB) meeting which Monthei had assigned me to attend, instead of the MHSDS Management Meeting.

Monthei was aware of the simultaneously scheduled LGB and MHSDS Management Meetings. In fact, on 03/13/2014, I sent Monthei an email clarifying that I had submitted an edited document that we would consider at the LGB Meeting.

Monthei and Deems were previously made aware of my activity on 03/13/2014, as I responded to this false claim when it was initially alleged in the Letter of Expectations that Monthei and Deems delivered to me on 05/16/2014.

See the attached document:

> *2014-05-18 Memo to Deems & Monthei.pdf*
> *2014-03-13 LGB Meeting at 11am.pdf*
> *Figure 3 - Timeline - Retroactive Allegations (May 2014).pdf*

*[Item 4c]:*

*…On or about March 19, 2014, there was a mandatory Suicide Prevention meeting. You arrived for the meeting approximately 20 minutes late, stayed for five minutes while talking on your cell phone, and then left the meeting. You have set a poor example for the Mental Health Staff by arriving late, leaving early, and not paying attention in the mandatory MHSDS meetings. Therefore, you were issued a counseling chrono on March 19, 2014 for your unexcused absence.*

Monthei's presented recollection of 03/19/2014 mischaracterizes what actually occurred. His allegation underscores his lack of familiarity with the impromptu demands that may be required of a Medical Director of an inpatient unit who is also the institution's Chief Psychiatrist. In addition, Monthei didn't simply issue a counseling chrono to me on 03/19/2014. He issued a "counseling chrono" to 6 of his management staff for late/no arrival to this meeting, underscoring that his ability to reason was impaired.

See attached file:

> *2014-03-19 Reprimand for Everyone - woa.pdf*

*[Item 4e]:*

*…On or about June 19, 2014, at approximately 0811 hours, you sent an email to Dr. Burton stating, "I just learned of an urgent family need as I was leaving for work. I need to be away*

*Updated March 14, 2015*

*today, but I'll be back on-site tomorrow" or words to that effect.  You failed to contact Chief Monthei to report your absence and/or request the time off.  You violated the institutions expectations memo for time off requests…*

On the morning of 06/19/2014, I learned of an urgent/unexpected need to be off-site.  Unexpected absences are not anticipated.  A "time-off request" implies that the time-off is anticipated in advance and, thus, a request can be submitted beforehand.

I notified all members of the Management Team of my absence, including Monthei, and, within minutes, I received an acknowledgement-reply from the individual who would be providing coverage in my absence.

The Staff Unexpected Absences Local Operating Procedure directs staff to notify the institution in the event of an unexpected absence and/or late arrival.  The primary purpose of establishing an identified telephone number was so that, in the event of an inability to arrive for work as scheduled, staff would not need to access their CDCR email account from off-site.

An Office Technician is assigned to monitor the voicemail account multiple times daily in order to immediately alert supervisors of unanticipated absences.  Prompt notification of supervisory staff is the critical step of this process, so that supervisors can organize/arrange appropriate redistribution of workload in the event of a staff-member's unanticipated absence.

On the morning of 06/19/2014, my ability to readily access my CDCR email account from off-site permitted more prompt notification of all members of the MH supervisory staff, than if I had left a voicemail.  In addition, by sending an email, I have objective verification that my message was promptly delivered to the members of the Mental Health Management Team.

See attached file:

   *2014-06-19 Unexpected Leave - woa.pdf*
   *LOP - Staff Unexpected Absences.pdf*


**[Item 4f]:**

**…On or about July 31, 2014, you attended a lecture at Stanford University for the Annual Forensic Psychiatry Didactic…**

I had been invited to present a lecture to Stanford's Department of Psychiatry, an annual invitation that I've received from their faculty.  This presentation symbolized a valuable relationship that improves the quality of psychiatrists that we can attract to our institution.

As demonstrated in the attached files (*2014-07-31 Stanford event.pdf* and *2014-07-31 Leave Request - Approved.pdf*), Monthei had been made aware of this lecture, knew that I would be submitting a leave-request, and it was approved by the Chief of Mental Health (A) while he was away from the institution.

See attached files:

*2014-07-31 Leave Request - Approved.pdf*
*2014-07-31 Stanford event - woa.pdf*
*2014-08-07 Stanford aftermath.pdf*

# Notice & Progressive Discipline

## ITEM V

**[Item V - 1]**

*...On or about March 19, 2014, you received a counseling chrono for an unexcused absence.*

Monthei's allegation that I was "absent" from the meeting on 03/19/2014 is completely untrue. Monthei's allegation underscores his lack of familiarity with the impromptu demands that may be required of a Medical Director of an inpatient unit who is also the institution's Chief Psychiatrist. In addition, Monthei didn't simply issue a counseling chrono to me on 03/19/2014. He issued a counseling chrono to 6 of his management staff for late/no arrival to this meeting, despite several reasonable exculpatory explanations, underscoring that Monthei's ability to reason was impaired on March 19, 2014.

See attached file:

*2014-03-19 Reprimand for Everyone - woa.pdf*

**[Item V - 2]**

*…On or about May 16, 2014, you received your second probationary report. You were marked, "Improvement Needed" in the categories of Skill, Knowledge, Learning Ability, Communication, Ability as a Supervisor, Administrative Ability, and Overall Rating.*

This second probationary report was issued 8 months after probation began. This "second" report was issued on the same day as the "first" report. Notwithstanding Monthei's wide distribution of the "counseling chrono" to six of his supervisors on 03/19/2014, I had never received a negative report about my work performance.

Monthei's attempt to rewrite the history of my well-regarded performance is a clear act of retaliation and harassment.

See attached files:

*2014-03-19 Reprimand for Everyone - woa.pdf*
*2014-05-16 First Performance Report - Wadsworth.pdf*
*2014-05-16 Probationary Report 2.pdf*

*[Item V - 3]*

*…On or about May 16, 2014, you were issued an Employee Performance Improvement Plan for your position as the Chief Psychiatrist.*

After receiving the Employee Performance Improvement Plan (EPIP) on 05/16/2014, I clarified that the EPIP contained numerous misstatements in a reply-memorandum that I sent to Monthei and Deems on 05/18/2014. Given the numerous/obvious inaccuracies, I raised my reasonable concern, in an email dated 05/21/2014 to Monthei and Deems, that the proposed weekly supervisory meetings were *"a mere pretext to implementing adverse employment action against me, whether by the form of a formal adverse action or unwarranted rejection from probation."*

I requested, on numerous occasions, the opportunity to respond to the numerous inaccuracies and misperceptions contained within the EPIP (*2014-06 Unclarified EPIP emails - woa.pdf*). Had I been provided this opportunity, I would have been able to clarify that the premise for the EPIP was without merit. Numerous inaccuracies described in the EPIP are repeated in the Notice of Rejection During Probation (NRDP). Their refusal to consider objective, relevant information that I provided in my reply-memorandums is evident by repeating the EPIP's claims in the NRDP. This willful disregard for appropriate fact-gathering is at odds with the State of California's Supervisor's Handbook, in the section titled, "Fact Gathering."

Please see the above items to review the responses that clarify each of the concerns presented in the EPIP and the NRDP.

In addition, Deems and Monthei provided clear indication within the EPIP of their perception that I require the same reasonable accommodations of Effective Communication that CDCR healthcare providers are required to offer patients with mental disorders. I notified Deems and Monthei, in an email dated 05/19/2014, of my intentions of filing a claim of harassment against them. Only days after sending this notification, Monthei began to collect documents from members of his Management Team that outlined numerous fictitious allegations about my professional capacity and capabilities.

See attached files:

*2014-05-18 Memo to Deems & Monthei.pdf*
*2014-05-19 Notify of Intent to File - woa.pdf*
*2014-06 Unclarified EPIP emails - woa.pdf*
*2014-06-10 DFEH Official Complaint.pdf*
*2014-07-05 Monthei & Deems - DFEH.pdf*
*Figure 3 - Timeline - Retroactive Allegations (May 2014).pdf*

*[Item V - 4]*

*…On or about May 16, 2014, you were issued a Letter of Expectations to clarify your current duties as Chief Psychiatrist.*

Within one day of receiving their Letter of Expectations (LOE), I responded to several of the concerns that were raised within, in a reply-memorandum that I authored and emailed to Deems and Monthei. As the Letter of Expectations instructed, I was directing my questions/concerns about the document to Deems and Monthei (*2014-05-17 Response to Letter of Expectations - woa.pdf*). This document factually discredited numerous inaccuracies made within the LOE.

Monthei/Deems did not respond to my reply-memorandum which responded to numerous inaccurate claims that they made. However, several months later, they repeated the same inaccuracies/inconsistencies in their 09/12/2014 NRDP.

See attached file:

*2014-05-17 Response to Letter of Expectations - woa.pdf*
*Figure 3 - Timeline - Retroactive Allegations (May 2014).pdf*



*Reinstatement Rights*

*ITEM VI*

*Updated March 14, 2015*

*…Pursuant to the provisions of Government Code Section 19140.5 you have mandatory reinstatement rights to a Staff Psychiatrist position within the State of California. You have the option to reinstate as a Staff Psychiatrist at California Medical Facility or California State Prison, Solano. Your report date will be September 22, 2014.*

My reinstatement to a position that was not located at San Quentin State Prison is further evidence of retaliation, as Monthei and Deems knowingly attempted to deprive me of my lawful right to return to my former position. During the week of 09/15/2014, the Receiver's Office was notified that, despite available/vacant Staff Psychiatry positions at San Quentin to which I had a lawful right to return, these positions were being concealed by Monthei and Deems.

Based upon emails that Deems forwarded to a series of unintended recipients on 09/17/2014, the Administration at San Quentin concealed these positions despite receiving feedback from the Receiver's Office that preventing my lawful right to return would expose CDCR/CCHCS to further liability.

Despite the requests made by the Receiver's Office, Deems continued to assert that "bonafide" offers had been made to psychiatrists who planned to relocate from the East Coast. Two days later, on 09/19/2014, I received an amended Notice of Rejection During Probation whose content was nearly identical to the Notice I originally received on 09/12/2014. The document delivered on 09/19/2014 indicated that I had a legal right to return to vacant staff psychiatry positions at San Quentin State Prison. The attached documents strongly support that Deems/Monthei were willfully attempting to prevent my legal right to return to vacant Staff Psychiatrist positions at San Quentin State Prison.

Monthei and Deems were aware that multiple Staff Psychiatry vacancies existed at the time that I was initially issued the NRDP on 09/12/2014. However, despite knowing that I had a lawful right to be assigned to one of these vacancies, Monthei and Deems willfully disregarded this right and instead documented that I would only be able to return to a vacant position in Solano County. Attempting to deprive me from my lawfully-entitled (and well-earned) position further exemplifies that the actions of Deems and Monthei have been inconsistent with the expectations of individuals in their position(s).

See attached files:

*Summary - Willfully Attempting to Prevent a Lawful Right to Return.pdf*

*Updated March 14, 2015*

*Appendix 1 - Admission Problems & Patient Harm*

*Appendix 2a - 2014 MHCB Referral Increase*

*Appendix 2b - MHCB Need*

*Appendix 3 - Monthei pre-03-23-2014*

*Appendix 4 - Weekend Presence Prior to 3-23*

*Appendix 5 - Intent - UOF Assignment*

*Appendix 6 - Unethical Management*

*Appendix 7 - Board of Psychology*

*Appendix 8 - Performance Recognition*

*Appendix 9a - Past is Prologue (Tarasoff)*

*Appendix 9b - Past is Prologue (Chapman)*

## *Appendix 10 - Probationary Reports Due (February 2014)*

## *Appendix 11 - Intentional Conflicts with Explicit Instruction*

## *Appendix 12 - Return to Staff Psychiatrist Position*

## *Appendix 13 - Evidence of Inpatient Restriction*