# REPORT OF A NEAR-MISS, CONSTITUTING AN ADVERSE SENTINEL EVENT

# SAN QUENTIN STATE PRISON

# IP DOE1 (redacted) – CDC# (redacted)

This near-miss involves an unnecessary delay in processing nonformulary medication requests that are generated by the psychiatrists at San Quentin State Prison. This delay in notifying the treating psychiatrist if the recommended treatment has been approved directly deprives patients from receiving clinically indicated healthcare. Without timely decisions regarding nonformulary requests, psychiatrists must delay provision of clinically indicated care for serious mental disorders.

**Fortunately, in the three cases that have been identified during the month of May, no known harm has occurred to the impacted patients. However, the risk is clear: if a patient with a serious mental disorder is unnecessarily deprived of clinically indicated treatment due to unnecessary delays caused by known procedural/systematic flaws, the liability rests with those who permitted the flaws to persist. This is a true "near-miss" and deserves appropriate attention/remedy.**

The excessive delay in processing nonformulary medication requests exposes a procedural flaw in a nonformulary-request system that was unnecessarily altered by San Quentin's Chief of Mental Health. Despite the Chief Psychiatrist preemptively drawing attention to the flaw in San Quentin's recently-altered system that, if left unaddressed, will continue to result in delays impacting patient care, the Chief of Mental Health has declined to provide clarification that can remedy the flawed system.

**04/30/2014:** During the weekly Mental Health Program Subcommittee meeting that occurred on 04/30/2014, it was confirmed that CMH Eric Monthei had, without outlining his rationale or notifying the psychiatrists, directed a change in San Quentin's Nonformulary request procedure. In effect, Eric's direction had taken the responsibility of nonformulary approval away from the institution's Chief Psychiatrist.

| QUALITY MANAGEMENT | Mental Health Program Subcommittee | |
|---|---|---|
| | Institution: CSP San Quentin | |
| Minutes Taker: D. Boles, OT | Meeting Date: April 30, 2014 | Meeting Start Time: 10:30 am<br>Meeting End Time: 11:00 am |

b. Dr. Wadsworth requested clarification on the non-formulary drug request authorization. Dr. Burton reported that he currently approves or denies these requests.

In addition, Eric had, without justifiable reason, restricted the Chief Psychiatrist from participating in any clinical/administrative issues involving condemned population or MHCB inmate-patients. This limitation precluded San Quentin's Chief Psychiatrist from serving, in the absence of the senior psychiatrist, as a back-up to approve any nonformulary medication requests for these two populations.

Eric Monthei's unjustified alteration to the institution's process of nonformulary approval is a divergence from the statewide protocol that is defined on the CDCR 7374 form:

### NonFormulary Drug Request
### CDCR Form 7374

**Nonformulary Drug Request Process:**
1. This form must be completed and sent to the Facility Medical Authority (CMO, Chief Psychiatrist, Regional Dentist) along with the prescription (Physicians Order Form 7221).
2. If approved, the Facility Medical Authority shall forward the nonformulary request and the prescription to the pharmacy for dispensing (forms 7374 and 7221). If denied, the request and prescription should be returned to the requesting provider with reason for denial.
3. This form must be completed before the pharmacy can acquire a nonformulary drug for dispensing.
4. A 24 to 48 hour advance notice may be required before approved nonformulary drugs can be obtained by the pharmacy for dispensing.
5. A therapeutically equivalent agent may be available on the formulary. Please consult your pharmacist for assistance in formulary selection.

Exhibit 6 - Page 1

**05/13/2014:** On this date, the nonformulary medication request is generated by the treating psychiatrist responsible for the mental healthcare of newly-arrived, condemned IP DOE1 (redacted).

**05/15/2014:** In an email that Dr. Wadsworth sent to Eric Monthei on 05/15/2014, Dr. Wadsworth expressed that he accepted Eric's instruction (i.e., that Dr. Wadsworth would no longer provide authorization for NFDRs) regarding nonformulary medication requests. However, Dr. Wadsworth cautioned that, without providing further clarification about the nonformulary process to the psychiatrists at San Quentin State Prison, the patients would be exposed to an unnecessary delay in receiving treatment for serious mental illnesses.

In fact, Dr. Wadsworth generated his email on 05/15/2014 because he was concerned that there would be a delay in processing the nonformulary request generated by IP DOE1 (redacted)'s treating psychiatrist on 05/13/2014. Eric did not reply to this email.

**05/28/2014:** Although Dr. Wadsworth was instructed that he would not participate in the nonformulary medication approval-process, two psychiatrists approached him on 05/28/2014 to express their frustration that they had yet to receive a response to their nonformulary medication requests that they generated on 05/21/2014, 05/15/2014, and 05/13/2014. These delayed requests included the NFDR for IP DOE1 (redacted), about which Dr. Wadsworth had specifically addressed his concerns nearly two weeks prior. Dr. Wadsworth generated an email to several members of San Quentin's healthcare team, including Eric Monthei, on 05/28/2014 which stated:

> *Two of the psychiatrists mentioned today that they had submitted non-formulary medication requests ... and appropriately wondered if/how those items would be processed, given the PsychOne RN's integral role in the timely delivery of clinically necessary care. I received clarifying instruction this morning that I will not be involved in approving nonformulary medication requests for any inpatient and/or condemned patients. I understand this differs from the instruction provided on the CDCR 7374 statewide form, and I apologize that my hands are tied for these particular requests. I pass along the information to provide clarity.*

In his emailed reply, Eric Monthei incorrectly stated that there were not any outstanding nonformulary medication requests. Eric noted, "As of yesterday [05/27/2014] there were no outstanding requests. Please advise as to our current and pending non-formulary requests for our inpatient an condemned population. Thank you." Dr. Wadsworth corrected Eric's misperception in his subsequent reply when he notified Eric that IP DOE1 (redacted) (whose NFDR was generated on 05/13/2014) was among the patients with an outstanding NFD request. Eric did not reply to this email.

**It was at this moment that Eric, who had already inappropriately interfered with San Quentin's nonformulary medication approval process, was clearly aware of the excessive delay in the provision of healthcare and yet did nothing to intervene. In the absence of the psychiatrist to whom he had assigned this responsibility, Eric did not assign/appoint an alternate person to address these outstanding requests for approval, thus subjecting the patients to even further delays in receiving the clinically indicated treatment.**

**05/29/2014:** Dr. Wadsworth sent an email to Eric requesting that Eric provide the psychiatrists with further clarification on how to proceed with the nonformulary approval process if a situation would present itself as it had on 05/28/2014:

> *To follow-up on your request for pending/delayed nonformulary medication requests for the condemned, there were outstanding requests from the prescribing psychiatrists, as of 05/27:*
>
> ***IP DOE1 (redacted) CDC# (redacted), IP DOE2 (redacted) CDC#2 (redacted), and IP DOE3 (redacted) CDC#3, three condemned inmates, have outstanding NFDRs*** *in need of administrative management, as each of these requests were submitted by the prescribing psychiatrist over a week ago.*
>
> *Can you clarify: if* [the sole psychiatrist authorized by Eric to approve these requests] *is absent (e.g., yesterday), how can these nonformulary requests (for condemned and/or inpatients) be handled so that there is not a further delay in care? Please advise, so that we can efficiently deliver healthcare to a highly scrutinized (CDM) and high-utilizing (MHCB/NAMH) populations, particularly on days when* [the assigned psychiatrist] *is away.*
>
> *Thanks,*
>
> *Chris*

Exhibit 6 - Page 2

Eric sent a reply to this email where he erroneously stated that the issue of San Quentin's nonformulary approval process was "well under control." However, the psychiatrists continue, as of today (06/03/2014) to express their confusion with the current process and their concern that their requests face inordinate delays. However, Eric declines to further clarify.

**05/30/2014:** In a final attempt to encourage Eric to provide definitive clarification about a process that he had unnecessarily disrupted, Dr. Wadsworth sent the following email:

> *Eric,*
>
> *I agree that, on the day after recognition of a delay-in-care impacting three condemned patients, we were in good shape with Paul's return. Upon his return, the issues were under control, as he has the sole authority, per your direction, to provide approval for NDFR for this population.*
>
> *However, given the situation that arose on Wednesday, I would like the psychiatry team to have clear direction:*
>
> *If Paul is (unexpectedly or expectedly) away, in the future, how should we proceed (or who to turn to) for NFDR for condemned patients and inpatients? I would not be in favor of simply waiting until Paul's return, as that would unnecessarily delay care. My instruction is clear: I cannot provide this authorization for these populations, a deviation from the statewide instruction listed on CDCR 7374..*
>
> *Can you please clarify your preferred direction/instruction for handling these medication prescription requests in such situations? Who should the psychiatrists contact and/or turn to?*
>
> *Thank you, in advance, for providing your clarity,*
>
> *Chris*

However, rather than providing guidance and clarification for a medication-prescription process that he had unnecessarily disrupted, Eric replied with the following, pre-written email, that he has previously sent to Dr. Wadsworth as he attempted to resolve a separate :

> *Unfortunately, it appears that you are continuing to have a difficult time understanding reporting structures and relationships. The below is inconsistent with our discussion during supervisory and management meetings. These issues are properly addressed on an individual basis during our weekly supervision meetings. These numerous contacts with coworkers is having a deleterious impact on the working relationships at San Quentin and cannot continue. At this time, please cease-and-desist from furthering this thread. Thank you.*
>
> *Eric E. Monthei, Psy.D.*
>
> *Chief of Mental Health*

The instruction to "cease and desist" placed Dr. Wadsworth in a situation where, to appropriately pursue clarity for his team of psychiatrists regarding an important process of medication prescription, Dr. Wadsworth risks unwarranted claims of insubordination for attempting to resolve a process that remains prone to significant delays in the provision of clinically indicated care for the treatment of serious mental disorders. The unnecessary delays have already impacted three inmates during the month of May.

**06/02/2014:** IP DOE1 (redacted)'s nonformulary medication was approved on 05/29/2014, and the medication was started on 06/02/2014. This represents an unnecessary delay of 20 days after the original request was generated. San Quentin's system/procedure of nonformulary approval that was unnecessarily devised by SQ's CMH needs revision to prevent further impacts upon patient care that may not resolve as favorably as the three cases in May 2014.

Exhibit 6 - Page 3

# Attachment to Report of a Near-Miss, Constituting an Adverse Sentinel Event

# San Quentin State Prison



Upon learning, on the morning of **06/04/2014**, that I had submitted the Sentinel/Adverse Event Report to CCHCS' Patient Safety Committee (PSC), Eric Monthei sent the following email instruction to me (and copied SQ CEO Andy Deems):

> *Unfortunately, it appears that you are continuing to have a difficult time understanding [supervisory roles and administrative responsibilities]. Your below reported actions (i.e., submitting the report to PSC) are not appropriate and cannot continue.*
>
> *Should you have a concern that you perceive raises to the level of a sentinel event, **please relieve yourself of your perceived duty** by informing Mr. Deems and I, prior to any such report being filed. We will be happy to better assist you with ensuring that sentinel event reporting protocols are appropriately employed.*

Dr. Monthei's statement is contrary to the **CCHCS Performance Improvement Culture Statement (PICS)** and the **IMSP&P Patient Safety Program Procedure** which specifically authorize all members of the CCHCS healthcare staff to generate reports of adverse/sentinel events, which include near-misses. Beyond simply authorizing the PSC, IMPS&P notes that staff have a *duty to report* such events**.**

Dr. Monthei's attempt to stifle my *duty to submit* a report that identifies a flawed nonformulary procedure that unnecessarily delayed care highlights a well-established pattern of behavior that he frequently exhibits as the Chief of Mental Health at San Quentin State Prison: disagreement with Eric will result in swift penalty and retaliation. The fear of retaliation/retribution is reinforced when Eric visibly humiliates and suppresses attempts to present an opinion that differs from his own.

Eric's patterned behaviors impact far more than the nonformulary process. However, I do not wish to blur the current platform and intent of my report to the PSC. To be clear, I will seek appropriate remedy in the appropriate forum for more personalized impacts upon me, if necessary. However, my purpose in drafting this attachment to my original report is decidedly separate from those goals: **I am proceeding with more fully outlining the impact of Eric's pattern of punishment and blame to draw the Committee's attention to the substantial impact it has upon the cultivation of a culture of continuous learning and improvement.**

I anticipate that Eric will respond to my report on the nonformulary process at San Quentin with the following: he will portray me, to the PSC, as an underperforming troublemaker who suffers from cognitive impairments and poor leadership style. He has used this pattern with other supervisors in the past, as well. **Please, if the PSC further investigates the culture at San Quentin, please extend your inquiry beyond Andy Deems and Eric Monthei. You will find the truth about my motivation and my interest in patient advocacy while understanding the institutional mission.** For example, please interview any of the staff psychiatrists, or medical providers, or any provider who has ever been on one of my teams.

Eric was able, following my submission of a 03/23/2014 memorandum (see attached) that respectfully disagreed with Eric's decision about patient care, to convince Andy that I was incapable of performing as the Chief Psychiatrist. **However, this view is contrary to my actual performance, to their appraisal prior to 03/23/2014, and to the high-regard as a leader with integrity who promotes patient advocacy that I am fortunate to enjoy from the rest of the healthcare staff at San Quentin.** Eric will offer examples to support his unsupported view, but each of these examples will be misleading or inaccurate. Upon closer inspection, his claims of my underperformance are meritless. Please consider that Eric and Andy will, undoubtedly, attempt this same mischaracterization with the PSC.

For example, Eric and Andy co-authored a document that they presented to me on 05/16/2014. In this document (see 2014-05-16 EPIP.pdf), they misrepresented specific past actions as examples of my underperformance and documented that they had concerns that I had deficits in comprehension or cognition and was unable to understand their direction. They repeated, on three separate occasions, the following verbatim perceptions that they held while communicating with me:

> …In order to satisfy my concern:
>
> - I took care to speak slowly, clearly an used simple English;
> - I provided you with substantive responses indicating EC had been reached;
> - Accommodation of Louder, Basic Speech was utilized, as was speaking clearly, and making sure that 'mouth was visible' in cases of hearing concerns;

- Confirmation that EC was achieved or established was indicated by your answers to the information being provided and your acknowledgement that you did understand the information being provided to you by asking questions and summarizing information

This is an example of retaliatory harassment and intimidation because I chose to present an objective opinion of patient advocacy on 03/23/2014. The techniques described above are the same reasonable accommodations that must be documented with patients who suffer from various disabilities, pursuant to *Armstrong* and *Clark* remedial plans. Having your direct supervisors document, only after I voiced a well-reasoned clinical opinion that differed from their own, that they employ the same methods of effective communication that they would for a patient who suffers from mental retardation ***does not cultivate a culture of continuous learning that prioritizes patient safety.***

In addition, Eric uses the concept of *chain of command* and *explicit direction* to stifle the expression of clinical opinions of professional healthcare staff that are contrary to his own goals. He uses his position of authority to threaten insubordination, reassignment, and termination for those who test his orders to *cease-and-desist*, even if the employee is discharging his lawful duties of patient care and patient advocacy (e.g., nonformulary medication procedures or submission of a report to the Patient Safety Committee). Recent examples that have impacted me and that clarify that the culture in San Quentin's MH Department is focused upon fear and punishment, rather than honest appraisal and improvement of patient safety:

- After submitting a memorandum on **03/23/2014** (see attached) about the clinically safe allocation of inpatient bedspace at San Quentin State Prison, Eric swiftly intervened via email dated **03/23/2014 @ 20:25h:**

    *As we have previously discussed, the medical director is a title not a position. Please consider this final clarity on an issue that we have previously discussed and that I have previously made explicit. Your compliance is expected and continued deviation from the proper chain of command will not be tolerated. Until such time as administration determines your options, you are to cease-and-desist from further communication on the condemned allocation of bedspace.*

    Suppression of the Medical Director's in-depth report that utilized known techniques of bedspace design is inconsistent with a cultivation of continuous improvement of health care processes. Even if my opinion was wrong, I should not have faced the severe retaliation that it elicited. This retaliation was swift, severe, and visible to every member of the MH Department. The message is clear.

- On the morning of **03/24/2014**, after Eric ordered me to immediately leave San Quentin, he further tightened his leash on my communication in an email sent at **08:50h:** *Please direct any and all communication moving forward to my attention alone. Thank you.*

    This type of inappropriate communication restriction does not foster an environment of improving patient safety.

- I was forced to voluntarily demote on **03/27/2014,** with termination as the only available alternative. Again, the visible dismantling of my former job/responsibilities was a clear threat that instilled fear among all staff.

- On **03/27/2014,** Eric sent a memorandum to all SQ healthcare staff announcing that I was being assigned to "special projects." I had been removed from the inpatient unit and he verbally told me that I would never "step foot on the 4th floor" [which houses the inpatient unit] again. This restriction of privileges and abrupt reassignment sent a clear message to the entire department: the focus, at the top, was far from cultivating an environment of patient safety. My situation turned into a visible example of what to expect if anyone voiced disagreement with Eric, even if the disagreement was focused on continuous learning an improving patient safety.

- Throughout the month of **April**, I threatened with reassignment to Stockton as retaliation for the memorandum I authored, which represented *my clinical opinion* and was respectful in its disagreement. These visible threats of relocation were another reminder to our staff of the consequence of attempting to "proactively analyze processes, design and improve systems to support a safe patient care environment."

- Upon recognizing the excessive delay impacting the novel, nonformulary process at San Quentin, I asked Eric to clarify this process for me and for the psychiatrists. Instead, he replied with a message to all psychiatrists on **05/30/2014** that, once again, questioned my cognitive capacity/comprehension, and ordered me to cease and desist:

> *Unfortunately, it appears that you are continuing to have a difficult time understanding reporting structures and relationships. The below is inconsistent with our discussion during supervisory and management meetings. These issues are properly addressed on an individual basis during our weekly supervision meetings. These numerous contacts with coworkers is having a deleterious impact on the working relationships at San Quentin and cannot continue. At this time, please cease-and-desist from furthering this thread.*

- Finally, this morning **(06/05/2014)** while I was completing this attachment, Eric sent me the following two emails in which he 1) predictably resorted to, once again, questioning my capacities of cognition and comprehension as I indicated he would, and 2) again provided incorrect interpretations about my reporting abilities and responsibilities.

    **In an email sent at 06:57h:**

    > *As you are aware, you and I have discussed the reported issue on multiple occasions. Accordingly, my hope was that you would avail yourself to discussing your perceived sentinel event submissions in a much more consistent manner. Should you avail yourself to a more constructive dialogue, I suspect that you will find the guidance of Mr. Deems and I to be of benefit.*
    >
    > *In this situation, your submission is not consistent with the spirit of the IMSP&P sentinel event reporting process. Specifically, the IMSP&P patient safety reporting structure assumes a blame free process. Had you consulted with Mr. Deems and myself prior to your submission, we could have constructively assisted you in clarifying your erroneous assumptions as well as recommended a more neutral presentation and/or submission. Supervisory roles and administrative responsibilities associated with reports that have a potential impact on local healthcare operations is a skill set that I am happy to continue assisting you to develop.*

However, this email disregards that I had attempted, on multiple occasions, to resolve the issue locally. Ultimately, despite my honest requests for clarification, Eric ordered me to cease-and-desist. I had no open avenue to further discuss this item with him. He would have accused me of insubordination. In addition, he mischaracterizes that, even though he and Andy bear some element of culpability for the creation of this environment, the IMSP&P mandates that a more neutral report should have been generated. However, this is inaccurate.

**In another email he sent at the same time, 06:57h, Eric continued his harassment and unprofessional treatment by outlining the humiliating methods of communication that he employs with me:**

> *In order to satisfy my continued concern that we appear to be discussing the same issues absent a shared understanding:*
>
> - *I took care to speak slowly, clearly and used simple English.*
> - *I provided you with substantive responses indicating EC had been reached.*
> - *Accommodation of Louder, Basic Speech was utilized, as was speaking clearly, and making sure that 'mouth was visible' in cases of hearing concerns.*
> - *Confirmation that EC was achieved or established was indicated by your answers to the information being provided and your acknowledgement that you did understand the information being provided to you by asking questions and summarizing information.*
> - *Prior to ending this conversation, I simply stated, "Dr. Wadsworth, I am concerned that you appear to confused despite explaining things in every way possible, do you understand what I am saying?"*
> - *You replied, "Yea, I think I always have."*

As I mentioned above, as he has done with others in the past, and as he has done with me in the last ten weeks, Eric is unjustifiably questioning my abilities of cognition and comprehension. And yet again, he documents that he utilizes the same techniques of communication that he would employ with patients who suffer from mental retardation.

The above descriptions further clarify that, far beyond the singular process of delayed approval of nonformulary medications, the management style that percolates throughout San Quentin's MH Department is far from the environment that is envisioned in the CCHCS Performance Improvement Culture Statement. The punitive environment discourages reasonable healthcare professionals from participating in a culture of learning and improvement. I hope that the PSC can assist with improvement of an environment that is filled with threats and fear, rather than learning and collaboration.

As I state above, I will seek appropriate remedy in the appropriate forum for more personalized impacts upon me, if necessary.  However, my purpose in drafting this attachment to my original report is separate from those goals: **I am proceeding with more fully outlining the impact of Eric's pattern of punishment, retaliation, and blame to draw the Committee's attention to the substantial impact it has upon the cultivation of a culture of continuous learning and improvement.**

July 6, 2014

# Near-Miss Report
# San Quentin State Prison

## Summary & Overview

This report involves the inappropriate, unjustified, reckless denial of a physician's safe delivery of patient care. The report described below is consistent with the "near-miss" defined in CCHCS IMSP&P's Patent Safety Program Policy. As I identified/described below, clinically indicated patient care is being arbitrarily denied at San Quentin State Prison. Without timely/immediate intervention, the currently identified procedure will result in an adverse/sentinel event.

SQ's Chief of Mental Health Eric Monthei had recently ordered that I must seek his permission to be at San Quentin at any time, aside from the standard, non-holiday 40-hour workweek. I professionally disagree with his explicit direction that I must first obtain his approval to safely discharge my patient-care duties as a physician. This unprecedented requirement that, as chief psychiatrist, I must seek approval from Monthei to appropriately discharge my duties as a physician is a **profound system weakness that exposes our patients to significant harm.** Nevertheless, I complied with this direction.

On **07/04/2014,** I notified Monthei that I had developed a medical/psychiatric opinion that, in order to safely deliver care to our patients, I would need to be on-site for several hours during the current, extended holiday weekend.

In his **rejection** of this initial request, he noted that his **denial** was, in part, based upon his disagreement with my "rationale, logic, and conclusions." However, Monthei asked me to justify my medical conclusions to him, by providing an itemized list of identified duties. He indicated that, pending receipt of this list, my request was denied. He noted that my ability to safely deliver medical/psychiatric care would hinge upon his review of the items he requested. **His requirement that I prove or justify the medical necessity of my conclusions is completely inappropriate and harmful to the patients within our institution.**

I sent Monthei a list of the medical/psychiatric responsibilities that necessitated my on-site presence. In this follow-up message I specified, "*These items are crucial to oversee…Denying my request to perform my expected responsibilities as a physician is harmful to our patients*."

**Despite my explicit statements that his denial would 1) prevent me from addressing critical responsibilities, and 2) unnecessarily expose our patients to harm via deprivation of clinically-indicated care, Monthei denied my request without explanation.**

**This procedure, whereby Monthei must approve a physician's clinically reasonable plan before the physician is permitted to discharge his clinical responsibilities and medical determinants of care:**

1. is clinically inappropriate and harmful to our patients;
2. undermines the quality of health care provided at San Quentin State Prison;
3. threatens the timely implementation of medical care; and
4. creates an unnecessary barrier to provide this care.

According to this newly devised process that Monthei created, the clinical decisions of a physician are exclusively approved/denied by a non-physician. And in this particular instance (see 07/04/2014, below), Monthei's denial exposed our patients to harm. His implemented methodology is profoundly inconsistent with ethical guidelines outlined by the American Medical, American Psychological, and American Psychiatric Associations.

**This is the latest example of Monthei transgressing the limits of his licensure.** One month ago, I submitted another report related to his intentional alteration of San Quentin's nonformulary medication prescription process. **His unjustified adjustments to the Nonformulary medication process remain in place and I am fearful that, without appropriate intervention, he will continue to overstep the limitations of his licensure until a more unfortunate outcome involving patient care will mandate appropriate, immediate intervention.**

## Pre-03/23/2014



Exhibit 6 - Page 8

From **October 2012** until **March 23, 2014**, while serving in various supervisory capacities at San Quentin State Prison (e.g., CTC Medical Director, Acting Chief Psychiatrist, Chief Psychiatrist), I spent a portion of most weekends working on-site. I conducted weekend visits because the task of supervising a clinical service that delivers 24h/7d healthcare to the institution often cannot be completed within the confines of a standard 40-hour workweek.

My direct supervisor, SQ Chief of Mental Health Eric Monthei, was aware that I conducted these **pre-03/23/2014** weekend visits, as supported by the following:

1) I would often contact him from within the prison to ask if he needed anything from "behind the walls;"
2) I would provide him updates about various clinical items that required supervisory awareness; and
3) During weekday meetings, Monthei often expressed his gratitude for my preceding-weekend-presence, particularly when my presence had reinforced our mission to meet the healthcare needs of our patient population.

**Consistent with my duty statement, ethical guidelines, and common-law expectations of healthcare providers, I never felt compelled (nor was I required) to seek "permission" to perform these essential functions.**

## Post-03/23/2014

My functions as chief psychiatrist abruptly changed on **03/23/2014** after I submitted a memorandum, at the request of SQ Chief Executive Officer Andrew Deems, documenting my **opinion** about the responsible allocation of inpatient bedspace at San Quentin State Prison. Although, my **pre-03/23/2014** supervisory performance had been positively reinforced by Monthei and Deems; although I was specifically asked to produce the memorandum; I have since suffered (and continue to suffer) **severe actions of unjustified retaliation, harassment, and retribution.**

The most recent example of unjustified retaliation is the requirement that I must seek Monthei's approval to be at San Quentin beyond a standard, non-holiday 40-hour workweek.

## Retaliatory Requirement

**I was notified on 06/04/2014, that any on-site, weekend work must be pre-approved by Monthei.** Specifically, in his email to me dated **06/04/2014**, Monthei wrote the following:

> *[I]t is not uncommon for our management team to work weekends and holidays. However, our past practice is for management to coordinate this need with me beforehand. Given that you did not coordinate your weekend presence with me, I am unclear as to what patient related work you may have been conducting and your unscheduled presence absent approval is concerning…*
>
> *… I would encourage you to prioritize your time, energy and efforts on completing assigned duties. Accordingly, please adhere to your current work schedule.*

Without providing any rationale/explanation, he noted, on **06/04/2014**, that visits that are not approved beforehand would elicit beliefs that my work-performance is "concerning." Of note, I have substantial documentation to support that my after-hours presence at San Quentin State Prison has been focused on patient-care.

In my reply dated **06/05/2014**, I clarified that on-site, weekend work is unpredictable, thus complicating the newly devised, beforehand-coordination. Monthei did not reply to this clarification. In addition, any "concerns" that Monthei held about the preceding weekend visit were unfounded since I had been present during the preceding weekend to complete a lengthy, complex consultation for a psychotic patient with HIV who was refusing prescription anti-retroviral medications. In fact, I sent Monthei a copy of this comprehensive, 5-page report on **06/05/2014** to diminish his unjustified fears/concerns.

Exhibit 6 - Page 9

## Weekend of July 4th

On **07/04/2014 @ 18:28h**, I outlined via email that I had clinical duties/responsibilities that required my presence at SQ for a few hours during the holiday weekend. In order to comply with his unreasonable requirement that I seek Monthei's approval to safely deliver healthcare, I wrote, in part, the following to Monthei and Deems:

> ...I am humbly requesting, per Eric's email dated **06/04/2014** (which announced that my unscheduled presence on weekends was "concerning"), permission to be on-site this weekend for a few hours (likely not more than 4-5 hours), in order to complete **patient-care items that cannot wait until Monday**...
>
> ...Please let me know if you'll approve my weekend-presence so that I can take care of these **clinical/psychiatric, patient-related needs that cannot wait until Monday**. If I do not hear a reply, I will allow ethical guidelines (and my duty statement) to drive my decision to provide necessary healthcare, and will discharge these duties, as common-law (and general ethics, physician expectations, etc) would mandate. [emphasis added]

Monthei replied on **07/04/2014 @ 20:26h**. He wrote:

> Please be advised that I **disagree with your rationale, logic and conclusions**. Notwithstanding, in order to fully consider your request, please provide an itemized list of:
>
> (1) your assigned patient care duties that you were remiss in completing during your scheduled work hours;
> (2) your assigned patient care duties that you are requesting to complete outside of your scheduled work hours; and
> (3) an explanation as to why you were not proactive in addressing these issues during your scheduled work hours with assigned supervisors prior to the below e-mail.
>
> Consideration of the below referenced request will be given upon receipt and review of the above. Pending receipt, review and explicit approval of the above, your below referenced request is hereby **denied**. Thank you. [emphasis added]

In addition to inappropriately concluding that I had been "remiss" and "not proactive," Monthei's reply indicated that he disagreed with my **rationale, logic, and conclusions.** However, my rationale, logic, and conclusions were the product of my training as a physician: I needed to address multiple clinical items before the weekend's conclusion. These conclusions are the product of my clinical training. By denying my ability to implement effective patient care and insisting that I would need to justify my medical decisions to him, Monthei was acting beyond the scope of his licensure. Nevertheless, I adhered to his request when I sent him a reply on **07/04/2014 @ 21:03h.** My response stated, in part, the following:

> **(1)** I was not "remiss;" I'll again ask you to join me in appropriate fact-gathering before drawing conclusions, particularly about the performance of our employees. As I said, the services that provide 24/7-coverage will have occasional weekend responsibilities. This is especially true during weeks that, irrespective of the 4-day work week, the services' 24/7-orders/oversight/care and responsibilities continue.
>
> **(2)** I conduct regular analyses of institution-wide medication prescription practices, non-formulary requests, non-formulary expirations, non-nonformulary expirations, psychiatric appointment analyses to maintain fidelity with MAPIP parameters, and analyses to maintain fidelity with recognized clinical care guidelines. I produce these analyses, review the information, and determine what items are most crucial to address, if any.
>
> I notify the psychiatrists who have clinical-care items that must be addressed, including labs, medications, vital-signs, renewals, needed ducats, etc. It's a valuable supervisory tool that requires access to on-site computers; file-size and processing-speed "crash" the system if access is instead attempted via VPN or remote desktop. Completing these items prior to beginning the work week is necessary.

Exhibit 6 - Page 10



> *(3)   See Number (1) above.  Your conclusion that I was "not proactive" is also incorrect.  Particularly during a work-week that is reduced from 40-hours to 32-hours with an interceding three-day weekend, the likelihood of needing to conduct a weekend visit is higher, even with infinite weekday proactivity.  Although the time you'll "allow" me to be on-site may shrink, psychiatric responsibilities do not [shrink].*
>
> ***These items are crucial to oversee*** *and requiring me to seek your permission to perform my expected duties as a supervising physician is an unusual supervisory approach.*
>
> *Denying my request to perform my expected responsibilities as a physician **is harmful to our patients.  I respectfully disagree with your post-03/23/2014 mandate that I must seek permission from you to appropriately care for our patients and discharge my duties as a physician.***  [emphasis added]

Monthei replied on **07/04/2014 @ 22:33h** by stating the following:

> *Your opinions are noted.  Your clarification has been received and reviewed.*  ***Your request is denied.***  *Thank you.*  [emphasis added]

Monthei's misinterpretation that I had been "remiss" or "not proactive" highlights his profound misunderstanding of the continuous requirements/attention that are demanded by a physician's orders/coverage/oversight of medications, laboratory results, vital signs, studies, EKGs, and monitoring for a long list of medical disorders.  Proper oversight of these items, particularly institution-wide oversight provided by a physician-supervisor, is continuously performed and does not stop for weekends/holidays.  His inappropriate oversight (and denial) of my ability to properly supervise these item is an abuse of his authority, a disregard for the limits of his licensure, and a substantial threat to patient care.

# Conclusion

As a capable physician, I cannot fulfill my clinical responsibility to safely provide care to our patients if my medical/clinical decisions must first receive the explicit, clinical approval of a supervisor whose training/licensure does not incorporate my scope of practice.  Ethical responsibility requires all healthcare providers to carefully act within the scope of their licensure.  For example, although I am a physician, I will not inappropriately direct/oversee/approve/deny the clinical plans/conclusions that a trauma surgeon determines to be necessary.  I recognize the limits of my licensure and respect that those who are appropriately trained/licensed/credentialed will implement the necessary care.

**Monthei's inappropriate clinical interference with medical-psychiatric care undermines the safe delivery of care to the patients within our institution.  Even worse, Monthei "denied" my clinical request to safely deliver patient care.  These actions transgress the limits of his licensure.  Furthermore, Monthei's denial, despite my explicit statements that his denial would be harmful to our patients, represents a reckless pattern of disregard that compromises patient care.**

**I hope that, consistent with the CCHCS Performance Improvement Culture Statement, the "zero-tolerance for reckless behavior [and] blameworthy acts" can be strongly considered before allowing this behavior to result in an unfortunate patient outcome.**

**Patient safety/care is my priority.  If applicable, I will seek assistance to address Monthei's continuous ongoing, post-03/23/2014 retaliation in a more appropriate forum.  However, I have significant concerns that his inexplicable denial of a physician's provision of medical care is part of his ongoing, retaliatory campaign against me, described above.  By including the deprivation of appropriate patient care in his personal campaign against me, Monthei has clearly demonstrated his recklessness that substantially threatens the safe delivery of patient care.  Without immediate intervention, I fear that, rather than discussing a flawed healthcare process/system/procedure as a "near-miss," we will instead be reviewing an unfortunate patient-care outcome, as a result of this reckless oversight and substantial abuse of authority.**

Exhibit 6 - Page 11

December 8, 2014

On the morning of 09/12/2014, I evaluated five patients at San Quentin State Prison. By noon on 09/12/2014, I began to document my diagnostic conclusions and medical recommendations that I had developed during these visits. This documentation included 7230-F Progress Notes, Medication Orders, Lab Orders, and signed medication consent forms. Minutes after noon, I had completed the documentation for a single patient.

Before I was able to complete the documentation/records for the four additional patients that I evaluated on 09/12/2014, I was unjustifiably, involuntarily, and immediately removed from San Quentin State Prison under ISU-escort. Despite my unwarranted removal from SQ (that would endure for the following two weeks), I remained focused on prioritizing patient care: I notified MH Management by email that I had necessarily left incomplete patient documentation on my desk.

**Rather than responsibly addressing these glaring deficiencies, I have recently become aware that my outpatient visits from 09/12/2014 have been deleted (except for a single patient) in MHTS. In the electronic medical record, there is no record of the four patient evaluations I performed on 09/12/2014, the diagnostic conclusions I drew, the medical follow-up plan(s) that I established, or the medication/laboratory orders that I either wrote (or intended to write) before being involuntarily walked-off site, a retaliatory instruction issued by my supervisor. The medical records of four patients that I evaluated on 09/12/2014 have been "obliterated," as there is "no trace of the original information" that I documented (IMSPP - v06 - ch26).**

CCHCS policy indicates that this situation qualifies as a "correctable deficiency" that can be remedied as a "late entry," but must be entered into the record "as soon after the event as possible" (IMSPP - v06 - ch26). Despite offering my assistance to address these deficiencies for the preceding weeks, I have not received a reply from MH Management. After exhausting all attempts to remedy this situation at the institutional level, I hope that submission of this Patient Safety Report can remedy this procedural flaw.

Proper completion of the records for these physician-patient evaluations would ensure compliance with numerous applicable policies, procedures, codes, and law (including sections of the California Code of Regulations, the California Business & Professions Code, and the California Penal Code).

Allowing these deficiencies to persist threatens the integrity of the medical record, whose primary purpose is to serve as the basis for planning, maintaining, and communicating the quality of patient care. Allowing the obliteration of medical records to continue without correction is a systematic flaw that threatens the quality of our patient care and will result in an adverse/sentinel event.

January 14, 2015

**Retaliating against a physician for generating patient safety reports compromises the integrity of healthcare offered to patients at San Quentin State Prison and exposes our patients to unnecessary risks of preventable error. Retaliation against a concerned physician who appropriately reported concerns of patient care represents a Near-Miss.**

I recently submitted Patient Safety Reports that identified significant issues that deprived patients of medically indicated care. These events constituted a Near Miss: *"a situation that could have resulted in an adverse/sentinel event but did not, either by chance or through timely intervention."*[1] CCHCS Policy reassures providers that authors of Patient Safety Reports will not suffer retribution or retaliation:

> *[CCHCS staff] must be able to report care incidents without being subject to unjust punitive investigation and penalties.*[2]

However, in response to my reported concerns of medical care, my non-physician supervisor instructed that, if I had patient-safety concerns, I should "relieve" myself of my "perceived duty" to identify these concerns. Monthei indicated that he and the (non-clinical) CEO would evaluate the clinical validity of my concerns of compromised medical care. His instruction demonstrates a misunderstanding of the utility of a physician's duties, obligations, and liabilities. The abridgement of a physician's obligation to report patient safety concerns threatens the safety of patient care delivered under Monthei's leadership.

After suppressing these reports, local leadership identified these patient safety reports as "causes" to justify my removal from my position of physician leadership (cf, 09/12/2014 Notice of Rejection). This punitive reaction to my medical opinion regarding patient safety violates CCHCS policy and is inconsistent with governing guidelines, policies, and state/federal law. By retaliating against physicians who report legitimate concerns of patient safety, CCHCS' mission to provide responsible, high-quality healthcare is replaced by a fear of retribution.

The results of the CCHCS Patient Safety Culture Survey of August 2014 demonstrated that 75% of respondents feared that voicing concerns of patient safety would result in a "punitive response."[3] Medical errors represent major barriers to the improvement of healthcare quality. Voluntary reports of adverse and Near-Miss events are consistently identified as one of the most effective ways to prevent medical errors.[4,5]

The pattern of suppressing patient safety reports (and retaliating against those who author them) constitutes a serious "Near Miss" in a healthcare organization. Permitting the culture of suppression and retribution to continue will, without change, result in preventable medical errors and patient harm.

---

[1] *CCHCS Patient Safety Program Policy (IMSP&P 3.7.1)*
[2] *CCHCS Performance Improvement Culture Statement (IMSP&P 3.7.6)*
[3] *CCHCS Patient Safety Culture Survey, Statewide Results, August 2014*
[4] *Doing What Counts for Patient Safety: Federal Actions to Reduce Medical Errors and Their Impact. Report of the Quality Interagency Coordination Task Force (QuIC) to the President. Washington DC: Quality Interagency Coordination Task Force; February 2000*
[5] *Institute of Medicine Division of Healthcare Services Committee on Quality of Healthcare in America. To Err Is Human: Building A Safer Health System. Washington, DC: National Academy Press; 1999*