**The following evidence supports Dr. Wadsworth's allegation that the emails/memoranda authored by six members of Monthei's staff during a week-long stretch from May 29th - June 4th, 2014 were not genuine appraisals:**

A) The first concern was submitted two days after Monthei provided Dr. Wadsworth with "*permission*" to file his claims of harassment against Monthei and within two weeks of Monthei receiving notification of Dr. Wadsworth's intent to file claims of harassment against Monthei and Deems.

See attached: *2014-05-19 Email re EEO.pdf*



B) At/around the end of May or beginning of June, Associate Warden John Curzon noted that he was approached by Chera Van Burg and asked to sign a memorandum, which characterized Dr. Wadsworth as disruptive, disrespectful, and incompetent. AW Curzon refused to sign this document, noting that its contents were untrue. This fact demonstrates that Monthei's subordinate staff was circulating untrue appraisals about Dr. Wadsworth and soliciting signatures from local, on-site leaders.

C) On June 10, 2010, at 09:26 am, Monthei sent an email to his Management Team. In his email, he instructed his Management Team to tell Dr. Wadsworth that, if he approached them (as he had been instructed to do in the EPIP), they "*will provide your feedback in writing to me and then follow-up in that manner*." This instruction demonstrates that Monthei had instructed his subordinate staff to submit written appraisals about Dr. Wadsworth.

See attached: *2014-06-10 Inappropriate Staff Involvement - woa.pdf*

D) Dr. Wadsworth had worked at San Quentin State Prison since 2011 and had been a part of the Management Team since September 2012. He had worked closely with many of these six members of the Management Team and yet, their alleged concerns about him had never been voiced before a synchronized 4-5 day stretch.



E) While not impossible, the chance that these six, newly established opinions were genuine is, at least, unlikely because of the following:

   a) Six members of Monthei's Management Team had formed newly established conclusions about Dr. Wadsworth's behavior that represented remarkable departures from their prior appraisals (and/or non-documented, implied neutrality) of his character;

   b) The likelihood that these newfound appraisals were genuine is further reduced by the near simultaneous development of these novel conclusions within the same 4-5 day span;

   c) Finally, the chance that these assessments were sincere and non-compelled is further reduced by the formal presentation of their alleged concerns in composed emails and memoranda. Rather than informally/verbally mentioning his/her concerns to a supervisor, each of these six subordinate staff members memorialized/documented their concerns.

Monthei's email dated 06/10/2014 demonstrates that he was capable of instructing his subordinate staff to document their appraisals of Dr. Wadsworth *"in writing."*

See attached: *2014-06-10 Inappropriate Staff Involvement - woa.pdf*
  *2014-07-03 Proffered Feedback.pdf*

F) These numerous emails/memoranda alleged very serious cognitive deficiencies, non-reality-based beliefs, and extreme interpersonal difficulty (e.g., violence risk). Rather than ordering a fitness-for-duty evaluation or initiating a referral to the Professional Practice Executive Committee, Monthei instead responded to these concerns of Dr. Wadsworth's mental/cognitive impairments by assigning Dr. Wadsworth to assume responsibility for a new caseload of 86 patients on 05/22/2014. Among the retaliatory actions that Monthei had implemented in the weeks following 03/23/2014, he had removed Dr. Wadsworth from nearly all administrative actions. Monthei's decision to newly assign Dr. Wadsworth to manage a caseload of 86 patients, an activity reserved for Staff Psychiatrists, demonstrates that he was transitioning Dr. Wadsworth out of a supervisory role in the weeks following completion of the 03/23/2014 memorandum.

However, if Monthei had legitimate concerns that Dr. Wadsworth was cognitively impaired, psychotic, or violent, Monthei (as a licensed, supervising psychologist) would not have assigned Dr. Wadsworth to assume medical/psychiatric responsibilities for these 86 patients. The fact that Monthei authorized Dr. Wadsworth to assume medical/psychiatric responsibility of these patients demonstrates that Monthei did not have legitimate concerns that Dr. Wadsworth was mentally impaired, psychotic, or violent.

G) The newly established concerns contained within the six email/memoranda prompted Monthei to limit the hours Dr. Wadsworth would be permitted to be on-site. Monthei specified that Dr. Wadsworth would need to adhere to a rigid 7:00 am - 3:00 pm schedule. Monthei denied each of Dr. Wadsworth's requests to work (i.e., to provide clinically indicated care to his patients) beyond those rigid hours.

However, if Monthei had genuine concerns that Dr. Wadsworth was at risk of committing actions of workplace violence and that Dr. Wadsworth had instilled fear in his co-workers, then he would not have allowed Dr. Wadsworth's current, post-Rejection assignment.

Dr. Wadsworth's Staff Psychiatrist assignment (which began on 09/30/2014 requires him to remain on-site until 9:00 p.m. and, at times, as late as midnight. In Dr. Wadsworth's current capacity, on many days, he spends hours in an office with only a single coworker on the entire floor. If Monthei were genuinely concerned about the risks associated with Dr. Wadsworth's on-site presence "*with limited staff and support*" he would not have jeopardized the safety of the limited staff who maintain the same, current schedule (and work in the same area) as Dr. Wadsworth.

H) Chera Van Burg, during the summer months of 2014 (i.e., after she had written her emails to Monthei about her alleged concerns that Dr. Wadsworth represented a high risk of future violence), would frequently (i.e., several times per week) enter Dr. Wadsworth's office without knocking or requesting entry, even when the door was closed, in order to use the color printer and scanner in Dr. Wadsworth's office. She typically entered Dr. Wadsworth's office alone. If a reasonable person had been legitimately afraid that an allegedly psychotic coworker was at risk of "*implod[ing] and resort[ing] to violence*," this reasonable person would not have voluntarily elected, on numerous occasions, to enter the coworker's office alone.

See attached: *2014-05-30 Van Burg.pdf*

I) The allegations mentioned by these six staff members represent substantial concerns that, if genuine, would have placed all staff/patients at risk if the concerns had been allowed to persist without correction. Despite having known about these alleged concerns as early as 05/29/2014, Monthei failed to identify/address the specific concerns before Dr. Wadsworth was served with a Notice of Rejection over three months later, on 09/12/2014. The failure to mention these alleged concerns to Dr. Wadsworth prior to identifying them as causes for his rejection would have represented a substantial dereliction of Monthei's supervisory responsibility.

J) Dr. Wadsworth had not previously been notified of these alleged concerns before he was served with a rejection notice on 09/12/2014. This would indicate that, despite having known about these significant concerns/allegations, Monthei failed to inform Dr. Wadsworth of alleged problems or provide ample opportunity to correct them. Assuming that Monthei understands his supervisory responsibility to allow an employee the opportunity to correct identified deficiencies, Monthei's 3-month silence about these issues is consistent with the idea that these appraisals were inaccurate.

# CHEN

K) Rachel Chen reports that, at the time that she sent her email on May 29, 2014, she had been concerned about Dr. Wadsworth's behaviors "*in the last month or two*." However, Dr. Wadsworth had been assigned to "*special projects*" for approximately 2 months. Monthei announced, via email on 05/16/2014, that Dr. Wadsworth's assignment to "*special projects*" ended on this date. Dr. Wadsworth had not attended MH Management meetings that occurred after the week of 03/16/2014 until May 20, 2014. In contrast to Chen's comments, Dr. Wadsworth had only been reintegrated into Management meetings for 9 days at the time of her email.

L) Chen notes that Dr. Wadsworth "*has been emailing the entire management team with questions directed towards you, instead of just emailing you individually.*" Of note, Dr. Wadsworth sent numerous emails to Chen on May 22, 2014 and May 23, 2014. However, the content of these emails were relevant/appropriate for distribution to the Management Team. These topics included:

- Coordination of a clinical response to a patient's suicide that occurred on the morning of May 22, 2014;
- A request for critical clarification about Dr. Wadsworth's newly assigned role as San Quentin's Use of Force Supervisor, even though he had never attended a single UOF event and even though Monthei failed to allow Dr. Wadsworth to attend statewide, mandatory training. In this context, including the entire Management Team on this email was appropriate, given the two separate Use of Force extractions that would imminently occur on San Quentin's Adjustment Center;
- An appropriate request sent to the entire MH Management Team to assist with meeting Monthei's newly announced requirement that, to travel during weekends/RDOs, Dr. Wadsworth would need to have a co-supervisor provide their signature authorization for Dr. Wadsworth's established travel plans. Of note, at the time of Monthei's

        announcement, Dr. Wadsworth was scrambling to find "*coverage*" for his pre-planned travel plans that would begin in less than 48 hours.
- Dr. Wadsworth notifying his supervisory colleagues about the content of Judge Karlton's April 2014 court order

In contrast to Chen's claims that the emails were "*loaded*" or that they involved clarified issues, these topics were relevant/appropriate to distribute to all members of the MH Management Team. The emails sought and/or provided necessary information regarding the novel responsibilities to which Dr. Wadsworth had been assigned.

**M)** Aside from relevant emails that Dr. Wadsworth appropriately distributed, work-related emails sent to all members of the MH Management Team (see topics listed above) on May 23 and May 24, 2014, Rachel Chen received one email from Dr. Wadsworth's account between the dates of April 1, 2014 and May 29, 2014. These statistics do not support Rachel Chen's alleged "*concerns about the recent strings of emails…by Dr. Wadsworth*."

(*Note: these statistics are based on a search of Dr. Wadsworth's CDCR email account, for all items sent to "Chen." At the time that this search was performed, Dr. Wadsworth was not aware of any email messages that had been deleted or stored in an alternate folder.*)

**N)** After having been re-integrated to his first Management Meeting in 2 months on May 20, 2014, Dr. Wadsworth was given numerous novel assignments on May 21st and May 22nd, 2014. These novel assignments compelled necessary, work-related email communications with the MH Management Team. During the two-day span from May 22 to May 23, 2014, Dr. Wadsworth sent the following emails that included Rachel Chen as a recipient:

### Number of emails sent from Dr. Wadsworth's account to (or copied to) Rachel Chen on May 22nd and May 23rd, 2014

| Topic | Received by all members of the MH Management Team | Received by Chen +/- 1-2 other recipients |
|---|---|---|
| Seeking supervisory coverage during scheduled weekend travel | **3** | 0 |
| Protocol for handling CEO & CMH conflicting instructions | **1** | 0 |
| Use of Force Court Order | **2** | 0 |
| Requested access to Policy/Procedures re: Imminent UOF events | **2** | 0 |
| Expression of gratitude for Chen's generosity | 0 | **3** |
| Coordination of departmental response to a patient suicide that occurred on the morning of May 22, 2014 | 0 | **2** |
| **Total Emails** | **13** | |

In the context of his reintegration into the MH Management Team meetings and the assignment of novel responsibilities, sending a total of 13 emails to Chen to over a two-day stretch is far from excessive. The content of the emails was appropriately work-related. Aside from these 13 emails, Dr. Wadsworth had sent a single email to Chen during the 8-week stretch preceding her email on May 29, 2014.

**O)** Chen's email also indicates that, during Subcommittee meetings, Dr. Wadsworth often "*often ask[ed] questions that he should have known the answers to, and/or challenging the answers given to him*." However, the attached files demonstrate that, during the Subcommittee meeting on May 14, 2014 Dr. Wadsworth asked an appropriate question about how to be integrated into department-wide email distributions that contained crucial information.

Prior to the Subcommittee meeting, Dr. Wadsworth had repeatedly asked Monthei, Daye, Deems, and Belavich for assistance to be added to these distribution lists, but they failed to intervene. Dr. Wadsworth had sent nine emails to Monthei, Deems, Daye, and Belavich from April 4, 2014 until the MH Subcommittee Meeting on May 7, 2014. Following the Subcommittee

meeting, Dr. Wadsworth sent three additional emails to Monthei, Deems, and Burton requesting reintegration to these email distributions.

Of note, after his emails had remained unanswered/unaddressed for several weeks, Monthei directed MH Management staff to reintegrate Dr. Wadsworth to the email distributions from which Monthei had previously removed him during the week following this Subcommittee Meeting. Dr. Wadsworth "*challeng[ed]*" unlawful, retaliatory restrictions of Dr. Wadsworth's access to necessary information that would aid him in his responsibilities as Chief Psychiatrst. If Dr. Wadsworth's actions to obtain necessary information made Monthei's MH Management Staff uncomfortable, the solution should be to avoid implementing unlawful, retaliatory actions, rather than penalizing the victim who advocates to undo them.

See attached: *Requests for Reintegration.pdf*
*2014-05-16 Email re Distribution lists.pdf*

# CORRADO

**P)** Corrado's untrue, disparaging commentary represented an abrupt change from the perceptions she had developed during nearly two years that preceded May 2014. Our mutual, pre-existing, positive regard is evident in our communications that occurred prior to Monthei abruptly ordering me to leave San Quentin on the morning of 03/24/2014.

See attached: *Corrado Emails - Pre-Memo.pdf*

**Q)** Dr. Corrado made numerous incorrect allegations about my professional capabilities. However, her allegations that I was unable to responsibly, professionally, or reliably perform are inconsistent with her interactions with me since my post-Rejection return to San Quentin State Prison. For example on 10/09/2014, Dr. Corrado asked me to serve as the psychiatric representative at the Institutional Classification Committee (ICC) for inmates in Administrative Segregation.

See attached: *Corrado - Post-Rejection.pdf*
*Institutional Classification Committee - Function & Purpose.pdf*
*Statewide Memo Re ICC (1997-09-04).pdf*
*Statewide Memo Re ICC (1998-04-06).pdf*
*Statewide Memo Re ICC (1998-08-14).pdf*
*Statewide Memo Re ICC (2000-08-17).pdf*

**R)** Institutional Classification Committees, chaired by the Warden or Chief Deputy Warden, entail substantial collaboration between multiple disciplines. CDCR's Department Operations Manual defines the ICC as "*the institution's highest level of committee*." In addition, numerous memorandums and court orders have reiterated the importance of psychiatric presence at ICC.

See attached: *Institutional Classification Committee - Function & Purpose.pdf*
*Statewide Memo Re ICC (1997-09-04).pdf*
*Statewide Memo Re ICC (1998-04-06).pdf*
*Statewide Memo Re ICC (1998-08-14).pdf*
*Statewide Memo Re ICC (2000-08-17).pdf*

**S)** San Quentin's MH Management Team would not have selected a representative to attend ICC who was "*increasingly bizarre*," "*strange*," or displaying "*inappropriate behavior at work*," as Dr. Corrado's 06/03/2014 email suggests. By selecting Dr. Wadsworth to represent the MH Department at San Quentin's Institutional Classification Committee, Dr. Corrado acted in a manner that contradicts the damaging allegations made within her 06/03/2014 email. Her contradictions supports the notion that Eric Monthei, her direct supervisor, enlisted Dr. Corrado's disingenuous remarks that she authored about Dr. Wadsworth's professional capabilities on 06/03/2014.

See attached: *Corrado - Post-Rejection.pdf*
*Institutional Classification Committee - Function & Purpose.pdf*
*Statewide Memo Re ICC (1997-09-04).pdf*
*Statewide Memo Re ICC (1998-04-06).pdf*

*Statewide Memo Re ICC (1998-08-14).pdf*
*Statewide Memo Re ICC (2000-08-17).pdf*

# EDWARDS

T) Edwards' email references a subject that is addressed in Paragraph "O" above. In short, her email confirms that Monthei's retaliatory actions had created a hostile work environment.

# VAN BURG

U) In her email dated July 2, 2014 at 4:44 p.m., Dr. Van Burg wrote, "[*Dr. Gibbs*] *indicated that he has already done farewell sessions with the patients he felt was necessary to do so with prior to them being transferred to [Dr. Wadsworth].*" However, Dr. Van Burg's statement is not possible. Specifically, the Mainline Team (inclusive of Dr. Gibbs) was informed, during a team meeting on the afternoon of 05/21/2014, that Dr. Wadsworth would be joining the team as a Staff Psychiatrist. Approximately 24 hours later, Monthei sent Dr. Wadsworth a list containing the names of 86 patients.

Monthei's message read, "*Effective immediately, and until further notice, please assume responsibility for the attached mainline caseload*." Per scheduling protocol, even if Dr. Gibbs had identified the patients that would require a "*farewell visit*" immediately following the meeting on the afternoon of 05/21/2014, the San Quentin procedures of notifying custody officials of a non-urgent psychiatry appointment would not have allowed Dr. Gibbs to schedule an appointment sooner than 05/23/2014.

See attached: *2014-05-22 Transfer of Care - woa.pdf*

V) In Monthei's emails to:

a) Van Burg (no additional recipients are identified) on 07/02/2014 at 10:57 p.m., Monthei referred to "*Dr. Wadsworth's continued insubordination*." He previewed for Van Burg, "*I will send him an email directing him to comply with previous instruction first thing in the morning. I apologize that you…are having to experience the worst of Dr. Wadsworth on an ongoing basis.*"

b) Van Burg (copied to Deems) on 07/03/2014 at 6:18 p.m., Monthei referenced "*Dr. Wadsworth's inappropriate and/or insubordinate actions*."

These communications from Monthei to Van Burg (his subordinate employee) about Wadsworth (another subordinate employee) violate the State of California's Guide to Employee Conduct and Discipline, which mandates that supervisors "*discuss infractions by a single employee only with that employee*."

See attached: *2014-07-02 Gibbs & Stress.docx*

W) Chera Van Burg's email to Monthei on 05/30/2014 at 6:43 pm indicates that she found that Dr. Wadsworth's email was "*yet another example of Dr. Wadsworth airing supervisory issues in a manner that is uncomfortable for me in this case…*" Of note, Dr. Wadsworth had been notified that NP Nelson had requested a psychiatric consultation to evaluate her patient's capacity to refuse HIV medications. Dr. Wadsworth's 05/30/2014 email was sent appropriately notify NP Nelson of the conclusions Dr. Wadsworth had reached, as they would possibly impact healthcare decisions regarding the patient's refusal of antiretroviral medication.

See attached: *2014-05-30 Van Burg.pdf*

X) Van Burg's 05/30/2014 email (6:43 p.m.) concluded that appropriate communication between healthcare providers is "*particularly concerning,*" then she is likely not well-suited to supervise physician consultants who will be expected to conduct communications (e.g., Dr. Wadsworth's 05/30/2014 email).

See attached: *2014-05-30 Email from Wadsworth.pdf*

Y) In her 05/30/2014 email sent at 6:43 p.m., Van Burg documents that "*airing of these issues in this manner will no doubt undermine the perspective of other disciplines towards mental health.*" However, Dr. Wadsworth's "*agenda*" was to provide the consultant with an update about his findings, as this particular case required timely communication of relevant details. It is unclear which "issues" Van Burg feels will undermine the perspectives of other disciplines. In fact, contrary to the vague, nonspecific allegations voiced by Van Burg, Dr. Wadsworth's email represented a courtesy, initial follow-up with a Primary Care colleague who had requested a psychiatric consultation. NP Nelson expressed her appreciation for the quality of Dr. Wadsworth's efforts in her follow-up email dated 06/10/2014, which clearly indicated that her perspective of mental health had not been undermined:

> "*I just wanted to thank you for your thoughtful and thorough evaluation of this patient. I am in agreement with your assessment of the current situation… People with a CD4 count of zero, who are not on antiretrovirals, generally have a life expectancy of a year or less… Anyway, thank you again…*"

See attached: *2014-06-10 Reply from Ingrid Nelson.pdf*

Z) In her 05/30/2014 email sent at 6:43 p.m., Van Burg noted that Dr. Wadsworth's "*perception*" is "*intentionally skewed to serve his personal agenda, which is apparently to present you in an unfavorable or questionable light.*" However, this vague email provides no indication of which of Dr. Wadsworth's perceptions were "*intentionally skewed.*" Although the incorrect conclusions drawn by Van Burg would have been harmful to Dr. Wadsworth's reputation if they had been accurate, her comments are not consistent with an objective review of the referenced emails.

See attached: *2014-05-30 Van Burg.pdf*

AA) Chera Van Burg's email dated 05/30/2014 at 6:43 p.m. notes that Dr. Wadsworth's decision to address Eric Monthei as "*Eric*" represents "*an attempt to undermine [Monthei's] authority and seems condescending…The management team also address each other as 'Dr.' with our last name…*" She adds that addressing Monthei by his first name in meetings and in emails is "*quite uncomfortable given its passive aggressive nature and tone.*" Van Burg's assertion that members of the management team "*address each other as 'Dr.'*" is inconsistent with her own prior emails.

Nevertheless, the Hiring Authority, not Van Burg, elected to include this item as a cause for rejecting Dr. Wadsworth during his probation as Chief Psychiatrist. Deems has consistently and frequently authored communications to Dr. Wadsworth that address him as "*Chris.*" Deems' choice to address a member of the MH Management Team by his first name clearly demonstrates that this allegation does not represent a "*cause for rejection during probation.*"

See attached: *2013 - 2014 Emails to Chris from Deems.pdf*
               *2014 Emails from Van Burg without Doctor.pdf*

BB) Van Burg's 05/30/2014 email (6:43 p.m.), which draws fictitious conclusions about Dr. Wadsworth's intentions, motivations, and perceptions of reality, are based upon two objectively-identified behaviors:

> 1) the appropriate email that Dr. Wadsworth sent to NP Ingrid Nelson on 05/30/2014; and
> 2) Dr. Wadsworth addressing Eric Monthei as "*Eric.*"

No reasonable person would have been able to draw, based upon objectively benign actions, the fictitious conclusions offered by Van Burg. In addition, her impressions of Dr. Wadsworth are inconsistent with the reciprocal, professional regard that they shared prior to 03/23/2014.

CC) **In Van Burg's email to Monthei dated 05/30/2014 at 6:43 p.m.:** "*…I must add that Dr. Wadsworth's underlying anger, distorted thinking, and hostile behavior is not inconsistent with some of the characteristics of individuals who have imploded an resorted to violence.*"

Van Burg is a trained psychologist who is familiar with the standards expected by her profession when making determinations about a client's risk of future violence. In fact, she is the supervisor of the Psychology Training/Assessment Team, which

oversees the administration of assessment instruments to patients. Van Burg knew or should have known that the accepted standard for performing violence risk assessments involve a requisite combination of:

1) a focused, in-depth interview;
2) a review of legal records and health records; and
3) an applicable, standardized violence assessment instrument/battery.

Van Burg knew or should have known that, even when these three components are appropriately employed, the predictive value of the resulting violence risk appraisal is often inaccurate. Van Burg "determined" that Dr. Wadsworth was a high risk of future violence despite not having performed an interview, a review of legal/health records, or employing an appropriate assessment instrument.

Her transparently inaccurate conclusions about Dr. Wadsworth's risk of violent behavior are careless and inconsistent with the expectations that accompany her training and background. Her production of these gross mischaracterizations are more consistent with a subordinate employee adhering to the unlawful instructions of her direct supervisor to knowingly cause harm to Dr. Wadsworth's reputation and career.

# WHYTE & LIPPINCOTT

**DD)** Whyte's initial email to Monthei on Saturday 05/31/2014 at 11:49 a.m. contains a single sentence: "*Wadsworth is onsite*." She does not, within this initial email, state her alleged safety concerns. Instead, she continued to work several doors down from Dr. Wadsworth's office on an open during the 55 minutes after her initial email. Whyte's willingness to remain in close proximity to someone who generated her substantial safety concerns is not consistent with a genuine perception of fear/threat. She could have easily, quietly, and discreetly, gone to another area of the building while she contacted Monthei to establish her next steps to seek safety.

See attached: *2014-05-31 Whyte.pdf*

**EE)** On 05/31/2014, while working several doors down from Dr. Wadsworth's office, Whyte spent several minutes in her office on the telephone. After she got off the telephone, she left her office for several minutes to go to the 5th floor corridor where Robert Lippincott's office is located. Of note, Robert Lippincott generated his memorandum documenting his alleged concerns on the same day, May 31, 2014. These events are consistent with Whyte receiving instruction from Monthei to document disparaging commentary about Dr. Wadsworth and relaying this instruction to Robert Lippincott on 05/31/2014.

**FF)** On Saturday 05/31/2014, Whyte walked by Dr. Wadsworth's open office door on at least two separate occasions, inclusive of when she left the institution. She greeted Dr. Wadsworth upon her arrival to the 5th floor and said goodbye to him upon her departure from the 5th floor. If Whyte had been generally fearful of Dr. Wadsworth and if her fear had been "*heightened with limited staff and support around,*" it is highly likely that she would have chosen one of several different available routes to leave the 5th floor instead of selecting the only route that would have compelled her to walk by Dr. Wadsworth's open office door.

**GG)** Whyte's newly-established concerns that Dr. Wadsworth was "*unprofessional…deceitful…perseverat[ing]…unwilling or unable to understand…malicious…[un]stable…disrupting*" are a remarkable departure from her communications with Dr. Wadsworth prior to March 23, 2014. In the weeks preceding March 23, 2014, she had addressed me as "*Lucky*" and "*Buddy*" and punctuated some of her messages with "*lol*." These pre-03/23/2014 communications are consistent with

See attached: *2014-05-31 Whyte.pdf*
*Communications with Whyte prior to March 23.pdf*

**HH)** If Monthei genuinely believed the communications he had received from Whyte, he would not have his supervisory authority to ensure the safety of a single member of the staff. He would have ensured that numerous members of the on-site Mental Health staff, including the Psychiatric Technicians, Psychiatrists, Psychologists, Social Workers, etc. were either accounted for or instructed to immediately leave grounds. If he knowingly failed to ensure a safe workplace for his staff, he would have violated governing sections of the Labor Code, Government Code, and Department Operations Manual.