

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## NOTICE OF REJECTION DURING PROBATION

**CHRISTOPHER WADSWORTH**
Chief Psychiatrist
P.O. Box 640811
San Francisco, CA 94164

### I
### NATURE OF ACTION

You are hereby notified that pursuant to Government Code section 19173 you are rejected during your probationary period from your position and civil service classification of Chief Psychiatrist, Correctional Facility, with the California Department of Corrections and Rehabilitation (CDCR), California Correctional Health Care Services (CCHCS), at California State Prison, San Quentin (SQ).

### II
### EFFECTIVE DATE

This rejection during probation shall be effective at the close of business on September 19, 2014.

### III
### STATEMENT OF CAUSES

This rejection during probation is based on your failure to conduct yourself in a manner consistent with the qualifications, the good of the service, and your failure to demonstrate merit, efficiency, and fitness in your employment as Chief Psychiatrist. Specifically, your failure to follow the direction of your supervisor; your inability to maintain a professional working relationship with the staff at SQ, including the management team; and your inappropriate conduct and behavior which has jeopardized your credibility as a Chief Psychiatrist.

Your actions are in violation of the following laws, rules, regulations, departmental policies, procedures, and/or manuals as follows:

**California Code of Regulations (CCR), Title 15, Section 3391**
**Section 3391 – Employee Conduct** states in pertinent part:

(a) Employees shall be alert, courteous, and professional in their dealings with inmates, parolees, fellow employees, visitors and members of the public… Irresponsible or unethical conduct or conduct reflecting discredit on themselves or the department, either on or off duty, shall be avoided by all employees.

Department Operations Manual (DOM), Sections 33030.3.1 and 33030.2.

### 33030.3.1 – Code of Conduct.

As employees and appointees of the Department, we are expected to perform our duties, at all times, as follows:

- Demonstrate professionalism, honesty, and integrity;
- Accept responsibility for our actions and their consequences;
- Appreciate differences in people, their ideas, and opinions;
- Treat fellow employees, inmates, wards, parolees, victims, their families, and the public with dignity and respect;
- Respect the rights of others and treat them fairly regardless of race, color, national origin, ancestry, gender, religion, marital status, age, disability, medical condition, pregnancy, sexual orientation, veteran status, or political affiliation;
- Comply with all applicable laws and regulations;
- Report misconduct or any unethical or illegal activity and cooperate fully with any investigation.

### 33030.3.2 – General Qualifications.

All employees are subject to the requirements as specified in the CCR, Title 2, Section 172, General Qualifications, which states, in pertinent part, the following:

> All candidates for, appointees to, and employees in the state civil service shall possess the general qualifications of integrity, honesty, sobriety, dependability, industry, thoroughness, accuracy, good judgment, initiative, resourcefulness, courtesy, ability to work cooperatively with others, willingness and ability to assume the responsibilities and to conform to the conditions of work characteristic of the employment, and a state of health consistent with the ability to perform the assigned duties of the class.

## IV
## STATEMENT OF FACTS

### A. Employment History

You began working at SQ on or about September 1, 2011, a Staff Psychiatrist. You were promoted to Chief Psychiatrist, on or about September 20, 2013, and this is your current position.

### B. Training

You have been provided with regular on-the-job training. As part of your training, you were introduced to the DOM and the CCRs. The purpose of introducing you to the DOM and the

CCRs was to ensure that you possess the resources necessary to meet the job expectations and to ensure that you properly carry out the duties of your position. The DOM is available to you through your supervisor. The Department's rules and regulations are also available on the Internet via the State of California website and the CDCR homepage.

In addition, you also received the following training:

- Medical Staff Training - April 15, 2011, and August 22, 2013
    - Medical policy and procedure training.
- *Armstrong,* Americans with Disabilities Act (ADA) Staff Training – November 9, 2011
    - History of the *Armstrong* lawsuit, reasons for court orders, expectations associated with compliance and manner in which to successfully maintain compliance associated with documentation, audits, and reports.
- Warden's Executive Staff Meeting – August 20, 2012, December 9, 2013, and December 30, 2013
    - Multi-disciplinary meeting that reviews the sentinel events that occurred over the preceding 24 hours. It is held each morning to ensure common understanding of related issues.
- *Clark* Best Practices Guide – September 11, 2012
    - History of *Clark* lawsuit, reasons for court orders, expectations associated with compliance and manner in which to successfully maintain compliance associated with documentation, audits and reports.
- Special Housing Unit Training – October 15, 2012
    - Training specific to working with the condemned population, Administrative Segregation Unit (ASU) population, and Adjustment Center population.
- Inmate Medical Scheduling Program (IMSP) Access to Primary Care – January 14, 2013
    - Training on how to utilize the IMSP system, data tracking, and reports.
- Custody Health Care – March 5, 2013, April 2, 2013, and May 1, 2013
    - 8 hour training focused on the importance of mental health care in prisons, due to the increase in mentally ill offenders; provided an overview of what mental illness is and ways in which custody and mental health clinicians can work together. There are exercises that help participants identify barriers to collaboration, including stereotypes of different careers within CDCR, and brainstorming ways to improve communication within the institution.
- Mental Health Collaboration Training for Trainers – March 6, 2013
    - 8 hour training to teach Custody and Health Care collaboration (two custody and two mental health trainers), trainers must complete a 2-day course that is taught by staff from headquarters.
- ADA Training – January 28, 2014, and February 5, 2014
    - Additional follow-up training associated with *Armstrong* Corrective Action Plan (CAP) items. Brief history of *Armstrong* lawsuit, reasons for CAP items,

expectations associated with compliance and manner in which to successfully remedy CAP compliance associated with documentation, audits, and reports.

C. **Causes for Rejection**

On or about December 10, 2013, Lawrence K. Karlton, Senior Judge, United States District Court, signed an Order instructing SQ's Mental Health operations to, in part, "…conduct an assessment of unmet need for inpatient care in the condemned inmate population at San Quentin" and to "…resume working under the guidance of the Special Master to establish a durable remedy that provides adequate access to necessary inpatient mental health care or its equivalent for seriously mentally ill inmates on California's death row."

Subsequent to the Order, SQ management held numerous meetings in which you participated with various stakeholders to outline how the assessment would be performed.[i] By January 2014, the decision as to how the Department would move forward was clearly explained to you. However, you took it upon yourself to conduct extensive research on such matters, including, but not limited to: national executions, Supreme Court rulings on condemned prisoners, and the history of the death penalty. You then submitted a lengthy memorandum, disputing the Department's analysis and recommendation, in an effort to undermine the decision and bring opposition to the Department's efforts to comply with the Order.

Prior to March 2013, it was explained to you that the Department's decision regarding bed utilization was final and you were expected to support this decision. You failed to comply with the directive, and even after your supervisor advised you that your insubordinate behavior could lead to disciplinary action, you continued. You have been provided with clear expectations of your duties as Chief Psychiatrist.

Your insubordination became even more apparent after you expressed your opinion and "concern" of the Department's recommendation and decision to allocate a certain number of inpatient beds for the Condemned Treatment Population (CTP), and your opinion was not accepted. Your fixation on this issue resulted in your inability to complete work assignments timely. In addition, you failed to act professionally during meetings, and on numerous occasions your conduct and behavior was inappropriate.

1. <u>Willful Disobedience</u>

    a. In a series of meetings you attended, the issue concerning CTP, including bed utilization, was discussed at length, resulting in consensus about the approach that management intended to support. The meetings were held on or about February 4, 6, 11, 13, 18, 20, 25 and 27, 2014. These plans were further discussed on March 4, 6, 11, and 13, 2014. You were instructed what Mental Health management's direction on this issue was. Despite this clear instruction, on or about March 20, 2014, you informed your supervisor, Chief of Mental Health, Eric Monthei, of an, *"…unplanned and informal discussion"* with Chief Executive Officer (CEO), Andrew Deems. You shared your concerns with CEO Deems relating to management's plan associated with the allocation of bed space. Chief Monthei

instructed you not to engage in further discussions or communications on this issue until such time as Chief Monthei had an opportunity to brief CEO Deems on the details of bed space specific to the CTP.

On or about March 23, 2014, you ignored your supervisor's instruction, and sent CEO Deems and Chief Monthei an e-mail that acknowledged the above instruction, but you then actively deviated from it. Your e-mail included two attachments: (1) 12 page memo; (2) partial court order. Later that same day, you sent Chief Monthei another e-mail that acknowledged his instructions to you, and then purported to explain your rationale for deviating from the previous instruction.

Your failure to abide by Chief Monthei's directions to you undermined your manager's ability to present the background and status of a sensitive issue to CEO Deems, as he had planned. Your actions usurped Chief Monthei's presentation and jeopardized how the presentation would be received.

b. On or about March 24, 2014, you were provided with further and final direction by Chief Monthei to cease-and-desist from engaging in further communication specific to the allocation of inpatient beds related to the CTP, and in conjunction with relevant court orders and/or agreements. Approximately one hour after receiving this instruction, you sent an e-mail to executive staff at headquarters attempting to explain your rationale for deviating from Chief Monthei's previous direction. You were once again provided with further direction from Chief Monthei to cease-and-desist from engaging in further communication specific to the allocation of inpatient beds related to the CTP an in conjunction with relevant court orders and/or agreements. Despite this clear direction, you sent Chief Monthei another e-mail one-half hour later stating, *"...you'll be included in all e-mails I send moving forward,"* or words to that effect. This response clearly demonstrates your failure to follow clear instructions given to you by your supervisor.

2. Failure to Understand and Follow Direction and Complete Assignments Timely

During your probationary period, you have struggled with following directions and direct orders from your supervisor. You have placed your values, thoughts, and ideas above the explicit directions of your supervisor and management at SQ, the direction of the Special Master, CDCR, CCHCS, and the Receiver's Office. Your failure to comply with supervisory instruction, your inability to follow direction, and work in a constructive manner has caused deficits in your work product and has prevented you from completing assignments on time.

a. On or about January 6, 2014, Chief Monthei sent an e-mail to the Mental Health Services Delivery System (MHSDS) management team regarding the upcoming Environmental Health Survey that was scheduled for fiscal year 2013–2014, during the week of January 13-17, 2014. The survey, conducted by California Department of Public Health, was intended to provide CDCR with a means to measure and ensure the health and safety of inmates and staff, and to support the accreditation process with the American Correctional Association (ACA). This survey was a high visibility

and important undertaking for SQ, CDCR, and CCHCS. You were aware of its significance to your managers at that information was shared and presented in the Management Meetings, whereby assignments and mentoring was readily offered. You were verbally informed that the survey must be completed prior to the site visit. You failed to complete your part of the survey by the due date, which resulted in Chief Monthei sending you a reminder e-mail. Even after the reminder, you still failed to complete the assignment. This lack of follow through was discovered during a physical audit performed by Chief Monthei. When verbally asked about the status of the survey in the Management Meetings, you responded, *"things are on track,"* or words to that effect. You knew or should have known from previous discussions at the Management Meetings and within your own psychiatry meetings, that your failure to complete this assignment by prior to the site visit would reflect poorly on Mental Health Crisis Bed (MHCB) and CTP operations associated with ACA accreditation compliance. Therefore, as a result of your inability to complete this assignment timely, another staff member was required to complete this assignment.

b. On or about January 6, 2014, Chief Monthei verbally instructed you to provide your recommendation to him in regards to the Psychiatry Medication Non-Compliance Referrals process. It had been noted by Staff Psychiatrist, Dr. Steven Gibbs that the problem was the communication between Nursing and Pharmacy staff. He also noted that the monitoring and reporting system was not flexible enough to distinguish between medication non-compliance and other sorts of concerns. You responded to Chief Monthei on the following day that you wanted to share your strong opposition with him regarding the current practices. However, you failed to follow through and Chief Monthei verbally reminded you, on or about January 9, 2014, that he still had not received your recommendations. During the week of January 14-16, 2014, Chief Monthei again verbally discussed your failure to provide your recommendation. Chief Monthei advised you that he was open to discuss the issue with you anytime and asked you to provide your recommendations on how to improve the identified system. During the Management Meeting, you determined that every other discipline was at fault and that it was not your issue. Your failure to complete the assignment caused an increased workload on Staff Psychiatrists because they had to rewrite active orders or risk inmate-patients not receiving their prescribed medication. Additionally, your failure of leadership on this issue required other subordinate and managerial staff to resolve a workload issue that you were unable to complete.

c. On or about January 21, 2014, Chief Monthei gave you instructions to complete a Power Point presentation that captures current 7388B/MHARP (Mental Health Assessment Referral Project) data as of January 21, 2014. You responded that you would complete the assignment in the next few minutes, but the LAB portion was coming from Senior Psychologist, Dr. Douglas Peter-Frank, and Office Technician, Tonia Barsi, and would be completed by the end of the day. Chief Monthei responded, on or about January 21, 2014, that he wanted the assignment prior to the end of the day and that he had originally expected the assignment to be presented to him by close of business on January 17, 2014. He further stated that he did not need the data from Ms. Barsi, and he instructed you to have Clinical Social Worker,

Dana Ricciardi, put together the current 7388B data on a single slide. Despite Chief Monthei's clear instruction, you failed to submit the assignment. This caused an unnecessary hardship on your peers, as someone else had to be assigned to complete the assignment.

d. On or about February 3, 2014, at 1326 hours, Chief Monthei sent you an e-mail instructing you to walk the first floor with Associate Warden Joe Curzon, and Senior Psychologist, Dr. Christopher Roach, in order to determine if there was an easy solution by which to ducat inmate/patients to the first floor. You failed to complete this assignment as instructed. This caused an unnecessary hardship on your peers, as someone else had to be assigned to complete the assignment.

e. On or about March 21, 2014, you sent an e-mail to Chief Monthei stating, *"At the moment, we cannot accommodate any further admissions, but it's unlikely that we'll have a Non-Acute Mental Health (NAMH) admission today..."* or words to that effect. This decision was contrary to the discussed plans associated with the allocation of bed space specific to the condemned population and in conjunction with relevant court orders and/or agreements that took place, on or about February 4, 6, 11, 13, 18, 20, 25 and 27, 2014. These plans were further discussed on March 4, 6, 11, and 13, 2014. Following your e-mail, Chief Monthei advised you to contact the Health Care Placement Oversight Program and make arrangements for a MHCB to MHCB transfer as previously discussed. You indicated that you needed to suddenly be off-site. Chief Monthei had to direct a fellow supervisor to complete this assignment, as a result of your inability to complete the assignment. Due to your failure to comply with directions, alternate supervisory staff had to be called in to efficiently and effectively implement Chief Monthei's direction associated with the allocation of bed space specific to the CTP, and in conjunction with relevant court orders and/or agreements, with little effort.

f. On or about March 23, 2014, you sent an e-mail to Chief Monthei expressing your confusion about your role, responsibility, reporting relationship, etc., which are items which were explicitly discussed at MHSDS Management Meetings, on or about February 4, 6, 11, 13, 18, 20, 25, and 27, 2014, respectively. The plans associated with the allocation of bed space specific to the condemned population and in conjunction with relevant court orders and/or agreements and your role were further discussed during MHSDS Management Meetings on March 4, 6, 11, and 13, 2014, specifically between you and Chief Monthei. Despite the frequent discussions, you failed to grasp the information being shared.

g. On May 27, 2014, you authored an e-mail to Chief Monthei seeking clarification on Non-Formulary Drug Requests (NFDR). Chief Monthei replied, *"Dr. Wadsworth, now that you have returned (from your special project), please assume the outpatient non-formulary requests"*. (You had just ended an assignment to a special project, on or about May 16, 2014.) On May 29, 2014, you authored an e-mail to Chief Monthei and the entire psychiatry team regarding a concern that you deemed as a delay in care to the condemned and/or inmate-patients. You stated that inmate/patients CDCR

▇▇▇ (outpatient), CDCR ▇▇▇ (outpatient), and CDCR ▇▇▇ (outpatient), had outstanding NFDRs in need of administrative management, as each of the requests were submitted by the prescribing psychiatrist over a week ago. Senior Psychiatrist, Dr. Paul Burton, who was assigned leadership over this particular area and had been out of the office on May 27, 2014, responded to your e-mail stating that the non-formulary requests were under control and if you felt the need to touch base with him directly, encouraged you to discuss your concerns with him directly. On June 3, 2014, you then effectively submitted a 'near-miss sentinel event' report. Your "concern" was unwarranted and only served to undermine unnecessarily a colleague's competence.

Your failure to accept the direction, as outlined above, demonstrates your deliberate attempt to deviate from the discussion that took place during supervisory and management meetings, where this was situation was discussed in detail.

h. On or about May 21, 2014, CDCR Mental Health headquarters notified institutions that they were required to have a clinical supervisor or manager identified as responsible to conducting mental health evaluations related to Use Of Force (UOF). On this same day, Chief Monthei sent an e-mail to the Mental Health unit that you would be assigned to take the lead as the Clinical Manager and Supervisor for UOF. On or about May 22, 2014, you addressed an e-mail to Chief Monthei and the entire psychiatry team requesting clarification for your new role as the clinical manager and supervisor of UOF contacts. You stated that you had not been provided education regarding the policies, procedures, expectations, availability, specific items that are expected for what you would state on camera. You further asked Chief Monthei to direct/guide you to past practices as it relates to the expectations of UOF. Chief Monthei directed you to, and re-forwarded you an e-mail, that had been distributed to all CDCR staff statewide, including you, on or about May 6, 2014. You knew or should have known the policies, procedures, and expectations of UOF as you had received the e-mail since you are part of the global network of CDCR.

To further assist you in understanding UOF policies, procedures, and expectations, Chief Monthei scheduled you to attend the UOF training on or about May 27, 2014, at approximately 0700 hours. You arrived late to the meeting and were rescheduled for the course at 1100 hours on the same day. You were excused from the MHSDS Management Meeting in order to ensure that you could attend. Your tardiness for the earlier class caused you to miss the MHSDS Management Meeting.

i. On or about May 23, 2014, Chief Monthei sent you an e-mail identifying and describing your Quality Management (QM) assignments. You in turn sent him a detailed e-mail expressing your lack of knowledge of your responsibilities as listed:

- Clarification on how to complete the Medication Administration Process Improvement Project (MAPIP) measures assignment. Specifically, you wrote:

*"Also, I will need appropriate training regarding the system, database, methods, deadlines, presentations, etc associated with the expectations of this item. I want to be sure that I am meeting all the requirements that you set forth.*

*I will need to be assigned to training with knowledgeable resources of this particular item before I can effectively manage it. I would like a syllabus/document which outlines what will be covered in the training so that I won't need anyone to repeatedly request someone to re-educate/re-orient me to these novel (to me) procedures/measures. Perhaps these items can be effectively captured/recorded on an IST sheet?"*

However, you should not have needed additional training because you used to review and complete these audits (see attached email) and oversee the review/completion of these audits once Dr. Burton became a Senior Psychiatrist and assumed these duties. You were also copied on the audits completed by other team members, so you were clear as to what the expectation was. As a Chief Psychiatrist, you should have a global understanding of departmental systems and operations.

- How to complete the assignment related to the spotlight items from HQ Performance Reports. Specifically, you wrote:

*"I won't be able to proactively investigate or oversee the successful maintenance of our institutional parameters for these critical reports until I have been adequately trained in these items".*

However, Senior Psychologist, Dr. Desmond has discussed the headquarters Performance Reports on various occasions in the Management Meetings, as well as in Mental Health Program Subcommittee (MHPS). She informed all of the managers that the reports are accessed through the "back-end reports," which you are familiar with (see email Priority Project). Previously, you used these exact reports to develop an assignment for the QM Team. Your failure to complete this assignment timely had grave consequences; because it was assigned from the Receiver's Office and must be completed and reviewed prior to submission, as these metrics reflect performance at SQ. As a Chief Psychiatrist, you should have a global understanding of departmental systems and operations.

- Clarification regarding Reception Center, Mainline, and ASU compliance measures. Specifically, you wrote:

*"I will need to be assigned to training with knowledgeable resources of this particular item before I can effectively manage it. I would like a syllabus/document which outlines what will be covered in the training so that I won't need anyone to repeatedly request someone to re-educate/re-orient me to these novel (to me)*

*procedures/measures. Perhaps these items can be effectively captured/recorded on an IST sheet?"*

However, you are rather knowledgeable about Mental Health Tracking System (MHTS) back-end reports, which include compliance measures for the various programs, as you in fact developed ideas on how to use those back-end reports to provide information to headquarters (see attached "RE Priority Project..."). Additionally, you specifically requested and received information on the QM Team's performance reports (see attached "Report request. . ." which are two separate emails Chief Monthei put on a Word document), and you appeared familiar with these reports at the monthly presentations in MHPS. As a Chief Psychiatrist, you should have a global understanding of departmental systems and operations.

j. On or about July 6, 2014, you submitted what you perceived to be a "near-miss" sentinel event report suggesting that your incomplete assignments constituted a patient crisis. Within this report, you stated to CEO Deems, in part,

> *"SQ's Chief of Mental Health Eric Chief Monthei had recently ordered that I must seek his permission to be at San Quentin at any time, aside from the standard, non-holiday 40-hour workweek. I professionally disagree with his explicit direction that I must first obtain his approval to safely discharge my patient-care duties as a physician. This unprecedented requirement that, as chief psychiatrist, I must seek approval from Chief Monthei to appropriately discharge my duties as a physician is a profound system weakness that exposes our patients to significant harm. Nevertheless, I complied with this direction."*

The statement that you complied with Chief Monthei's direction was dishonest in nature because you reported to CEO Deems that you were onsite that weekend, but you reported to Chief Monthei that you obliged his order.

It was determined by Staff Psychiatrist, Dr. Igor Weisz that after seeing inmate/patient CDCR K01264, on or about July 9, 2014, Weisz acknowledged that although the plan to taper the Geodon medication to K01264 was not properly implemented due to an oversight and his dose of Ziprasidone 60 mg QPM was d/c-ed from one day, on or about July 3, 2014, without the stepwise decrease, however Inmate K01264 reported to Dr. Weisz that, *"he was doing fine. He apparently was not aware of the sudden discontinuation of one medication among the many other meds he is taking. Patient denied any rebound symptoms and stated that his sleep, mood are all fine and that he is free of suicidal thoughts. He denied a resurgence of psychosis, anxiety, agitation or insomnia. No resumption of Geodon taper necessary".*

Your pre-diagnosis and/or assumption that this was a "near-miss" sentinel event, without first consulting with the treating physician was incorrect. This is an example of your desire to develop a perception that is not in line with current medical practices

and an overreaction. As a Chief Psychiatrist, you should have a global understanding of departmental systems and operations.

    k. On or about July 15, 2014, by close of business, you were supposed to submit your completed MAPIP Measures to Health Program Specialist (HPS I), Carla Thompson-McKinney. HPS I Thompson-McKinney sent an e-mail to you on or about July 17, 2014, at approximately 0621 hours, to remind you that you had not submitted the report as assigned. She requested that the report be submitted by close of business on July 17, 2014. On or about July 18, 2014, at approximately 1213 hours, HPS I Thompson-McKinney sent you another e-mail because you still had failed to submit the report as requested. As a member of the Department in a leadership role, it is imperative that you lead by example and submit all assignments on time. Chief Monthei sent you an e-mail on July 18, 2014, at approximately 1252 hours, you instructing you to complete this assignment prior to your departure for the day because the assignment was overdue.

3. <u>Unprofessional or Rude and Discourteous Behavior</u>

During your probationary period, you have demonstrated willful and disruptive behavior. On several occasions you have sent out group e-mails to employees in the Mental Health Unit that did not pertain to them, included rank and file staff.

    a. On or about March 19, 2014, at approximately 1208 hours, Chief Monthei sent you an e-mail during the MHSDS meeting advising there was very poor attendance from the mandatory Suicide Prevention Committee meeting you were scheduled to attend. He sent a follow-up e-mail stating he would reference the sign in sheet to see the supervisory approved absences. You informed Chief Monthei that you had excused the entire inpatient team from attending the mandatory meeting; your decision caused division within the unit because Chief Monthei had discussed your poor leadership habits with you on or about March 12, 2014, and the need for staff to attend mandatory trainings. He sent you an e-mail on this at approximately 0938 hours to remind you of his previous request that you ensure that all MHSDS supervisors have reviewed the agenda and minutes, and are timely.

    b. On or about May 22, 2014, you were directed by Chief Monthei to immediately meet with all of the inmate/patients that are on your caseload. On or about July 2, 2014, at approximately 1644 hours, Senior Psychologist, Dr. Chera Van Burg, sent you an e-mail regarding a conversation that she had with Staff Psychiatrist, Dr. Gibbs, on or about July 2, 2014. In this e-mail she brought to your attention that Dr. Gibbs was feeling that unable to see the inmate/patients that had been recently transferred to you by Chief Monthei. You instructed him to have a farewell session prior to you seeing them. Dr. Gibbs indicated that he already had completed a farewell session with the inmate/patients and did not feel it was necessary to do so again prior to them being transferred to you. Your instructions to Dr. Gibbs placed undue stress on him and left him having received conflicting instructions. Chief Monthei instructed you to see

your assigned patients, and Dr. Van Burg informed you that she would send a separate e-mail to Dr. Gibbs advising him he did not need to see your inmate/patients.

You sent a reply e-mail to include Dr. Gibbs, which left him in an uncomfortable position between supervisors. This behavior is what you continuously model to the Mental Health staff at SQ, and it continues to have a deleterious impact on the working relationships at SQ.

c. On or about May 29, 2014, at approximately 1612 hours, Senior Psychologist Rachel Chen, authored a concern to Chief Monthei in regard to the recent string of e-mails and behaviors exhibited by you at meetings. She wrote that the questions that you pose in the meetings should be directed to Chief Monthei and not the management team as a group. Dr. Chen wrote that the questions you pose, should be ones you know or should know. Your behavior has caused the management meetings to be unproductive as none of the managers feel comfortable speaking around you because of your ulterior motives.

d. On or about May 30, 2014, at approximately 1843 hours, Dr. Van Burg authored a concern regarding you airing out supervisory issues in a manner that is uncomfortable for her and the management team. She wrote that the management meetings are difficult to attend because she cannot openly express concerns. She further stated that your attendance at the management meetings is disruptive to the work environment.

e. On or about Saturday, May 31, 2014, at approximately 1149 hours, Senior Social Worker (SSW), Laura Whyte, sent an e-mail to Chief Monthei that you were onsite and that she was feeling quite uncomfortable and anxious. She requested permission to leave because she could not work in fear.

f. On or about Saturday, May 31, 2014, Senior Psychiatric Technician, Robert Lippincott, authored a memorandum in regard to a concern about your ability to process communication and discern proper boundaries. He stated that he felt uncomfortable with your demeanor and states that your presence is unsettling to the work environment.

g. On or about June 4, 2014, at approximately 1016 hours, SSW Whyte, authored an email to Chief Monthei regarding your demeanor and approach at Department meetings, management meetings, individual conversations with management, and individual conversations with line staff in an unprofessional and deceitful way. You continuously state that you lack training, although you have historically in the past completed the tasks with ease. SSW Whyte wrote an email and verbally reported that you asked Psychologist, Dr. Angelina Enos, to amend mental health program subcommittee minutes via e-mail and requested that she inform the meeting participants of your amendment in your absence. This left the staff member uncomfortable and expressed discomfort and fear related to your request. Supervisory staff resented your suggested edits and found your suggested edits to be inconsistent with the actual meeting. The minutes were approved absent your

suggested edits. SSW Whyte further noted that you asked her to take assignments to the fourth floor condemned inpatient program for you. At the time of the request, you knew that you had no duties assigned to that area. You have on several occasions sought out Psychiatrist Deal to provide you with information from the fourth floor, but you do not have a business need to know such information.

h. On or about June 4, 2014, at approximately 1301 hours, Senior Psychologist, Courtney Corrado, authored a memorandum regarding your strange and inappropriate behavior at the management team meetings and via e-mails strings. Dr. Corrado further wrote that your attendance and line of questioning, at management and subcommittee meetings make for an uncomfortable environment. Your behavior, as described by Dr. Corrado, was unprofessional, inappropriate, disruptive, and strange. This behavior has affected her ability to be productive and has hindered the work environment.

i. On or about June 4, 2014, at approximately 1656 hours, HPS I, Alyssa Edwards, authored a memorandum to Chief Monthei in regard to you not using the proper chain of command. She wrote that she is uncomfortable being copied on back-and-forth e-mail conversations that she has no involvement with the subject or general content being addressed. HPS I Edwards also wrote that during the management meetings you address issues in front of the group of supervisors, that are clearly meant to be directed at Chief Monthei.

4. Preparation Failures

You have been counseled on several occasions in regards to you arriving late to scheduled meetings and being unprepared for the meetings. The warnings advised you that your performance was setting a bad example to the entire Management Team.

a. On or about March 11, 2014, you arrived late to the standing MHSDS Management meeting, were unprepared to discuss agenda items, and spent the majority of the meeting distracted by your portable electronic devices.

b. On or about March 13, 2014, you arrived late to the standing MHSDS Management meeting.

c. On or about March 19, 2014, there was a mandatory Suicide Prevention meeting. You arrived for the meeting approximately 20 minutes late, stayed for five minutes while talking on your cell phone, and then left the meeting. You have set a poor example for the Mental Health staff by arriving late, leaving early, and not paying attention in the mandatory MHSDS meetings. Therefore, you were issued a counseling chrono on March 19, 2014, for your unexcused absence.

d. On or about March 20, 2014, there was a scheduled Suicide Autopsy. You arrived 16 minutes late to the meeting and came unprepared to discuss any items contained within the draft report. Following this meeting, you publicly stated, "…how can they

      do that? It would be nice if there was a forum to discuss what 'contributory' means..." or words to that effect. In response, Chief Monthei publicly stated, "This was the forum" or words to that effect. You responded, "oh," or words to that effect.

e. On or about June 19, 2014, at approximately 0811 hours, you sent an e-mail to Dr. Burton stating, *"I just learned of an urgent family need as I was leaving for work. I need to be away today, but I'll back on-site tomorrow"* or words to that effect. You failed to contact Chief Monthei to report your absence and/or request the time off. You violated the institutions expectations memo for time off requests. You knew the institution's policy on time off requests because you have correctly followed them in the past and have enforced the policy with your psychiatry staff.

f. On or about July 31, 2014, you attended a lecture at Stanford University for the Annual Forensic Psychiatry Didactic. You sent an e-mail to Dr. Burton on this day at approximately 0840 hours stating, *"Although I already had my leave approved for today's talk at Stanford..."* or words to that effect. However, in fact, you did not submit a leave request to Chief Monthei and did not have authorization to be off-site in order to give a presentation at Stanford. You violated the institutions expectations memo for time off requests.

## V
## NOTICE AND PROGRESSIVE DISCIPLINE

1. On or about March 19, 2014, you received a counseling chrono for an unexcused absence.
2. On or about May 16, 2014, you received your second probationary report. You were marked *"Improvement Needed"* in the categories of Skill, Knowledge, Learning Ability, Communication, Ability as a Supervisor, Administrative Ability, and Overall Rating.
3. On or about May 16, 2014, you were issued an Employee Performance Improvement Plan for your position as the Chief Psychiatrist.
4. On or about May 16, 2014, you were issued a Letter of Expectations to clarify your current duties as a Chief Psychiatrist.

## VI
## REINSTATEMENT RIGHTS

Pursuant to the provisions of Government Code Section 19140.5 you have mandatory reinstatement rights to a Staff Psychiatrist position with the State of California. You have the option to reinstate as a Staff Psychiatrist at California Medical Facility or California State Prison, Solano. Your report date will be September 22, 2014.

## VII
## RIGHT TO RESPOND TO APPOINTING POWER

In accordance with SPB Rule 52.6 (CCR title 2, section 52.6), you are entitled to at least five (5) working days within which to respond to this Notice of Rejection during Probation. You may respond either orally or in writing prior to the effective date of this action. The effective date is stated above in Section II.

If you choose to respond orally, you must request a meeting that will occur before the effective date of this action. You have the right to a representative at this meeting; however, at this stage of the proceedings you are not entitled to a formal hearing with the examination of witnesses.

You are entitled to a reasonable amount of state time to prepare your response to the charges. You may be represented by another in presenting your response. The appointing power may amend, modify, or revoke the adverse action in whole or in part. If you choose to respond in writing, your response should be mailed or hand-delivered so it is received prior to the effective date. To ensure confidentiality, your written response should be placed in an envelope that has the notation "CONFIDENTIAL – TO BE OPENED BY ADDRESSEE ONLY" on both the front and back of the envelope. Your request for a meeting or your written response should be directed to the individual indicated below who will make the appropriate arrangements. You must act promptly to ensure that it is received and may be acted upon before this action takes effect.

**Kishia M. Ogans**
**Medical Employee Relations Officer**
**Performance Management Unit**
**P.O. Box 588500**
**Elk Grove, CA 95758**
**Telephone (916) 691-3731**

## VIII
## RIGHT TO APPEAL TO THE STATE PERSONNEL BOARD

Regardless of whether you respond to these charges to the appointing power as discussed in Section V above, you are advised that you have the right to file an appeal with the SPB pursuant to Government Code section 19575, no later than <u>fifteen (15) calendar days</u> after the effective date of this action as stated in Section II above. Your appeal should be taken or mailed to:

**State Personnel Board**
**Attention: Hearing Office**
**801 Capitol Mall**
**Sacramento, CA 95814**

If you file your appeal in person, please be advised that the SPB business hours are from 8 a.m. – 5 p.m., Monday – Friday, except on holidays when its offices are closed.

**You are responsible for notifying the SPB and your hiring authority of any changes in your address that occur after the effective date of this rejection during probation.**

## VIIII
## MATERIALS AND DOCUMENTS

Pursuant to SPB Rule 52.6 (CCR Title 2, Section 52.6) copies of all documents or materials upon which this action on is based accompany this Rejection during Probation. This material is not being provided to the SPB in advance of any appeal hearing which may be scheduled, unless it is material referenced in this action as being incorporated herein.

## X
## IMPORTANT NOTICE
## REGARDING YOUR BENEFITS AND OTHER PAYROLL DEDUCTIONS

You have been served with an action that may result in a lapse of benefit coverage (health, dental and vision) and the non-issuance of other payments made by payroll deduction (e.g., credit union deductions for mortgage/car payments, 401K, life insurance, etc.). The impact this action will have is dependent on several factors and can only be determined by the personnel office staff that is responsible for your pay and benefits.

It is recommended that you contact your personnel office immediately to learn what impact (if any) this action will have on your payroll deductions (including benefit premiums) and what entitlements/options you have for continuing those benefit/payments should you choose to do so.

_____       9.12.14
ANDREW W. DEEMS                      DATE
Chief Executive Officer – Health Care
California Correctional Health Care Services

cc:     Official Personnel File – Christopher Wadsworth

---

[1] Participants included staff from CCHCS Mental Health Service Delivery System, Headquarters personnel, plaintiff's counsel, the Attorneys General, CDCR Office of Legal Affairs, and the Special Master's panel of experts.

## LIST OF SUPPORTING DOCUMENTS

1. Chief Psychiatry Duty Statement (3 pages)
2. Welcome to the Department of Corrections and Rehabilitation memo signed 6/26/12 (6 pages)
3. Annual Audit of Training Rating Period 8/6/09 – 8/6/14 (2 pages)
4. California Code of Regulations Title 15 Section 3391 (2 pages)
5. Department Operations Manual Article 22 Sections 33030.3.1 and 33030.3.2 (2 pages)
6. **Attachment 1.a.** Email from Wadsworth to include memo dated 3/23/14 to Deems
7. **Attachment 1.b.** Email from Monthei: Subject – Allocation of inpatient beds dated 3/23/14 (2 pages)
8. **Attachment 2.a.** Email from Wadsworth: Subject – EHS CDPH SQ Audit Week January 13-17, 2014 dated 1/7/14 (6 pages)
9. **Attachment 2.b.** Email from Monthei: Subject – Psychiatry Med Noncompliance Referrals dated 1/8/14 (8 pages)
10. **Attachment 2.c.** Email from Monthei: Subject – RE dated 1/21/14 (14 pages)
11. **Attachment 2.d.** Email from Monthei: Subject – R & R Screening dated 2/3/14 (2 pages)
12. **Attachment 2.e.** Email from Wadsworth: Subject – REL Today's NAMH Admit (1 page)
13. **Attachment 2.f.** Email from Monthei: Subject – HELP! – Allocation of inpatient beds: an update dated 3/23/14 (2 pages)
14. **Attachment 2.g.** Email from Monthei: Subject – FW: dated 5/30/14 (6 pages)
15. **Attachment 2.h.** Email from Monthei: Subject – Update RE: MH HQ Memorandum Clinician Presence During Controlled Use of Force dated 5/22/14 (33 pages)
16. **Attachment 2.i.** Email from Monthei: Subject – QM Assignments dated 5/23/14 (7 pages)
17. **Attachment 2.j.** Email from Monthei: Subject – Request to address patient care issues this weekend dated 7/6/14 (12 pages)
18. **Attachment 2.k.** Email from McKinney: Subject – MAPIP Measures are due dated 7/18/14 (8 pages)
19. **Attachment 3.a.** Email from Monthei: Subject – SPR FIT dated 3/19/14 (9 pages)
20. **Attachment 3.b.** Email from Monthei: Subject – ML Caseload Assignment dated 5/22/14 (13 pages)
21. **Attachment 3.c.** Email from Chen: Subject – Issues dated 5/29/14 (1 page)
22. **Attachment 3.d.** Email from Van Burg: Subject – FW: IP Williams – OHU, question re: capacity dated 5/30/14 (3 pages)
23. **Attachment 3.e.** Email from Monthei: Subject – RE: FYI dated 5/31/14 (2 pages)
24. **Attachment 3.f.** Memorandum from Lippincott dated 5/31/14 (1 page)
25. **Attachment 3.g.** Email from Whyte: Subject – RE: FYI dated 6/4/14 (9 pages)
26. **Attachment 3.h.** Email from Corrado: Subject – Dr. Wadsworth dated 6/3/14 (1 page)
27. **Attachment 3.i.** Email from Edwards: Subject – Re: Dr. Wadsworth (7 pages)
28. **Attachment 4.a-d.** Employee Performance Improvement Plan dated 5/12/14 (10 pages)
29. **Attachment 4.e.** Email from Monthei: Subject – Fwd: Urgent/unexpected (3 pages)
30. **Attachment 4.f.** Email from Wadsworth: Subject – Stanford Psychiatry – Annual didactic, Burton & Wadsworth dated 6/30/14 (5 pages)
31. Report of Performance for Probationary Employee dated 5/16/14 (3 pages)
32. Letter of Expectations dated 5/16/14 (2 pages)