**MARVIN FIRESTONE, MD, JD & ASSOCIATES**
Marvin H. Firestone, State Bar No. 103678
Michael A. Firestone, State Bar No. 282479
1700 S. El Camino Real, Suite 204
San Mateo, California 94402
Telephone: (650) 212-4900
Facsimile: (650) 212-4905
Firestone@LawMDJD.com

**LAW OFFICE OF EDWARD J. CADEN**
Edward J. Caden, State Bar No. 166922
9245 Laguna Springs Drive, Suite 200
Elk Grove, California 95758
Telephone: (916) 729-3172
Facsimile: (916) 673-2134
Edward.Caden@Cadenlaw.org

Attorneys for Plaintiff, Christopher Wadsworth, M.D.

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER S. WADSWORTH, M.D., <br><br> Plaintiff <br><br> vs. <br><br> JEFFREY BEARD; J. CLARK KELSO; TIMOTHY BELAVICH; EUREKA DAYE; ANDREW DEEMS; ERIC MONTHEI; CHERA VAN BURG; LAURA WHYTE; RACHEL CHEN; COURTNEY CORRADO; and DOES 1 through 50, inclusive. <br><br> Defendants. | **Case No. 3:15-cv-02322** <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> **VIOLATION OF FIRST, FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION (DUE PROCESS, FREE SPEECH); (42 U.S.C. § 1983, 1988); VIOLATION OF BANE ACT (CALIFORNIA CIVIL CODE § 52.1); RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY (BUSINESS AND PROFESSIONS CODE § 2056, HEALTH AND SAFETY CODE 1278.5, AND GOVT. CODE § 8547); WHISTLEBLOWER RETALIATION (LABOR CODE § 1102.5); FAILURE TO PERFORM MANDATORY DUTY; DENIAL OF FAIR HEARING AND DUE PROCESS; UNFAIR EMPLOYMENT PRACTICES; WRONGFUL DISCHARGE/ DEMOTION IN VIOLATION OF PUBLIC POLICY (LABOR CODE § 2856); VIOLATION OF FEHA (GOVT. CODE § 12940) & ADA; IMPROPER REJECTION OF PROBATION & BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; NEGLIGENT HIRING, SUPERVISION, AND RETENTION; DEFAMATION; TORTIOUS** |

)   **INTERFERENCE WITH CONTRACT;**
)   **CONSPIRACY TO TORTIOUSLY**
)   **INTERFERE WITH CONTRACT AND**
)   **CONTRACTUAL RELATIONS;**
)   **INTENTIONAL INTERFERENCE**
)   **WITH PROSPECTIVE ECONOMIC**
)   **ADVANTAGE; NEGLIGENT**
)   **INTERFERENCE WITH**
)   **PROSPECTIVE ECONOMIC**
)   **ADVANTAGE; INTENTIONAL**
)   **INFLICTION OF EMOTIONAL**
)   **DISTRESS; NEGLIGENT INFLICTION**
)   **OF EMOTIONAL DISTRESS; AND**
)   **WITNESS TAMPERING AND**
)   **INTIMIDATION.**
)
)
)
)

2

# I.  JURISDICTION AND VENUE

1.  **Jurisdiction.**  This Court has original subject matter jurisdiction over defendants and federal civil rights claims pursuant to 42 U.S.C. § 1983.

2.  28 U.S.C. § 1331 and § 1343(a)(3) gives the federal district courts jurisdiction over 42 U.S.C. § 1983 cases.

3.  **Supplemental Jurisdiction.**  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over state law claims which "*are so related . . . that they form part of the same case or controversy*" (§ 1367(a)).

4.  **Venue.**  Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because a "*substantial part of the events or omissions giving rise to*" Plaintiff's claims occurred within this district and because the individual defendants reside and the defendant agencies are based within this district.

5.  **Intradistrict Assignment.**  This lawsuit should be assigned to San Francisco Division of this Court because a "*substantial part of the events or omissions giving rise to*" Plaintiff's claims occurred within Marin County**.**

# NATURE OF ACTION

6.  This is a civil action under 42 U.S.C § 1983 seeking damages and injunctive relief against Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Constitution and laws of the United States, depriving Plaintiff of a vested property right by restricting Plaintiff's clinical privileges without affording due process or fair proceeding; retaliating against Plaintiff for his exercise of constitutionally protected speech; retaliation against Plaintiff contrary to public policy and for raising issues of public concern; and for refusing and/or neglecting to prevent such deprivations and denials to Plaintiff; and for refusing and/or neglecting to prevent retaliation against Plaintiff.

7. Several causes of action pursuant to California's State laws and statutes are implicated in this case, including, but not limited to, Government Code §§ 8547 *et seq.* ("California Whistleblower Protection Act"); Business and Professions Code § 2056; Business and Professions Code § 805, *et seq.*; Health and Safety Code § 1278.5; Labor Code § 1102.5; and Government Code § 19995 – 19995.5; tortious conduct under State law (Cal. Civil Code §§ 51.7, 52, and 3345 (intentional tort) and 43, 1709, 3333, and Government Code §§ 815.6 and 830 (negligence)).

8. Plaintiff, the then Chief Psychiatrist and Medical Director of San Quentin State Prison (SQSP), brings this action resulting from damages incurred when Defendants ignited a malicious, unlawful, and retaliatory campaign against Plaintiff for his raising and reporting concerns of imminent compromised patient and public safety; violation of Federal and State Constitutional rights; Federal court orders; Federal and State laws; Federal court oversight; Federal and State regulations; public endangerment; fraud; wasteful government spending; administrative and clinical incompetence; and misappropriation of valuable government property and taxpayer funds.

9. On or around March 2014, as SQSP's Chief Psychiatrist and Medical Director, Plaintiff reported his concerns to his superiors verbally, by email, and then authored a memorandum to express his grave concerns about SQSP's then Chief of Mental Health, Eric Monthei's proposed inpatient plan, entitled Non-Acute Mental Health (NAMH), which would deprive SQSP inmate-patients suffering from acute episodes of severe mental disorders of timely access to critically necessary inpatient treatment. Plaintiff reported that Defendant Monthei's proposed plan was dangerous to patient safety and a clinical and financial misallocation of limited health resources at SQSP, posed a danger to the public and SQSP staff, was not clinically motivated nor the product of a judicial mandate, court order, or directive of the Special Master; the plan violated the inmate-patients' constitutional rights, Federal judicial mandates/court orders, and was inconsistent with the mission of the Federal Receivership and Special Master's oversight regarding constitutional healthcare for inmates suffering from severe mental disorders at SQSP.

10. Plaintiff not only raised significant issues of public concern involving deprivation of inmate-patients' constitutional rights, public safety, and wasteful government spending, he raised concerns that were a proper discharge of his duties as a reasonable physician upholding his ethical pledge to patient care.

11. Defendants silenced Plaintiff's legitimate concerns and proceeded to establish Monthei's ill-advised NAMH plan. In part, the decision to ignore Plaintiff's reasonable medical concerns were based upon a completely false and improper characterization of Plaintiff's medical concerns as "*an effort to undermine the [Department's analysis and recommendation] and bring opposition to the Department's efforts to comply with the [Coleman court's] order*." This purposeful misconception that Plaintiff opposed court orders formed a crucial, yet flimsy foundation, upon which Defendants built a feeble frame of poorly constructed fiction to retaliate against Plaintiff during the ensuing 14 months. In contrast to Defendants' depictions, Dr. Wadsworth's March 23, 2014 memorandum was drafted in support of patient care. It should come as no surprise that a physician's reasonable advocacy for his patients' welfare which was aligned with the spirit of the court's order to ensure that inmate's medical needs not be ignored by those upon whom they depend.

12. At all times relevant to this Complaint, Plaintiff's actions and motivations were in support of patient care and court orders.

13. Defendant Monthei's plan was focused on a poorly designed, poorly developed inpatient plan that disregarded objective statistics and posed a substantial safety risk to the patients at San Quentin State Prison.

14. Plaintiff's March 23, 2014 memorandum was based on objective facts and data. During the four-month period following submission of Plaintiff's memorandum, dozens of patients who required acute inpatient psychiatric care at SQSP, based on Defendants' NAMH plan, were restricted from, or entirely deprived of, access to the inpatient beds within the $136 million SQSP healthcare facility recently opened in 2010, and paid for by the California taxpayers. Instead, those patients suffering from acute episodes of mental illness were held in

improper, temporary overflow cells where they would often wait for several days before a transportation team was available to deliver them to vacant beds within a proper treatment setting at distant institutions. These deprivations of timely access to inpatient care continue today.

15. Defendants' actions are inconsistent with well-established court orders and laws designed to remedy the ongoing constitutional inadequacy of California's prison healthcare. Numerous *Coleman* court orders and agreements limit the duration of a patient's confinement to overflow cells during acute episodes of severe mental illness. In addition, as the *Madrid* court recognized, "*[A] primary component of a minimally acceptable correctional health care system is the implementation of procedures to review the quality of medical care being provided.*" (*Madrid v. Gomez*, 889.F. Supp. 1146, 1258 (1995)).

16. Defendants retaliated against Plaintiff for his advocacy for proper patient care and public safety by depriving him of his fundamental rights of due process guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution and under article I, section 7(a) of the California Constitution, when his privileges to practice medicine in San Quentin State Prison's licensed inpatient facility was summarily suspended without peer review or a fair proceeding. Plaintiff's privileges remain suspended. The primary purpose of proper peer review is to protect the health and welfare of the patients by excluding professionals who provide substandard care. No substandard care by Plaintiff was ever cited by Defendants.

17. Another important purpose of peer review "*is to protect competent practitioners from being barred from practice for arbitrary or discriminatory reasons.*" (*Mileikowsky, M.D. v. West Hills Hospital* (2009) 45 Cal.4th 1259). If a physician's medical practice is intentionally crippled by unlawful, unjustifiable actions of a non-physician supervisor that circumvent constitutional protections of due process, then patients served by this supervisor are not receiving constitutionally adequate medical care. Defendants' disregard of Plaintiff's constitutional protections demonstrates that California's prison healthcare fails to offer "*a primary component of a minimally acceptable correctional health care system*" and ensures that the need for the costly expense of federal oversight will continue.

18.     Defendants' actions have wasted California taxpayer dollars spent to fund federal oversight of its prison healthcare at a cost that has greatly exceeded hundreds of millions of dollars.  Plaintiff raised concerns and reported that Monthei's plan would be inefficient and fiscally wasteful.  Ultimately, these concerns have come to fruition in the months following Plaintiff's memorandum.  Because the available acute, inpatient bed space was reduced by Monthei's plan, patients suffering from acute psychotic or suicidal symptoms of severe mental disorders are forced to wait, often for several days until a vacant hospital bed was identified at another state prison facility.  Until a vacant bed was identified, these acutely psychotic and/or suicidal patients waited in temporary holding cells that the *Coleman* court has repeatedly determined to be unsuitable for patients' acute inpatient hospitalization.  Each of these patients required additional staff members who were often paid overtime wages for their requisite, round-the-clock, 1:1 observation of these patients.  But for the ill-advised misallocation of San Quentin's inpatient treatment space, coverage by these additional staff and their overtime wages would not have been necessary.

19.     Patients suffering from acute episodes of severe mental disorders are often kept in these temporary overflow cells for prolonged periods, even when vacant inpatient treatment space is available at SQSP.  Monthei's NAMH plan deprives patients with the highest clinical acuity of available, urgently needed treatment resources at SQSP.  A state correctional healthcare system that disregards basic principles involving medical needs of patients is not compatible with constitutional adequacy.

20.     At the time of their transportation, many mentally ill patients suffering from acute episodes of mental disorder, as documented by licensed healthcare providers, represent a high risk of imminent dangerousness to themselves and to others.  Plaintiff advocated, to no avail, for these acutely psychotic, imminently suicidal and dangerous patients suffering from severe mental disorders to be placed into an inpatient setting where they could safely receive appropriate treatment, rather than on public roadways traveling hundreds of miles.  These prolonged journeys

on California roads and highways weren't only a threat to the health and safety of the patients, but unnecessarily endangered the safety of the staff and public.

21.    The transportation of suicidal and severely psychotic patients to facilities hundreds of miles away required an escort by multiple prison staff members in specially-equipped vehicles and caused a significant waste of government funds for travel, hotels for staff, overtime, wear and tear on government vehicles, and fuel costs.

22.    After Plaintiff reported his concerns, he was coerced by Defendants, under threat of immediate termination, into voluntary demotion out of his Chief Psychiatrist position.  He was subjected to relentless adverse employment actions of harassment and discrimination; abruptly stripped of his title as Medical Director; improperly rejected during the requisite probationary period as Chief Psychiatrist; experienced significant harm to his mental health that was proximately caused by Defendants' outrageous, intentional, and negligent actions; and suffered irreparable damage to his professional reputation by defamatory statements made by Defendants.

23.    Plaintiff was further retaliated against by Defendants for raising concerns about the adverse employment actions taken against him, the hostile work environment, harassment and disparate treatment to which he was subjected by his supervisors who repeatedly threatened to terminate him from the California Department of Corrections and Rehabilitation (CDCR) or transfer him to an institution "*in the middle of the desert*" if he communicated his concerns to anyone but them.  In addition to being stripped of his position as Medical Director, Plaintiff was effectively removed from all administrative and clinical responsibilities of the inpatient and condemned patient populations.  These adverse employment actions were clearly motivated to silence Plaintiff from reporting his concerns to the agencies, entities, and courts overseeing the California prison system, and to discredit his professional opinion by damaging his professional reputation.

24.    Plaintiff's memorandum cautioned about the grave dangers associated with placing suicidal patients within overflow cells *"which fall short of the requisite physical design of an acute, inpatient bedspace, during a time of critical clinical need."* On several occasions in 2014

and 2015, despite vacant/available inpatient beds, suicidal patients were, instead, placed within overflow cells with exposed electrical cords. In August 2014, a suicidal patient used these cords to attempt self-strangulation. His death was narrowly avoided when four officers emergently entered his cell to prevent him from committing suicide. Afterwards, Plaintiff implored Monthei and Deems that placing actively suicidal patients into an unsafe setting was an issue "*that need[ed] to be urgently addressed…In my opinion, these issues need immediate resolution…before we are dealing with an unacceptable patient-care outcome.*"

25. Much like his March 23, 2014 memorandum, Plaintiff's safety concerns were silenced by Monthei and Deems. Plaintiff was unlawfully removed from his position as Chief Psychiatrist two weeks after seeking resolution of a critically unsafe practice at San Quentin State Prison.

26. Sadly, in May 2015, Plaintiff's fears became an unfortunate, preventable reality. Although the on-call psychiatrist had ordered staff to place an acutely suicidal patient into available inpatient psychiatric bed, this imminently dangerous patient was instead, placed into an overflow room despite vacant, available inpatient beds. Similar to the near-death in August 2014, the overflow room contained exposed electrical wires and cords. The on-call report distributed to psychiatric staff summarized the unfortunate patient-care outcome that Dr. Wadsworth had feared: "*[Inmate-patient] was placed in Alt housing. He asphyxiated himself with a cord. Deceased.*" Predictable patient deaths are avoidable in a healthcare system that incorporates proper, lawful practices of peer review and in a system where its providers do not feel silenced and terrorized by Management's culture of retribution and terror.

27. In the paragraphs that follow, Plaintiff will highlight what concerns he reported; to whom he reported these reasonable medical opinions; and the relentless, prolonged campaign of retaliation, harassment, and trauma that he has endured since March 23, 2014.

//

//

## II.    PARTIES

**Plaintiff**

28.    Plaintiff, Christopher Wadsworth, MD, is a citizen of the United States, resident within Marin County, California, and was at all the times relevant to this Complaint, a psychiatrist with the CDCR, San Quentin State Prison ("SQSP").

29.    Dr. Wadsworth was hired as a Staff Psychiatrist at SQSP on September 1, 2011. Prior to employment with the CDCR he had completed medical school, internship in psychiatry, residency training in psychiatry, and fellowship training in the sub-specialty of forensic psychiatry.

30.    Dr. Wadsworth was, and remains dually board certified in psychiatry and forensic psychiatry. Dr. Wadsworth has authored numerous peer-reviewed articles and textbook chapters dealing with forensic psychiatry issues among prison populations and other forensic psychiatry issues, the most recent of which was published in July 2014.

31.    As a Staff Psychiatrist with CDCR, Dr. Wadsworth received outstanding ratings in probationary performance report in all qualification factors.

32.    Beginning on or about July 23, 2012, Dr. Wadsworth was assigned to assume duties of a Senior Psychiatrist, a supervisory position, at San Quentin State Prison.

33.    On or about October 25, 2012, Plaintiff was appointed to the position of Medical Director of SQSP's Correctional Treatment Center, a licensed inpatient health facility. Dr. Wadsworth's appointment to the position of Medical Director had been made by vote of the local governing body.

34.    On or about January 15, 2013, Dr. Wadsworth was assigned the responsibilities of the civil-service classification of Chief Psychiatrist, a management position.

35.    On August 23, 2013, after Dr. Wadsworth had assumed the responsibilities of the Chief Psychiatrist for over eight months, Defendant Andrew Deems, CEO of SQSP, specified, in his written endorsement of Plaintiff's capabilities as the executive leader of SQSP Psychiatry:

> *This is an executive-level position requiring clinical and administrative knowledge and experience that cannot be delegated or redirected to other staff. That nature of the*

*program-specific duties of this position can only be assigned to current staff with the skills and experience that Dr. Wadsworth has[,] as he has been involved in the planning or soon-to[-]be implemented program changes.* (Exhibit 1)

36.     On or about September 20, 2013, Dr. Wadsworth was officially promoted to the position of Chief Psychiatrist at San Quentin, a management position.

37.     As SQSP's Medical Director, Dr. Wadsworth reported directly to the local governing body, which was chaired by SQSP CEO Andrew Deems.  However, in his position as Chief Psychiatrist, Dr. Wadsworth's direct supervisor was Chief of Mental Health, Eric Monthei.

38.     On October 1, 2013, Deems presented Dr. Wadsworth with SQSP's Employee of the Month Award for outstanding performance, service and dedication.

39.     On December 19, 2013, Dr. Wadsworth was presented a plaque by the SQSP Mental Health Services Delivery System, recognizing him for demonstrating superior knowledge of the policies, procedures, rules, regulations and laws governing the provision of mental health services within a forensics setting.  This achievement was recognized by Eric Monthei, Chief of Mental Health.

**Defendants**

40.     Defendant JEFFREY A. BEARD (Beard) was the Secretary of the CDCR and was responsible for overseeing CDCR, California's correctional agency, and participated in the Federal oversight of California's prisons during all relevant times.  Defendant Beard is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on acts and omissions under color of state law.

41.     Defendant TIMOTHY BELAVICH (Belavich) was the statewide Deputy Director of Mental Health Services and the statewide Acting Director of the Division of Correctional Health Care Services within the CDCR during all relevant times.  Defendant Belavich is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on acts and omissions under color of state law.

42.     Defendant J. CLARK KELSO (Kelso) is the federal receiver ("Receiver"), appointed by Judge Thelton E. Henderson, United States District Court, Northern District of

California in case number C01-1351 TEH, *Plata v. Schwarzenegger*, dated January 23, 2008, who is responsible for the management of the California Correctional Health Care Services (CCHCS) agency whose headquarters is in Elk Grove, Sacramento County, California. The Northern District assigned the Receiver "*all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system.*" Thus, in short, the Receiver was the chief executive officer of the medical division of CDCR. Defendant Kelso is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on acts and omissions under color of federal law.

43. Defendant EUREKA DAYE (Daye) was, during all relevant times, the CEO for the Northern Region of CCHCS who, in part, provided supervisory oversight of the CEOs located at the individual institutions throughout the Northern Region, inclusive of San Quentin State Prison. Defendant Daye is sued here in her official capacity (for injunctive and declaratory relief) and in her individual capacity (for damages) based on acts and omissions under color of state law.

44. Defendant ANDREW DEEMS (Deems) was San Quentin State Prison's CEO within CCHCS and served as the hiring authority for physicians, including psychiatrists, at SQSP in Marin County, California at all relevant times. Deems additionally served as Defendant MONTHEI'S direct supervisor. Defendant Deems is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on acts and omissions under color of state law.

45. Defendant ERIC MONTHEI (Monthei), a psychologist, was the Chief of Mental Health at SQSP, providing administrative oversight for the Mental Health Department at SQSP at all relevant times. San Quentin's Chief Psychiatrist directly reports to Defendant MONTHEI. CEO Andrew Deems was Monthei's direct supervisor. Defendant Monthei is sued here in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on acts and omissions under color of state law.

46.     Defendant CHERA VAN BURG (Van Burg) upon information and belief, at all relevant times Van Berg was an employee of CDCR and was one of SQSP's Senior Psychologists.  In her role as Senior Psychologist, VAN BURG's direct supervisor was Defendant MONTHEI.  Defendant Van Burg is sued here in her official capacity (for injunctive and declaratory relief) and in her individual capacity (for damages) based on acts and omissions under color of state law.

47.     Defendant LAURA WHYTE (Whyte) upon information and belief, at all relevant times was an employee of CDCR was one of SQSP's Senior Social Workers.  In her role as a Senior Social Worker, WHYTE's direct supervisor was Defendant MONTHEI.  Defendant Whyte is sued here in her official capacity (for injunctive and declaratory relief) and in her individual capacity (for damages) based on acts and omissions under color of state law.

48.     Defendant RACHEL CHEN (Chen) upon information and belief, at all relevant times was an employee of CDCR, was one of SQSP's Senior Psychologists.  In her role as Senior Psychologist, CHEN's direct supervisor was Defendant MONTHEI.  Defendant Chen is sued here in her official capacity (for injunctive and declaratory relief) and in her individual capacity (for damages) based on acts and omissions under color of state law.

49.     Defendant COURTNEY CORRADO (Corrado) upon information and belief, at all relevant times was an employee of CDCR and was one of SQSP's Senior Psychologists.  In her role as Senior Psychologist, CORRADO's direct supervisor was Defendant MONTHEI.  Defendant Corrado is sued here in her official capacity (for injunctive and declaratory relief) and in her individual capacity (for damages) based on acts and omissions under color of state law.

50.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff will amend this complaint to allege true names and capacities when ascertained.  Plaintiff is informed and believes and thereupon alleges that each of the fictitious and named defendants is responsible in some manner for the occurrences here alleged, and that Plaintiff's injuries as he herein alleged were proximately caused by the acts of these defendants.  For convenience, each

reference to any of the named Defendants herein shall also refer to Does 1 through 50, inclusive, as well.

51.     Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, were and are the agents, employees, partners, joint venturers, co-conspirators, owners, principals and/or employers of the remaining Defendants, and at all times herein mentioned were and are acting within the course and scope of such agency, employment, partnership, conspiracy, ownership and/or joint venture. Plaintiff is further informed and believes, and based thereon, alleges that the acts and conduct herein alleged of each such Defendant were known to, authorized by and/or ratified by the other Defendants, and each of them.

52.     Each of the individually named defendants is sued here in their official capacity (for injunctive and declaratory relief) and in their individual capacity (for damages) based on acts and omissions under color of state law or under color of federal law, and was, at all times relevant to this lawsuit, employed by the State of California, the CDCR, or the CCHCS, and was obligated to take all steps necessary to ensure that the respective agency's mission was carried out in accordance with all applicable laws and regulations.

## III.     GENERAL ALLEGATIONS

53.     CDCR is a state agency, with its headquarters in Sacramento County.  CDCR operates prisons throughout the state, including SQSP, located in Marin County, California.  The CDCR was established by statute for the housing and treatment of persons sentenced to state prison pursuant to Penal Code §1170, et seq.  The Secretary of Corrections is empowered by Penal Code §5058 to establish rules and regulations for the operation of the CDCR, as well as to manage all adult prisons, juvenile facilities, and parole functions.  SQSP is operated by the CDCR and subject to all rules, regulations, policies, procedures and training provided by CDCR.

54.     CCHCS is an agency created by order of the United States District Court, Northern District of California, case number C01-1351 TEH, *Plata v. Schwarzenegger*, dated February 14, 2006, whose headquarters is in Elk Grove, Sacramento County, California.  CCHCS is overseen

by the federally appointed Receiver, the executive manager of medical care for all inmates confined to the CDCR, located throughout the state of California, including the SQSP.

55. Mental health services offered within California state prisons are the subject of a separate federal class action lawsuit (*Coleman v. Schwarzenegger*). The services overseen by *Coleman* include many of the duties and responsibilities of civil servant psychiatrists. The policies and procedures contained within the Mental Health Program Guide have been authorized by the *Coleman* court.

56. Although they remain separate cases, numerous, overlapping issues apply to *Coleman* and *Plata*. The presiding judges have agreed that the Receiver will assume responsibility for managing the remedial activity for these overlapping issues. Accordingly, the Receiver manages nursing, pharmacy, medical records, and information technology. In addition, the Receiver is responsible for oversight of the credentialing and privileging of all healthcare providers.

57. As a state agency and employer, CDCR is bound to comply with various federal and state laws governing the hiring, training, discipline, supervision and treatment of employees. Of the many statutes that effect CDCR's employment practices the following statutes, among others, are at issue in this case: California Government Code §§ 8547 et seq. ("California Whistleblower Protection Act"); Business and Professions Code § 2056; Business and Professions Code § 805 et seq.; Health and Safety Code § 1278.5; Labor Code § 1102.5 and Government Code §§ 19700-19706, 19170-19180, and 19995-19995.5. In addition, CDCR maintains rules promulgated under the Administrative Procedures Act (APA) and are published in Title 15, California Code of Regulations (CCR), Division 3, §§ 3000 – 3800.3, as well as a Department Operations Manual (DOM) Chapter 1 through 10, comprising some 860 pages.

58. CDCR staff are trained that they are prohibited from engaging in retaliation against an employee who reports actual or suspected misconduct. Such reporting is protected by Government Code § 8547.1. Supervisors and managers are specifically trained in how to handle such reports of actual or suspected misconduct, waste, fraud, abuse of authority, violation of law,

or threat to public health, and ensure that subordinates are free from fear or retaliation. Government Code §19995.4 requires all supervisors and managers to complete a mandated training program before completion of their probationary period.  (See also DOM Article 18-General Training, § 32010.6, Department Managers/Supervisors; § 32010.12 Probationary Employees; § 32010.14 Required Training Subjects; § 32010.1 4.3 Supervisor Training; § 32010.1 4.4 Managers; and § 32010.1 7.1 Second Line Supervisor Development).

59.     The required training instructs supervisors and managers, in pertinent part, on federal, state, and departmental rules and regulations prohibiting various forms of discrimination, harassment, and retaliation.  These trainings also instruct CDCR supervisors and managers about the proper, lawful administration of employee discipline.

## IV.     STATEMENT OF FACTS

### A.  BACKGROUND *Plata* Receivership and *Coleman* Special Master.

60.     The CDCR is charged with the safe housing and care of inmates who, by virtue of their conviction and sentencing, are wards of the state.  These inmates have a constitutional right to healthcare.

61.     The *Plata* and *Coleman* courts have determined that the CDCR has violated, and continues to violate, the Eighth Amendment rights of the inmate-patient population by providing constitutionally inadequate medical and mental health care.  For example, in January 2013, although the CDCR filed a motion to the U.S. District Court seeking to terminate the *Coleman* lawsuit, this motion was denied by Judge Karlton.

### *Plata* Receivership

62.     *Plata* v. *Brown* is a federal class action civil rights lawsuit which found that the inadequacy of CDCR's medical services violate the constitutional rights of California prisoners. The alleged deficiencies included untimely responses to medical emergencies; the interference of non-medical staff's provision of medical care; the failure to recruit and retain sufficient numbers of competent medical staff; disorganized and incomplete medical records; and a lack of quality control procedures, including lack of physician peer review.

63.     The *Plata* court found that "*repeated gross departures from even minimal standards of care resulted in a shocking number of deaths in the prisons and that peer review of CDCR physicians was either bogus or not done at all.*" (*Plata* Findings of Fact and Conclusions of Law, filed October 5, 2005, pp. 10-13, 16).

64.     In 2006, CDCR's Office of Legal Affairs General Counsel Bruce Slavin wrote, in a letter addressed to then-Receiver Robert Sillen, that implementing disciplinary measures against a civil servant physician without adhering to the California Civil Service Act would violate due process protections offered by the Fourteenth Amendment, as well as property rights afforded by the Fifth Amendment to the United States Constitution. (Exhibit 2).

65.     Mr. Slavin's letter reviewed the peer review protections guaranteed to healthcare providers. He emphasized that, "*in promulgating these statutory schemes, the United States Congress and the California Legislature provided healthcare practitioners with a constitutionally protected property interest in their medical privileges.*" (*Id.*, page 2).

66.     Mr. Slavin's letter also reported that in order "*to be consistent with the requirements of the Eighth Amendment, a prison healthcare system must have an effective peer review process.*" He noted that the Madrid court had previously held that, "*a primary component of a minimally acceptable correctional health care system is the implementation of procedures to review the quality of medical care being provided.*" (*Madrid v. Gomez*, 889.F. Supp. 1146, 1258 (1995)). (Exhibit 2, page 9).

67.     Mr. Slavin reassured Mr. Robert Sillen that the CDCR had created the Professional Practices Executive Committee (PPEC) to satisfy legal obligations of professional practice issues. In his 2006 analysis to Mr. Sillen, Mr. Slavin described that "*a physician must have a full evidentiary hearing before a peer review privileging action becomes final.*" (Exhibit 2, page 12).

68.     Mr. Slavin emphasized that civil servant physicians in the state of California "*have a protected property interest in their patient care privileges*" that is protected by the Fifth and Fourteenth Amendments of the United States Constitution. (*Id.*, page 14).

69.     On December 11, 1995, the *Coleman* court appointed a Special Master to oversee the remedial phase of the action. (Order Appointing a Special Master at 2).  The specific duties of the Special Master included working with defendants to develop a remedial plan to address the constitutional violations identified by the court, monitoring defendants' implementation of and compliance with the remedial plan, and submitting interim reports on the progress of the remedial plan and defendants' compliance.

70.     Plans were built around the Mental Health Services Delivery System ("MHSDS") set forth in the original Program Guides and the Revised Program Guide. The MHSDS is designed to provide mental health care to all inmates with current symptoms of serious mental disorders identified in the current Diagnostic and Statistical Manual, 22 inmates who need mental health treatment "*to protect life and/or treat significant disability/dysfunction*" resulting from a diagnosed or suspected mental disorder.

71.     In 1997, the court approved CDCR's Mental Health Program Guide (MHPG), which addressed constitutional inadequacies in mental health treatment programs by establishing services at different levels of care. The MHPG continues to provide the policies and procedures that govern delivery of these mental health services.  The latest revision of the MHPG was completed in 2009.

72.     Inadequate access to inpatient mental health care for inmates in the CDCR was one of the issues that set the stage for litigation in *Coleman v. Brown*.  (*Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995)).

73.     The *Coleman* court identified several significant deficiencies in the delivery of mental health care to California's inmates.  The court found delays in access to necessary mental health care "*at each level of the mental health care delivery system as it exist[ed] in the CDC[R]*," which "*result[ed] in exacerbation of illness and patient suffering*." (*Id.* at 1308-1309).

74.     The CDCR has had a track record of having difficulties making projections of its inpatient beds and mismanaging those that existed, leading experts in 2001 to label CDCR's

estimates as "*inadequate and often incomprehensible.*" (Special Master J. Michael Keating, Jr., 2001) Inadequate access to Mental Health Crisis Beds (MHCBs) and treatment space for thousands of inmates with serious mental disorders were identified as major issues that were to be addressed at every level of the mental health care delivery system within CDCR.

75.     The CDCR had previously addressed the problem by transporting patients who required acute inpatient hospitalization to an available hospital bed at other institutions, including civilian hospitals and facilities within the Department of State Hospitals. The Supplemental Bed Plan Report of August 2007 boasted that their projections would "*leave institutions with the ability to treat crisis patients locally as opposed to transporting a patient throughout the State to an available bed…allows for greater availability of MHCBs closer to patients. However, if transportation is required…MHCB units…allow for a decrease in transport distance to care, thereby increasing access to mental health services.*" Prior to 2014, CDCR had recognized the importance of providing locally available inpatient treatment facilities for patients suffering from acute episodes of severe mental illness. (CDCR Supplemental Bed Plan Report, August 2007).

76.     Significant progress was made during the ensuing decade, including the plans for the construction of acute inpatient psychiatric beds at San Quentin State Prison. In the recent past, the CDCR had projected that, to meet provide adequate treatment services, SQSP would have 32 total MHCBs comprised of 12 MHCBs in the Condemned Complex and 20 additional MHCBs in the Central Health Services Building (CHSB). However, when construction of the Condemned Inmate Complex was canceled, SQSP was left with only 17 beds for acute inpatient psychiatric needs. (CDCR Supplemental Bed Plan Report, August 2007, page 13 of 18, footnote).

77.     SQSP's Central Health Services Building (CHSB) is a 5-story healthcare unit that was opened in the fall of 2009. The CHSB has an inpatient unit on its 4th floor composed of 50 inpatient beds. Originally, all 50-beds were slated to be endorsed by California Department of Public Health (CDPH) (via California Code of Regulation, Title 22, Chapter 12), but staffing/financial needs of the 33 medical beds forced this primary-care/medical unit to operate as

an Outpatient Housing Unit (OHU).  The 17-bed unit has been licensed by CDPH since the building was opened in 2009.  (Exhibit 3a, page 1).

### MENTAL HEALTH CRISIS BED (HIGH-ACUITY)

78.     The CHSB's 17-bed unit was initially designed to serve the acute inpatient psychiatric needs of its patients, a level of care designated as "*Mental Health Crisis Bed*" (MHCB) within the statewide Mental Health Services Delivery System authorized by the *Coleman* court.  Admission criteria for MHCB placement includes acute impacts of serious mental disorders, such as: Grave Disability (GD), Dangerousness to Others (DTO), or Dangerousness to Self (DTS).  Hospitalization in a MHCB facility entails an average length-of-stay of 7 to 10 days.

### INTERMEDIATE CARE FACILITY (LOW-ACUITY)

79.     In contrast to the high-acuity, short-duration hospitalization implied by MHCB placement, patients who require longer-term, non-acute inpatient treatment, are referred to the Intermediate Care Facility (ICF) level of care.  Admission criteria for ICF placement includes inadequate functioning despite enhanced outpatient services and the need for highly structured treatment activities.   In contrast to MHCB placement, patients referred to ICF are not experiencing an acute psychiatric crisis with symptoms such as grave disability or imminent risks of harm to self or others.  ICF placement entails an average length-of-stay of several months.

80.     According to the MHSDS Program Guide, patients admitted to ICF programs undergo a multidisciplinary assessment: "*From this information an individualized treatment program is developed from a wide variety of treatment modalities including group and individual psychotherapy, medication management, depression and crisis management, training in daily living skills and interpersonal skills, substance abuse, management of assaultive behavior, supportive counseling, modification of maladaptive behaviors, and educational and vocational programs.*" (2009 MHSDS Program Guide, page 109).

## INPATIENT BEDS AT SAN QUENTIN STATE PRISON

81.     At all times relevant to this Complaint, Over 700 condemned (death row) inmates reside at SQSP.  In addition, at all times relevant to this Complaint, over 3,000 non-condemned inmates reside at SQSP.  Pursuant to Section 3600 (b)(4) of the California Penal Code, condemned inmates were unable to access low acuity inpatient treatment within an ICF.

82.     In February 2013, this lack of access was partially addressed when 10 beds in SQSP's OHU were designated to provide non-acute, inpatient mental health needs to the condemned row inmate population.  (Exhibit 3a, page 2).

83.     By the summer of 2013, these 10 OHU beds were filled to capacity.

84.     Amid concerns that the condemned inmates had a greater, low-acuity inpatient need than the 10 OHU beds could provide, plaintiffs' counsel in the *Coleman* case petitioned the U.S. District Court, Eastern District of California, for hearing on enforcement of the *Coleman* order.

85.     In October 2013, Dr. Wadsworth, as Chief Psychiatrist for SQSP, was tendered by the State as an expert witness regarding suicide rates on death row.  He also provided testimony as a fact witness before Judge Karlton, on behalf of the CDCR, the California CCHCS agency, and SQSP.


### *COLEMAN* COURT ORDER: DECEMBER 10, 2013

86.     Following the evidentiary hearing before Judge Karlton in October 2013, Defendants Deems and Monthei previewed the changes that were being discussed in the *Coleman* court.  In an email sent to Deems and copied to Plaintiff on December 6, 2013 at 9:56 am, Monthei stated that he had conducted telephone discussions with *Coleman* Plaintiffs' counsel Jane Kahn and Secretary of Corrections Jeffrey Beard.  He stated that the beds located on SQSP's 17-bed unit would be used as "*swing beds*," that would accommodate a mixture of high-acuity and low-acuity patient populations.

87.     On or about December 10, 2013, Judge Karlton issued an order requiring the Special Master to oversee a thorough assessment of the unmet, non-acute inpatient needs of SQSP's condemned inmates.

88.     On January 9, 2014 at 10:09 am, Katherine Tebrock, Chief Deputy General Counsel with CDCR's Office of Legal Affairs, reported that the Special Master anticipated his visit to SQSP on January 22, 2014 would begin "*the conversation on how to handle the Dec 10 order.*"

89.     During the month of January 2014, SQSP conducted an internal assessment to identify the number of condemned patients who qualified for placement into a low-acuity inpatient mental health program.  In a memorandum dated January 17, 2014, SQSP Senior Psychiatrist, Paul Burton, reported that 10 condemned patients met criteria for non-acute, inpatient mental health treatment.

90.     As of January 17, 2014, inclusive of the 10 condemned patients that were receiving treatment within the OHU, SQSP staff had identified 20 condemned inmates that required treatment in a non-acute, long-term mental health facility.

91.     By January 29, 2014, Dr. Wadsworth had assembled a Quality Improvement Team that would, over the course of the ensuing 8-9 months, establish and implement the creation of new processes, procedures, and strategies for the Psychiatric Inpatient Program.  The creation of novel policies for a novel program demanded sufficient time to create a meaningful, effective inpatient program.

92.     By February 2014, the *Coleman* Special Master, his panel of experts, plaintiffs' counsel, and CDCR had reached an agreement that SQSP's 50 beds in the CHSB would be licensed by the California Department of Public Health as a Correctional Treatment Center.  Forty of these inpatient beds would be dedicated for mental health inpatient care and the remaining 10 beds would be designated for inpatient primary-care/medical beds.

93.     In February 2014, it was determined, in a series of meetings conducted at SQSP and via teleconference, that these 40 mental health beds would eventually become the Psychiatric

Inpatient Program (PIP) and accreditation via the Joint Commission would be pursued. Once established in the fall of 2014, the PIP would increase the number of inpatient mental health beds from 27 to 40. (Exhibit 3, page 5).

94.     In February 2014, it was anticipated that the PIP would be formally established on or around October 2014. The existing projections at that time indicated that approximately half of the 40-bed PIP would be needed for low-acuity services similar to the ICF services offered within the Department of State Hospitals, while the remaining inpatient space would be used to meet the acute care needs of the institution. This projection was reasonably expected to meet all of SQSP's inpatient mental health needs for the then foreseeable future.

95.     Following the February 2014 meetings, the *Coleman* Special Master directed his panel of experts to oversee the clinical assessment of all condemned inmates at SQSP to better determine the number of patients who would need non-acute inpatient services, yet were not currently in an inpatient treatment setting. This on-site needs-assessment was scheduled to occur at SQSP over the course of several weeks, commencing in April 2014.

96.     Attorney Mohamedu Jones of the Special Master's Office noted in his email dated March 18, 2014 at 10:10 am that numerous parties would attend some portions of the assessment, including counsel for defendants, *Coleman* plaintiffs' counsel, CDCR Headquarters representatives, and the Special Master or his designee. Mr. Jones indicated that the on-site assessment would begin on April 8, 2014.

97.     As reviewed on February 24, 2014 in a presentation at SQSP, the establishment of the low-acuity inpatient program would require several months of preparation by SQSP's healthcare staff, including, but not limited to, creation/incorporation of substantial policy/procedure for this program; staff recruitment, hiring, and allocation; establishment of appropriate treatment services; multidisciplinary staff training; consultation/oversight by numerous agencies (e.g., California Department of Public Health, Joint Commission, State Fire Marshal, etc.); physical plant changes; etc.

98. The novel inpatient program would require the addition of substantial new staff from numerous disciplines in order to effectively establish the inpatient program envisioned by the *Coleman* court's December 10, 2013 order. A staffing package was distributed to Dr. Wadsworth on February 11, 2014. The recruitment and hiring of additional staff would take several months before sufficient staff had been assembled for the opening of the PIP.

99. These necessary steps to safely and properly establish a novel inpatient program at SQSP would take several months of careful, multidisciplinary collaboration to fully and meaningfully implement before the anticipated opening of the PIP in the Fall of 2014, the program established to comply with Judge Karlton's December 10, 2013, court order.

## NAMH: A MAKESHIFT, TEMPORARY PROGRAM

100. Defendant Monthei announced at/around the end of February 2014, that SQSP would place the 10 condemned patients (with low-acuity needs) identified in Dr. Burton's January 2014 memo within the 17-bed crisis unit that had historically been dedicated for high-acuity, inpatient mental health crisis care (i.e., MHCB).

101. On or around the end of February 2014, Monthei directed the SQSP Mental Health Management Team that he wanted those 10 beds filled prior to when the *Coleman* Special Master's assessment initiative was anticipated to begin in early April 2014.

102. Monthei's interim program was designated the Non Acute Mental Health (NAMH) Program. This interim plan was not ordered by the *Coleman* Special Master and was not the envisioned remedy to address Judge Karlton's December 10, 2013 order. In addition, this plan was insufficient to meet the Special Master's expectations that had been subsequently established during meetings at SQSP in January and February 2014.

103. On or around late February 2014, Monthei indicated that his primary motive to rapidly establish this NAMH program was so that when the *Coleman* Special Master's team arrived at SQSP on April 8, 2014, to conduct an assessment of the condemned row inmates, the 10 low-acuity patients identified in Dr. Burton's January 2014 memorandum would be in

inpatient beds, and thus excluded from the Special Master's planned assessment. By placing these 10 patients into an inpatient treatment setting, Monthei felt this would cast a favorable impression upon the *Coleman* monitors.

104.     On or around early March 2014, when Plaintiff learned of Monthei's NAMH program, as the licensed Correctional Treatment Center's (CTC) Medical Director and Chief Psychiatrist, Plaintiff was concerned that this plan would endanger patient safety because the plan would put these low-acuity patients into the inpatient treatment space that had been historically necessary for treatment of the remainder of the San Quentin prisoner population.

105.     As the Medical Director of the inpatient unit with responsibility for the overall medical care provided to these patients, Plaintiff had concerns that the NAMH would be clinically inappropriate, endanger patent safety, and unnecessarily deny critical patient care to the patients with the highest acuity medical need from timely access to urgently needed inpatient care.

106.     As the CTC's Medical Director, Plaintiff was familiar with patterns and composition of the population on the inpatient unit. During an 8-month span from January 2013 to August 2013, SQSP's CTC had an average daily population of 6.9 non-condemned inmates who had been housed at SQSP. This average of 6.9 non-condemned inmates did not include consideration of inmates who had been sent to SQSP from other institutions. (Exhibit 3c).

107.     Monthei's newly announced NAMH plan continued to expand throughout the month of March. Although Monthei initially indicated that only 10 beds would be utilized for this program, this number had, by mid-March 2014, risen to 13 beds. All of these beds would be taken from the existing 17-bed inpatient unit intended to provide acute crisis care.

108.     Upon learning, on March 18, 2014, that Monthei's plan had expanded to taking over 75% of the available inpatient beds for acute inpatient management at SQSP, Plaintiff emailed his concerns to Monthei,

> *We'll have more beds eventually, but I would strongly oppose the MHCB, at this juncture, being less than 6 beds...for the last month, I don't believe we've had less than 6 MHCB patients, and at times we've had as many as 10 on the CTC. To assign less than six, at this point, could be a real danger.*

109.     Until the week of March 17, 2014, SQSP's administration had offered Plaintiff only positive, reinforcing feedback regarding the performance of his job duties and responsibilities as Chief Psychiatrist.  However, by mid-March 2014, Monthei began to express his disapproval of Plaintiff, which mirrored Plaintiff's growing concerns about Monthei's NAMH plan.

110.     On March 18, 2014 at 1:16 pm, Monthei replied to Plaintiff's email from March 18, 2014, by instructing that all low-acuity condemned patients would be removed from their non-inpatient housing unit by April 8, 2014.  Of note, April 8, 2014 coincided with the date that the court-ordered, on-site assessment would begin.

111.     On March 18, 2014 several minutes after sending his 1:16 pm email, Monthei came to Plaintiff's office and asked, "*What's the problem?  We're filling those beds with all the non-acute guys before Coleman gets here!*"  Monthei, using a raised voice, said, "*If it's 11, we take 11 beds; if it's 15, we take 15 beds.  I don't care if it's 17…we'll take 17 fucking beds!  All of them.*"  Plaintiff tried to explain his rationale and concern to Monthei, but Monthei interjected, "*Wadsworth!  I'm done listening to this.  We're getting them all out of East Block before Coleman gets here [April 8th].*"

112.     On March 19, 2014, at approximately 3:45 pm, Plaintiff had a conversation with Deems to voice his professional concerns regarding patient safety and providing timely/appropriate mental health treatment that Monthei continued to ignore (for non-clinical reasons).  Given Monthei's opposition to hearing the rationale for Plaintiff's concerns regarding patient safety, Plaintiff sought the assistance and input of Deems, who had authority to intervene.

113.     Deems indicated that he shared Plaintiff's concerns and he encouraged Plaintiff to evaluate whether Plaintiff's opinion could be supported by any objective data, including statistics or figures.  Deems indicated that he would schedule a meeting with members of SQSP's healthcare leadership during the following week.

**RETALIATORY ACTIONS AGAINST PLAINTIFF BEGIN**

114.     After meeting with Deems on March 19, 2014, Plaintiff spent several days researching SQSP's recent and historical inpatient needs/trends and recognized that his growing concerns were supported by objective data that verified that Monthei's plan to eliminate 13 of San Quentin's 17 acute, inpatient beds would deprive high acuity patients of immediate access to medically-indicated inpatient care and be a drain on resources needed to transport and treat the patients at other facilities.  The data Plaintiff reviewed confirmed that Monthei's plan posed a substantial danger to patients, staff, and the public, which could also prolong the CDCR's ongoing effort to remedy constitutional violations, as the *Coleman* court had ordered.

115.     On the morning of Sunday, March 23, 2014, Plaintiff contacted Deems by telephone to review his analysis and conclusions regarding his research of the objective data to evaluate the impact of Monthei's proposed NAMH plan and whether it was safe clinically and its impact on SQSP personnel.  After a brief discussion, Deems authorized Plaintiff to prepare a memorandum that documented these findings.

116.     On March 23, 2014, at 10:16 a.m., Dr. Wadsworth notified Monthei by email of his concerns of the planned unsafe allocation of inpatient beds in Monthei's NAMH plan.  In his email, Dr. Wadsworth noted, consistent with his roles as Chief Psychiatrist and Medical Director, that he concluded that "*we will need to dedicate some number of beds for the acutely mentally ill… By definition, these needs are more acute, more unpredictable, and their consequences are dangerous*".  Dr. Wadsworth reported further:

> *Dr. Monthei, I hope you can appreciate the conflict I have in furnishing my opinion that may be at odds with previously discussed plans.  I have an unbiased responsibility as medical director to directly furnish this information to the CEO and was verbally directed to do so…I hope you understand how much objective work I have put into my job, my career, and (most recently) this particular project.  As I am expected to do in any professional role, I am furnishing my best clinical opinion to the best of my abilities.*

117.    On March 23, 2014 at 5:55 p.m., Plaintiff sent an email with a twelve page memorandum attached to Deems and to Monthei which analyzed Monthei's NAMH proposed plan and called into question the safety of Monthei's NAMH proposed plan.  (Exhibit 3b).

Plaintiff's email reported, in pertinent part, that:

> *My conclusion is that we will need to dedicate beds for the acutely mentally ill and that, without this dedication, we will have knowingly put ourselves into a clinically irresponsible position that will invite even more firestorm. But more importantly, it would set the stage for unacceptable patient care of the acutely mentally ill. By definition, these needs are more acute, more unpredictable, and their consequences are more dangerous.*

Plaintiff's memorandum also reported, in pertinent part, that:

> *with reasonable medical certainty that, as a physician, as Medical Director of the San Quentin Correctional Treatment Center, and as San Quentin Chief Psychiatrist, that it would be a clinical error of resource allocation/distribution to dedicate fewer than 9 beds (of our existing 17-bed unit) to the acute-care, inpatient needs (e.g., MHCB) of the patients at San Quentin State Prison. My suggestion is to dedicate 10 inpatient beds for acute-care, MHCB patients.*

Plaintiff's memorandum further reported that Monthei's NAMH plan would be consistent with 8th Amendment violations regarding the mental healthcare needs of SQSP's patient population and that it would not satisfy the court's order in *Coleman*.  Plaintiff reported: "*In my opinion, those who are responsible for appropriately allocating available resources based upon a reasonable assessment of the needs are the very prison officials who could be implicated if those healthcare needs are knowingly diverted from an existing/identified need.*"

118.    Plaintiff raised concerns in the memorandum that Monthei's NAMH plan "*would be clinically irresponsible and result in the following unavoidable consequences*":

> a) placement of acutely suicidal inmates within Alternative Housing holding cells, which fall short of the requisite physical design of an acute, inpatient bedspace, during a time of critical clinical need;

> b) disruption of the flow of outpatient resources for activities on the 2nd and 3rd floor of the CHSB;

> c) presence of a 1:1 clinical observation until transportation is available;

d) arrangement of a transport team to deliver the patient to the receiving institution;

e) compromise the standard operation of multiple members of a multidisciplinary staff; and

f) redirection OHU nurses to provide services for patients in Alternative Housing.

119. On March 23, 2014, at 6:16 p.m., twenty minutes after Plaintiff transmitted the memorandum to Deems and Monthei, Plaintiff was copied on an email sent by Monthei to members of CDCR Headquarters' management, which stated, in part:

> *Please be advised, the opinions proffered by Dr. Wadsworth, below and attached do not represent my opinion nor the opinion of the mental health services delivery system administration at San Quentin State Prison…He has been provided explicit direction to the contrary that is consistent with our previously outlined discussions and his compliance is expected.  As the aforementioned is likely to become a subject matter of future discovery motion; I will work more closely with Dr. Wadsworth on understanding the commitments of CDCR beyond [San Quentin State Prison]…*

120. Twenty-five minutes later, on March 23, 2014, at 6:41 p.m., Plaintiff, alarmed by Monthei's response, spoke with Deems by telephone about Monthei's email to Headquarters. Deems reassured Plaintiff, "*Everything will be okay.*"

121. On Monday morning, March 24, 2014, Dr. Wadsworth reported to SQSP before 7:00 a.m. to begin his daily work.  Just after 7:00 a.m., Monthei entered Plaintiff's office. Monthei closed Plaintiff's office door and, as Monthei's face reddened and his lips quivered, he told Plaintiff, "*You need to get the fuck out of [San Quentin State Prison].  You're done here!*" He explained that Plaintiff's report that called into question Monthei's interim plan as being a danger to patient safety was outside of "*the chain of command.*"  Monthei told Plaintiff that he had explicitly warned Plaintiff, "*The state chose a direction; I told you to shut up about this issue and that we'd fill the CTC with all of the non-acute patients!*"  Monthei threatened Plaintiff that Plaintiff would "*never step foot*" on an inpatient unit in the CDCR ever again.  He told Plaintiff that, even if Plaintiff was able to avoid termination with the CDCR, Plaintiff would work "*in the*

*middle of the fucking desert!*" Monthei then instructed Plaintiff in a raised tone of voice to gather a few of his belongings and "*get the fuck out!*" of SQSP.

122.     On March 24, 2014 at 7:08 a.m., Plaintiff sent an email to Belavich and Diana Toche, members of CDCR Headquarters Executive Management staff who received Monthei's email the night before, which stated the following:

> *I have spent approximately 25 to 30 hours this weekend conducting a treatment setting needs assessment… I offered my opinion about the management of beds in the unit where I am medical director. In the process, I develop critical conclusions which suggest the direction that would be simultaneously in our patients' best clinical interest and legally protective for the CDCR…I feel stuck: I have valuable, new information that needs consideration. I fear that this valuable information will be disregarded as subordinate. I am doing my job, fulfilling responsibility. To have this information and do nothing would be worse. Can you help me understand the way that I can avoid a misappraisal of the information's meaning? Again, our patients' clinical care and legally solid ground is at stake.*

123.     Before leaving SQSP on the morning of March 24, 2014 at the direction of Eric Monthei, Dr. Wadsworth had a brief meeting with CDCR psychiatrist, Dr. Hanlin, who was beginning his first day of employment at SQSP.

124.     In the meantime, Plaintiff's recent email to Belavich and Toche was apparently forwarded to Monthei by one of its recipients, and Monthei returned to Plaintiff's office just moments after Plaintiff had sent the email and interrupted the private meeting between Plaintiff and Dr. Hanlin.

125.     After Plaintiff abruptly excused Dr. Hanlin from his office and Dr. Hanlin exited Plaintiff's office, Monthei asked Dr. Wadsworth in an angry, loud and threatening manner, "*What the fuck don't you understand about a fucking chain of command?!*" Monthei repeated that phrase three times, each time in an angrier and more threatening manner.

126.     Plaintiff felt physically threatened by Monthei's disproportionate response to Plaintiff's memorandum, including Monthei's tone, use of expletives, door-slamming, and hostility.

127.     Monthei concluded this aggressive interaction by instructing Dr. Wadsworth to stop all communications with anyone, about anything. Monthei advised that if Dr. Wadsworth

wanted to communicate with anyone, Dr. Wadsworth's communication would need to be first sent to Monthei.

128.    On March 24, 2014, at 8:50 a.m., Monthei memorialized this verbal direction in an email sent to Plaintiff, and stated, "*Please direct any and all communication moving forward to my attention alone.*"

129.    Plaintiff then packed his belongings and left SQSP at approximately 9:00 am to return home because he was gravely concerned and believed that if he did not follow Monthei's instruction to leave SQSP, Monthei had the power and influence to cause Plaintiff's termination from his employment with CDCR without any further notice.

### COERCION & "VOLUNTARY" DEMOTION

130.    The following day, March 25, 2014, at 1:32 p.m., Plaintiff received a telephone call from Eric Monthei from Monthei's mobile phone. The call lasted 21 minutes. Monthei explained, at great length, that he had convinced headquarters not to terminate Plaintiff. Monthei indicated that "*everyone in headquarters*" wanted to see "*Wadsworth's head roll*". He specified that "*everyone*" included Belavich, Diana Toche, and Beard. Monthei then advised that, although Plaintiff could remain employed in the CDCR, Plaintiff would not be able to return as SQSP's Chief Psychiatrist. Monthei advised Plaintiff that, to remain employed with CDCR, Plaintiff had to immediately submit a request for voluntary demotion. Monthei described an open position in CDCR as a Senior Telepsychiatrist and recommended that Plaintiff take that position.

131.    During this 21-minute phone call, Monthei repeatedly emphasized that Plaintiff only had one hour to make a final decision about this offer. Monthei instructed Plaintiff that if Plaintiff took longer than one hour to make a final decision, Plaintiff would be terminated. Monthei instructed Plaintiff to submit a memo indicating that Plaintiff was requesting a voluntary demotion. Monthei urged Plaintiff to act quickly and complimented Plaintiff on his clinical and administrative abilities and emphasized the good fit for the Senior Telepsychiatrist position.

Before ending the telephone call, Monthei repeated again that Plaintiff would need to submit the memorandum within the hour.

132.    Plaintiff felt threatened by Monthei and felt he was being harassed and coerced into an involuntary demotion as retaliation for writing his March 23, 2014, memorandum expressing his concerns and advocacy for patient safety and his other protected whistleblowing on matters of public concern, including government waste and inefficiency; misallocation of valuable government property; and violations of multiple laws, regulations, and court orders.

133.    Plaintiff was stunned by Monthei's assertion that high-ranking officials within the CDCR (e.g., Beard) were demanding Plaintiff's immediate termination from state service. Plaintiff suspected that Monthei was embellishing involvement of high-ranking CDCR officials. However, Plaintiff had received prior emails from Monthei, which documented Monthei's communication with Beard, so it didn't seem too far-fetched to believe Monthei's statements. Although Plaintiff suspected Monthei was trying to compel Plaintiff's demotion, Plaintiff felt that he had little choice but to consent to Monthei's coercion in order to remain employed within the CDCR.

134.    Plaintiff then called Dr. Kaftarian by telephone, who oversaw Telepsychiatry. Dr. Kaftarian told Plaintiff that he was surprised that Monthei had offered a senior position in Telepsychiatry which had not been posted formally within CDCR. Within CDCR there is a strict posting, interview, and application process required for open positions. Dr. Kaftarian reported, although he felt that Plaintiff would qualify for the position, that the requisite hiring steps were not completed, so it was unlikely that Monthei's promise was legitimate. Dr. Kaftarian advised Wadsworth to carefully consider the consequences of issuing a memorandum that stated he was voluntarily requesting a demotion. Dr. Kaftarian said "*Chris, you have options. It is not as dire as it is being presented.*"

135.    On March 25, 2014, at 4:27 p.m., nearly three hours after being instructed by Monthei to submit a memorandum requesting a demotion, Plaintiff received another telephone call from Monthei.

136.    During this call, Monthei continued to pressure and coerce Plaintiff to submit a memorandum requesting a voluntary demotion. Monthei maintained that "*everyone*" at CDCR headquarters was now waiting for Plaintiff's memo requesting a voluntary demotion. Monthei threatened, that if Plaintiff did not submit a memorandum requesting the voluntary demotion within the hour, Plaintiff would be terminated.

137.    On March 25, 2014 at 5:17 p.m., Plaintiff sent Monthei an email identifying Plaintiff's request to voluntarily demote "*in lieu of termination*."

138.    On March 25, 2014 at 5:18 p.m., following receipt of Plaintiff's email, Monthei called Plaintiff by phone. Monthei told Plaintiff that he was unable to accept Plaintiff's email and that Plaintiff would need to delete the clause "*in lieu of termination*." Monthei instructed Plaintiff that Plaintiff would need to generate a "*simple*" memorandum that stated Dr. Wadsworth was requesting to voluntarily demote.

139.    Plaintiff told Monthei that he would need to carefully consider the implications of documenting a "voluntary" request, as this was not objectively true. Plaintiff told Monthei that the position of Chief Psychiatrist at SQSP had been his dream job and that leaving the position at this point would be involuntary.

140.    Monthei told Plaintiff that he was risking his entire career in CDCR, and advised Plaintiff to fully consider what was at stake.

141.    On March 25, 2014, at 5:35 p.m., Dr. Wadsworth received an email asking him to call Monthei's office. When Plaintiff contacted Monthei, Monthei continued to apply pressure, in an attempt to coerce Plaintiff to issue the demotion memo and repeated his assertion that this was Plaintiff's last chance to preserve his employment. Plaintiff advised Monthei that he would not be able to compose such a memorandum.

**INITIAL RETALIATION BY BELAVICH**

142.    On March 25, 2014, a few minutes after concluding his telephone call with Monthei, Belavich asked Plaintiff to call Belavich by telephone. At that time, Belavich was the

Statewide Director of Mental Health for the CDCR and, as such, was in a managerial position and senior in rank to Monthei. Belavich, who was in Colorado on March 25, 2014, noted that Plaintiff's memorandum had generated anxiety at Headquarters, and that the timing had been strategically poor.

143.    Belavich stated that he believed that Plaintiff's future within the CDCR would be bright and that he was very motivated to put Plaintiff into another management position. Belavich suggested that Plaintiff take the highest-ranking position that was being made available by Monthei, i.e., the Senior Psychiatrist position within CDCR's Telepsychiatry Department.

144.    Belavich discussed the impact of Plaintiff's March 23, 2014, memorandum, and indicated that the most damaging impact was that it had been sent electronically to Headquarters. Belavich indicated that the *Coleman* plaintiffs' counsel had immediate access to items electronically sent from the 34 CDCR institutions to Headquarters.

145.    Plaintiff indicated that the "*poor timing*" reflected the clinical impropriety of an expanding inpatient program that would underserve the mental health needs of the inmate-patient population at SQSP.  Plaintiff reiterated to Belavich that the NAMH program fell short of the *Coleman* Special Master's team to address the December 10, 2013, court order.  Plaintiff informed Belavich that Plaintiff's March 23, 2014 memorandum was his response to Monthei's plan to eliminate more acute inpatient beds as part of the expanding NAMH plan.  Plaintiff emphasized that he had reported the results of his objective findings and concerns for patient safety to Deems and Monthei.

146.    Plaintiff informed Belavich that Monthei's administrative decisions disregarded well-established needs of acute psychiatric inpatients and the dangers that deprivation of timely access to inpatient care would entail.  Plaintiff explained to Belavich that the March 23, 2014 memorandum reflected Plaintiff's obligation as a physician and Medical Director.  Plaintiff repeated to Belavich what Plaintiff wrote in his earlier email: *"to have access to this information and do nothing would be far worse than any slight that was generated by my memo dated March 23."*

147.     Belavich told Plaintiff that he would not interfere with the "*personnel decisions made by local administration*" and that he had to place faith in the decisions made by San Quentin's administration.   Plaintiff responded by informing Belavich that Monthei had told him that the decision to remove Plaintiff from the position of Chief Psychiatrist had been generated by Headquarters' officials, including Beard.  Plaintiff told Belavich that it felt like he was being punished for offering a clinical opinion that conflicted with Monthei's attempts to impress the stakeholders visiting San Quentin in April and May 2014.

148.     Belavich reiterated that local SQSP administrators had removed Plaintiff from the position as Chief Psychiatrist.  Belavich indicated that he was not in a position to second-guess their judgment, "*even if it was illegal or improper*".  Belavich added that he was familiar with Monthei and his management style and that Monthei had a pattern of compelling psychiatrists to leave SQSP.  Belavich recommended that Plaintiff accept the demotion and accept the most senior position available.  He told Plaintiff, based on Monthei's history, that resisting him would be futile and could potentially harm Plaintiff's career.

**MARCH 26, 2014 MEETING WITH DEEMS**

149.     On March 26, 2014, Plaintiff returned to work at San Quentin after being ordered to leave by Monthei on the morning of March 24, 2014.  Plaintiff went to Deems' office to seek his advice/input.  Plaintiff directly asked Deems, "*Do you think I am the right person for the job of Chief Psychiatrist at San Quentin*?"

150.     Plaintiff was completely caught off guard when Deems told him that he did not think Plaintiff was the right person for the job.  Deems indicated that, in the last two days "*more than one person*" had cemented his newly announced appraisal.  Deems told Plaintiff that his sources had been Monthei and Chief Support Executive Chad Hickerson.

151.     In his role as Chief Support Executive, Chad Hickerson reported directly to Deems.  In his role as Program Director of the Psychiatric Inpatient Program, Hickerson reported directly to Monthei

152.    Deems stated: "*Listen, I'm probably telling you too much, as it is, but Chris, I promise you, it's only related to the role of Chief Psychiatrist and only at San Quentin. It's not some type of thing that would follow you around or give you concerns about your performance in any other position.*"

153.    Deems said he was not concerned with Plaintiff's role as a psychiatrist, that he would fully support Plaintiff in another position as psychiatrist within the CDCR, even as Chief at another institution, or as a staff or Senior Psychiatrist at San Quentin.  Deems concluded by advising, "*Listen Chris, take whatever it is [i.e., accept the demotion] they're offering you. Just take it. I'm telling you, take it. But don't force my hand to make me wait until tomorrow like you did yesterday, because I will terminate you. This afternoon. I will. Don't force my hand. I'll have no choice and I will terminate you.*"

154.    When Plaintiff asked Deems if his newly articulated doubts about Plaintiff's performance as Chief Psychiatrist had to do with the memo he had produced on March 23, 2014, Deems replied, "*You should be well versed in the unique politics of CDCR, particularly at San Quentin.*"  Deems said that "*your memo had caused everyone to panic at headquarters and that, with the upcoming Coleman visit, I can't afford to have a Chief Psychiatrist (Dr. Wadsworth) say some of those things.*" Plaintiff reminded Deems that the memo was intended to serve as an opinion about the responsible use of bed space for the inmate population and proper patient care. Deems replied by admitting that the contents of the memo could possibly get San Quentin into a lot of trouble, particularly with the upcoming presence of the *Coleman* Plaintiffs' counsel and the *Coleman* Special Master and experts.

155.    Plaintiff immediately left Deems' office and verbally summarized this meeting in a conversation he had with SQSP's Chief Physician & Surgeon, Lisa Pratt, M.D.

156.    On March 26, 2014, at 2:01 p.m., acting out of fear for his job, Plaintiff generated an email to Monthei and Deems which requested a "voluntary demotion" Plaintiff stated: "*…I believe the wording appropriately captured what we've discussed and removes the 'in lieu of' clause.*"

157. On March 26, 2014, at approximately 2:10 p.m., Monthei sent an email to Belavich and Deems requesting that they "*consider approving his unsolicited voluntary demotion from Chief Psychiatrist. . .*"

158. On March 27, 2014, Monthei drafted a memo directed to the SQSP Mental Health Services Delivery staff, Subject: Dr. Wadsworth, Chief Psychiatrist. The memo stated: "*...Dr. Wadsworth has agreed to assist with various special projects...During this period, I would request that you allow Dr. Wadsworth the time necessary to focus on the aforementioned special projects...*"

159. Prior to Monthei's March 27, 2014 memorandum that alludes to "*special projects*" Plaintiff was never made aware of being assigned to any special project within CDCR.

160. On Thursday, March 27, 2014, Dr. Wadsworth sent a message to San Quentin's healthcare staff, expressing his gratitude for staff that he had held in high regard. Following transmission of this email numerous correctional and healthcare staff expressed their high regard for his leadership and skill in a series of email replies.

**DENIAL OF "VOLUNTARY" DEMOTION**

161. On Wednesday, April 2, 2014, at approximately 2:50 p.m., Monthei met with Plaintiff to provide him a memorandum, dated April 2, 2014, signed by Deems denying Plaintiff's request to voluntarily demote from Chief Psychiatrist to Senior Psychiatrist.

162. During this meeting, Dr. Wadsworth asked if Monthei or Deems had devised a specific plan or strategy on how to handle his presence with *Coleman* and all associated visitors over the ensuing weeks since he had acted as a witness previously on behalf of SQSP. Plaintiff was concerned that San Quentin's administration would move him to another facility to ensure that he would not speak to the *Coleman* monitors or *Coleman* plaintiffs' counsel. Monthei shrugged his shoulders and recommended that Plaintiff to use his leave-time to limit the possibility that Dr. Wadsworth would be placed in a situation of having to truthfully answer questions regarding the memo of March 23, 2014.

163.    During this meeting, Monthei told Plaintiff, "*We are where we are today because you decided that you wanted to have a disagreement and then broadcast that disagreement for everyone to see*." Monthei stated that, in the week preceding March 23, 2014: "*[Monthei] told [Plaintiff] in every way that I possibly could: if you disagree with the position of the state, then give responsibility to [Monthei], put everything [i.e., all blameworthy actions] in [Monthei's] lap.*" Dr. Wadsworth explained that he is unable to transfer the responsibilities as Medical Director to Monthei, who is not a licensed physician, a necessary legal requirement for that position.

164.    Monthei then said that he had given Dr. Wadsworth ample warning that furnishing a report that was contrary to the "*State's opinion*" would be the equivalent of "*digging* [Dr. Wadsworth's] *own grave*." This last comment left Dr. Wadsworth feeling fearful and physically threatened by Monthei.

### ACTS OF RETALIATION

#### *SUMMARY SUSPENSION*

165.    Plaintiff's medical treatment privileges and responsibilities were drastically changed following his distribution of his medical opinion in the March 23, 2014 memorandum to Monthei and Deems.

166.    Monthei's threat, delivered on the morning of March 24, 2014, that Plaintiff would "*never step foot*" on an inpatient unit came to fruition and resulted in Plaintiff's immediate removal from all clinical and administrative activity on San Quentin's licensed inpatient health facility, i.e., a summary suspension of Plaintiff's clinical privileges.

167.    Upon information and belief, Monthei's restriction of Plaintiff's clinical privileges was not approved by the Local Governing Body (LGB) or by the statewide Professional Practices Executive Committee (PPEC) at CDCR Headquarters. Monthei's actions are inconsistent with CDCR General Counsel Bruce Slavin's letter, authored on August 9, 2006, in which he noted that a physician's privilege to practice medicine is protected by state and federal legislation. Mr.

Slavin asserted that "*to be consistent with the requirements of the Eighth Amendment, a prison healthcare system must have an effective peer review process*."  (Exhibit 2, page 9).

168.    Upon information and belief, Monthei and Deems have never referred the summary suspension of Dr. Wadsworth's clinical privileges to the Governing Body or to the CCHCS Professional Practices Evaluation Committee (PPEC), the peer review body for CCHCS and CDCR, as required by law and CCHCS procedures.  Plaintiff was informed by SQSP's Chief Medical Executive, a physician, and therefore alleges that the Local Governing Body conducted a meeting on March 28, 2014, and did not involve any discussion of Plaintiff's clinical privileges to practice medicine on SQSP's licensed inpatient unit.

169.    Monthei's decision to, without clinical rationale, restrict Plaintiff's medical privileges, of which Deems, Belavich, and Daye were at all times aware, is incompatible with constitutionally adequate healthcare.  Monthei's actions, of which Deems, Belavich, and Daye were at all times aware, violated the protections afforded to Plaintiff by the Fifth and Fourteenth Amendments of the United States Constitution and Business and Professions Code 805 *et seq.*  Monthei's restriction on Plaintiff's clinical privileges were done without fair proceeding, peer review, or due process.  (Exhibit 2, page 14).

170.    The Receiver's office provided training on February 18, 2015 for institutional healthcare leadership about the process of peer review.  The presentation, prompted by "*real situations*" outlined example scenarios to illustrate improper supervisory action taken upon a physician's clinical privileges.  The presented examples were far less extreme and outrageous than the impropriety of Defendants' actions against Plaintiff.  This training appears to have occurred far too late to protect Plaintiff or the patients who were denied his medical care. (Exhibit 4b, page 5)

171.    The presentation provided by the Receiver's office on February 18, 2015 included a contact email address for bringing peer-review related concerns to the attention of Headquarters staff.  Although Plaintiff sent two messages about peer-review concerns to this email address, he did not receive a response or reply.  (Exhibit 4b).

172.    Upon information and belief, even though Plaintiff's clinical privileges have been restricted for more than 15 days, Monthei and Deems have never prepared a report to the Medical Board of California (MBC), as required by Business and Professions Code § 805 *et seq*.

**ONGOING ACTS OF RETALIATORY TREATMENT DIRECTED AT PLAINTIFF**

*Removal from Necessary Email Distribution Lists*

173.    Beginning on March 23, 2014, Monthei has consistently addressed Plaintiff in a hostile, disparaging, outrageous manner.

174.    On the morning of March 24, 2014, Monthei announced that Plaintiff would "*never step foot*" on an inpatient unit.  Plaintiff was effectively stripped of his title as Medical Director and was barred from all activity on the inpatient unit.

175.    As background, prior to Dr. Wadsworth, SQSP's Chief Psychiatrist had been Gregory Tarasoff, M.D.  Monthei affirmed, according to the Grievance Decision authored by the Office of Labor Relations on September 4, 2014, that the Chief Psychiatrist position was, during the seven months spanning January to August 2013, "*a position that was actively filled by Dr. Tarasoff.*"

176.    As background, on January 4, 2013 at 1:28 pm, Plaintiff had previously received instruction from Monthei to exclude San Quentin's existing chief psychiatrist from email distribution lists that provide crucial information about health operations.  At that time, Monthei wrote, in part, "*Effective immediately: To assist Dr. Tarasoff in filtering e-mail communication and stay on task, please remove Dr. Tarasoff from any and all SQ MHSDS distribution lists until further notice.*"

177.    Furthermore, for six weeks after stripping Plaintiff of his privilege to practice medicine on San Quentin's inpatient unit on the morning of March 24, 2014, Dr. Wadsworth was removed from departmental email distribution list.

178.    Upon information and belief, neither Deems, Belavich, nor Daye appropriately intervened after repeated requests by Plaintiff to be included in these important emails.  These

repeated notifications of Plaintiff's exclusion from necessary distribution lists were issued to Daye (on April 6th, April 16th, and April 21st, 2014), to Belavich (via two emails sent on April 21, 2014) to Monthei (on April 23rd, April 30th, May 9th, and May 13th, 2014), and to Deems (on April 25th, May 9th, and May 14th, 2014).

179.     On May 14, 2014, during a Subcommittee meeting, Plaintiff asked about reintegration into department-wide email distributions that contained crucial information. Plaintiff would later learn that Monthei had ordered his subordinate staff to remove Plaintiff from all email distribution lists.

180.     Following the Subcommittee meeting, Plaintiff sent three additional emails to Monthei, Deems, and Burton requesting reintegration to these email distributions.

181.     Plaintiff's emails remained unanswered/unaddressed for several weeks.

182.     On May 16, 2014 at 11:50 am, Monthei sent an email to his directly subordinate staff instructing them to reintegrate Dr. Wadsworth "*to any distribution lists necessary.*"

183.     Plaintiff challenged the unlawful, retaliatory restrictions upon Plaintiff's access to necessary information that was necessary to fulfill his responsibilities as Chief Psychiatrist and the provision of proper healthcare to the patients at San Quentin State Prison.

***Portable Electronic Devices***

184.     In an email sent by Monthei on April 16, 2014 at 7:37 am, Plaintiff was ordered to return all state-issued equipment, including his assigned laptop and state-issued cell phone. Plaintiff requested that he be allowed to keep his assigned laptop and cell phone to facilitate his patient care responsibilities and 24/7 availability to staff as a supervising physician.  Amazingly, Monthei denied Plaintiff's requests.

185.     During the months following distribution of Plaintiff's memorandum of March 23, 2014, Monthei and Deems were either non-communicative with Plaintiff or they were abrasive and discourteous in their communications with him regarding work-related matters such that it

impacted both Plaintiff's ability to perform his job as a physician and psychiatrist, to the detriment of both patient care and the supervision of San Quentin's psychiatrists.

### Reassignment to "special projects"

186. Beginning on or about March 27, 2014, Monthei reassigned Plaintiff to something Monthei referred to as "*special projects*."

187. "*Special projects*" was a newly created responsibility and/or assignment, yet Plaintiff was never provided with any meaningful guidance by Monthei or Deems on what "*special projects*" entailed and what job duties the projects entailed.

188. The duration of Plaintiff's "special project" would last from March 27, 2014 to May 16, 2014. Of note, this time period coincided with the timeline of the on-site assessment that had been arranged by the Special Master to comply with the *Coleman* court's December 10, 2013 order.

189. The restrictions upon Dr. Wadsworth's clinical practice imposed by Monthei on the morning of March 24, 2014, effectively excluded Dr. Wadsworth from any activities that would overlap with the on-site presence of stakeholders in the *Coleman* litigation, including counsel for defendants, *Coleman* plaintiffs' counsel, CDCR Headquarters representatives, and the Special Master or his designee. Their on-site presence at SQSP would focus on inpatient clinical services provided to condemned inmates. Monthei's orders restricted Plaintiff from any involvement with condemned inmates and inpatient services.

190. During this two-month period, Monthei, Belavich, and Deems threatened Plaintiff on numerous occasions, with immediate, temporary and/or permanent redirection to the Correctional Health Care Facility (CHCF) in Stockton if he went against their orders.

191. On April 3, 2014, Angela Ponciano Associate Director, Policy and Clinical Support, Statewide Mental Health Program met with Dr. Wadsworth in his office at San Quentin State Prison.

192. In her role as Associate Director, Policy and Clinical Support, Statewide Mental Health Program, Ponciano was a direct subordinate of Timothy Belavich. Of note, Ponciano had been included as a recipient of Belavich's email reply to Plaintiff's March 26, 2014 request for "*voluntary*" demotion.

193. Ponciano announced that Plaintiff's assignment to "*special projects*" would entail an immediate transition to Stockton. She encouraged Dr. Wadsworth to report to Stockton on the following day, April 4, 2014.

194. Plaintiff was alarmed that Belavich's direct subordinate was pressuring him to temporarily relocate from San Quentin State Prison during a timeframe that would coincide with the on-site presence of numerous stakeholders in the *Coleman* litigation.

195. Plaintiff was concerned that Ponciano's relocation proposal represented further retaliation for his voicing objective opinions concerning patient safety; government waste; safety to public and staff; and misallocation of a limited health resource.

**EUREKA DAYE RETALIATION – COMMUNICATION**

196. On April 4, 2014 at 7:07 p.m., following Belavich's instruction to contact Daye, Plaintiff sent an email to her. Plaintiff alerted Daye that he had been "*given a forced-choice option to demote…I 'voluntarily' demoted.*" Plaintiff added that Monthei had told him "*that the single reason for my removal from this position is the generation of this memo.*"

197. Throughout the month of April, Plaintiff notified Daye of the numerous retaliatory actions he was suffering at the hands of Monthei and Deems. Plaintiff provided her substantial, supportive documentation corroborating his concerns.

198. On April 16, 2014 at 9:53 pm, Plaintiff authored an email to Daye with the heading "*Confidential*." He wrote that if their communication was not kept confidential, "*I fear even worse retaliation*." After detailing the retaliatory actions of Monthei and Deems, Plaintiff's desperation was evident when he wrote, "*Please, can you please advise what steps I can take to reasonably prevent further isolation, retaliation, and (most concerning): undeserved, long-term*

*impacts upon my career as a physician…I feel that this situation is quickly reaching an unwelcome, undeserved conclusion."* Plaintiff attached a 51-page document to this email to substantiate his concerns of retaliation.

199.    Daye's only substantive response to Plaintiff's repeated requests was in the form of a recommendation to Plaintiff to meet with one of San Quentin's Equal Employment Opportunities (EEO) Counselors.

200.    On April 21, 2014, Plaintiff met with Associate Warden (AW) Jim Robertson, a designated EEO counselor.  However, at that time, Plaintiff was unaware that he belonged to a protected class, pursuant to EEO policy/legislation.

201.    Plaintiff informed Daye, in an email sent on April 21, 2014 at 1:38 pm, after his meeting with AW Robertson that, since he was not aware that he belonged to a protected class, EEO remedies would not relieve the retaliation he was suffering.

202.    Upon information and belief, Daye was informed by Plaintiff's emails sent directly to Daye that Monthei and Deems were actively engaged in retaliating against Plaintiff.

203.    Daye was in a position superior to Deems and Monthei, and yet did nothing to effectively stop the retaliation, harassment, coercion, and adverse employment actions.

**MAY 16, 2014: MEETING WITH MONTHEI AND DEEMS**

204.    On the morning of May 16, 2014, Monthei arrived unannounced at Plaintiff's office and instructed Plaintiff that Plaintiff would meet with Monthei, in Monthei's office, within a few minutes.  Plaintiff had been informed by legal counsel that, given his reasonable fears of adverse action and severe, ongoing harassment, Dr. Wadsworth had a legal right to the presence of a third party during this meeting.

205.    Prior to meeting with Defendant Monthei in his office, Plaintiff sent numerous emails to Monthei and Deems advocating for Plaintiff's right to have a non-supervisory third-party present.  Plaintiff sent these emails on the morning of May 16, 2014 at 9:27 am, 10:12 am, and 10:23 am.

206.     On May 16, 2014, at 10:12 a.m. Dr. Wadsworth sent an email to Monthei with a courtesy copy to Deems.  In his email, Dr. Wadsworth stated, "*...it is my understanding that I do have a right to have a representative present [i.e., based upon an employee's impressions of what may occur in the meeting]. And of course, this representative will not impede the flow of the meeting (or even offer input)... With that being said, I will conduct a meeting with only Eric (i.e. without any additional parties present) if that is your collective, supervisory decision.*"  Dr. Wadsworth then specified that, without a representative present, Monthei would continue to threaten and harass him.

207.     Several minutes after sending these email, Deems arrived at Plaintiff's office to inform him that Deems was denying Plaintiff's right to have a third party attend the meeting. Deems instructed Plaintiff to meet with Monthei immediately.  Deems indicated that he would attend the meeting to justify Monthei's and Deems' deprivation of Plaintiff's legal right to the presence of a non-supervisory third party.

208.     During this meeting on the morning of May 16, 2014, Monthei provided Plaintiff with four documents: an Employee Performance Improvement Plan (EPIP); a Letter of Expectations (LOE); and two probationary performance reports.

**SIMULTANEOUS DELIVERY OF TWO PROBATIONARY REPORTS**

209.     During the required one-year probationary period as Chief Psychiatrist, Dr. Wadsworth received his first two performance reports on the morning of May 16, 2014, during his meeting with Monthei and Deems.

210.     The first probationary performance report as Chief Psychiatrist rated Plaintiff "standard" in all qualification factors including a category of overall rating.  The performance report form notes, "*As your first report of performance for probationary employee evaluation was not issued to you on January 19, 2014, by default it is deemed to be 'standard' on all qualification factors.*"  Monthei and Deems concurred with these ratings, as indicated by their signatures.  (Exhibit 4a, pages 1-3)

211.    During this same meeting on May 16, 2014, Dr. Wadsworth was served his second probationary performance report as Chief Psychiatrist. This report indicated that Dr. Wadsworth needed improvement in the following areas: skill, knowledge, learning ability, communication, and ability as supervisor, administrative ability, factors not listed above, and an overall rating of improvement needed. Plaintiff received a "*standard*" rating in the following categories: work habits, relationships with people, and attitude. (Exhibit 4a, pages 4-6)

212.    The comments contained within the second probationary performance report stated that, since Plaintiff's performance was *"less than 'standard' on several qualification factors, an Employee Performance Improvement Plan (EPIP) being initiated. The purpose of this EPIP is to define serious areas of concern, gaps in your work performance, reiterate California Department of Corrections and Rehabilitation California Correctional Health Care Services expectations, and allow you the opportunity to demonstrate improvement and commitment."*  Monthei and Deems signed this report, dated May 16, 2014.

213.    The ratings outlined in the second performance report are not consistent with any of the feedback, ratings, or reports of Dr. Wadsworth's professional performance that he had received prior to voicing his disagreement with Monthei's makeshift NAMH inpatient program prior to March 2014. In addition, the second performance report violates the terms of Article 12.5 E [Performance Appraisal] of the Bargaining Unit Memorandum of Understanding, which states, "*A management peer of the employee's profession shall countersign any Unit 16 employee's rating which indicates 'I' or Improvement needed and which involves the employee's licensed professional competency*." This Memorandum of Understanding represents an agreement between the State of California and the Union of American Physicians and Dentists.

214.    Neither Deems nor Monthei are physicians. As such they do not possess the knowledge, skills, training, or experience to provide a rating of Plaintiff's skills and knowledge, which clearly involve Plaintiff's "*licensed professional competency*." The ratings that were co-authored by Monthei and Deems exceeded their professional scope and also violate the State's

agreement with Plaintiff's collective bargaining unit. The Performance reports also were not consistent with Government Code §§ 19171, 19172, and 19702.

**LETTER OF EXPECTATIONS**

215.    On May 16, 2014, Dr. Wadsworth was issued a memorandum, Subject: "*Letter of Expectations*" (LOE), authored by Monthei and Deems. This memorandum stated, in pertinent part,

> *...On March 26, 2014, you requested a change of position to Senior Psychiatrist. That request was granted. However, it was later discovered that because you had not served as Senior Psychiatrist in the past - except in an acting capacity - you are ineligible to reinstate to that position...additionally, this is to advise you that certain tasks are being redirected to other staff as follows, in order to assist you to successfully fulfill your responsibilities as the Chief Psychiatrist. Specifically, the following tasks are being redirected a. MHCB Medical Director b. Professional and or administrative oversight associated with patient care for the condemned population at San Quentin State Prison (i.e. PIP, ICF, SCCP, etc.).*

The LOE warned Dr. Wadsworth not to have any further contact with CCHCS Headquarters staff regarding his concerns about his working condition and treatment by Monthei and Deems. (Exhibit 4a, pages 7-8).

216.    The LOE stated, "*A copy of your duty statement is attached.*"  However, it was not attached and Plaintiff was not provided with a duty statement during the meeting on May 16, 2014.  Plaintiff requested a copy of the alleged duty statement on multiple occasions following this meeting.  However, this document was never provided.  Of note, during the entire probationary period as Chief Psychiatrist, Dr. Wadsworth was never provided with an associated Duty Statement.

217.    The document titled "Guide to Supervisors' Responsibility During the Probation Period," published by the California Department of Human Resources' (accessed from https://www.calhr.ca.gov/Documents/supervisor-responsibility-during-probation.pdf on May 18, 2015) describes the importance of providing employees with Duty Statements: "*Accurate, up-to-date job descriptions are critical to the probation period. In order to honestly assess your employee's*

*skills at their new job, they must have a job description that accurately reflects what they are doing.*
*Everything will tie back to the job description – it will be one of the first documents that will be*
*included in the Rejection during Probation, if that happens."*

218.    On May 17, 2014, Plaintiff directed a memo to Monthei and Deems documenting his concerns that Deems and Monthei knowingly misrepresented that Dr. Wadsworth had "*requested*" demotion.  Dr. Wadsworth also addressed Monthei's and Deems' false assertion that Dr. Wadsworth's communication with individuals in Headquarters had been "*inappropriate*" and "*unfair.*"  Dr. Wadsworth asked that they provide "*any documentation or emails to verify the ways that*" they had "*attempted to assist me in resolving my concerns of retaliation, including attempting to resolve those issues directly with me.*"  To date, neither Deems nor Monthei has ever responded to that request for documentation.

## EMPLOYEE PERFORMANCE IMPROVEMENT PLAN

219.    During the meeting on May 16, 2014, Monthei and Deems delivered a co-authored Employee Performance Improvement Plan (EPIP) signed on May 12, 2014.  It was also marked confidential.  (Exhibit 4a, pages 9-18).

220.    The EPIP alleged that Dr. Wadsworth's performance deficiencies began prior to the completion of his March 23, 2014 memorandum.  At the time of the meeting on May 16, 2014, the EPIP alleged that substantial deficiencies had started more than four months beforehand.  However, prior to their meeting on May 16, 2014, Dr. Wadsworth had never been informed of his supervisors' "*concerns*" previously.  (Exhibit 4a, page 19).

221.    Following the meeting, Dr. Wadsworth objectively determined that the information contained within the EPIP was either grossly misleading or completely false.  Plaintiff notified Monthei and Deems on numerous occasions that he was able to objectively demonstrate that their concerns about Plaintiff's performance were inconsistent with objective findings.  Despite his persistent requests to respond to their allegations over the ensuing 2 months, Plaintiff was never provided with an opportunity to respond to the EPIP's allegations.

## EFFECTIVE COMMUNICATION AND IMPAIRING DISORDERS

222.    Correctional and healthcare staff within the CDCR are required to use court-mandated *reasonable accommodations* of documenting "Effective Communication" ("EC") in communications with patients that have mental disorders or disabilities that impair abilities of comprehension pursuant to the *Clark* Remedial Plan (*Clark v. California*).

223.    Documenting "EC" is a practice intended to be used with patients who have or who are suspected of having disabilities that impair comprehension. The *reasonable accommodations* for the qualifying disorders may include hearing aids, sign-language interpreters, transcription, and many other forms. Documentation of "EC" is also a legally-defined *reasonable accommodation*.

224.    The EPIP that was drafted by Monthei and Deems on May 12, 2014, and given to Plaintiff on May 16, 2014, included repeated, verbatim usage of the court-ordered *reasonable accommodation* of "EC"-verification reserved for patients with mental disorders and disabled patients. (Exhibit 4, pages 9-18). Prior to his receipt of the EPIP on May 16, 2014, Plaintiff was unaware that employees had ever communicated with colleagues utilizing the "EC"-verification in their communications.

225.    All reasonable mental health professionals would recognize EC language that was used and consider its use to be inappropriate in the context of communicating with someone who did not have a mental disability or impairment that impacts comprehension.

226.    In subsequent communications, Monthei clarified his belief that Plaintiff suffered from a mental, rather than a physical, disability. In an email sent to Plaintiff and copied to Deems on June 5, 2014 at 6:58 am, Defendant Monthei wrote that he was "*perplexed as to [Plaintiff's] level of confusion...you appear to be the only person who continues to be confused*." This email continued by using the same, verbatim "EC"-verification contained within the Employee Performance Improvement Plan.

227.    On June 6, 2014 at 12:51 pm, Monthei alleged that Plaintiff had been "*perseverating*," a symptom usually resulting from a significant brain injury or disorder. In

addition, he reported within this email, "*Great efforts are being made to ensure your understanding and awareness of our communication despite your actions continued to the contrary.*" On June 10, 2014 at 1:55 pm, Monthei wrote, "[I]t *remains unfortunate that we spent much of our first supervision defining basic words and much of our second supervision defining fundamental concepts.*" On July 2, 2014 at 7:11 am, Monthei wrote, "*the degree of preservation (sic) associated with [an email authored by Plaintiff] continues to be unproductive, nonconforming and inconsistent with reality.*" Each of these emails was sent to Dr. Wadsworth and copied to Deems.

228. Dr. Wadsworth implored Monthei to immediately stop addressing him using this humiliating, degrading, and defamatory language. Despite Plaintiff's repeated requests, Monthei continued to utilize insulting and humiliating language in his emails to Dr. Wadsworth. Dr. Wadsworth issued requests on May 25th, May 30th, June 5th, June 6th, June 9th, and September 10th, 2014. Deems was a recipient of each of these emails. These messages were more than simply vulgar or condescending, particularly given their documented belief that Plaintiff suffers from a disability and were defamatory in that they called into question Plaintiff' professional abilities of a physician.

**FAILURE TO PROVIDE AN OPPORTUNITY FOR PLAINTIFF TO RESPOND TO FALSE ALLEGATIONS**

229. Beginning with the four documents delivered to Plaintiff on May 16, 2014, Monthei and Deems continued a pattern of falsely alleging acts of misconduct, insubordination, and incompetence without providing Plaintiff with a chance to respond to their inaccurate allegations. Even when Plaintiff objectively discredited their false claims. (*Donovan v Peter Zimmer America, Inc.*, 557 F. Supp. 642 (D.S.C. 1982)).

**CONTINUED DENIAL OF THIRD-PARTY PRESENCE**

230.     Following the meeting on May 16, 2014, Monthei mandated Dr. Wadsworth to meet with him on a weekly basis as "supervision" to remediate alleged deficiencies identified in the four documents provided to Plaintiff.

231.     Plaintiff sent repeated requests for the presence of a third party at these meetings. Dr. Wadsworth sent emailed requests to Monthei and Deems on May 20, 2014 at 4:02 pm, 4:12 pm, and 9:31 pm; on May 21, 2014 at 3:53 pm and 8:46 pm; on May 27, 2014 at 9:21 pm; on May 28, 2014 at 8:05 pm; on June 2, 2014 at 8:22 pm; and on June 9, 2014 at 4:28 pm and 3:36 pm.

232.     Dr. Wadsworth also provided Monthei with a citation to specific legal authority that allows a representative's presence, *Redwood Community College District v. Public Employment Relations Board,* 159 Cal. App. 3d. 617.

233.     Monthei and Deems denied these repeated requests; Despite Monthei's denial of Plaintiff's requests for the presence of a third party, Plaintiff met with Monthei on May 21, 2014 and May 28, 2014. Monthei used these meetings to create a hostile work environment and continue to harass Plaintiff, alleging gross incompetence and insulting Plaintiff's abilities of comprehension and perception of reality.

234.     Following the meeting on May 28, 2014, Monthei transitioned their weekly supervisory meetings to an electronic forum.

**CONCLUSION OF *"SPECIAL PROJECTS"***

235.     Following his meeting with Monthei and Deems on May 16, 2014, Dr. Wadsworth received a memorandum directed to all MHSDS staff from Monthei.  This memo stated in pertinent part that "… *Effective May 16, 2014, please be advised that Dr. Wadsworth special project has ended and he will be rejoining local operations*."

236.     On May 16, 2014, at 11:50 a.m., Monthei distributed an email to the fourteen members of San Quentin's MHSDS Management Monthei, stating "*Now that we are not pulling*

*Dr. Wadsworth away from his special projects, please add him to any distribution lists*
*necessary."*

237.    In the ensuing weeks, Monthei would drastically alter Plaintiff's job duties and assignments.  Following his reintegration into "*local operations*," Plaintiff's assignments no longer resembled those of a Chief Psychiatrist.  The general Duty Statement of a Chief Psychiatrist at SQSP indicates that a Chief Psychiatrist will oversee the care of all patients "*occupying crisis intervention beds*" and supervision of the function of the inpatient unit.  However, since the morning of March 24, 2014, Plaintiff's privilege to practice medicine on this inpatient unit had been suspended.

**NOVEL JOB DUTIES AND RESPONSIBILITIES AFTER MAY 16, 2014**

238.    On May 22, 2014, Monthei reassigned Plaintiff the responsibilities for caring for a new caseload of 86 patients.  These were responsibilities that were typically reserved only for SQ Staff Psychiatrists.  Monthei's notification stated, "*Effective immediately, and until further notice, please assume responsibility for the attached mainline caseload*."

239.    Additional novel responsibilities that were inconsistent with the duty description of a Chief Psychiatrist and with Plaintiff's functions prior to March 23, 2014, included the following items which were included in the MH Management Team meeting agenda on May 27, 2014: assisting functional supervisors with timesheets, supervision of PsychOne nurse and clinic, Zone Coverage on Monday and Tuesday, oversight of Injection Clinic, quarterly MAPIP measures, collection of monthly quality management measures, and notification to staff about delinquent quality management measures.

240.    Many of these additional novel responsibilities assigned to Plaintiff as SQSP's Chief Psychiatrist SQSP were functions that did not require a medical license, and were mostly administrative duties that Plaintiff was overqualified to complete.  Monthei's improper utilization of Plaintiff's training as a physician, with the assent of Deems, Daye, and Belavich, was yet another example of profound waste of taxpayer funds and mismanagement of medical resources.

**ASSIGNMENT AS MANAGER AND SUPERVISOR OF USE OF FORCE EXTRACTION EVENTS**

241.    On the evening of May 21, 2014, Plaintiff first learned via email, that Monthei had assigned Dr. Wadsworth to serve as the "clinical manager and supervisor" for Use of Force events.  This email was simultaneously distributed to MH Management and Custody Administration.

242.    At the time that Monthei assigned Plaintiff to serve as the manager and supervisor of violent Use of Force extractions Monthei was aware that Use of Force events had attracted intense court scrutiny; knew that the *Coleman* court had ordered, on April 10, 2014, CDCR staff to complete required, updated training; knew that Belavich had issued a March 23, 2014 memo ordering Chiefs of Mental Health to assure that "*all mental health staff*" attend the training by April 21, 2014; and knew that Plaintiff had not attended these trainings, as he had been removed from all email distribution lists during his assignment to "special projects."

243.    Most importantly Monthei knew, prior to assigning Plaintiff to this position, that Plaintiff had not received the necessary and mandated training.  Monthei was aware that numerous Use of Force events were being planned to occur within San Quentin's Adjustment Center, the housing unit reserved for San Quentin's most violent and disruptive population and yet, he assigned Plaintiff to serve, without having been trained, as the clinic manager and supervisor of several Use of Force events.  (Exhibit 5a).

**DESPERATE RETALIATORY TREATMENT BY MONTHEI INTERFERING WITH MEDICALLY INDICATED PATIENT CARE**

244.    Monthei exceeded the scope of his licensure when he arranged a supervisory structure that left Monthei, a psychologist, with oversight of the non-formulary medication approvals at San Quentin State Prison.  This improper oversight designated that a non-physician would have administrative authority over medical prescriptions and contributed to significant delays in providing medically indicated treatment for patients with severe mental disorders at San

Quentin State Prison. Consistent with CCHCS policy and procedure, this unlawful interference constituted a Near Miss. Plaintiff submitted an Adverse/Sentinel Event report on June 3, 2014.

245. Upon learning of Plaintiff's Near-Miss Report, Monthei attempted to limit Plaintiff's medical obligation to report concerns of patient safety by issuing an illegal order. On June 4, 2014 at 10:37 a.m., Monthei wrote, "*Should you have a concern that you perceive raises to the level of a sentinel event, please relieve yourself of your perceived duty by informing Mr. Deems and I, prior to any such report being filed. We will be happy to better assist you with ensuring that sentinel event reporting protocols are appropriately employed*." Of note, Plaintiff's submission adhered to CCHCS policy, common law expectations, and ethical codes. By contrast, Monthei's attempt to control Plaintiff's medical obligation conflicts with these governing principles and represented an illegal order. (Exhibit 6, pages 1-7)

246. Monthei imposed a requirement on Plaintiff that did not apply to any other member of his staff. Plaintiff was now required to obtain Monthei's approval to travel out-of-town during weekends and holidays. Monthei's instruction, with the apparent tacit approval of Deems would require Dr. Wadsworth to be on-call and available to respond to the prison 365 days a year, or on call-back status 24 hours per day unless Mr. Monthei approved Plaintiff's personal plans in advance.

247. On or about June 4, 2014, Monthei notified Plaintiff of a novel restriction upon the hours that Plaintiff would be permitted to be on-site at SQSP. Monthei specified that Plaintiff was not able to work beyond a rigid 40-hour week without special permission from Monthei to deviate from these hours.

248. The Chief Psychiatrist is considered a management position and the incumbent is considered a work week group 4C employee and therefore does not receive any additional compensation for time spent over the usual 40-hour workweek. In addition, 4C employees are required to work as many additional hours as is necessary to complete assigned tasks.

249.    This requirement to seek advance permission was unprecedented, as no other SQSP physician was required to seek permission from Monthei, a psychologist, to provide medical care to patients.

250.    Prior to March 23, 2014, Dr. Wadsworth spent numerous evenings/weekends at SQSP in order to properly supervise SQSP's medical and mental health delivery, patient care, and to provide direction/leadership to weekend healthcare staff.  Prior to March 23, 2014, neither Deems nor Monthei had required Dr. Wadsworth to seek/obtain permission to meet the demands of his management/leadership position.

251.    Following his novel restriction upon Plaintiff's ability to provide services after-hours and during weekend, Monthei denied each of Dr. Wadsworth's requests. (i.e., to provide clinically indicated care to his patients) beyond those rigid hours.

252.    Due to a shortened work-week because of the July 4th Holiday, Plaintiff followed Monthei's instruction and requested permission to visit SQSP during the holiday weekend to complete medically necessary patient care.  Plaintiff sent his request to Monthei on July 4, 2014 at 6:28 pm.   Monthei denied this request.  After Plaintiff explained that Monthei was denying patients from receiving medically indicated care, Monthei replied, "*Your opinions are noted. Your clarification has been received and reviewed.  Your request is denied.*"

253.    Despite Monthei's denial of Plaintiff's request to provide medically necessary care during the holiday weekend, Dr. Wadsworth reported to the SQSP in order to provide patients with timely clinical care that was medically indicated.  As a licensed physician, Plaintiff recognized that Monthei's denial was an improper/illegal order, a threat to patient safety, an attempt to practice medicine without a license, and that the risk of depriving patients of medically indicated care outweighed the risk that Monthei would accuse Plaintiff of insubordination or some other misconduct.

254.    Plaintiff informed CEO Deems of his on-site presence during the weekend of July 4, 2014, and of Monthei's unlawful order.  Dr. Wadsworth explained that adherence to Monthei's direction would have deprived patients of medically indicated healthcare.

255.     On or about July 6, 2014, Dr. Wadsworth submitted a Sentinel Event report, pursuant to Department policies and procedures alerted CCHCS Headquarters of Monthei's attempts to improperly prevent patients from receiving physician-authorized care.  In the report Plaintiff stated that denying a physician from providing necessary medical care "*is a profound system weakness that exposes our patients to significant harm."* (Exhibit 6, pages 8-11).

256.     The draft meeting minutes from SQSP's Quality Management Committee meeting, chaired by Deems, on July 17, 2014 document, in the section titled "*Sentinel Event:"* "*This agenda item will be reevaluated*."

257.     The draft meeting minutes from SQSP's Quality Management Committee meeting on August 21, 2014 document, in the section titled "*Sentinel Event;"  "No report."*

258.     Plaintiff contacted CCHCS Quality Management staff on December 10, 2014 who recommended, on December 9, 2014 at 2:37 pm, "*I am sorry to say I have no further information for you in regards of the report submitted…no outcomes were shared with me & this case has been closed...*"

259.     Upon information and belief, CCHCS never responded Plaintiff following submission of his report; did not intervene against Monthei's improper denial of medical care for inmate-patients at SQSP.  Monthei's willful disregard for the identified medical needs of inmate-patients at SQSP was not corrected.


**EFFECTIVE COMMUNICATION AFTER THE EPIP**

260.     Despite Plaintiff's repeated requests for Monthei to stop utilizing the EC language when communicating with Plaintiff, Monthei continued to communicate with Plaintiff while using the EC protocol.  For example, on June 5, 2014 at 6:58 a.m., Monthei sent an email to Plaintiff expressing concern about Plaintiff's "*level of confusion*" and alleged that Plaintiff was "*the only person who continues to be confused*."

261.     After reviewing the EPIP and recognizing that Deems and Monthei elected to use verbatim "EC"-verification, Plaintiff notified Monthei and Deems on May 19, 2014 of his intent

to file a harassment claim against them. Monthei's and Deems' use of "EC"-verification demonstrated their perception that Plaintiff suffered from a physical or mental disability.

262. On June 5, 2014, Monthei sent another email to Plaintiff, which included this condescending and humiliating language which stated,

*I took care to speak slowly, clearly and used simple English; I provided you with substantive responses indicating EC had been reached; Accommodation of Louder, Basic Speech was utilized, as was speaking clearly, and making sure that 'mouth was visible' in eases of hearing concerns; Confirmation that EC was achieved or established was indicated by your answers to the information being provided and your acknowledgement that you did understand the information being provided to you by asking questions and summarizing information; Prior to ending this conversation, I simply stated, 'Dr. Wadsworth, I am concerned that you appear to confused despite explaining things in every way possible, do you understand what I am saying? ; You replied, 'Yea, I think I always have.'*

263. On June 6, 2014, in an email sent at 12:54 p.m., Monthei repeated usage of these verbatim *Clark*-mandated EC stating these accommodations "*accurately reflects my efforts at ensuring [Plaintiff's] understanding and awareness.*"

264. On or about May 16, 2014, Monthei and Deems informed Plaintiff that he was prohibited from speaking to anyone about the EPIP. The document was marked "Confidential" and it concluded with the admonishment, "*Additionally, the contents of this EPIP are to remain confidential. Should you have questions or concerns regarding the content, you will be expected to follow up directly with me or with [Deems].*" This further restricted Plaintiff's speech.

265. On May 27, 2014 at 8:55 am, Plaintiff wrote, "*Over a week has passed since I first mentioned that I wished to share my concerns of harassment and retaliation…*" On five separate occasions Plaintiff subsequently requested permission to discuss the contents of the EPIP with an Equal Employment Opportunities Counselor before Monthei offered approval.

266. On May 27, 2014, Monthei finally granted Plaintiff permission to discuss the confidential contents of the EPIP with an Equal Employment Opportunities Counselor.

**SYNCHRONIZED, COMPELLED PRODUCTION OF DEFAMATORY DOCUMENTS BY CDCR SUPERVISORS**

267.     Prior to March 23, 2014, Plaintiff's maintained reciprocal, professional relationships with each member of the Mental Health Management Team.  After the completion of his assignment to "*special projects*," Dr. Wadsworth recognized a palpable change in these relationships during the last two weeks of May 2014.

268.     Plaintiff would later learn that, beginning on May 29, 2014, two days after Plaintiff received Monthei's May 27, 2014, permission to review his concerns of harassment with an EEO counselor, six members of Monthei's Mental Health Management Team who were Monthei's direct subordinate employees, began to submit documents directly to Monthei, which outlined their alleged concerns that Plaintiff was exhibiting severe symptoms of mental illness. Interestingly, these six documents were submitted directly to Monthei during a 5-workday-span from May 29, 2014 to June 4, 2014. (Exhibit 7, which was originally labeled Attachment C in the Notice of Rejection During Probation provided to Plaintiff on September 12, 2014).

269.     Of note, these six members of Monthei's Mental Health Management Team had had limited interactions with Plaintiff during his seven-week assignment to "*special projects*" that concluded on May 16, 2014.  Despite their infrequent interactions with Plaintiff during this time period, they shared defamatory, harmful, and disparaging opinions with Monthei about Plaintiff that were drastically different from their expressed and/or implied perceptions prior to March 23, 2014.

270.     Plaintiff is informed and believes the Monthei instructed these subordinate employees to document written appraisals about Plaintiff.  On June 10, 2014, at 09:26 am, Monthei sent an email to his subordinate staff within the Mental Health Management Team, whereby he instructed them to tell Plaintiff that, if Plaintiff sought their feedback (as he had been instructed to do in the EPIP), they should "*provide [their] feedback in writing to [Monthei] and then follow-up in that manner.*"

271.     On July 1, 2014, at 12:22 pm, Monthei re-forwarded the verbatim email message (that he had previously sent on June 10, 2014 at 09:26 am) to the Mental Health Management Team instructing his subordinate staff to submit written appraisals about Plaintiff directly to Monthei.

## STATEMENTS OF MONTHEI'S MANAGEMENT TEAM

272.     Upon information and belief, Monthei's subordinate staff circulated false, untrue, and defamatory appraisals about Plaintiff and solicited signatures from local, on-site leaders.

273.     Plaintiff is informed and believes on or around the end of May or early June 2014, Associate Warden John Curzon was approached by Van Burg and asked to sign a pre-authored memorandum, which characterized Plaintiff as disruptive, disrespectful, and incompetent.  AW Curzon refused to sign this document, noting that its contents were untrue.  Associate Warden Curzon later cautioned Plaintiff that "*[Dr. Wadsworth] needed to watch his back*."

274.     At approximately the same time that Curzon was asked to sign a fictitious memorandum, six members of Monthei's Management Team had formed newly established, near-simultaneous conclusions about Dr. Wadsworth's behavior that represented remarkable departures from their prior appraisals (and/or non-documented, implied neutrality) of his character.

275.     These six members of Monthei's Management Team elected to formalize their abrupt reconsideration of Dr. Wadsworth's character in emails and memoranda that were submitted directly to Monthei.

276.     The six documents were submitted to Monthei during a 5-workday stretch beginning on May 29, 2014, two days after Monthei had given Plaintiff "permission" to discuss his concerns of workplace harassment with an EEO Coordinator.

277.     Monthei has a documented pattern of instructing his MH Management Team to author comments and opinions about Dr. Wadsworth and to submit their comments directly to Monthei.

***Statements of Rachel Chen***

278. On May 29, 2014, Chen, sent an email to Monthei and indicated that she had developed "*concerns*" about Plaintiff's behaviors "*in the last month or two*." She further stated that she had "*concerns about the recent strings of emails…by Dr. Wadsworth*" and that Plaintiff "*has been emailing the entire management team with questions directed towards you, instead of just emailing you individually*."

279. Plaintiff had been assigned to *"special projects"* for approximately 2 months, spanning March 24, 2014 to May 16, 2014. Plaintiff had not attended Mental Health Management meetings during his assignment to "*special projects*" and had limited interactions with Chen or other members of Monthei's MH Management Team.

280. On May 22, 2014 and May 23, 2014, Plaintiff sent 13 emails to Chen. The content of these emails was relevant for distribution to the Management Team in the context of Plaintiff's recent reintegration into Management Team Meetings. Plaintiff's emails sought and/or provided necessary information regarding the numerous novel responsibilities to which Plaintiff had been assigned. (Exhibit 8).

281. Aside from the 13 work-related emails that Chen received from Plaintiff on May 23 and May 24, 2014, Plaintiff had sent a single email to Chen during the 8-week period preceding May 29, 2014.

282. Chen's email to Monthei also stated that during Subcommittee meetings, Plaintiff "*often ask[ed] questions that he should have known the answers to, and/or challenging the answers given to him.*"

283. Of note, after Plaintiff had been excluded from necessary email distribution lists, he attempted to seek resolution from Daye (on April 6th, April 16th, and April 21st, 2014), to Belavich (via two emails sent on April 21, 2014) to Monthei (on April 23rd, April 30th, May 9th, and May 13th, 2014), and to Deems (on April 25th, May 9th, and May 14th, 2014).

284. Without having received a response to these individualized requests, Plaintiff raised a question about integration into department-wide email distributions that contained crucial

information necessary for effective completion of his job duties and responsibilities. Plaintiff would later learn that Monthei had ordered his subordinate staff to remove Plaintiff from all email distribution lists.

285. Although Chen asserted that, during Subcommittee meetings, Dr. Wadsworth "*asked questions that he should have known the answers to,*" Plaintiff had no choice but to raise this concern in a group forum. Plaintiff made numerous attempts to overcome Monthei's senseless, retaliatory instruction to remove Plaintiff from relevant email distributions that crippled his ability to uphold his responsibilities to his patients and his staff.

286. Two days after the May 14, 2014 Subcommittee Meeting, Monthei ordered his subordinate Management Team to reintegrate him into relevant email distribution lists.

### Statements of Corrado

287. On June 3, 2014, Corrado sent an email to Monthei which included untrue, disparaging comments about Plaintiff that represented an abrupt departure from the perceptions she had developed during nearly two years that she had known Dr. Wadsworth prior to May 2014. In this email she stated that Plaintiff exhibited "*increasingly bizarre,*" "*peculiar,*" "*strange,*" or that he was displaying "*inappropriate behavior at work.*" Corrado made numerous additional false allegations that Plaintiff was "*inappropriate, disruptive, and strange*" professional capabilities, including allegations that Plaintiff was unable to responsibly, professionally, or reliably perform his duties as Chief Psychiatrist.

288. Prior to Monthei abruptly ordering Plaintiff to leave SQSP on the morning of 03/24/2014, Corrado held a positive professional regard for Plaintiff which is evident in numerous prior communications she had with Plaintiff.

289. Even though Corrado allegedly was concerned that Plaintiff exhibited "*increasingly bizarre,*" "*strange,*" or displaying "*inappropriate behavior at work*", on or about October 9, 2014, Corrado asked Plaintiff to serve as the psychiatric representative at the Institutional Classification Committee (ICC). ICCs are chaired by the Warden or Chief Deputy

Warden and entail substantial collaboration between multiple disciplines.  CDCR's Department Operations Manual defines the ICC as "*the institution's highest level of committee*."  Numerous memoranda and court orders have reiterated the importance of psychiatric presence at ICC.

### Statements of Laura Whyte

290.     Prior to March 23, 2014, Plaintiff had a professional and cordial working relationship with Whyte, a direct subordinate of Monthei.

291.     In the weeks preceding March 23, 2014, she had addressed Plaintiff as "*Lucky*" and "*Buddy*" and punctuated some of her messages with "*lol*."

292.     On Saturday, May 31, 2014, Plaintiff reported to SQSP to complete unfinished work items following his recent reassignment to numerous novel responsibilities.  Whyte reported to SQSP during the same morning.

293.     During the morning of May 31, 2014, at 11:49 a.m., Whyte sent an email to Monthei which contained a single sentence: "*Wadsworth is onsite*."

294.     At 12:32 p.m. Monthei replied to Ms. Whyte stating:

> *Given that he did not coordinate his presence with me and does not have any specific weekend related assignment, I have no idea what nonpatient related work he may be conducting. ... [I]f Dr. Wadsworth's unscheduled presence without other supervisors being on-site is discomforting or disruptive then please feel free to leave. Given the uniqueness of this situation, please let me know if we should coordinate making alternative arrangements for the inpatient ICF assignments that you requested to complete on this date.*

295.     At 12:44 p.m., Whyte responded to Monthei stating that she was uncomfortable and anxious about being onsite with Plaintiff and that "*generally-these feelings are heightened with limited staff and support around. . . . Working in fear is unproductive*."

296.     At 12:50 p.m. Monthei requested a follow-up email from Whyte to contact him when she was off-site.

297.     After sending the first email to Monthei at 11:49 a.m., Whyte continued to work for 55 minutes in her office located several doors down from Plaintiff's office on the 5th Floor of

SQSP's Central Health Services Building. During this period of time, Whyte walked by Plaintiff's open office door on at least two separate occasions, inclusive of when she left the institution. She greeted Plaintiff upon her arrival and said goodbye to him upon her departure from the 5th floor. There were other exits available to Whyte that would have avoided her need of passing by Plaintiff's open office door.

298. On June 4, 2014, Whyte sent a follow-up email to Monthei which further described her concerns about Plaintiff and stated that Plaintiff's "mental status is concerning." She stated further:

> *I am afraid to speak with him. I am uncomfortable with him in the institution and have grave concerns about him working with our line staff and more importantly our patient population. He does not appear to approaching his work genuinely. He is clearly not executing the department's mission and I fear this is undermining treatment. Of additional concern is the manner in which his presence is disrupting the work environment. Specifically, members of your staff, both management and line, are routinely entering my office to avoid interactions with him in the hall. They are afraid to talk with him, they do not want to work with him, and don't feel they can go to him as his behavior has been unsettling to all. I am hopeful you will be able to assist with some of these issues.*

### Statements of Van Burg

299. Van Burg is a trained psychologist and supervisor of the Psychology Training/Assessment Team, and upon information and belief would be expected to be familiar with the standards expected by her profession when making determinations about someone's risk of future violence.

300. The accepted standard for performing violence risk assessments involves a requisite combination of: 1) a focused, in-depth interview; 2) a review of legal records and health records; and 3) an applicable, standardized violence assessment instrument/battery.

301. On May 30, 2014 at 6:43 p.m., Van Burg stated in an email to Monthei: "...*I must add that Dr. Wadsworth's underlying anger, distorted thinking, and hostile behavior is not inconsistent with some of the characteristics of individuals who have imploded and resorted to violence…*"

302.     Van Burg has never clinically interviewed Plaintiff, reviewed his legal/health records, or employed an appropriate assessment instrument prior to sharing her alleged conclusion that Plaintiff posed a high risk for future violence.

303.     In the same May 30, 2014 email, Van Burg stated that Plaintiff's addressing Eric Monthei as "Eric" represents "*an attempt to undermine [Monthei's] authority and seems condescending…The management team also address each other as 'Dr.' with our last name…*"

304.     Van Burg stated that Plaintiff's addressing Monthei by his first name in meetings and in emails is "*quite uncomfortable given its passive aggressive nature and tone.*" Van Burg also stated that Plaintiff's "*perception*" is "*intentionally skewed to serve his personal agenda, which is apparently to present you [Monthei] in an unfavorable or questionable light.*"

305.     Van Burg's assertion that members of the management team "*address each other as 'Dr.'*" conflicts with numerous emails collected by Plaintiff in which she addresses psychologist and physician colleagues by their first name.

306.     Van Burg had routinely communicated with Plaintiff and others by addressing him as "Chris" instead of Dr. Wadsworth.

307.     In the same May 30, 2014 email sent to Monthei, Van Burg alleged that she found that Plaintiff's email update sent to a Nurse Practitioner (NP) consultant to be "*yet another example of Dr. Wadsworth airing supervisory issues in a manner that is uncomfortable for me in this case…*"

308.      Van Burg concluded that appropriate communication between healthcare providers is "*particularly concerning*" and stated that "*airing of these issues in this manner will no doubt undermine the perspective of other disciplines towards mental health.*"

309.     On May 30, 2014, Plaintiff was notified that nurse practitioner (NP) Nelson had requested a psychiatric consultation to evaluate her patient's capacity to refuse HIV medications. In response, Plaintiff sent an email to notify NP Nelson of the conclusions Plaintiff had reached, as they would possibly impact healthcare decisions regarding the patient's refusal of antiretroviral medication.

310.    On June 10, 2014, NP Nelson expressed her appreciation for the quality of Plaintiff's efforts in a follow-up email, which clearly indicated that her perspective of mental health had not been undermined.  NP Nelson commented that Plaintiff's evaluation had been *"thoughtful and thorough."*  NP Nelson also provided insight on the patient's condition when she indicated, *"People with a CD4 count of zero, who are not on antiretrovirals, generally have a life expectancy of a year or less."*

311.    Nurse Practitioner Nelson's gratitude and appreciation for Plaintiff's communications conflict with Van Burg's appraisal.

312.    One day after Monthei reminded his Mental Health Management Team, on July 1, 2014, to provide him with their written feedback about Dr. Wadsworth, Van Burg dutifully complied on July 2, 2014.

313.    On July 2, 204 at 10:32 pm, Van Burg, Monthei's direct subordinate, wrote, *"Dr. Wadsworth's behavior continues to create a stressful work environment, and his recent behavior in our management meeting this past week was particularly uncomfortable and concerning.  I don't understand why our concerns do not seem to have been taken seriously by those investigating this, but the situation continues to be untenable."*

314.    In her email sent on July 3, 2014 at 6:06 am, Van Burg described her *"hesitancy to subject myself to a diatribe of [Dr. Wadsworth's] distorted, or self-serving perception of reality."*

**Fictional Investigations in Official Personnel File**

315.    Of note, Deems authored the Notice of Rejection During Probation that was delivered to Plaintiff on September 12, 2014.  Deems included copies of these email exchanges between Monthei and Van Burg, which referenced an apparent investigation, as attachments to the Notice of Rejection.

316.    Plaintiff asked Deems to clarify what investigation Van Burg was referring to in her email sent on July 2, 2014 at 10:32 pm.  Plaintiff asked Deems for clarification about an apparent investigation that had occurred during the summer of 2014, whose existence was

mentioned in a document designed to outline the rationale for Plaintiff's rejection during probation.

317.    Plaintiff asked Deems for more information about this investigation on October 8th, October 10th, and October 21st, 2014.  Plaintiff wrote, in an email sent on October 21, 2014 at 12:17 pm, "*Obviously, I'm anxious to learn how/why an investigation was initiated (and the results it yielded)…*"

318.    Plaintiff did not receive a response from Deems about the investigation and thus sent additional requests to Deems on November 6th, 2014 and January 8, 2015.

319.    On January 12, 2015 at 10:30 am, after Plaintiff had awaited a response for over 3 months, Deems responded with two sentences, "*There was no investigation.  That was Dr. Van Berg's (sic) word and perception.*"

320.    Plaintiff replied, in an email sent on January 13, 2015, "*I can't understand why, if an investigation had not been conducted, Van Burg's incorrect perception was included/permitted as an attachment to the Notice of Rejection.*"  Plaintiff's email added the following:

> *As you probably know, Van Burg's incorrect perceptions weren't limited to her implication of an investigation, but include each of her improper conclusions about my cognition and/or violence-risk.  The misperceptions weren't limited to Van Burg, either, but involved the orchestrated lies authored by the other five members of Monthei's staff.*
>
> *I can't understand why this completely fictional document was authorized.  Filled with clear/obvious lies in every single sentence, its caustic commentary has had demoralizing impacts upon my career, my health, and my family…*

### Monthei's Communications with Van Burg

321.    The State of California's Guide to Employee Conduct and Discipline mandates that supervisors "*discuss infractions by a single employee only with that employee.*"

322.    On July 2, 2014, at 10:57 p.m., Monthei sent an email to Van Burg stating: "*I will send [Dr. Wadsworth] an email directing him to comply with previous instruction first thing in the morning.  I apologize that you…are having to experience the worst of Dr. Wadsworth on an ongoing basis.*"

323. On July 3, 2014, at 6:18 p.m., Monthei sent an email to Van Burg (copied to Deems) to describe "*Dr. Wadsworth's inappropriate and/or insubordinate actions.*"

324. Monthei's discussion of an employee's alleged infractions with another subordinate employee is not compatible with the State of California's Guide to Employee Conduct and Discipline.

## THE IMPACT OF MONTHEI's ALLOCATION PLAN

325. Monthei's NAMH program continued to grow throughout the month of March 2014. Monthei's bed-space allocation plan progressively depleted the inpatient beds that had been historically necessary to meet the needs of those who required acute, inpatient treatment of severe mental disorders.

326. At Monthei's direction, by April 8, 2014, San Quentin was limited to only 4 acute-care inpatient beds, less than 15% of the acute inpatient space that had been presented to the *Coleman* court in 2009.

327. Monthei furthered the depletion of acute inpatient resources when he directed staff that the 4 acute-care beds would be exclusively reserved for condemned inmates. Throughout the summer of 2014, even when acute-care inpatient beds were vacant/available at San Quentin State Prison, non-condemned inmates who required acute inpatient hospitalization were denied access to these unused, often vacant, clinically indicated resources at San Quentin State Prison.

328. Depriving patients of available healthcare resources, based exclusively upon their prison sentence conflicts with established ethical codes and responsibilities of delivering healthcare in a timely fashion. Monthei's deprivation of basic standards of medical care from patients at SQSP, and the endorsement of his decision by his supervisors, affirms the ongoing violations of prisoners' Eighth Amendment protections.

329. As a sign of the severity of their mental illness, many of the non-condemned inmates sent to overflow cells when they had needed acute inpatient hospitalization during the

summer of 2014 had been recently court-ordered to involuntarily take psychiatric medications. Court-ordered involuntary medications are reserved for severe cases of mental illness.

330.  More than a dozen of the non-condemned inmates sent to overflow cells at SQSP when they had needed acute inpatient hospitalization during the summer of 2014 had been determined to have a high risk of acute suicide by an evaluating healthcare provider.

331.  Denying patients who need acute inpatient treatment of severe mental illnesses from access to available, on-site resources unnecessarily jeopardized the safety of mentally ill patients, healthcare staff, custody staff, other patients, and the public.

332.  Monthei ordered his staff to place non-condemned patients suffering from severe episodes of acute mental illness and who clinically required acute, inpatient hospitalization into overflow cells, even when inpatient beds were vacant and available at SQSP.  In many cases, the holding cells were located in the middle of an outpatient waiting area.  Aside from being deprived of timely access to the proper treatment setting, these patients were stripped of basic rights of patient confidentiality during times when it was most needed.  Deprived of available, clinically indicated mental health resources, patient safety reports were submitted to oversight agencies.

333.  Non-condemned patients who represented imminent, high risks of acute harm, were often kept in these overflow cells for lengthy periods of time awaiting vacant hospital beds at other institutions, clearly exceeding the 24-hour time limit mandated by the *Coleman* court's orders to remedy ongoing constitutional violations.

334.  During the 3 months preceding the opening of the Psychiatric Inpatient Program, dozens of patients in need of acute psychiatric hospitalization were kept in these overflow cells for durations that violated court agreements.  Patients were confined to temporary, overflow cells for periods exceeding 4 days while waiting inpatient hospitalization.

335.  For each patient confined to an overflow cell awaiting inpatient availability, a member of the nursing staff was assigned to continuously observe these patients until they were properly placed into an inpatient treatment setting.

336.     After these lengthy delays, these patients who met clinical criteria for placement into an inpatient hospital, were then transferred to distant institutions such as High Desert State Prison (301 miles), Pelican Bay State Prison (349 miles), California State Prison, Los Angeles County (364 miles) and California Institute for Men (422 miles).

337.     Transferring patients to other institutions required expenditure of government resources as several custody staff were required to accompany each patient transferred to an outside facility.  Due to the distance driven and time required, overtime pay would often be expended for multiple CDCR custody staff that had to drive hundreds of miles roundtrips.  In addition, meal costs and overnight hotel stays were typically required, in addition to fuel costs and unnecessary wear and tear on government vehicles.  In some cases, more than one vehicle would be used for the transportation.

338.     Without Monthei's non-clinical instruction, these unnecessary transfers would not have endangered the patients, staff, and the public at risk by placing these patients, many of whom were suffering from acute episodes of psychotic illness.  These patients belonged in hospital beds located at SQSP, not on our public roadways.

339.     Monthei's NAMH plan nearly eliminated acute inpatient resources at San Quentin State Prison.  This clinically irresponsible decision impacted patient care on several occasions.  The following are examples of these avoidable incidents that occurred during the months following Monthei's NAMH plan:

340.     A patient with a high risk of acute suicide (as documented by the evaluating healthcare provider) who had been waiting several days in an overflow cell because space was "*unavailable*" was transported several hundred miles to Corcoran State Prison (CSP) before staff realized he should have been delivered to another facility.  The patient was held in CSP's overflow cells for another night before undergoing another long journey to finally arrive in the proper setting, days after this need had been identified.

341.     A severely psychotic inmate with a history of prolonged treatment in Napa State Hospital was placed into the overflow cell after he was identified as requiring inpatient care

because staff were prevented from admitting him to an inpatient acute treatment room due to Monthei's NAMH plan. Consistent with severe psychotic disorders, this patient was having difficulty with reality-based, meaningful communication. He had been focused on "*bringing eggs to life*" and various religious delusions when officers tried to escort him out of the overflow cell for transfer to a distant institution. In his psychotic state, the patient didn't comply, and likely wasn't able to comply. A violent, Use-of-Force cell-extraction performed by a team of officers in body armor was required in order to transport this mentally ill inmate to the requisite treatment setting. His psychiatrist wrote that, following this extraction, the patient "*could not be meaningfully engaged…being held down by several officers, with a spit mask in place…still struggling…*" This violent extraction was avoidable and predictable since this patient should have been put admitted into the inpatient acute care treatment room, which are specially designed to be safe for patients in acute distress.

342. In addition, significant costs were incurred to ensure that a multidisciplinary staff was present to safely monitor these patients until they were safely delivered to vacant inpatient beds in distant institutions. The overtime costs for this level of supervision and transportation was an unnecessary waste of state funds, particularly when vacant/available beds were available at San Quentin State Prison.

343. Monthei's makeshift plan resulted in inmate-patients suffering acute psychiatric crises from access to timely and appropriate treatment. Once his plan was implemented, inmate-patients in need of acute psychiatric care were turned away from vacant, unused beds at San Quentin State Prison that had been specially designed to safely accommodate patients suffering from an acute psychiatric crisis.

### NEAR-DEATH IN OVERFLOW HOUSING

344. On August 16, 2014, an actively suicidal patient who required acute, inpatient hospitalization was instead placed into an overflow room that was not designed to safely

accommodate this clinical population. This room contained exposed electrical cords that a patient could use for self-asphyxiation.

345. Amazingly, according to Monthei's novel use of treatment space, this patient had been placed into the unsafe treatment setting despite the availability of two vacant, inpatient rooms that had been designed to safely accommodate suicidal patients.

346. On August 17, 2014, this patient used the room's exposed electrical cords to attempt self-strangulation. Four correctional officers emergently entered the patient's room to physically restrain him from completing certain suicide.

347. The on-site physician telephoned the assigned inpatient Administrator On-Call, Chad Hickerson to inform him that the patient had been placed into the suicide resistant room.

348. Chad Hickerson was, at the time, Monthei's direct subordinate and had been clinically trained as a Psychiatric Technician before his California license expired on March 31, 2012.

349. Despite his expired clinical license, Hickerson instructed the physician, via telephone and from his off-site location, to immediately remove this actively suicidal patient from the suicide resistant room. Hickerson's decision to overrule a physician's clinical treatment orders demonstrates that, with the assent of Monthei, Hickerson was clinically practicing on SQSP's inpatient unit without a valid license.

**IMPEDING MEANINGFUL REVIEW OF A NEAR-DEATH**

350. Following the patient's near-death on August 17, 2014, Plaintiff recognized substantial issues of patient safety that deserved discussion and review to prevent these missteps in the future.

351. On August 21, 2014 at 10:06 am, Monthei replied to Plaintiff's request, noting, in part, "…*I must further insist that you cease from your efforts toward instilling fear into subordinate staff. Please accept this e-mail as my continued notice that your actions are having a continued deleterious effect on your co-workers and cannot continue.*"

352. Despite Monthei's attempts to silence Plaintiff's reasonable medical discussions with healthcare staff, Plaintiff elected to prioritize patient safety and review the near-suicide during the weekly psychiatrist meeting held on August 26, 2014.

353. Upon learning of Plaintiff's plan to discuss the events of August 17, 2014, which had nearly resulted in a patient's death, Burton demanded to know if Monthei had provided Plaintiff with permission to deviate from the meeting agenda that Burton had pre-planned.

354. Burton sent an email to Monthei's direct subordinates, Hickerson and Senior Psychologist Diane Desmond, copied to Plaintiff on August 26, 2014, at 1:18 pm. The email stated, *"Wadsworth stated he will be providing his own handouts and will not be following the psychiatry meeting agenda. I will redirect him to the agenda - he will fight it."*

355. On August 26, 2014, at 1:25 pm, Plaintiff replied, in part, *"It's my duty and responsibility as chief psychiatrist to eliminate…ambiguity that threatens patient care…I will not leave our psychiatrists in the dark with ambiguous instruction that compromises patient care."*

356. After receiving Burton's email, Hickerson and Desmond attended the psychiatry meeting that occurred on August 26, 2014, at 1:30 pm. Throughout the 30-minute meeting, when Plaintiff tried to review the safety concerns with placing actively suicidal patients into rooms with exposed electrical cords, Hickerson forcefully interjected to offer unreasonable justifications.

357. Plaintiff responded to Hickerson's advocacy of unsafe patient management by reviewing applicable components of ethical guidelines governing a physician's practice of medicine. Burton interrupted Plaintiff to announce to the psychiatrists in attendance, *"Everyone has gotten so tired of you talking about ethics, Dr. Wadsworth!"*

358. Plaintiff's attempts to inform his physician staff about a patient's near-death and to generate a reasonable peer review discussion about reducing the possibility of similar, future events were silenced by Burton and Hickerson, Monthei's direct subordinates.

//

//

## MAY 25, 2015: PATIENT'S SELF-ASPHYXIATION IN OVERFLOW HOUSING

359.     On August 25, 2014, at 12:51 pm. Plaintiff sent an email to Monthei and Deems, and reviewed that a patient had been placed into an overflow cell "*with an exposed electrical cord... vacant [inpatient] beds remained unused...[the] patient used the exposed cord...to actively harm himself...prompting officers to urgently enter his cell...there are multiple issues that directly impact patient care at San Quentin that need to be urgently addressed...In my opinion, these issues need immediate resolution...before we are dealing with an unacceptable patient-care outcome.*"

360.     However, Monthei continued to instruct staff to place suicidal patients into dangerous, improper, overflow housing when they, instead needed to access a properly designed patient room that could accommodate suicidal patients.  Policies remained unaltered despite clear threats to patient safety that had been identified.  On numerous occasions, actively suicidal patients were placed into overflow cells, even when inpatient space was available.

361.     On Monday May 25, 2015, the on-call psychiatrist provided inpatient admission orders for an acutely suicidal patient who was actively psychotic, "*experiencing paranoia*" and "*acting out of character.*"  The on-call psychiatrist authorized placement of this patient into MHCB-designated treatment space.

362.     Consistent with Monthei's bedspace allocation plans for patients that require MHCB placement at SQSP, this acutely psychotic patient was instead placed into an overflow cell that was not physically designed to safely house patients experiencing an acute psychiatric crisis.  This placement occurred despite vacant, available, safe inpatient rooms designed to accommodate suicidal patients.

363.     The overflow cell contained exposed cords and wires, items that are not consistent with the suicide resistant features of a properly designed MHCB treatment space, and items that had been recently used by a patient to attempt suicide.

364.     The on-call report, distributed to SQSP psychiatric staff on the morning of May 26, 2015, unfortunately confirmed Plaintiff's fears that placing acutely suicidal patients into

treatment spaces that are not designed to accommodate high acuity patient needs can lead to devastating consequences. The report concisely reviewed the event that, on May 25, 2015: "*[Inmate-patient] was placed in Alt housing. He asphyxiated himself with a cord. Deceased.*"

365. Plaintiff is informed and believes and thereon alleges the cord that this patient utilized for self-asphyxiation does not meet safety specifications for a room designed to safely house suicidal patients suffering from an acute psychiatric crisis and this acutely suicidal patient would not have had access to these cords if had he been placed into an available, appropriately designed, MHCB space.

366. The American Medical Association's Opinion 2.03, "*Allocation of Limited Medical Resources*" indicates that "*allocation procedures of institutions controlling scarce resources should be…subject to regular peer review from the medical profession.*"

367. Defendants chose a clinically irresponsible approach to inpatient psychiatric hospitalization at SQSP that knowingly and unnecessarily jeopardized the safety of a vulnerable patient population, even when vacant, appropriately designed inpatient rooms were available.

368. This patient's unfortunate death was avoidable, preventable, and predictable. Unfortunately, Defendants silenced reasonable healthcare providers from implementing protective peer review processes that could have prevented this patient from committing suicide in an improper treatment setting. A vacant, available, appropriately designed treatment space was only steps away from the site of his death.

**FURTHER EVIDENCE OF MONTHEI'S IMPROPER BEHAVIOR**

369. An email sent by Monthei November 15, 2012, at 6:43 p.m. highlights the nature of his response to disagreements. The email stated: "*if anyone doubts your respective delegated authority then, when the time comes, pick a fight with someone and watch Dr. Tarasoff and/or I drop the hammer…we will get our way regardless of whether the local administration like it or not, but it is better for them to believe that they had a say in the matter.*" This message

exemplifies Monthei's manipulative and malignant approach to professional matters involving staff, including "*local administration.*"

370.  In an email dated January 18, 2013, Monthei spoke of another healthcare employee by noting, "*Nothing to prepare just a voice to shut down Ms. Martinez who tends to go on an absurd rant…*"  Later, he makes disparaging comments about CDCR's statewide Chief Psychiatrist.  Monthei's tone illustrates the surreptitious and toxic environment characteristic of an organization managed by him.

## SUMMER 2014 RETALIATORY ADVERSE EMPLOYMENT ACTIONS AND HOSTILE WORK ENVIRONMENT

### AWOL Accusation #1

371.  On June 19, 2014 at 8:03 a.m., Dr. Wadsworth sent an email notification to the Staff Psychiatrists and Mental Health Management Team, including Monthei, notifying them that he would be off-site for the day.  He previously notified Burton of an unexpected, urgent need to be away from the institution on June 19, 2014.  Although Monthei was aware that Plaintiff had notified staff of his unexpected absence, Monthei documented in an email sent to Monthei at 2:12 pm, that Plaintiff was "absent without approved leave."

### Absent Medical Director

372.  In July 2014, Burton was assigned as Medical Director, when he left the institution for a planned, 10-day absence.  Burton knowingly departed the inpatient unit without assigning this critical leadership role to another physician in his absence.  His failure to assign a covering Medical Director violated Section 79775(a)(2) of Title 22 of the California Code of Regulations and general standards of medical care.  Without proper notification of CTC staff of Burton's absence, the on-call physicians, searching for supervisory guidance, tried to contact the unit's Medical Director without success.

373. Monthei and Deems recognized that they should have assigned coverage for the inpatient unit and instructed staff to produce a back-dated memorandum as an attempt to conceal their failure to assign a covering Medical Director for San Quentin State Prison's inpatient unit. This memorandum created a fictitious record that retroactively assigned a physician to the Medical Director role.

***AWOL Accusation #2***

374. Plaintiff was invited to provide a lecture at Stanford University's Department of Psychiatry on July 31, 2014. Pursuant to San Quentin's policy regarding leave time, Plaintiff's leave request for July 31, 2014 was approved several weeks in advance and had been properly submitted. In addition, Plaintiff notified Monthei and Deems about this event.

375. Despite Plaintiff's ability to demonstrate numerous communications and documents confirming that he had appropriately taken leave, Monthei improperly accused Plaintiff of being "Absent without Approved Leave."

## DEPRIVATION OF FAIR AND APPROPRIATE COMPENSATION

376. On or about May 15, 2014 Dr. Wadsworth requested back-pay for his Out-of-Classification service as Acting Chief Psychiatrist, for the eight-month period preceding his September 20, 2013, civil-service appointment to the role of Chief Psychiatrist.

377. Despite sending numerous requests for fair and appropriate compensation to Defendant Monthei, Plaintiff did not receive a response.

378. Plaintiff submitted a grievance to CDCR's Office of Labor Relations on June 24, 2014.

379. On or about September 4, 2014, Dr. Wadsworth was notified in a letter received from CDCR's Office of Labor Relations that he had been awarded the requested back-pay. This letter highlighted that, in his attempts to deprive Plaintiff of fair and appropriate compensation, Monthei had attempted to mislead the Office of Labor Relations when he stated, "*per the statewide policy, it is not possible for someone to 'act out of class' into a position that is actively*

*filled by another person. Nevertheless to be explicit: No, Dr. Wadsworth was not asked to 'act out of class' into a position that was actively filled by Dr. Tarasoff."*

380.    The Office of Labor Relations disregarded Monthei's misrepresentation of statewide policy and awarded fair compensation to Plaintiff.

**NOTICE OF REJECTION DURING PROBATION (NRDP)**

381.    A probationary employee in the State of California is entitled to ongoing and continuing feedback and critique by his supervisor to identify weaknesses and provide training and guidance to successfully complete probation the California Department of Human Resources provides an Internet web portal at www.calhr.ca.gov/training/pages/supervisors-virtual-help-desk.aspx.

382.    Plaintiff is informed that the materials provided for supervisors and managers from Cal HR represent, in part, the State's training policies and procedures for supervisors and managers in conformity to Government Code § 19995.4.  Included in the Helpdesk website for Supervisors and Managers are several modules of training including "Supervisors' Responsibilities During the Probation Period", "On-Boarding – Orienting to Success", and "Cal HR's Supervisors Guide to Addressing Poor Performance."

383.    On September 12, 2014, Plaintiff was served with a Notice of Rejection During Probation (NRDP), which included substantial new false statements, retrospective allegations, and damaging conclusions.  The document's attachments included the alleged concerns and damaging appraisals of six members of Monthei's Mental Health Management that had been authored over three months beforehand. The NRDP was signed by Deems.  (Exhibit 4c, Exhibit 4d)

384.    Aside from incorporating many of the inaccurate allegations from the EPIP and LOE delivered to Plaintiff on May 16, 2014, Plaintiff had not previously been notified of numerous concerns contained within the EPIP or offered the opportunity to devise a plan to remediate them before he was served with a rejection notice on September 12, 2014.

385.     According to Cal HR guidelines, September 12, 2014 was the final date by when, if CDCR intended to reject Plaintiff during probation, they were able to serve him with a Notice of Rejection before he would have successfully completed probation.

386.     In addition, this Notice was accompanied by a notice that placed Plaintiff on Administrative Time Off (ATO).

387.     Administrative Time Off is a feature reserved for employees who have been charged with a felony; are suspected of smuggling contraband; have shown unacceptable familiarity with inmates; have seriously jeopardized the security of the institution; or have committed other serious violations of the California Code of Regulations that adversely affects the safety and management of the facility.

388.     There are numerous authoritative sources detailing the general state policy on placing a person on ATO: the CDCR Employee Relations Officer training curriculum, DOM section 33030.27, the Federal Receiver's policy regarding ATO, the Cal HR (formally Department of Personnel Administration) ATO policy, procedures and documentation requirements; Department of General Services Statewide Personnel Operations Manual, and CDCR's memorandum regarding Placement and Reporting of Administrative Time Off.

**ATTEMPTED DEPRIVATION OF RIGHTS TO REINSTATE**

389.     In the Notice of Rejection During Probation dated September 12, 2014, on page 14, Reinstatement Rights, it stated that Plaintiff had the right to reinstate at positions in Solano County.  Employee Relations Officer Kishia Ogans, who provided Plaintiff with the NRDP on September 12, 2014, indicated that all Staff Psychiatry positions at San Quentin State Prison were currently filled.  Monthei and Deems knew, or should have known, through the exercise of due diligence, that there was a vacant Staff Psychiatrist position available at San Quentin State Prison. Plaintiff's right to reinstate to a vacant Staff Psychiatry position at San Quentin State Prison was guaranteed by state and federal constitutions.

390.    Plaintiff's attorneys contacted staff counsel for CCHCS and pointed out that Deems and Monthei were depriving Plaintiff of his lawful right to return to his former position as a Staff Psychiatrist at San Quentin State Prison.

391.    On September 19, 2014, Plaintiff was provided with an Amended Notice of Rejection During Probation, signed by Eureka Daye, Regional CEO.  The changes to the document include an indication that Plaintiff had a right to return to his former position at San Quentin State Prison.

### OBLITERATION OF MEDICAL RECORDS

392.    On September 12, 2014, Deems and/or Monthei ordered officers from San Quentin's Investigative Services Unit to remove Plaintiff from SQSP, under escort.

393.    When custody officers arrived at Dr. Wadsworth's location on September 12, 2014, he had been providing treatment to patients.  Plaintiff was documenting his findings and authoring his medical orders for inclusion in the medical records.  Their interruption and the need to immediately remove Plaintiff from the facility resulted in Plaintiff being forced to violate the Medical Practice Act which requires physicians to maintain adequate and accurate records for their patients pursuant to Business and Professions Code § 2266 because he was unable to complete the medical records of the patients he had treated that morning.

394.    Following his removal from SQSP property, Plaintiff made numerous requests for assistance in correcting and completing the obliterated medical records.  Neither Monthei nor Deems responded to these requests.

### DEFAMATORY REMARKS AND DANGEROUS RUMORS

395.    Plaintiff was informed by numerous members of San Quentin's staff that Monthei's direct subordinates had referred to him in ways that were designed to harm his professional reputation.  Plaintiff learned that Monthei's staff had made statements to others that Plaintiff "*was going to go postal*" and that they had often referred to Plaintiff as "*Dexter.*"

396. Minutes before his unexpected, involuntary escort from SQSP's property on September 12, 2014, Defendant Chen and Alyssa Edwards, direct subordinates of Monthei, directly addressed Plaintiff as "Dexter" when they walked by him.

397. Upon his return to SQSP on September 30, 2014, Plaintiff became aware of fictitious rumors that were circulating about him throughout the institution. For example, staff informed Plaintiff that they had been told that Plaintiff had been removed from the institution on September 12, 2014, because he was allegedly in the process of publishing literature that would publicly identify correctional officers who had performed acts of physical abuse against death row inmates.

398. After learning of these false, damaging, and dangerous rumors, Plaintiff alerted Deems about these ongoing rumors on September 30, 2014. Deems requested Plaintiff send him examples of the rumors as they occurred, so that he could understand how to intervene. Plaintiff emailed Deems on October 1st, October 2nd, and October 3rd, 2014, detailing the rumors.

399. On October 8, 2014, after Plaintiff didn't hear a reply to the email he had sent to Deems, Plaintiff alerted, Deems, Daye, Belavich, and Undersecretary Diana Toche of the ongoing rumors.

400. On November 14th, 2014, Plaintiff notified Deems, Daye, and Belavich that the rumors continued.

401. On November 25th, 2014, Plaintiff notified Deems, Monthei, Daye, Belavich, Toche, and Statewide Chief Psychiatrist Michael Golding.

402. On January 30, 2015, Plaintiff again notified Deems, Daye, Belavich, and Monthei of the impact of ongoing rumors that were negatively impacting him at San Quentin State Prison.

403. Plaintiff reported these rumors, as instructed, over the course of several months, outlining that these false, untrue statements were being made by Monthei's direct subordinates or that these rumors were detrimental to workplace safety; impacted Plaintiff's professional reputation; and had taken a toll on Plaintiff's health.

404. Dr. Wadsworth did not receive a reply to his numerous notifications sent to CDCR managers that offered any meaningful way to assist with the ongoing retaliation.

### *SKELLY* HEARING

405. Monthei and/or Deems intentionally concealed vacant Staff Psychiatrist positions (at SQSP) in a failed attempt to deprive Plaintiff of his statutory right to reinstatement to his last permanent civil service position as a Staff Psychiatrist.

406. Plaintiff's *Skelly* hearing was scheduled for September 25, 2014.

407. Plaintiff invested considerable time, effort, and resources preparing for the due process hearing. Each allegation in the Notice of Rejection was false and Plaintiff was able to discredit each of the accusations using objective evidence.

408. On the evening of September 24, 2014, Plaintiff had a discussion with SQSP Senior Psychologist Emily Hollander. Dr. Hollander reported to Plaintiff that, during a Management Meeting on/around September 23, 2014, Monthei informed his team that Plaintiff would be returning to SQSP as a Staff Psychiatrist. They decided, during the meeting, that Plaintiff would be assigned to Cheri Smith's team, who oversees the clinical functions in Receiving & Release at SQSP.

409. Plaintiff is informed, believes, and thereon alleges that Monthei's September 23, 2014, discussion of Dr. Wadsworth's return to SQSP as a Staff Psychiatrist and his assignment to Cheri Smith's team was not a hypothetical discussion in anticipation of the potential that Dr. Wadsworth did not prevail in his due process hearing.

410. Plaintiff had an additional telephone discussion with Staff Psychiatrist Bradley Deal on the evening of September 24, 2014. Dr. Deal indicated that Cheri Smith had reported that Plaintiff would be returning to SQSP as a Staff Psychiatrist. Aside from Ms. Smith, Dr. Deal indicated that Staff Psychiatrists Igor Weisz and Nabyl Tejani were also aware that Plaintiff would be returning to SQSP. Dr. Deal told Plaintiff that Ms. Smith indicated that Plaintiff's

office would be on the first floor, and that his assignment would be to evaluate newly-arrived patients in Receiving & Release who required psychotropic medications.

411.    Plaintiff was alarmed to discover that his position had already been determined before the *Skelly* due process hearing had occurred.

412.    On September 25, 2014, during the due process hearing, counsel reported his concern that, since Plaintiff's new office, clinical assignment, supervisor, assigned team had already been determined, he felt that Deems had already reached his conclusions and therefore, Plaintiff was denied even limited due process protection.

413.    On September 26, 2014, Plaintiff received a letter signed by Deems, which sustained Plaintiff's rejection during probation.

414.    On September 26, 2014, Plaintiff received an email from Eric Monthei which confirmed what Plaintiff had been told on September 25, 2014: Cheri Smith was his supervisor; his office would be located on the first floor; and his had been assigned to the Receiving and Release team.  All items about which he had been informed were consistent with those that were shared with him prior to the *Skelly* hearing.

**RETURN TO SQSP**

415.    Since returning to SQSP, Monthei and/or Deems have declined to reverse Monthei's decision made on the morning of March 24, 2014, to restrict Plaintiff's privileges to practice medicine on SQSP's licensed inpatient facility or to treat the condemned population.  As confirmed in Plaintiff's most recent Duty Statement, signed by Plaintiff and his assigned supervisor, Plaintiff's legally protected privilege to practice medicine at San Quentin State Prison remains restricted in violation of his state and Federal Constitutional rights as well as Business and Professions codes §§ 805-809 et seq.

//
//

**Prior victims contact Plaintiff**

416.     Several former SQSP employees contacted Plaintiff upon learning of his recent experiences with Monthei.  These former employees offered support and revealed that Plaintiff's encounter with Monthei was part of a pattern about which CDCR Headquarters has known for years.

417.     Some of these former employees revealed that their experiences had triggered prior CDCR-initiated investigations and resulted in cash settlements financed by California taxpayers.  Their experiences reveal that, despite Monthei's pattern of costly misbehavior, CDCR's management has allowed Monthei to retain managerial authority, which he uses to exploit and abuse civil servant subordinates.

418.     CDCR's reluctance to remove Monthei from a leadership position had predictably created a toxic workplace where Monthei's impressionable, loyal subordinates mimic his unlawful treatment of well-intentioned, hard-working, civil servant healthcare employees.  The six subordinate employees who elected to author untrue, damaging allegations about Plaintiff during a 5-workday stretch beginning at/around May 29, 2014 exemplify the consequences of CDCR's unwillingness to provide Plaintiff with a workplace free from unlawful harassment.

419.     Toxic work environments impact the physical and psychological health of the employees who work within them.  When the workplace mission is healthcare, toxic work environments impact professional satisfaction and, more importantly, patient care.  CDCR's unwillingness to properly discipline supervisory abuse has created a system that cripples any hope of emerging from costly federal oversight of California's prison healthcare.

**Retaliatory Acts in the Form of Renewed Attempts to Deny Plaintiff of Fair Compensation**

420.     Plaintiff dutifully fulfilled the responsibilities of SQSP's Senior Psychiatrist for nearly six months without receiving appropriate compensation for this assignment.

421.     Throughout the summer of 2014, Plaintiff requested retroactive compensation for this assignment from Monthei, who was aware of Plaintiff's assignment as a Senior Psychiatrist. Plaintiff did not receive a response from Monthei, which compelled Plaintiff to seek remedy through the established Union procedures.

422.     Monthei had previously demonstrated his willingness to misrepresent statewide policy in an attempt to deprive Plaintiff of fair compensation for his Out of Classification assignment as Acting Chief Psychiatrist.  The Office of Labor Relations overruled Monthei's denial on September 4, 2014.

423.     On November 24, 2014, Plaintiff requested Deems to serve as the reviewer instead of Monthei.  Deems agreed to serve as the institutional reviewer of Plaintiff's request.

424.     On December 2, 2014, Deems wrote, "*I agree with Dr. Wadsworth's request that because he essentially performed the work of a Senior Psychiatrist between 7/23/12 and 1/14/13 he should be compensated accordingly.*"

425.     On February 6, 2015, the Office of Labor Relations reported that "the institution [SQSP]" was "*not agreeing that the time listed in the grievance (7/2512 to 1/14/13) was out of class.*"

426.     Upon learning that "*the institution*" had disagreed with its own hiring authority, Union of American Physicians and Dentists Representative wrote, "*This is flabbergasting. I f Deems granted the grievance at Level 1, it should have been sent to Payroll/Personnel to issue the retroactive pay. How did it get further into labor relations?*"

**Defendants' toxic workplace conflicts with *Coleman* court orders to employ mental health staff in "*sufficient numbers to identify and treat…serious mental disorders.*" *Coleman v. Wilson*, 912 F. Supp. 1282, 1306 (E.D.Cal.1995).**

427.     In 2014, the *Coleman* court found that CDCR continues "*to struggle with the task of hiring sufficient mental health staff, particularly psychiatrists.*"  (*Coleman v. Brown,* ECF No. 5171 at 2-3).

428.    Judge Mueller ordered the Special Master, on May 15, 2015, to provide ongoing focused monitoring of CDCR's lengthy struggle to effectively retain psychiatrists. (*Coleman v. Brown,* ECF No. 5307 at 5).

429.    Monthei's pattern of severe workplace harassment; intimidation; infringement upon scope of licensure; disregard for physician privileges; unlawful retaliation; and supervisory incompetence clearly conflict with remedial efforts to recruit and retain a sufficient number of psychiatrists. Monthei's impact upon staff recruitment and retention, and its tacit approval by CDCR Administration, oppose numerous *Coleman* court orders that have been crafted within the last decade.

430.    Monthei's well-established pattern of supervisory ineptitude and reprehensible disrespect for his employees has been supported and endorsed by Defendants Daye, Deems, and Belavich.   Collectively, their tolerance of his unlawful behavior has permitted a culture that is incompatible with "*hiring sufficient mental health staff,*" incompatible with *Coleman* court and incompatible with constitutionally adequate healthcare.

431.    Plaintiff recalls numerous examples of highly qualified, motivated, competitive correctional psychiatrists whose recruitment and/or retention was made nearly impossible by Monthei's unprofessional behavior.  These behaviors sabotage CDCR's efforts to provide constitutional healthcare.


**Argument Against Mental Health Management Team**

432.    Chen, Corrado, Van Burg, and Whyte knew that their depictions of Plaintiff contained within the disparaging emails they authored within seven calendar days of May 29, 2014 were untrue.  Despite knowing that their statements were untrue, they chose to publish their comments about Plaintiff in email communications to Monthei.

433.    Chen, Corrado, Van Burg, and Whyte knew that publication of their untrue statements about Plaintiff would impugn Plaintiff's professional character or standing.

434. The false statements made by Chen, Corrado, Van Burg, and Whyte were included by Monthei, Deems, and Daye as causes of Plaintiff's rejection during his probationary period as Chief Psychiatrist. These untrue, disparaging commentary subjected Plaintiff to professional humiliation, mental anguish, suffering, and lost wages/benefits.

## BELAVICH IS AWARE, FAILS TO EFFECTIVELY INTERVENE

435. In an email sent to Belavich on April 21, 2014, at 5:45 am, Plaintiff described Monthei's numerous, novel actions of retaliation. Plaintiff wrote, "*Most worrisome, I fear that worse actions of retaliation are yet to come…I am fearful that [concerning items] will 'appear' [in Plaintiff's personnel file] so that an unethical cause for my demotion/termination can be established.*"

436. Belavich has initiated numerous, abrupt, retaliatory attempts to immediately reassign Plaintiff to different CDCR facilities around the state:

    a) On April 3, 2014, Belavich's direct subordinate conducted a meeting with Plaintiff and advised him that he would be reassigned to Stockton. Ponciano insisted that this assignment would begin as early as April 4, 2014.

    b) On April 21, 2014, Belavich responded to Plaintiff's concerns of retaliation by noting, "*One recommendation that may come out of this is a temporary reassignment if you for your safety and to prevent further retaliation if that is occurring.*"

    c) On April 13, 2015, Ponciano, Belavich's direct subordinate, contacted Plaintiff by telephone one year after her last attempt to reassign Plaintiff to Stockton, to indicate that Plaintiff was being reassigned to a position in Telepsychiatry.

437. From October 2014 through March 2015, Belavich has received numerous emails authored by Plaintiff that outlined the severe retaliatory campaign waged by Deems and Monthei, including: the generation of untrue rumors designed to harm Plaintiff's career; Monthei's denial

of Plaintiff's requests for fair compensation; obliterated medical records; and use of *Clark* reasonable accommodations when communicating with Plaintiff.

438.    On or around Friday December 19, 2014, Belavich met with Plaintiff for approximately 120 minutes to discuss his future with the CDCR.

439.    At Belavich's suggestion, Plaintiff met with him away from San Quentin State Prison at approximately 9:00am.

440.    At the time of their December 19, 2014 meeting at a coffee shop in Tiburon, California, both parties expected that a State Personnel Board hearing regarding Dr. Wadsworth's appeal of the Rejection During Probation would occur the following month, in January 2015.

441.    During their meeting, Belavich urged Dr. Wadsworth to consider alternative positions within CDCR, including positions in Salinas Valley State Prison; California Medical Facility, Vacaville; and Elk Grove.

442.    Belavich acknowledged, during their conversation on December 19, 2014, that Plaintiff would likely prevail in the upcoming, scheduled hearing before the State Personnel Board.

443.    Belavich advised Dr. Wadsworth that, if he prevailed in the State Personnel Board hearing, Dr. Wadsworth would regain the position of Chief Psychiatrist and would be awarded back-pay, but that Monthei would remain his supervisor.

444.    Belavich indicated that Monthei would have the authority to assign Dr. Wadsworth, in his role as Chief Psychiatrist, to spend his entire workday conducting 1:1 observations of suicidal patients, a task that is usually performed by nursing staff.  Belavich indicated that, as Dr. Wadsworth's supervisor, Monthei's assignments would not be second-guessed by Headquarters.

445.    Plaintiff reported to Belavich and Undersecretary Diana Toche, in an email dated January 21, 2015:

> *I have been systematically and relentlessly terrorized, harassed, injured, and traumatized…I have discovered that Eric [Monthei] has a pattern/history of harassing*

*[San Quentin staff]…Tim, I resisted the appeal of your offer to prematurely depart San Quentin, having faith that justice will be served and the presently toxic situation cannot, with proper oversight, continue…In my situation, the perpetrators and the officials who have the authority to intervene are the same. They are motivated to protect themselves. The courtroom parallel would be allowing a defendant to be his own judge, or vice-versa…Knowing that I've fully exhausted all remedies at the local level, are there any resources that you can recommend?*

446.    Belavich was in a position superior to Deems and Monthei, and yet did nothing to effectively stop the retaliation, harassment, coercion, and adverse employment actions suffered by Plaintiff.

### DAYE IS AWARE, FAILS TO EFFECTIVELY INTERVENE

447.    From October 2014 through March 2015, Daye received numerous emails authored by Plaintiff that outlined the severe retaliatory campaign waged by Deems and Monthei, including, but not limited to: the generation of untrue rumors designed to harm Plaintiff's career; Monthei's denial of Plaintiff's requests for fair compensation; obliterated medical records; and use of *Clark* reasonable accommodations when communicating with Plaintiff.

### PROFESSIONAL RAPPORT PRIOR TO MARCH 23, 2014

448.    Plaintiff alleges that prior to March 23, 2014, he enjoyed very good rapport with his direct supervisors at San Quentin State Prison, Andrew Deems and Eric Monthei, having received praise for his professional performance.

449.    From July 23, 2012 through January 14, 2014, Plaintiff was assigned to fulfill the responsibilities of San Quentin State Prison's Senior Psychiatrist, a supervisory position. His performance in this acting position was sufficiently superior that he was shortly thereafter assigned the responsibilities of the civil-service classification of Chief Psychiatrist, a management position, for a period of 8 months (from January 15, 2013 until September 19, 2013).

450.    In October 2013, Andrew Deems presented Plaintiff with the Employee of the Month Award for outstanding performance, service, and dedication.

451. On December 19, 2013, Plaintiff was presented a plaque by the SQSP Mental Health Services Delivery System recognizing him for demonstrating superior knowledge of the policies, procedures, rules, regulations and laws governing the provision of mental health services within a forensics setting, as recognized by Dr. Eric E Monthei, Chief of Mental Health.

452. These acknowledgments reflected Plaintiff's passion for the field of correctional healthcare, a passion that was evident from field-specific publications he had recently authored.

453. Plaintiff was one of the few managers at San Quentin to be asked to testify for the CDCR and San Quentin in an enforcement hearing in the *Coleman v. Brown* case held during several days in October 2013.

454. For the first 6 months of Plaintiff's appointment as Chief Psychiatrist, SQSP's administration had offered Plaintiff only positive, reinforcing feedback regarding the performance of his job duties and responsibilities as Chief Psychiatrist. In addition, Monthei had provided various forms of very positive feedback. For example, on January 23, 2014, after Plaintiff reassured Monthei that if he needed to unexpectedly leave to tend to a family emergency, Monthei sent Plaintiff a text message, which stated, "*Thank you brother. It's comforting knowing that should it come to that I can leave and have somebody here represent the issues in the department as well as I could have if not better. Your source of comfort my friend (sic).*"

455. Plaintiff was aware that Judge Lawrence Karlton of the United States District Court, Eastern District of California, had ordered remedies to the provision of mental health treatment to condemned inmate-patients at San Quentin.

456. Prior to voicing his opinion that the temporary, interim Non Acute Mental Health (NAMH) Program would endanger the patients at SQSP, Plaintiff had well-established professional relationships with Monthei and Deems.

**General Allegations:**

457. At all times mentioned herein, ANDREW DEEMS, ERIC MONTHEI, TIMOTHY BELAVICH, and EUREKA DAYE, were employees of the CDCR, were in supervisory or

management positions and are presumed, by their position, to know the various state laws, CDCR rules and regulations including Title 15 CCR and the DOM.  Each of the above named individuals are presumptively aware of their rights and responsibilities as a state employee and employee of the CDCR performing their respective duties on behalf of the California Correctional Health Care Services (CCHCS) agency, and the California taxpayer of the federal receivership established by the United States District Court to remediate Eighth Amendment violations existing in CDCR related to the provision of constitutionally adequate medical and mental health care.  As such, each of the above named employees has a heightened duty to provide medical and mental health treatment provided to inmate-patients sentenced to CDCR by the state courts and provide healthcare meeting constitutional standards.

458.    Each of the above named individuals has a heightened duty because of their respective positions and responsibilities to the Receiver and the courts to conduct themselves in an open and transparent manner such that the court's Special Master and experts, along with the *Coleman* class plaintiffs' counsel, receives true and complete information on the court ordered remediation.

459.    Additionally, each of the above named individuals is presumed by their job classification to be knowledgeable of the various federal and state laws, regulations, policies and procedures affecting state employees, including but not limited to, the recruitment, hiring, training, supervision, evaluation, and discipline of subordinate employees.  Each of the above named individuals is presumed by their job classification to be knowledgeable of the various federal and state laws, regulations, rules, policies and procedures related to both employee rights and protections, the prohibition against engaging in retaliation for engaging in protected activity, physician and psychiatrist credentialing and privileging, and the operation of both licensed and unlicensed medical and mental health facilities.

460.    Each of the above named, through their actions, inaction, and other conduct, have expressly or impliedly supported or condoned and have failed to properly investigate the

retaliatory conduct perpetrated by Monthei and Deems, and otherwise have failed to take necessary and appropriate steps to remedy their improper conduct directed at Plaintiff. As a result, Dr. Wadsworth, has been subjected to actual or threatened retaliatory acts, threats of violence, and/or other forms of intimidation, coercion, injury, and harm.

461.    To date, upon information and belief, despite numerous, well-supported complaints, no meaningful disciplinary action has been taken against Defendants.

## PATTERN AND PRACTICE OF RETALIATION, THREATS, HARASSMENT, AND INTIMIDATION

462.    Taken together, the incidents described in this Complaint evidence a pattern and practice of illegally retaliating against Dr. Wadsworth for reporting his professional medical opinion about Defendants' NAMH plan that has gravely impacted the CDCR's attempt to provide constitutionally adequate healthcare at San Quentin State Prison. Defendants' actions compelled government inefficiency, waste, and numerous safety concerns, which erode public trust and collectively jeopardized the welfare of patients and the public.

463.    The evidence described demonstrates a pattern and practice of illegally retaliating against Plaintiff with the intent to silence and isolate him away from being able to raise his concerns that relate to matters of public concern. Upon information and belief, Defendants removed Plaintiff and restricted his professional involvement with condemned inmate-patients to prevent him from voicing valid concerns to the Court and Special Master. Defendants' actions collectively constitute a corrupt concealment and witness tampering with the intent to improperly filter the provision of truthful testimony in official court proceedings, in contravention of 18 U.S.C. § 1512. Defendants resorted to severe harassment, threats against Plaintiff's constitutional protections, evidence suppression, and witness tampering, all aimed at covering up the concerns that Plaintiff raised about Defendants' noncompliance with the Court and Receiver's mandate. Defendants have intentionally hindered, delayed, prevented, and/or dissuaded Plaintiff from reporting his concerns and Defendants misconduct with their retaliatory adverse employment

actions. Intentionally limited his testifying in an official proceeding, in contravention of 18 U.S.C. § 1512.

### THE RECEIVER WAS AWARE OF INEFFECTIVE AND/OR ABSENT PEER REVIEW AND THE IMPACT OF ITS OMMISSION UPON DR. WADSWORTH

464. The Receivership is entrusted with properly sustaining critical components of California's prison healthcare delivery and accurately reporting his progress to the appointing power. The *Plata* court ordered the Receiver to uphold "*the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the medical delivery component of the CDCR.*" (No. C01-1351 TEH, February 14, 2006).

465. Beginning with the Receiver's Eighth Quarterly Report submitted on June 17, 2008, the Receiver has provided progress updates regarding his objective to establish an effective peer review system within CCHCS.

466. Judge Thelton Henderson's March 27, 2014 order directed the Receiver to "*discuss in each Tri-Annual report his views on the sustainability of the reforms he has achieved and plans to achieve.*" (No. C01-1351 TEH, March 27, 2014)

467. On May 16, 2014, Dr. Wadsworth's representatives sent Kelso a ten-page letter via certified mail, which outlined the numerous unlawful transgressions that Plaintiff had suffered, inclusive of unlawful, unjustified, summary suspension of his privilege to practice medicine on SQSP's licensed inpatient facility as retaliation for reporting valid patient safety concerns. A copy of Plaintiff's 12-page, March 23, 2014 memorandum was attached to this letter.

468. Within this May 16, 2014 letter, Plaintiff's counsel, Edward Caden, articulated that actions taken against Dr. Wadsworth "*constituted an unjustified and unlawful restriction of Dr. Wadsworth['s] clinical privileges, which is a violation of state law and the governing body bylaws…*"

469.    Within this same letter, Mr. Caden articulated that these unlawful actions against Dr. Wadsworth had occurred without requisite peer review and that neither Monthei nor Deems had the authority to suspend or restrict Dr. Wadsworth's medical privileges.

470.    Also on May 16, 2014, Plaintiff's counsel sent a 3-page letter via certified mail to Kelso and Beard which, after briefly summarizing Defendants' unlawful actions up to that point, requested the preservation of evidence in anticipation of pending litigation. This 3-page letter identified allegations that Monthei had engaged in "*unlawful retaliation, coercion, threatening and abusive behavior*" towards Dr. Wadsworth, including "*summary suspension, revocation or restriction of his clinical privileges.*"

471.    Plaintiff is informed and believes and thereupon alleges that Kelso was aware, at the time that he completed his Twenty-seventh Tri-Annual Report on October 1, 2014, that Plaintiff had alleged substantial deprivations of peer review, a fundamental component of a minimally adequate correctional healthcare system.

472.    Plaintiff is informed and believes and thereupon alleges that Kelso knew, at the time that he completed his Twenty-seventh Tri-Annual Report on October 1, 2014, that Plaintiff had indicated that very high-ranking members of CDCR's healthcare operations were involved in explicit and implicit deprivations of Plaintiff's protections of peer review and that these deprivations, if accurate, would indicate that CCHCS and CDCR failed to provide its patient population with a minimally adequate correctional healthcare system.

473.    On October 1, 2014, Kelso submitted his Twenty Seventh Tri-Annual report to the *Plata* court. Despite Kelso's awareness of Plaintiff's assertions, Kelso reported that the establishment of an effective peer review process "*[was] completed.*"

474.    After Kelso had indicated that the objective of peer review had "*been completed*" in fourteen consecutive Reports submitted to the *Plata* court, the topic of peer review did not appear in the Receiver's Twenty-eighth Report submitted on February 2, 2015.

475.    Plaintiff is informed and believes and thereupon alleges that, approximately two weeks after submission of the Receiver's Twenty-eighth Report, CCHCS conducted a two-day

training in Elk Grove to which healthcare supervisors and managers within the CDCR's Northern Region were invited. This training occurred on February 18-19, 2015.

476. The CCHCS two-day training, titled "*Peer Review Process - Employee Discipline Process Training*," involved two days of presentations and panel discussions to explain distinctions between peer review and discipline.

477. The presenters that were scheduled to appear during the two-day training included Roscoe Barrow, Chief Counsel, Office of Legal Affairs; John Day, Chief, Office of Internal Affairs; Joseph Macaluso, Assistant Chief Counsel of the Employment Advocacy & Prosecution Team; and Neil Robertson, Senior Assistant Inspector General.

478. These high-ranking officials outlined numerous details and features to warn of the consequences of improperly blending the duties of peer review with employee discipline.

479. The handouts provided to the training's attendees indicate that, on February 18, 2015, Attorney Pam Cantelmi of the Receiver's Office of Legal Affairs provided an hour-long presentation titled, "*Peer Review within CCHCS*."

480. The first slide contained within Ms. Cantelmi's presentation outlined three "*real situations that prompted this training*" on February 18, 2015.

481. Each of the "*real situations that prompted*" the training appears in a separate section titled "*Dangerous Waters*." These scenarios describe failures to properly incorporate processes of peer review for healthcare providers and the financial and clinical consequences of these "*real*" missteps.

482. The February 18, 2015 training provided participants with an overview of basic concepts and definitions of peer review. The training provided case summaries to outline the severe consequences of failing to timely file reports with the Medical Board of California when restricting the clinical privileges of licensed healthcare providers.

483. The Receiver's knowledge of "*real situations*" that prompted the training on February 18, 2015 demonstrates that the Receiver was aware of "*dangerous*" scenarios compelled by insufficient or absent peer review that were occurring throughout his organization.

484.     The "*real situations*" that prompted Ms. Cantelmi's training demonstrate that, at the time of the Twenty-Eighth Tri-Annual Report, the Receivership was aware that institutional leaders were largely ignorant of peer review, "*a primary component of a minimally acceptable correctional health care system.*"

485.     Ms. Cantelmi's February 18, 2015 training provided an email address to advise attendees how to "*bring my concerns to the attention of appropriate HQ staff.*"

486.     On February 20, 2015, Plaintiff sent an email to the provided address (cdcrppecsupport@cdcr.ca.gov), copied to the CCHCS attorney who provided the training, to highlight that he had been deprived of peer review; that PPEC or the Local Governing Body had not been involved; that an 805 report had not been submitted; and that the actions taken had been punitive/retaliatory, and not related to patient care.

487.     As of May 28, 2015, Plaintiff has not received a response to his emailed concerns from the Receiver's office.

488.     The absence of a response to Plaintiff's legitimate patient safety concerns and ongoing, unlawful retaliatory actions against him, including deprivations of constitutionally protected property rights, were not unique to the email that Plaintiff sent on February 20, 2015.

**PLAINTIFF'S PATIENT SAFETY REPORTS WENT UNADDRESSED**

489.     Kelso's Twenty-seventh Report submitted on October 1, 2014 described that healthcare staff were surveyed and a significant number of respondents "*believe that…individuals will be punished*" for reporting patient safety concerns.

490.     The Report by Kelso reassured that decision algorithms for handling patient safety reports had been established with the goal of developing an organizational culture where reporting concerns of patient safety is not punished.

491.     CCHCS distributes a Reporting Form User's Guide for reporting adverse events. The form indicates that, following submission of a patient safety concern: (1) The institution will complete a Root Cause Analysis (RCA); and (2) a Headquarters committee will triage and track

all incoming reports and monitor completion of the institution's Root Cause Analyses (RCAs). This form indicates that RCAs are due to Headquarters within 45 days.

492.    Monthei's and Deems' prolonged, retaliatory campaign against Plaintiff extended to their interference with his ability to provide indicated patient care.  As a result of these negative impacts on patient care, and consistent with Plaintiff's responsibilities as a physician, Plaintiff submitted four Adverse Events Reports between June 2014 and January 2015.

493.    Plaintiff is informed and believes and thereupon alleges that, despite voicing legitimate concerns of patient safety, none of the follow-up steps outlined in the CCHCS' Reporting Form User Guide were conducted.

494.    Five months after submitting his report on July 6, 2014, to outline that Monthei had attempted to deny Plaintiff from providing medically indicated care, Plaintiff was informed by CCHCS staff that Plaintiff's concerns had been assigned to Eureka Daye and the Regional Chief of Mental Health.

495.    Plaintiff was never contacted by anyone regarding these reports and supervisory attempts to deny medically indicated care continued to occur.

**Injuries to Dr. Wadsworth**

496.    As a result of the conduct of Defendants, including the adverse employment actions; hostile work environment; retaliatory, coerced demotion; improper rejection during probation; summary suspension of clinical privileges without fair proceeding, peer review, or due process; and the repetitive and continuous intimidation and harassment, Plaintiff has been injured, harmed, and/or deprived in, among others, the following ways:

    a.   Physical, psychological, and emotional stress and injuries;

    b.   Lost income, lost seniority, and lost opportunities for transfer to other positions, promotions, and career advancement within CDCR;

    c.   Impeded ability to seek other employment;

    d.   Demotion and tarnished personal and professional reputation;

e.  Increased threat to physical safety on the job; and

497.  These injuries, harms, and/or deprivations are ongoing and violated clearly established statutory and constitutional rights of which a reasonable person would have known.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of Fifth and Fourteenth Amendments to the United States Constitution**

**Deprivation of a vested property right by restricting Plaintiff's clinical privileges without affording due process**

**Brought Pursuant to 42 U.S.C. § 1983**

**(Against Monthei, Deems, and DOES 1 through 50)**

498.  Plaintiff incorporates by reference the all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

499.  Defendants are sued in their official capacities for injunctive and declaratory relief, and in their individual capacities for damages.

500.  The Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution guarantee that no one may be deprived of his property without due process of law.

501.  The Fourteenth Amendment to the United States Constitution provides, in part, that no State shall "*deprive any person of life, liberty, or property, without due process of law*."

502.  The Fourteenth Amendment to the United States Constitution guarantees that adverse action will not be taken against public employees without due process of law. This constitutional assurance exists because under applicable federal law, public employees have a protected property interest in their positions.

503.  The United States Supreme Court has held that civil service systems that allow public employees to retain their position during good behavior and efficient service create a

property interest in continued employment. (*Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 538- 539).

504.     The California Civil Service Act is consistent with the federal law governing due process, and defines the process that is due under the Fourteenth Amendment.

505.     In promulgating these statutory schemes, the United States Congress and the California Legislature specifically provided healthcare practitioners with a constitutionally protected property interest in their medical privileges.

506.     In addition to Plaintiff's federally guaranteed civil service protections, Plaintiff is considered a public employee who is also a healthcare practitioner subject to the provisions of Section 805 *et. seq.* of the California Business and Professions Code and therefore has a protected property interest in his patient care privileges.

507.     To be consistent with the requirements of the Eighth Amendment, prison healthcare systems must have an effective peer review process.  In *Madrid v. Gomez*, 889.F. Supp. 1146, 1258 (1995), the court held that "*a primary component of a minimally acceptable correctional health care system is the implementation of procedures to review the quality of medical care being provided.*"  In finding that the lack of quality control procedures throughout California prisons had resulted in grossly inadequate care that was neither disciplined nor redressed, the *Madrid* court emphasized the need for an effective peer review process in order to establish the fundamental foundation of constitutionally adequate. (*Ibid.* at 1208-1210).

508.     The peer review process within the CDCR's Division of Correctional Health Care Services and within the CCHCS is administered through the Professional Practices Executive Committee (PPEC) ("peer review body") which is governed by federal and state legislation aimed at improving the quality of healthcare in this country and came into existence through the implementation of the policies and procedures agreed to under the *Plata* Stipulation for Injunctive Relief.

509.     "Peer review is important to protect competent practitioners from being barred from practice for arbitrary or discriminatory reasons. . . Peer review that is not conducted fairly

and results in the unwarranted loss of a qualified physician's right or privilege to use a hospital's facilities deprives the physician of a property interest directly connected to the physician's livelihood. [Citation.]" (*Mileikowsky v. West Hills Hospital and Medical Center* (2009) 45 Cal.4th 1259, 1267).

510. Plaintiff's clinical privileges were restricted by Monthei when he prevented Plaintiff from treating all condemned inpatients and prevented Plaintiff from "*step[ping] foot*" on the 4th Floor of SQSP MHC. Monthei also ordered his subordinate staff to remove Plaintiff from all email distribution lists which provided critical information necessary to provide patient care.

511. The restrictions put in place by Monthei on Plaintiff's clinical privileges and administrative responsibilities amounted to a summary suspension of Plaintiff's clinical privileges.

512. Monthei implemented a policy under which Plaintiff's Constitutional rights were violated as Plaintiff was never afforded any due process prior to Monthei's restricting Plaintiff's clinical privileges.

513. Upon information and belief, the PPEC was never involved in the restriction of Plaintiff's privileges which were summarily suspended by Monthei.

514. The restrictions imposed on Plaintiff's clinical privileges by Monthei were made in retaliation for Plaintiff's raising concerns that Monthei's NAMH would result in numerous concerns of public/patient safety including, but not limited to: (1) jeopardize inmate patient safety; (2) cause a significant waste of public resources; (3) violate the Constitutional rights of inmates; and (4) deviate from the requirements of Coleman and the CDCR's obligations under the Receiver's court mandated oversight.

515. Plaintiff made multiple reports to his direct supervisors, and their supervisors about his predicament and the wrongful actions taken by Monthei. Therefore, supervisory employees within CDCR had sufficient information to put him/her on notice of the violation of Plaintiff's rights. The nature of these violations of Plaintiff's rights was one that CDCR management had the authority to fix.

516. Plaintiff's clinical privileges were restricted without due process or fair procedures and CDCR management (1) directly participated in the wrong; and/or (2) knew about the wrong but did not try to stop or fix it; and/or (3) failed to oversee the people who caused the wrong, such as by hiring Monthei and/or failed to adequately train the staff on the proper PPEC peer review process required; and/or (4) created a policy or custom that allowed the wrong to occur.

517. Plaintiff's supervisors (Deems and Monthei) and CDCR Management must be held liable for creating or allowing Monthei to implement an unconstitutional informal policy and/or custom which restricted Plaintiff's clinical privileges.

518. Plaintiff's supervisors and CDCR Management allowed the violations of Plaintiff's Constitutional rights to continue even after notice and failed to take any meaningful action to remedy these wrongful acts.

519. CDCR management showed deliberate indifference to Plaintiff's reports of retaliatory action by Monthei and the restriction against Plaintiff's clinical privileges and are "*grossly negligent*" in that they did not adequately supervise Monthei who violated Plaintiff's rights even after clear and convincing notice that Monthei posed a grave risk of harm, and had actual or constructive knowledge of that risk, and failed to take easily available measures to address the risk of known wrongful acts.

520. The restrictions placed on Plaintiff's clinical privileges caused significant damage to his professional reputation.

521. As a direct and proximate result of the Defendants' violations of Plaintiff's constitutional rights, Plaintiff has suffered severe and substantial damages.

522. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

**SECOND CAUSE OF ACTION**

**Violation of Fifth and Fourteenth Amendments to the United States Constitution**

**Deprivation of a vested property right by restricting Plaintiff's clinical privileges without affording due process**

**Brought pursuant to a *Bivens* action (*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971))**

**(Against Kelso)**

523.    Plaintiff incorporates by reference the all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

524.    Defendant is sued in his official capacity for damages; and injunctive and declaratory relief; and in his individual capacity for damages.

525.    Kelso is not automatically entitled to immunity for the violations of Plaintiff's constitutional rights.

526.    Plaintiff's claim is consistent with applicable federal laws governing suit against a Receiver.  Pursuant to 28 U.S. Code § 959(a), "*[R]eceivers...may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.*"

527.    The Receiver holds "*the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the medical delivery component of the CDCR.*" (*Plata v. Schwarzenegger*, No. 01-1351, February 14, 2006).

528.    The Northern District assigned the Receiver "*all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system.*"

529.    The Receiver, in short, "*is the chief executive officer of the medical division of CDCR, a basic part of whose operation includes contracting with and managing those*

*responsible for providing medical care to prisoners.*" (*Medical Dev. Intern. v. CA. Dept. Corr. & Rehabilitation* (9th Cir. 2009) 585 F.3d 1211, 1217).

530.    On May 16, 2014, Plaintiff sent a letter via certified mail to Kelso as Receiver, which informed him of Plaintiff's allegations of unlawful behaviors carried out by Defendants. The letter alleged that he was denied peer review and that high-ranking managers within CDCR were ignorant of peer review, a fundamental component of constitutional healthcare, and that their ignorance was hindering physicians' ability to address the serious medical needs of California prison inmates.

531.    Kelso had actual knowledge of Plaintiff's allegations of ongoing constitutional deprivations and yet, despite this actual knowledge, failed to intervene.

532.    Kelso's failure to take action after notice of Plaintiff's denial of peer review due process was the proximate cause of the deprivation of Plaintiff's constitutional rights.

533.    Upon information and belief, Kelso had provided updates to the court regarding the critical importance of peer review to ensure constitutionally adequate healthcare peer review in twenty consecutive reports submitted to the *Plata* court, spanning from 2008 to 2014.

534.    After Kelso had provided updates about peer review in twenty consecutive reports spanning the preceding six years, an update regarding peer review, a critical component of constitutional healthcare, was absent from Kelso's February 2, 2015 report.

535.    Plaintiff is informed and thereon alleges that, by February 2015, Kelso was aware, at the time that he submitted his February 2, 2015 report to the court, that deprivations of proper peer review were occurring throughout his organization.

536.    On February 18-19, 2015, training sessions were conducted by CCHCS to train its managers on the basic concepts of peer review.  Upon information and belief this demonstrates that the Receiver was aware of "*dangerous*" situations that prompted CCHCS to hold these training sessions and had been aware that an adequate system of peer review had not been sustained within CCHCS.

537.     Kelso's omission of peer review from his February 2, 2015 report indicates that, despite the Receivership's awareness of "*dangerous*" situations that prompted remedial training about "*a primary component of a minimally acceptable correctional health care system*," Kelso declined to update the *Plata* court about a newly discovered deficiency that left CCHCS with something less than a minimally acceptable healthcare system, depriving patients of constitutional healthcare, and depriving Plaintiff of constitutional protections of due process..

538.     This omission was not compatible with Judge Thelton Henderson's March 27, 2014 order, which directed the Receiver to "*discuss in each Tri-Annual report his views on the sustainability of the reforms he has achieved and plans to achieve.*" In this order, Judge Henderson expressed "*serious concerns*" with "*increasing difficulties with recruiting and retaining medical staff statewide.*"

539.     Plaintiff is informed and believes and thereupon alleges that by Kelso's omitting discussion about the inadequacies of peer review about which he was aware in February 2015, the Kelso, as Receiver deviated from the exercise of his assigned judicial function and Kelso's actions were taken in complete absence of all jurisdiction and prevented the *Plata* court from awareness of deficiencies that compelled Judge Henderson's "*serious concerns.*" (No. C01-1351 TEH, March 27, 2014).

540.     Although the training organized by CCHCS on February 18-19, 2015, improved the future conceptual understanding of peer review for those in attendance, the Receiver did not properly intervene to correct the ongoing deprivations suffered by Plaintiff, despite having been clearly informed.

541.     The omissions from Kelso's February 2, 2015 report, shielded the Federal Court from recognizing the deficiencies of a primary component of minimally adequate correctional healthcare, and furthered the constitutional deprivations suffered by Plaintiff and deviated from the exercise of his assigned judicial function and Kelso's actions were taken in complete absence of all jurisdiction.

542.     Due to the Receiver's dereliction of his judicially assigned duties to correct the unlawful actions of healthcare supervisors and to update the *Plata* court about the wavering sustainability of peer review, Kelso deprived Plaintiff of his constitutional due process protections of his property interest in his privilege to practice medicine on SQSP's licensed inpatient unit, and his right to work in an environment free from harassment and retaliation. Therefore, Kelso substantially deviated from the exercise of his assigned judicial function and his actions were taken in complete absence of all jurisdiction.

543.     Not only did Plaintiff make multiple reports to his direct supervisors, and their supervisors about his predicament and the wrongful actions taken by Monthei and others, he informed Kelso by certified letter of the violations of his constitutional rights. Therefore, Kelso, in the position as Receiver, had sufficient information to put him on notice of the violation of Plaintiff's constitutional rights. The nature of these violations of Plaintiff's rights was one that Kelso had the authority to fix.

544.     Plaintiff's clinical privileges were restricted without due process or fair procedures and Kelso (1) directly participated in the wrong; and/or (2) knew about the wrong but did not try to stop or fix it; and/or (3) failed to oversee the people who caused the wrong, such as by hiring Monthei and/or failing to adequately train CDCR/CCHCS staff on the proper PPEC peer review process required under the 5th and 14th Amendments; and/or (4) created a policy or custom that allowed the wrong to occur.

545.     Kelso showed deliberate indifference to Plaintiff's reports of retaliatory action by Monthei and the restrictions against Plaintiff's clinical privileges and deviated from the exercise of his assigned judicial functions and Kelso's actions were taken in complete absence of all jurisdiction.

546.     The restrictions placed on Plaintiff's clinical privileges caused significant damage to his professional reputation.

547.     As a direct and proximate result of Kelso's violations of Plaintiff's constitutional rights, Plaintiff has suffered severe and substantial damages.

548. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

**THIRD CAUSE OF ACTION**

**Violation of the First and Fourteenth Amendments**

**to the United States Constitution (Free Speech)**

**Brought Pursuant to 42 U.S.C. § 1983**

**(Against all Defendants and DOES 1 through 50)**

549. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

550. Defendants are sued in their official capacities for injunctive and declaratory relief, and in their individual capacities for damages.

551. The Fourteenth Amendment states that "*[n]o state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States*."

552. The First Amendment to the United States Constitution protects an individual's right to free speech.

553. Speech involves a matter of public concern when it can fairly be considered to relate to "*any matter of political, social, or other concern to the community*." (*Johnson v. Multnomah County, Or.*, 48 F.3d 420, 422 (9th Cir.1995)).

554. There is a significant First Amendment interest in encouraging public employees, who are positioned uniquely to contribute to the debate on matters of public concern, to speak out about what they think and know without fear of retribution, so that citizens may be informed about the instruments of self-governance.

555.     Plaintiff spent significant off-duty time researching to verify that his statements were supported by objective evidence and drafted a memorandum notifying CDCR personnel about the safety concerns he had regarding Monthei's NAMH bed space allocation plan as outlined in this complaint constituted speech on matters of public concern, the interest in which outweighed the state's interest in promoting workplace efficiency and avoiding workplace disruption.  These communications therefore constituted free speech protected by the First and Fourteenth Amendments.

556.     Plaintiff's statements were made in his capacity as citizen since he had no official duty to make the questioned statements that advocated for inmate patient care, warned of a substantial waste of government resources, or safety to the public and were not the product of performing the tasks the employee was paid to perform.

557.     Defendants were state actors and took adverse actions against Plaintiff because of Plaintiff's protected conduct.

558.     Plaintiff suffered adverse employment actions and his speech was a substantial and/or motivating factor in Defendant's adverse actions.

559.     Plaintiff's First Amendment rights outweigh the Defendants' administrative interests; there is no legitimate justification for treating Plaintiff differently from other members of the general public concerned about matters of public interest.

560.     Defendants would not have taken the adverse employment actions absent Plaintiff's protected speech.

561.     Defendants' action issued under color of the authority chilled Plaintiff's exercise of his First Amendment rights, and Defendants' actions did not reasonably advance a legitimate goal.

562.     Defendants' adverse employment and/or personnel actions taken against Plaintiff would have a chilling effect on a reasonable worker and would likely deter future employee complaints and reports by other workers.

563. Plaintiff's communications were the substantial and/or motivating factor in the accused Defendants' actions, inaction, and other conduct that was intended to interfere with, or had the effect of interfering with, his free speech rights. As a physician he has a moral and ethical duty to protect patient care. As concerned citizen, he raised questions about the waste of resources, and impact to public safety that would be caused by the implementation of Monthei's NAMH plan.

564. The accused Defendants' conduct therefore infringes on and constitutes a violation of Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution.

565. Defendants acted intentionally and with callous disregard for Plaintiff's clearly established constitutional rights.

566. Plaintiff made multiple reports to his direct supervisors, and their supervisors. Therefore supervisory employees within CDCR had sufficient information to put him/her on notice of the violation of Plaintiff's rights. The nature of these violations of Plaintiff's rights was one that CDCR management had the authority to fix.

567. Plaintiff's supervisors allowed the violations of Plaintiff's rights to continue even after notice.

568. CDCR supervisors should be held liable for creating and/or allowing Monthei to implement an unconstitutional informal policy and/or custom which prevented Plaintiff from utilizing his freedom of speech to communicate his concerns regarding matters of public concern, (i.e., patient safety, government waste, employee safety, public safety, and violations of inmate-patients' federal and state constitutional rights to adequate medical care, and violations of the Medical Practice Act of California).

569. Monthei put in place a policy that required Plaintiff to send all communications to Monthei and prohibited Plaintiff from communicating his concerns to anyone other than Monthei.

570. Plaintiff was prevented from using his freedom of speech and CDCR management (1) Directly participated in the wrong; and/or (2) Knew about the wrong but did not try to stop or fix it; and/or (3) Failed to oversee the people who caused the wrong, such as by hiring unqualified

people or failing to adequately train the staff; and/or (4) Created a policy or custom that allowed the wrong to occur.

571. Plaintiff's supervisors, after learning of the violation of Plaintiff's rights, failed to remedy the wrong.

572. Monthei created a policy or custom under which Plaintiff's constitutional rights were violated.

573. Deems and CDCR management allowed such a policy or custom to continue implemented by Monthei against Plaintiff.

574. CDCR management showed deliberate indifference to Plaintiff's reports of retaliatory action by Monthei and the restriction against Plaintiff's freedom of speech preventing his abilities to report unsafe conditions for inmate-patients and are "grossly negligent" in that they did not adequately supervise Monthei who violated Plaintiff's rights even after clear and convincing notice that Monthei posed a grave risk of harm, and had actual or constructive knowledge of that risk, and failed to take easily available measures to address the risk.

575. As a direct and proximate result of the Defendants' violations of Plaintiff's constitutional rights, Plaintiff has suffered severe and substantial damages.

576. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

//

//

//

//

# FOURTH CAUSE OF ACTION

## Unconstitutional Prior Restraint Pursuant to
## 42 U.S.C. §§ 1983, 1988
## Violation of First and Fourteenth
## Amendment Rights of Free Speech

### (Against Defendants Monthei, Deems, and DOES 1 through 50)

577. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

578. Monthei prohibited Plaintiff from communicating to anybody about his concerns about the impact of the NAMH plan, patient safety at SQSP, Near Miss events, and sharing the contents of the unlawful EPIP.

579. Monthei's prohibition to Plaintiff from speaking to anybody other than Monthei about his concerns for patient safety by "*following chain of command*" constituted an unconstitutional prior restraint against Plaintiff's freedom of speech.

580. As a direct result of the actions, statements and/or policies of the Defendants, Plaintiff suffered an unconstitutional deprivation of his rights under the First and Fourteenth Amendments to the U.S. Constitution.

581. Defendants acted intentionally and with callous disregard for Plantiff's known statutory and constitutional rights.

582. As a direct and proximate result of the Defendants' violations of Plaintiff's statutory and constitutional rights as described herein, Plaintiff has suffered damage to his professional reputation, humiliation, embarrassment, mental and emotional anguish and distress and violation of right to free speech as protected under the Constitution as well as other compensatory damages, in an amount to be determined by a jury and the Court.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

//

//

//

# FIFTH CAUSE OF ACTION

## Violation of Bane Act, California Civil Code § 52.1,
### Interference and Attempted Interference, By Threat, Intimidation, and/or Coercion, with the Exercise of Plaintiff's Constitutional and Statutory Rights

### (Against Monthei and Deems, and DOES 1 through 50)

583.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

584.    Monthei coerced Plaintiff to give up rights of due process and vested property interests, by threatening that Plaintiff would be terminated unless Plaintiff submitted a "voluntary" request for demotion out of the Chief Psychiatrist position.  Monthei threatened termination and intimidated Plaintiff by using a raised voice and a time deadline by which Plaintiff was expected to make a decision, or lose his job.

585.    Monthei threatened Plaintiff's termination if Plaintiff did not follow Monthei's orders to communicate about patient safety concerns and other violations of the law directly with Monthei; this was done under the color of law and restricted Plaintiff's right of speech.

586.    Monthei threatened Plaintiff's termination and threatened on multiple occasions to transfer to the desert if Plaintiff did not follow his orders not to communicate with anyone other than Monthei.

587.    Monthei and Deems denied repeated requests by Plaintiff for his right to be afforded a neutral third party to be present during their one-on-one meetings following the EPIP.

588.    There is no qualified immunity for government employees under the Bane Act.

589.    As a direct result of the actions, statements and/or policies of the Defendants, Plaintiff suffered an unconstitutional deprivation of his rights under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution and the Civil Service Act of California and related Government Code sections.

590.    Defendants acted intentionally and with callous disregard for Plaintiff's known statutory and constitutional rights.

591.     Defendants' adverse employment and/or personnel actions taken against Plaintiff would have a chilling effect on a reasonable worker and would likely deter future employee complaints and reports by other workers.

592.     As a direct and proximate result of the Defendants' violations of Plaintiff's statutory and constitutional rights as described herein, Plaintiff has suffered damage to his professional reputation, humiliation, embarrassment, mental and emotional anguish and distress and violation of right to free speech as protected under the Constitution as well as other compensatory damages, in an amount to be determined by a jury and the Court.

593.     Pursuant to California Civil Code § 52.1, Plaintiff requests damages, including, but not limited to, damages under California Civil Code § 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct as described in subdivision.

594.     In addition to any damages, injunction, or other equitable relief, the court may award the Plaintiff reasonable attorney's fees. (California Civil Code § 52.1(h)).

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

### SIXTH CAUSE OF ACTION

### Retaliation for Engaging in Protected Activity

### Advocating for Patient Care
### (Business and Professions Code § 2056; Health and Safety Code § 1278.5)

### (Against Monthei, Deems, Belavich, Beard, and DOES 1 through 50)

595.     Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

596.     Business and Professions Code § 2056 provides physicians protection against retaliation for advocating for medically appropriate health care for their patients.

597.     It is the public policy of the State of California that a physician is encouraged to advocate for medically appropriate health care for his patients.

598.     Plaintiff advocated for medically appropriate health care within SQSP by protesting/advocating against Monthei's decision to implement the NAMH plan/policy/ practice which Plaintiff reasonably believed impaired his and SQSP healthcare staff's ability to provide medically appropriate health care to the inmate-patients.  (Business and Professions Code § 2056(b)).

599.     No person shall terminate, retaliate against, or otherwise penalize a physician for advocating for medically appropriate health care.  (Business and Professions Code § 2056(c)).

600.     Monthei's decision to terminate Plaintiff's employment and otherwise penalize him was upon information and belief, principally for Plaintiff's advocating for medically appropriate health care.  (Business and Professions Code § 2056(c)).

601.     Health and Safety Code § 1278.5, adopted in 1999 and amended in 2007, also provides whistleblower protections for physicians and declares that it is "the public policy of the State of California to encourage members of the medical staff, and other health care workers to notify government entities of suspected unsafe patient care and conditions.

602.     SQSP is a health facility defined in Health and Safety Code § 1250.

603.     It is the public policy of the State of California, as expressed in the Health and Safety Code, that individuals shall not be terminated or discriminated from their employment on the basis of complaining about conditions within health facilities that affect the quality of care and services.

604.     To this end, Health and Safety Code § 1278.5 provides that "[n]o health care facility shall discriminate or retaliate, in any manner, against any. . . employee, member of the medical staff, or any other health care worker . . . because that person has . . . [¶] . . . [p]resented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity." (*Id*., subd. (b)(1)(A).)

605.    Besides providing for a civil penalty of up to $25,000 for each violation (§ 1278.5, subd. (b)(3)), the statute specifies, *inter alia,* that "*[a] member of the medical staff who has been discriminated against pursuant to this section shall be entitled to reinstatement, reimbursement for lost income resulting from any change in the terms or conditions of his or her privileges caused by the acts of the facility, . . . and the legal costs associated with pursuing the case, or to any remedy deemed warranted by the court pursuant to this chapter or any other applicable provision of statutory or common law*" (*Id.*, subd. g)).

606.    Several times within the statute of limitation preceding his coerced voluntary demotion, and ultimate Notice of Rejection of Probation, Plaintiff advocated for inmate patient safety and reported dangerous conditions within the SQSP mental health facility that Monthei's NAMH plan would create and also submitted multiple Near Miss reports over the course of seven months beginning in June 2014, with the last one submitted in January 2015.  Plaintiff also complained to Defendants and the other outside entities (Board of Psychology) that having a psychologist oversee and override a physician's medical judgment was unsafe and violated California law and a physician's ethical obligation to provide necessary care to patients that was medically indicated.

607.    Monthei and Deems, and CDCR management, retaliated against Plaintiff for raising these concerns and took adverse employment actions against him.

608.    Monthei's adverse employment and/or personnel actions taken against Plaintiff would have a chilling effect on a reasonable worker and would likely deter future employee complaints and reports by other health workers.

609.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer past and future monetary loses, loss of benefits, emotional damages, and physical injury, as well as damages to his professional reputation, lost income, attorneys' fees.

610.    As a result of defendants' unlawful conduct, Plaintiff had to retain legal counsel, and is entitled to reasonable attorneys' fees and costs of suit, pursuant to Health and Safety Code § 1278.5.

611. In doing the things herein alleged, defendants were guilty of oppression, fraud, and malice, and insofar as the things alleged were attributable to employees of defendants, said employees were employed by Defendants with advance knowledge of the unfitness of the employees and they were employed with a conscious disregard for the rights of others; or defendants authorized or ratified the wrongful conduct; or there was advance knowledge, conscious disregard, authorization, ratification or act of oppression, fraud or malice on the part of an officer, director or managing agent of defendants all entitling Plaintiff to the recovery of exemplary and punitive damages.

612. Defendants' conduct also was oppressive, fraudulent, and malicious in that Defendant Monthei intended to prevent the *Coleman* Special Master and experts retained by the Special Master from learning of Plaintiff's safety concerns that would affect the inmate-patients under his NAMH plan. These actions of Defendants were in conscious disregard of the public's safety and violated public policy and entitles Plaintiff punitive damages against Defendant for their actions.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

### SEVENTH CAUSE OF ACTION

**Retaliation for Engaging in Protected Activity - State Law Whistle Blower Retaliation — (Govt. Code § 8547)**

**(Against Monthei, Deems, Belavich, Beard, and DOES 1 through 50)**

613. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

614. The California Whistleblower Protection Act (Gov. Code, § 8547 et seq. (Whistleblower Act)) forbids retaliation against an employee of a state agency, for disclosing information that may evidence improper government activity, if the purpose of the disclosure was to remedy the improper situation. (*Id.*, §§ 8547.2(a), §8547.10(b) and (c)).

615.     "**Improper governmental activity**" means an activity by a state agency or by an employee that is undertaken in the performance of the employee's duties, undertaken inside a state office, or, if undertaken outside a state office by the employee, directly relates to state government, whether or not that activity is within the scope of his or her employment, and that (1) is in violation of any state or federal law or regulation, including, but not limited to, corruption, malfeasance, bribery, theft of government property, fraudulent claims, fraud, coercion, conversion, malicious prosecution, misuse of government property, or willful omission to perform duty, (2) is in violation of an Executive order of the Governor, a California Rule of Court, or any policy or procedure mandated by the State Administrative Manual or State Contracting Manual, or (3) is economically wasteful, involves gross misconduct, incompetency, or inefficiency. (Govt. Code § 8547.2(b)).

616.     "**Protected disclosure**" means a good faith communication, including a communication based on, or when carrying out, job duties, that discloses or demonstrates an intention to disclose information that may evidence (1) an improper governmental activity, or (2) a condition that may significantly threaten the health or safety of employees or the public if the disclosure or intention to disclose was made for the purpose of remedying that condition. (Govt. Code § 8547.2(e)).

617.     "**Illegal order**" means a directive to violate or assist in violating a federal, state, or local law, rule, or regulation, or an order to work or cause others to work in conditions outside of their line of duty that would unreasonably threaten the health or safety of employees or the public. (Govt. Code § 8547.2(b)).

618.     Plaintiff made several good faith communications (i.e., protected disclosures) regarding Monthei's NAMH plan, a plan which violates state and federal laws and regulations, and constituted a willful omission to perform required duties imposed by the *Coleman* court and Receiver.  Plaintiff's memorandum and Near Miss Reports reported economically wasteful activities, incompetency and inefficiency.  Plaintiff's reporting to his superiors about Monthei's

retaliatory conduct reported issues of gross misconduct. All of these were improper government activities that Plaintiff reported.

619. Upon information and belief, Beard, Belavich, and Deems were aware of the illegal orders and restrictions that were implemented by Monthei and Deems against Plaintiff and the adverse employment actions taken against Plaintiff for his protected disclosures.

620. Monthei silenced and excluded appointed, authorized, and medically trained physicians from participating in San Quentin's plans to address remedies for serious medical needs. Exclusion and suppression of well-developed safety concerns are inconsistent with constitutional healthcare and clearly improper.

621. Monthei's attempt to control the professional opinion of a subordinate physician was an attempt to practice medicine without a license, in violation of California's Medical Practice Act, Business and Professions Code § 2052.

622. Monthei's interim, temporary Non Acute Mental Health Program represented the reallocation of a valuable, limited, state-controlled health resource (i.e., inpatient treatment space) that was clinically irresponsible, dismissive of contrary opinions, and a misuse of valuable state property.

623. Plaintiff suffered retaliation at the hands of the individual Defendants after reporting (1) safety concerns that would be caused by implementing Monthei's NAMH plan; (2) that the NAMH plan would cause significant waste of government resources; and (3) cause violations of inmate's rights under the US Constitution and violate the Coleman court order.

624. Monthei insisted that Plaintiff was expected to endorse a clinically inappropriate NAMH plan that would have forced Plaintiff to disregard his training and ethical duty as a physician. Ordering a physician to adjust his professional opinion to endorse an unsafe, ill-advised plan of inpatient resources constitutes an illegal order.

625. Monthei's assigning Plaintiff to be the Use of Force Supervisor without providing him with proper training was an illegal order as it unreasonably threatened the health and safety of inmate-patients, CDCR employees, and Plaintiff.

626. Monthei's denying Plaintiff's ability to provide medically indicated treatment was an illegal order.

627. Monthei's plan to involuntarily remove Plaintiff from SQSP under escort of officers with the Investigative Services Unit without establishing a plan to ensure appropriate completion of patient medical records was an illegal order and irresponsible.

628. Monthei's failure to respond when, throughout November and December 2014, Plaintiff recognized the medical records deficiency and repeatedly asked for assistance retrieving obliterated medical records. Monthei's actions or inaction were incompatible with California Business and Professions Code § 2266.

629. Monthei used his official authority to intimidate, threaten, coerce, and command Plaintiff when he threatened to terminate Plaintiff unless he voluntarily demoted and if he communicated with anyone but Monthei which violated Govt Code § 8547.3.

630. Monthei's adverse employment and/or personnel actions taken against Plaintiff would have a chilling effect on a reasonable worker and would likely deter future employee complaints and reports by other workers.

631. Monthei directed others to take personnel action and disciplinary action against Plaintiff, including having Plaintiff escorted off SQSP property with custody officers.

632. Any employee who violates Govt Code § 8547.3(a) is liable for damages by the offended party. (Govt Code § 8547.3(c)).

633. Any person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a state employee or applicant for state employment for having made a protected disclosure, is subject to a fine not to exceed ten thousand dollars ($10,000) and imprisonment in the county jail for a period not to exceed one year. Pursuant to Section 19683, any state civil service employee who intentionally engages in that conduct shall be disciplined by adverse action as provided by Section 19572. (Govt Code § 8547.8(b)).

634. In addition to all other penalties provided by law, any person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a state employee or

applicant for state employment for having made a protected disclosure shall be liable in an action for damages brought against him or her by the injured party. Punitive damages may be awarded by the court where the acts of the offending party are proven to be malicious. Where liability has been established, the injured party shall also be entitled to reasonable attorney's fees as provided by law. (Section 8547.8(c)).

635.    Plaintiff has satisfied administrative prerequisites to suit expressly set forth in Government Code § 8547.8(c), and has first filed a complaints for Alleged Whistleblower Retaliation by Belavich, Daye, Deems, and Monthei with the State Personnel Board (SPB) (filed on March 4, 2015 and March 9, 2015).  On February 27, 2015, Plaintiff sent by Fed Ex a Request to File Charges against Belavich, Daye, Deems, and Monthei with the SPB.  On November 26, 2014, the Victim Compensation and Government Claims Board issued a rejection of Plaintiff's claim #G620537.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.


## EIGHTH CAUSE OF ACTION

**Retaliation for Engaging in Protected Whistleblower Activities (Reporting Violations and Noncompliance with State and Federal Statutes, Rules, and Regulations) Violating Labor Code § 1102.5**

**(Against Monthei, Deems, Belavich, Beard, and DOES 1 through 50)**

636.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

637.    Pursuant to California's General Whistleblower Statutes, beginning with California Labor Code § 1102.5, it is illegal in the State of California to retaliate against any employee who provides information to a government or law enforcement agency where the employee has reasonable cause to believe that the information discloses a violation or noncompliance with a state or federal statute, rule, or regulation.

638. Pursuant to Labor Code **§** 1104, CDCR is responsible for the acts of its managers, officers, agents, and employees for violations of Labor Code § 1102.5.

639. Monthei implemented and/or adopted rules and/or policies which for example ordered him to communicate his concerns only through Monthei and nobody else, which was intended to and did, prevent Plaintiff from disclosing information to government agencies including, but not limited to CDCR, Medical Board, to persons with authority over Plaintiff, including CDCR headquarters staff, Receiver, Special Master, and to others who had authority to investigate, discover, or correct the violation or noncompliance, and from providing information to, and/or testifying before a public body including but not limited to the *Coleman* court and Special Master who was conducting an investigation, hearing, or inquiry into the mental health treatment conditions at SQSP on behalf of the Receiver and *Coleman* court.

640. Upon information and belief, Beard, Belavich, and Deems were aware of the rules that Monthei implemented against Plaintiff and the adverse employment actions taken against Plaintiff for his protected reporting activities.

641. Plaintiff submitted a written report to Monthei and Deems on March 23, 2014, regarding his concern for patient safety if the NAMH plan went into effect.

642. Plaintiff submitted four different Near Miss reports regarding patient safety. (On June 3, 2014; July 6, 2014; December 8, 2014; and January 14, 2015).

643. After submitting the first report, Monthei ordered Plaintiff not to send any more reports directly, and directed him to only send them to him first.

644. Plaintiff had reasonable cause to believe that the information he disclosed regarding safety conditions of inmates on multiple occasions, demonstrated a violation of state laws and federal statutes, and/or violations of and/or noncompliance with a local, state, or federal rules and regulations.

645. Defendants retaliated against Plaintiff for disclosing the memorandum, dated March 23, 2014, that called into question the allocation design of Monthei's NAMH plan which posed a clear and present danger to patient safety if implemented at SQSP, and/or because they

believed Plaintiff disclosed that information or might disclose information to government agencies including, but not limited to CDCR, CCHCS, Medical Board of California, Psychology Board of California, or to persons with authority over Plaintiff including, CDCR headquarters staff, Receiver, Special Master, and to others who had authority to investigate, discover, or correct the violation or noncompliance, or that Plaintiff might provide information to, and/or testify before a public body including but not limited to the *Coleman* court and Special Master who was conducting an ongoing investigation, hearings, and inquiries into the mental health treatment conditions at SQSP on behalf of the Receiver and *Coleman* court.

646.   Monthei's assigning Plaintiff to be the Use of Force Supervisor without providing him with proper training was a dangerous and illegal order as it unreasonably threatened the health and safety of inmate-patients, CDCR employees, and Plaintiff and was another example of a retaliatory action taken against Plaintiff for disclosing information related to violations of state and federal rules and regulations.

647.   Plaintiff's reporting activities were a contributing factor in the retaliatory actions taken against Plaintiff.

648.   An employer or any other person or entity that violates Labor Code § 1102.5 is guilty of a misdemeanor punishable, in the case of an individual, by imprisonment in the county jail not to exceed one year or a fine not to exceed one thousand dollars ($1,000) or both that fine and imprisonment, or, in the case of a corporation, by a fine not to exceed five thousand dollars ($5,000).

649.   Labor Code § 1105 further provides that "*[n]othing in this chapter*" shall prevent an employee's suit for damages.

650.   As a direct and proximate result of Defendants termination/demotion of Plaintiff violation of the public policy of the State of California, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress and has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities, including but not limited to, lost employee benefits, lost raises, diminished earnings

capacity, lost career and business opportunities.  Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

651.    Plaintiff has incurred litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

652.    Plaintiff is informed and believes and based thereon alleges that the outrageous conduct of Defendants described above was done with malice, fraud and oppression and with conscious disregard for Plaintiff's rights and with the intent, design and purpose of injuring Plaintiff.  Defendants, through its officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct of all of the Defendants named in this action. By reason thereof, Plaintiff is entitled to punitive or exemplary damages from all Defendants in a sum according to proof at trial to deter these Defendants and others from engaging in similar, wrongful actions in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

## NINTH CAUSE OF ACTION
### Public Entity Liability for Failure to Perform Mandatory Duty
### (Monthei, Deems, Daye, Belavich, and DOES 1 through 50)

653.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

654.    Government Code § 815.6 provides: "*Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.*"

655.    "Government Code § 815.6 contains a three-pronged test for determining whether liability may be imposed on a public entity: (1) an enactment must impose a mandatory, not

discretionary, duty . . . ; (2) the enactment must intend to protect against the kind of risk of injury suffered by the party asserting section 815.6 as a basis for liability . . . ; and (3) breach of the mandatory duty must be a proximate cause of the injury suffered.' All three elements must be met before a government entity is required to confront the rebuttable presumption of negligence." (*Walt Rankin & Associates, Inc. v. City of Murrieta* (2000) 84 Cal.App.4th 605, 614, internal citation omitted.)

656.    Labor Code § 1102.5, Health and Safety Code § 1278.5, Govt. Code § 8547, and Business and Professions Code § 2056, all impose mandatory duties on the CDCR, a public entity, intended to protect against the kind of risk of injury suffered by Plaintiff, i.e., retaliation against Plaintiff's engaging in protected activities.

657.    CDCR violated these mandatory duties imposed by Labor Code § 1102.5, Health and Safety Code § 1278.5, Govt. Code § 8547, and Business and Professions Code § 2056.

658.    CDCR's failure to perform its duty was a substantial factor in causing Plaintiff's harm.

659.    As a direct and proximate result of Defendants' violating Labor Code 1102.5, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress and has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.  Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

660.    Defendants' acts were reckless, malicious, fraudulent, oppressive, and in bad faith, justifying an award of punitive damages to deter these Defendants and others from engaging in similar, wrongful actions in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

//

//

**TENTH CAUSE OF ACTION**

**Denial of Due Process - Restricting Privilege to Practice Medicine Without Peer Review**

**(Against Monthei, Deems, Belavich, Daye, and DOES 1 through 50)**

661.     Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

662.     SQSP is a health facility under Health and Safety Code § 1250.

663.     A physician's privileges cannot be restricted without due process by way of a valid peer review.

664.     The Business and Professions Code § 809 specifies the procedure for a "fair hearing" related to 805 reporting.

665.     A peer review body may only suspend or restrict clinical privileges of a licensed physician where the failure to take that action may result in an imminent danger to the health of any individual.  (Business and Professions Code § 809.5).

666.     When no person authorized by the peer review body is available to summarily suspend or restrict clinical privileges under circumstances specified in subdivision (a), the governing body of a licensed health facility, or its designee, may immediately suspend a licentiate's clinical privileges if a failure to summarily suspend those privileges is likely to result in an imminent danger to the health of any individual, provided the governing body of the health facility has, before the suspension, made reasonable attempts to contact the peer review body. A suspension by the governing body of a licensed health facility which has not been ratified by the peer review body within two working days, excluding weekends and holidays, after the suspension shall terminate automatically.

667.     Here, Monthei restricted Plaintiff's clinical privileges in retaliation for raising safety concerns.

668.     No peer review was ever performed or offered to Plaintiff.

669.     No 805 report was ever sent as required by Business and Professions Code § 805.

670.     Pursuant to Business and Professions Code § 809.9, in any suit brought to challenge an action taken or a restriction imposed which is required to be reported pursuant to

Section 805, the court shall, at the conclusion of the action, award to a substantially prevailing party the cost of the suit, including reasonable attorneys' fee, if the other party's conduct in bringing, defending, or litigating the suit was frivolous, unreasonable, without foundation, or in bad faith. For the purposes of this section, a defendant shall not be considered to have substantially prevailed when the Plaintiff obtains an award for damages or permanent injunctive or declaratory relief. For the purpose of this section, a Plaintiff shall not be considered to have substantially prevailed when the Plaintiff does not obtain an award of damages or permanent injunctive or declaratory relief.

671.    As a direct and proximate result of Defendants restriction of Plaintiff's clinical privileges without providing due process peer review or fair procedure, a violation of the public policy of the State of California, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress and has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

672.    Plaintiff is informed and believes and based thereon alleges that the outrageous conduct of Defendants described above was done with malice, fraud and oppression and with conscious disregard for Plaintiff's rights and with the intent, design and purpose of injuring Plaintiff. Defendants, through its officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct of all of the Defendants named in this action. By reason thereof, Plaintiff is entitled to punitive or exemplary damages from all Defendants in a sum according to proof at trial to deter these Defendants and others from engaging in similar, wrongful actions in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

//

//

//

**ELEVENTH CAUSE OF ACTION**

**Denial of fair and impartial *Skelly* hearing**

**(Against Monthei, Deems, Daye, Belavich, and DOES 1 through 50)**

673.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

674.    Plaintiff had a vested property right in his position, even if it was probationary.

675.    Plaintiff was denied a meaningful opportunity to be heard.

676.    The decision and outcome was predetermined prior to the Skelly hearing.

677.    Plaintiff's *Skelly* hearing was scheduled for September 25, 2014. On September 26, 2014, Plaintiff received an email from Eric Monthei which confirmed what Plaintiff had been told on September 25, 2014.

678.    The Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution guarantee that no one may be deprived of his property without due process of law. [1] When the government has conferred upon a person a legally enforceable right or entitlement to a government benefit, such as an interest in continued employment by the government absent sufficient cause for termination, this right constitutes a property interest protected by due process principles. (*Perry v. Sindermann* (1972) 408 U.S. 593, 602-603; *Board of Regents v. Roth* (1972) 408 U.S. 564, 576-578; *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206-207).

679.    The Supreme Court has stated that due process is the opportunity to be heard at a meaningful time and in a meaningful manner. (*Parratt v. Taylor (*1981) 451 U.S. 527, 540, overruled on other grounds *Daniels v. Williams* (1986) 474 U.S. 327, 330-331, fn. 3). Due process is a flexible concept requiring accommodation of the competing interests involved, and its procedural requisites necessarily vary depending on the importance of the interests involved and the nature of the controversy. (*Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542-543; *Mathews v. Eldridge* (1976) 424 U.S. 319, 335).

680.    State governments cannot mandate which procedures they unilaterally deem adequate to protect an individual's due process rights; the minimum requisite procedures are federally mandated. (*Cleveland Board of Education v. Loudermill*, 470 U.S. at p. 541).

681.    The right to a fair trial by a fair tribunal is a basic requirement of due process applying to administrative agencies which adjudicate. (*Withrow v. Larkin*, 421 U.S. 35, 46).

682.    The Constitution is offended, according to the Supreme Court, by an ultimate decision maker who exhibits personal animosity toward the employee.

683.    Our Supreme Court has said that procedural due process in an administrative setting requires notice of the proposed action; the reasons therefor; a copy of the charges and materials on which the action is based; and the right to respond to the authority initially imposing the discipline "before a reasonably impartial, noninvolved reviewer." (*Williams v. County of Los Angeles* (1978) 22 Cal.3d 731, 736-737).

684.    Here, the outcome of the "*Skelly* Hearing" was predetermined before it even started, therefore it was an unfair process devoid of even scant due process required under *Skelly*.

685.    Management had already established that Plaintiff would return to work as a Staff Psychiatrist, before the Skelly Hearing took place. Therefore, Plaintiff was denied even limited due process required under *Skelly*.

686.    The denial of Plaintiff's due process rights caused damage to Plaintiff's professional reputation, lost income, and emotional distress.

687.    As a direct and proximate result of Defendants' denial of Plaintiff's due process rights and a fair procedure, a violation of the public policy of the State of California, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress and has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.  Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

688.    Plaintiff is informed and believes and based thereon alleges that the outrageous conduct of Defendants described above was done with malice, fraud and oppression and with

conscious disregard for Plaintiff's rights and with the intent, design and purpose of injuring Plaintiff. Defendants, through its officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct of all of the Defendants named in this action. By reason thereof, Plaintiff is entitled to punitive or exemplary damages from all Defendants in a sum according to proof at trial to deter these Defendants and others from engaging in similar, wrongful actions in the future.

689.    Defendants knew that Plaintiff was represented by legal counsel prior to the Skelly hearing, therefore this was a waste of his attorneys' fees which should be reimbursed and Defendants sanctioned for this intentional waste.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

## TWELFTH CAUSE OF ACTION

### Unfair Employment Practices
### Wrongful Discharge/ Demotion/Termination in Violation of Public Policy
### (Violation of § 2856 of the California Labor Code)

### (Against Monthei, Deems, Daye, Belavich, Beard, and DOES 1 through 50)

690.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

691.    The California Supreme Court has extended employment claims to encompass demotions or other similar employment decisions. (See *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 473-474).

692.    "[W]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170).

693.    It is the public policy of the State of California as expressed in the Health and Safety Code and Business and Professions Code to that individuals shall not be terminated or discriminated from their employment on the basis of complaining about conditions at the SQSP

facilities of Defendant that would affect the quality of care and services for inmate-patients at SQSP.

694.    An employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions.

695.    The public policy of this state as reflected in the Business and Professions code sections referred to above would be seriously impaired if it were to be held that one could be discharged by reason of his advocating for patient safety.

696.    An employee's action for wrongful discharge is *ex delicto* and subjects an employer to tort liability.  As Professor Prosser has explained: "[Whereas] [c]ontract actions are created to protect the interest in having promises performed," "[t]ort actions are created to protect the interest in freedom from various kinds of harm. The duties of conduct which give rise to them are imposed by law, and are based primarily upon social policy, and not necessarily upon the will or intention of the parties ...." (Prosser, Law of Torts (4th ed. 1971) p. 613).

697.    Plaintiff was employed by CDCR.

698.    Plaintiff was subjected to working conditions that violated public policy in that he was treated intolerably in retaliation for raising patient safety concerns that called into question Monthei's NAMH plan, submitting Adverse/Sentinel Event reports, and seeking to redress the restrictions on his medical privileges that had been taken away without due process.

699.    Monthei terminated Plaintiff on March 24, 2014 when he ordered Plaintiff to get the fuck out of SQSP and that he would never step foot on the condemned inmate floor again.

700.    Monthei and Deems constructively discharged him by restricting his privileges to practice and administrative duties, forced him to turn in his equipment.

701.    The working conditions that Plaintiff had to endure were so intolerable that a reasonable person in Plaintiff's position would have had no alternative except resign.

702.    Monthei, Deems, Belavich, Daye, intentionally created and/or knowingly permitted these working conditions.

703.    Plaintiff resigned from Chief Psychiatrist because of these working conditions.

704.    The working conditions were a substantial factor in causing harm to Plaintiff

705.    Plaintiff's reporting concerns for inmate patient safety is an activity protected by public policy and was a motivating reason for Monthei's decision to discharge and demote Plaintiff from Chief Psychiatrist and take away his medical director position.

706.    Plaintiff was discharged/demoted for refusing to engage in illegal conduct at Monthei's request and this this act violates fundamental principles of public policy.

707.    Plaintiff's discharge/demotion caused Plaintiff harm.

708.    As a direct and proximate result of Defendants coerced voluntary demotion and unjustified rejection from probation, both in violation of public policy of the State of California, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress and has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities, as well as damage to his professional reputation.  Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

709.    As a direct and proximate result of Defendants' willful, knowing and intentional Retaliation against Plaintiff, Plaintiff has sustained, and continues to sustain, loss of earnings, the full nature and extent of which are presently unknown to Plaintiff, who therefore, will seek leave of court to amend Plaintiffs complaint at such time as these damages are fully ascertained.

710.    Plaintiff is informed and believes and based thereon alleges that CDCR management had advance knowledge of the unfitness of Monthei and employed him with a conscious disregard of the rights and safety of others and/or authorized or ratified the wrongful conduct for which the damages are awarded and/or was personally guilty of oppression, fraud, or malice.  (Civil Code § 3294(b)).

711.    Plaintiff is informed and believes and based thereon alleges that the outrageous conduct of Defendants described above was done with malice, fraud and oppression and with conscious disregard for Plaintiff's rights and with the intent, design and purpose of injuring

Plaintiff. Defendants, through its officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct of all of the Defendants named in this action. By reason thereof, Plaintiff is entitled to punitive or exemplary damages from all Defendants in a sum according to proof at trial.

712. As a direct and proximate result of Defendants termination/demotion of Plaintiff violation of the public policy of the State of California, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress and has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

713. Plaintiff is informed and believes and based thereon alleges that the outrageous conduct of Defendants described above was done with malice, fraud and oppression and with conscious disregard for Plaintiff's rights and with the intent, design and purpose of injuring Plaintiff. Defendants, through its officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct of all of the Defendants named in this action. By reason thereof, Plaintiff is entitled to punitive or exemplary damages from all Defendants in a sum according to proof at trial to deter these Defendants and others from engaging in similar, wrongful actions in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

## THIRTEENTH CAUSE OF ACTION

### Violation of the Fair Employment and Housing Act (FEHA) and Americans with Disabilities Act (ADA)

### (Against Monthei, Deems, and DOES 1 through 50)

714. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

715.     Defendants Monthei and Deems have alleged that Plaintiff suffers from a substantial mental disorder and/or disability impacting Plaintiff's abilities of comprehension. According to Monthei, Plaintiff was unable to understand basic words or concepts; demonstrated non-reality based symptoms of psychosis; exhibited symptoms of severe dementia or other brain dysfunctions; and was unable to comprehend simple communications.

716.     Monthei and Deems engaged in an ongoing campaign of harassment against Plaintiff and made numerous derogatory and highly damaging statements about Plaintiff. On information and belief, Monthei and Deems believed, and have stated publicly, that Plaintiff suffers from mental disorders.  Their perception generated Monthei's and Deems' pattern of producing offensive, derogatory and damaging comments about Plaintiff and his alleged mental illness.  These CDCR managers harassed Plaintiff, based on their perception that he suffered from a severe mental disorder.  Daye and Belavich, among other officials in Headquarters, were aware of their reprehensible conduct and yet did nothing to intervene.

717.     With the permission of CDCR, Monthei and Deems published outrageous insults and derogatory remarks targeting Plaintiff when they published the EPIP, which demonstrated their use of reasonable accommodations of documenting "EC."  Monthei's and Deems' perceptions, as documented in the EPIP, that Plaintiff required the same reasonable accommodations as patients suffering from substantial mental impairments was added to Plaintiff's employee personnel file and transmitted electronically to numerous recipients. Monthei verified, via email sent to Plaintiff, that Monthei's use of reasonable accommodations designed for those with severe mental disorders accurately reflected Monthei's belief that Plaintiff needed these accommodations.

718.     Although the EPIP, which first published Monthei's and Deems' perception that Plaintiff required "EC"-verification, identifies numerous alleged performance deficits, none of the proposed remedies within the EPIP involve consideration that Plaintiff's perceived disability may have contributed to the workplace deficiencies that they alleged.

719. Based upon the actions of Monthei and Deems, the sole utility of a court-mandated *reasonable accommodation* is to unreasonably accommodate vile actions of workplace discrimination and harassment of subordinate employees.

720. Monthei's and Deems' perception that Plaintiff suffered from a disabling condition was sufficient to incorporate Plaintiff within a protected class. Plaintiff's membership of a protected class should have triggered Monthei and Deems to properly and lawfully investigate whether Plaintiff's perceived unfitness, as outlined within the EPIP, could have been remedied by the provision of reasonable accommodation. Unfortunately, Monthei's and Deems' actions reveal that, while they believe reasonable accommodations can be an effective instrument to humiliate and degrade their subordinate employees, they have no interest in using these devices to assist their employee's successful completion of the assigned probationary period.

721. Rather than reasonably accommodate Plaintiff based on Monthei's claim that Plaintiff has an alleged qualifying disorder or disability, Monthei instead retaliated against Plaintiff by drafting a false and defamatory Notice of Rejection of Plaintiff's probation.

722. In response to Monthei and his subordinate staff's unlawful practices under the Fair Employment and Housing Act (FEHA) and Americans with Disabilities Act (ADA) by harassing Plaintiff about his alleged disabilities, and his public humiliation of Plaintiff by using EC and degrading comments about him and his alleged disabilities, Plaintiff publicly protested the adverse treatment and he tried to defend himself on several occasions spanning from May 2014 to September 2014.

723. Plaintiff pointedly protested Monthei's unrelenting unlawful harassment and called out the outrageous and degrading comments that were directed at him by Monthei which used the EC language.

724. Rejection of Plaintiff's probation as Chief Psychiatrist was due to among other things, Plaintiff's alleged inability to perform the essential duties of the position. The reasons given by Monthei and Deems were a pretext for discrimination on account of Monthei' and Deems' belief that Plaintiff, and his perceived mental disability, required the use of EC.

725. Monthei's and Deems discriminatory actions against Plaintiff constitute unlawful discrimination in employment on account of alleged mental disabilities in violation of Government Code §§ 12940(a) and (h).

726. As a proximate result of Monthei's and Deems' discriminatory actions against Plaintiff, Plaintiff has been harmed in that he has suffered the loss of salary and benefits and additional amounts of money he would have received had CDCR not rejected him on probation as Chief Psychiatrist. As a result of such discrimination and consequent harm, Plaintiff has suffered damages in an amount to be proven at trial.

727. As a further direct and proximate result of Defendants discriminatory actions against Plaintiff, Plaintiff has been harmed in that he has suffered intangible losses of such employment-related opportunities as continuing to be the Chief Psychiatrist and Medical Director which adds prestige and extra qualifications to Plaintiff's professional reputation which bring ancillary expert witness job opportunities that flow from being Chief Psychiatrist of SQSP, one of the most famous prisons in California. As a result of such discrimination and consequent harm, Plaintiff has suffered damages in an amount to be proven at trial.

728. The "gate stop" included his photograph/information were distributed to every entrance to SQSP property. This "gate-stop," a procedurally and purposely unnecessary tactic was designed to injure Plaintiff as a result of Monthei's and Deems' perception that Plaintiff suffers from a disabling disorder. As a result of such discrimination and consequent harm, Plaintiff is entitled to punitive and exemplary damages against Monthei in an amount to be proven at trial.

729. Defendants' actions in demoting his position from Chief Psychiatrist and taking away his position as Medical Director, were done with malice, fraud or oppression, and in a reckless disregard of Plaintiff's rights under FEHA and federal rights under the ADA. Specifically, Defendants removed him from the position in a public fashion by having him escorted off SQSP by prison guards, with a gate "hold" placed on his employee pass at every entrance to SQSP property; this was designed to injure Plaintiff as a result of the physical and

mental disabilities which Monthei and Deems claimed Plaintiff has. As a result of such discrimination and consequent harm, Plaintiff is entitled to punitive and exemplary damages against Monthei and Deems in an amount to be proven at trial to deter these Defendants and others from engaging in similar, wrongful actions in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

## FOURTEENTH CAUSE OF ACTION

### Improper Rejection of Probationary Civil Service Employee
### In Violation of Government Code § 19702
### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against All Defendants)

730. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

731. Implied in every contract is a covenant of good faith and fair dealing that neither party will engage in any act or omission that is intended or has the natural tendency to deprive the other party of the full benefits of its bargain. This covenant is implied into the employment agreement between Plaintiff and CDCR, and imposes upon CDCR a duty not to engage in acts or omissions that would frustrate the enjoyment of Plaintiff of any of the rights and benefits owed or reasonably expected under the agreement.

732. Plaintiff and CDCR entered into an employment agreement when he was hired as the Chief Psychiatrist of SQSP.

733. Plaintiff's State Civil Service position as Chief Psychiatrist required service of a probationary period.

734. During the probationary period the appointing power was required to evaluate the work and efficiency of a probationer in the manner and at such periods as the department rules may require. (Govt. Code §19172).

735. By virtue of the relationship between Plaintiff, on the one hand, and CDCR, on the other hand, Plaintiff placed trust and confidence in CDCR to perform all the duties and

obligations owed and reasonably expected pursuant to the terms of the Civil Service Act and his employment agreement and to honor the implied covenant to act in good faith and not to take any action which would unduly or unreasonably impair or harm any rights or benefits owed or reasonably expected under the Civil Service Act.

736. Plaintiff, as a probationer in the position of Chief Psychiatrist, could only be rejected by the appointing power during the probationary period for reasons relating to his "qualifications, the good of the service, or failure to demonstrate merit, efficiency, fitness, and moral responsibility." (Govt. Code § 19173(a)).

737. Plaintiff was rejected from probation on September 12, 2014, by the appointing power for an improper cause that constituted prohibited discrimination as set forth in Government Code § 19702. Plaintiff was retaliated against for (1) raising concerns about Monthei's NAMH plan (patient safety, waste of resources, and safety to the public and staff); (2); opposed and reported the harassment and retaliatory treatment he was subjected to at the hands of Monthei and Deems to the SQSP EEO officer after he received the EPIP which included harassing and derogatory EC language. This was a clear violation of Govt. Code § 19173.

738. Plaintiff substantially performed his job duties as Chief Psychiatrist until he was prevented from performing the duties of Chief Psychiatrist, Medical Director, by Monthei's, Deems, and administration's imposed restrictions on his clinical practice and duties.

739. Monthei and Deems' retaliatory conduct restricted Plaintiff's clinical privileges and duties and rejected him from probation in September 2014 for illegitimate reasons that had nothing to do with Plaintiff's qualifications, the good of the service, or failure to demonstrate merit, efficiency, fitness, and moral responsibility.

740. All of the justifications offered in the Notice of Rejection on Probation were false and defamatory and Defendants' wrongful acts prevented him from receiving the benefits that he was entitled to have received under his employment contract with CDCR.

741. Monthei's, Deems', and administration's conduct of coercing him into voluntarily demoting under the threat of being terminated, threats to have Plaintiff relocated to other prisons

in the desert, and ultimately present a Notice of Rejection with false and defamatory statements and criticisms were all failures to act fairly and in good faith.

742. CDCR has breached the implied covenant of good faith and fair dealing and denied Plaintiff the rights and benefits to which he was entitled or reasonably expected under the Civil Service Act as a probationary employee by engaging in the aforementioned conduct and by permitting and conspiring with Monthei and Deems in interfering with and frustrating the purpose of the rules and laws pertaining to probationary status of civil service employees and prevented Plaintiff from receiving the benefits reasonably expected under the Civil Service Act, including not retaliating against him for reporting patient safety, waste of resources, and safety to the public and staff, as well as reporting his own mistreatment and outrageous conduct he was subjected to at the hands of Monthei and Deems. Plaintiff is informed and believes and thereon alleges that CDCR and its agents/employees pursued this course of conduct in bad faith and with the intent to interfere with, injure and frustrate the enjoyment of the benefits and rights conferred upon Plaintiff pursuant to the terms and requirements of the Civil Service Act.

743. Both parties to an employment relationship have a duty not to do anything that prevents the other party from receiving the benefits of their agreement. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. Defendants were not being faithful to their duty or obligation to only reject Plaintiff's probationary status as Chief Psychiatrist for valid reasons.

744. The covenant of good faith and fair dealing and relevant Government Codes prevent Defendants from acting in bad faith to frustrate Plaintiff's actual benefits related to his civil service employment contract; this covenant was violated because Plaintiff's rejection on probation was a mere pretext to cheat him out of the contract and or implied contract benefit to which the Plaintiff was clearly entitled.

745. Even if and to the extent that Defendants' conduct did not constitute a breach of the express contractual terms in Plaintiff's employment agreement, Defendants' conduct as alleged herein has unfairly frustrated the agreed common purposes of the Civil Service Act and

has disappointed the reasonable expectations of Plaintiff and deprived Plaintiff of the benefits reasonably expected under the rules applicable to Civil Service employment.

746.    Plaintiff was harmed by Monthei's, Deems, and administration's conduct.

747.    As a proximate result of the breaches of the covenant of good faith and fair dealing inherent in the employment agreement and relevant Civil Service Rules and Government Codes, Plaintiff has been damaged. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court. When Plaintiff has ascertained the full amount of its damages, it will seek leave of Court to amend this Complaint accordingly.

748.    Plaintiff is informed and believes and based thereon alleges that the outrageous conduct of Defendants described above was done with malice, fraud and oppression and with conscious disregard for Plaintiff's rights and with the intent, design and purpose of injuring Plaintiff. Defendants, through its officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct of all of the Defendants named in this action. By reason thereof, Plaintiff is entitled to punitive or exemplary damages from all Defendants in a sum according to proof at trial to deter these Defendants and others from engaging in similar, wrongful actions in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.


### FIFTEENTH CAUSE OF ACTION

### Negligent Hiring, Supervision, and/or Retention of Employees

### (Against Belavich, Daye, Beard, Kelso, and DOES 1 through 50)

749.    "*Negligence liability will be imposed on an employer if it 'knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.'*" (*Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1139).

750.    CDCR and its management are liable to Plaintiff for negligently hiring, and/or supervising, and/or retaining Monthei, who was unfit for a supervisory role based on his prior track record of mistreating physicians and other CDCR/SQSP employees. (*Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1054).

751.    Plaintiff was harmed by Monthei's wrongful acts and Defendants are responsible for that harm because they negligently hired and/or supervised and/or retained Monthei.

752.    Plaintiff is informed and believes and based thereon alleges that Kelso as the federal receiver, is responsible for the management of the California Correctional Health Care Services (CCHCS) agency and therefore had direct oversight over Monthei.

753.    Plaintiff is informed and believes and based thereon alleges that Monthei was unfit to perform the work for which he was hired as a Chief of Mental Health at SQSP.

754.    Plaintiff is informed and believes and based thereon alleges, Monthei has had a lengthy track record of mistreating psychiatrists and other medical staff members, including psychologists working under him at SQSP.

755.    Plaintiff is informed and believes and based thereon alleges, that Monthei's behavior has given rise to prior investigations, monetary settlements, and numerous victims.

756.    Defendants had actual and/or constructive notice of Monthei's unfitness to act as Chief of Mental Health and a Manager at SQSP and knew or should have known that Monthei was unfit and/or incompetent and that this unfitness and/or incompetence created a particular risk to others.

757.    Monthei's unfitness and/or incompetence harmed Plaintiff.

758.    Defendants' negligence in hiring/supervising/ and/or retaining Monthei was a substantial factor in causing Plaintiff's harm.

759.    Defendants knew or should have known that it was highly likely that the Monthei would violate Plaintiff's rights based on his prior track record of mistreating employees.

760.     Hiring and/or retaining Monthei as Chief of Mental Health showed a deliberate indifference to the risk that a violation of a particular constitutional or statutory right would follow Defendants' hiring decision.

761.     A review of Monthei's background, would cause an objectively "reasonable policymaker" to conclude that the "plainly obvious" result of hiring and/or retaining that individual would be a violation of someone's legal rights and generate substantial liability.

762.     Monthei posed a danger to his subordinate staff and other employees, therefore, Defendants are liable for the damages caused by the wrongdoing of Monthei.

763.     Defendants acted with willful disregard to a clear and present danger that caused substantial violations of Plaintiff's constitutional and statutory rights.

764.     Based on information and belief, Plaintiff alleges that Monthei had knowledge of the untrue and defamatory statements made about Plaintiff by Chen, Corrado, Van Burg, and Whyte, and did not take meaningful efforts to prevent its use in management meetings.

765.     But for Defendants' acts and or inaction, Plaintiff would not have been subjected to adverse employment actions; hostile work environment; deprived of due process/peer review protections of a physician's clinical privileges; deprived of the freedom of speech; or deprived of the numerous protections against workplace retaliation.

766.     Plaintiff's harm was proximately caused by Defendants' wrongful acts and inaction.

767.     The intensity, severity, and duration of the damages suffered by Plaintiff were significantly and unnecessarily amplified by the unwillingness of Deems, Daye, and Belavich to intervene, even when they were aware that Plaintiff had become the latest, in a long line, of Monthei's victims.  Monthei continued to enjoy the ability to repeatedly and increasingly harass and retaliate against Plaintiff for over one year after Plaintiff submitted his March 23, 2014 memorandum.

768.     The supervisory actions of Defendants Chen, Corrado, Van Burg, and Whyte demonstrate that Monthei's negligent retention in a managerial position of authority has allowed

him to, over time, collect and select a supervisory staff that obscures the intensity of workplace terror from outside observers.

769. Plaintiff has suffered damages including lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

770. Defendants acts were reckless, malicious, fraudulent, oppressive, and in bad faith, justifying an award of punitive damages to deter these Defendants and others from engaging in similar, wrongful actions in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

## SIXTEENTH CAUSE OF ACTION

### Libel _Per Se_

**(Against Monthei, Deems,** Van Burg, Whyte, Chen, Corrado, **and DOES 1 through 50)**

771. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

772. Even internal company statements regarding a Plaintiff's "*'lack of job knowledge and cooperation'*" are considered "*published*." (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 944).

773. Under principles of *respondeat superior*, an employer may be held liable for a defamatory statement made by its employee. (See *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 411).

774. Monthei's subordinate staff published written statements about Plaintiff that were submitted to Monthei which included false statements of fact that Plaintiff suffered from a mental disability, represented a high risk of future violence, demonstrated "*bizarre*" workplace behaviors, had interpersonal difficulty, and disrupted Monthei's disordered workplace. These false statements were republished by Monthei and Deems.

775. Defendant Monthei published written statements by email and upon information and belief, by memorandum to CDCR Management which included false statements of fact regarding Plaintiff's professional abilities as a physician.

776. Defendants Monthei and Deems published written statements, which included false statements of fact that Plaintiff suffered from a mental disability requiring the use of court-mandated reasonable accommodations of EC-verifications in the EPIP, among numerous other communications.

777. Defendants Monthei and Deems published written statements in the simultaneous employee evaluations provided to him on May 16, 2014, that included false statements of fact regarding Plaintiff's professional abilities and qualifications that also violated Plaintiff's collective bargaining agreement.

778. Defendants Monthei and Deems published written statements in the EPIP and Notice of Rejection which included false statements of fact that called into question Plaintiff's professional abilities.

779. Upon information and belief, Monthei republished statements that Plaintiff was suffering from a mental disability, was dangerous, and "*likely to go postal*," which was false.

780. Van Burg stated "*Dr. Wadsworth's underlying anger, distorted thinking, and hostile behavior is not inconsistent with some of the characteristics of individuals who have imploded and resorted to violence.*"

781. Whyte published false and defamatory statements of fact in the emails she sent to Monthei on May 31, 2014, and June 4, 2014, where she falsely depicted Plaintiff as posing an immediate threat to her physical safety and called into question Plaintiff's mental status.

782. Chen published false and defamatory statements of fact when she sent an email on May 29, 2014, to Monthei that indicated that she had developed "*concerns*" about Plaintiff's behaviors "*in the last month or two*."

783. Corrado published false and defamatory statements of fact in the emails she sent to on June 3, 2014, Monthei she stated that Plaintiff exhibited "*increasingly bizarre*," "*peculiar*,"

"*strange*," or that he was displaying "*inappropriate behavior at work.*" Corrado made numerous additional false allegations that Plaintiff was "*inappropriate, disruptive, and strange*" professional capabilities, including allegations that Plaintiff was unable to responsibly, professionally, or reliably perform his duties as Chief Psychiatrist.

784. Defendants intentionally published these false statements to third parties, including CDCR staff and management; and upon information and belief, further statements were made by Defendants to other members of the Management Team. Defendants' defamatory EPIP document and Notice of Rejection were transmitted into Plaintiff's employee personnel file and reviewed by CDCR personnel staff.

785. The third parties reasonably understood that the statements made were about Plaintiff.

786. The statements made by Defendants described herein were and are untrue.

787. The statements made by Defendants described herein constitute libel *per se*, because they impugn Plaintiff with deviant criminal acts, symptoms of psychosis and cognitive deficiency, which significantly impair his professional reputation as a physician.

788. The third parties who read these statements made by Defendants reasonably understood the statements to mean that Plaintiff was mentally disturbed, dangerous, unqualified, and unprofessional.

789. The statements by Defendants described herein have directly and proximately caused actual damages to Plaintiff, including *inter alia*, financial losses, embarrassment, humiliation, emotional distress, injury to reputation, and loss of enjoyment of life. In addition, because the statements at issue constitute libel *per se*, general damages are presumed.

790. The statements by Defendants described herein were made intentionally, with actual malice, or were made in reckless disregard for the truth or falsity of the matters asserted by them. Accordingly, Defendants are not entitled to any qualified immunity or qualified privilege under applicable common law.

791.    As a proximate result of Defendants false statements, and the facts alleged herein, Plaintiff was damaged by being wrongly described as dangerous, suffering from a mental disability, and impugned his professional reputation as a physician.

792.    Defendants intentionally made these false statements that they knew to be false with the intention of thereby depriving Plaintiff of his legal rights and his property and Plaintiff is therefore entitled to punitive damages.

793.    Defendants acts were malicious, fraudulent, oppressive, and in bad faith, justifying an award of punitive damages to deter these Defendants and others from engaging in similar, malicious action in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

## SEVENTEENTH CAUSE OF ACTION

### (Slander _Per Se_)

### (Against Monthei, Chen, and DOES 1 through 50)

794.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

795.    "_Besides the personal rights mentioned or recognized in the Government Code, every person has, subject to the qualifications and restrictions provided by law, the right of protection from bodily restraint or harm, from personal insult, from defamation, and from injury to his personal relations_."  (Cal. Civil Code § 43).

796.    Pertinent parts of Civil Code § 46:  Slander _Per Se_ - Tends directly to injure a person in respect to his or her office, profession, either by imputing general disqualification in those respects which the occupation peculiarly requires, or by imputing something with reference to the profession that has a natural tendency to lessen its profits; or which, by natural consequence causes actual damage.  (Cal. Civil Code § 46).

797.    Publication occurs when a statement is communicated to any person other than the party defamed. (_Bindrim v. Mitchell_ (1979) 92 Cal.App.3d 61, 79, cert. den., 444 U.S. 984).

798.    Under principles of *respondeat superior*, an employer may be held liable for a defamatory statement made by its employee. (See *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 411). Defendant Monthei made false and unprivileged publications, orally uttered and communicated about Plaintiff to Deems and upon information and belief to CDCR Headquarters personnel.  These statements included false statements of fact that Plaintiff had direct disregarded orders.

799.    Plaintiff is informed and believes that Defendant Monthei published these statements to third parties, including to Deems, members of the SQSP Management team, and employees of CDCR.

800.    The statements made by Defendant Monthei described herein were and are untrue.

801.    The statements made by Defendant Monthei, described herein constitute slander *per se*, because they impugn Plaintiff with being incompetent and mentally unstable and tend to directly injure a person's professional reputation.

802.    On September 12, 2014, Chen directly addressed Plaintiff as "*Dexter*," a fictional television character whose known qualities include: dark homicidality; emotionally divorced from the rest of humanity; lacking empathy; devoid of feeling or conscience; and a psychopathic, violent, vigilante, serial murderer.  Chen made this defamatory comment with her colleague Alyssa Edwards, another direct subordinate of Monthei.

803.    Plaintiff witnessed Alyssa Edwards hearing Chen's defamatory statement and believes and thereupon alleges that Ms. Edwards understood that it was used by Chen to describe Plaintiff.

804.    Plaintiff is informed and thereupon believes and alleges that Chen and DOES 1 through 50 have referred to Plaintiff as "Dexter" on numerous occasions in workplace meetings which he did not attend.

805.    Plaintiff is informed and thereupon believes and alleges that Chen and DOES 1 through 50 republished information she received from Defendant Monthei and DOES 1 through 50.

806.     The statements made by Chen described herein were and are untrue.

807.     The statements made by Chen, described herein constitute slander *per se*, because they impugn Plaintiff with criminality and mental instability and tend to directly injure a person's professional reputation.

808.     As a proximate result of Defendant Monthei's false statements, and the facts alleged herein, Plaintiff was damaged by being wrongly accused of being mentally unstable, dangerous, and unable to comprehend basic instructions.

809.     As a proximate result of Chen's and DOES 1 through 50's false statements, and the facts alleged herein, Plaintiff was damaged by being wrongly accused of being mentally unstable, unprofessional, and a dangerous criminal.

810.     Plaintiff alleges the statements and or publications set forth above were motivated by hatred and/or ill will toward the Plaintiff and were published with express and implied malice and with design and intent to injure Plaintiff in his good name, reputation and employment.

811.     The statements by Defendants described herein have directly and proximately caused actual damages to Plaintiff, including lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages,  and loss of enjoyment of life. In addition, because the statements at issue constitute slander *per se*, general damages are presumed.

812.     The statements by Defendants described herein were made intentionally, with actual malice, or were made in reckless disregard for the truth or falsity of the matters asserted by them. Accordingly, Defendants are not entitled to any qualified immunity or qualified privilege under applicable common law.

813.     Defendants intentionally made false statements to other CDCR personnel with the intention of thereby depriving Plaintiff of his legal rights and his property and Plaintiff is therefore entitled to punitive damages.

814. Defendants acts were malicious, fraudulent, oppressive, and in bad faith, justifying an award of punitive damages to deter this Defendant and others from engaging in similar, malicious action in the future.

815. In doing the acts herein alleged, Defendants acted with malice in that his conduct was carried out with conscious disregard of Plaintiff's rights and Plaintiff is therefore entitled to punitive damages.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

### EIGHTEENTH CAUSE OF ACTION

**Tortious Interference with Contract; Intentional Interference with Contractual Relations**

**(Against Monthei, Belavich, Deems, Daye, Chen, Corrado, Van Burg, Whyte,**

**and DOES 1 through 50)**

816. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

817. Plaintiff had a valid employment contract with CDCR as the Chief Psychiatrist of SQSP and Medical Director of Correctional Treatment Center.

818. Defendants had knowledge of Plaintiff's employment contract with CDCR.

819. Defendants intentionally and maliciously procured the breach of Plaintiff's employment contract, and tortuously interfered with this contract by submitting false and defamatory statements to CDCR administration.

820. Defendants Monthei and Deems and Daye intentionally and maliciously procured the breach of Plaintiff's employment contract, and tortuously interfered with this contract by submitting the EPIP and Notice of Rejection which both included false and defamatory statements regarding Plaintiff's job work performance and professional capabilities.

821. These statements were intended to induce the breach of his employment contract and/or a disruption of the contractual relationship between Plaintiff and CDCR as a State Civil Servant.

822.    The breach of his employment contract was a foreseeable consequence of the Defendants' actions.

823.    The Defendants' conduct prevented performance of the agreement and interfered with relevant Government Code sections pertaining to probationary status employees and/or made performance more expensive and/or difficult.

824.    The contract would have been performed but for the Defendants' conduct.

825.    The Defendants' conduct was a substantial factor in causing Plaintiff's harm.

826.    As a direct and proximate result of Defendants' tortious interference with contract, Plaintiff was harmed and has suffered actual damages in the form of expenses related to loss of income, travel fees, legal fees and costs.  Plaintiff has further suffered actual damages in the form lost future earnings capacity, damage to professional reputation, lost job opportunities, and professional stigma, lost employment benefits, emotional distress, humiliation, embarrassment, and loss of enjoyment of life.  Accordingly, Plaintiff is entitled to recover actual damages from Defendants sufficient to compensate him for his economic and non-economic damages caused by Defendants' tortious interference with contract and contractual relations.

827.    Upon further information and belief, Defendants' tortious interference with Plaintiff's employment contract with CDCR was intentional and in reckless disregard of his rights to be free from such unlawful and malicious conduct.  Therefore, Plaintiff is entitled to recover punitive damages against Defendants in an amount to be determined by the jury, sufficient to deter these Defendants and others from engaging in such unlawful actions in the future.

828.    The Defendants' acts were malicious, fraudulent, oppressive,  and in bad faith, justifying an award of punitive damages so that Defendants and each of them will not engage in such conduct in the future and make an example of them.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

//

//

**NINETEENTH CAUSE OF ACTION**

**Conspiracy to Tortiously Interfere With Contract and Contractual Relations**

**(Against Belavich, Monthei, Deems, Daye, Chen, Corrado, Van Burg**

**and DOES 1 through 50)**

829.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

830.    Defendants made a conspiratorial agreement to have Defendant Monthei coerce Plaintiff into "voluntarily" request a demotion from his then position as Chief Psychiatrist using false and misleading statements of fact as described and alleged above.

831.    Defendants Monthei and Deems made a conspiratorial agreement to use EC language in the EPIP against Plaintiff.

832.    Defendants made a conspiratorial agreement when the Notice of Rejection was drafted that included false and defamatory statements of fact.

833.    Upon information and belief, Defendants had knowledge of the object and purpose of the conspiracy was to get Plaintiff to give up his position as Chief Psychiatrist and keep him away from condemned patients so that he would not be called as a witness and share his concerns for patient safety.

834.    Defendants' wrongful acts have caused damage to Plaintiff because he succumbed to Defendants' coercive pressure/efforts, fearing for his termination from CDCR he acquiesced on March 27, 2014, and requested a demotion from his position as Chief Psychiatrist. This coercive tactic by Monthei provided a false promise to Plaintiff because after being promised the position as Senior Psychiatrist in Telepsychiatry, Monthei later informed Plaintiff that this position was not available and so he was placed back into the Chief Psychiatry titled position, but Plaintiff's essential job functions/duties and responsibilities were stripped from him.

835.    As a proximate result of Defendant Monthei's false statements and false promises, and upon information and belief, additional statements were also made by Monthei and Deems to CDCR Headquarters' administration and management and the facts alleged herein, Plaintiff was

further damaged when his clinical privileges and access to relevant information pertinent to patient care were taken away from him without due process.

836. In doing the acts herein alleged, the Defendants' acts were malicious, fraudulent, oppressive, and in bad faith, justifying an award of punitive damages so that Defendants and each of them will not engage in such conduct in the future and make an example of them.

837. Defendants acted with malice in that their conduct was carried out with conscious disregard of Plaintiff's rights and Plaintiff is therefore entitled to punitive damages.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

## TWENTIETH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

### (Against Belavich, Monthei, Deems, Daye, Van Burg, Whyte, Corrado, Chen and DOES 1 through 50)

838. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

839. A claim for wrongful termination in violation of a public policy gives rise to tort damages. (*Tameny v. Atlantic Richfield Company* (1980) 27 Cal.3d 167). The Supreme Court emphasized that: "an employer's authority over its employees does not include the right to demand that an employee commit a criminal act to further its interests, and any employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order. The employer engaging in such conduct violates the basic duty imposed by law upon all employers." (*Id.* at p. 178).

840. Prior to engaging in the aforementioned conduct, Defendants were fully aware that Plaintiff had a business relationship with CDCR which was very likely to result in economically-advantageous relationships between Plaintiff and CDCR in the future. Defendants were also fully aware that Plaintiff often worked as a forensic psychiatry expert witness and that his employment

record with CDCR would very likely result in economically-advantageous relationships between Plaintiff and attorneys who would retain him as a forensic psychiatry medical expert.

841. Defendants have engaged in the conduct alleged above with the intent to interfere with and/or destroy these economically-advantageous relationships and have disrupted the business relationship between Plaintiff and the CDCR and also between Plaintiff and attorneys and courts in California and nationwide, by improper methods which fall outside the boundaries of fair competition.

842. There was a probability of future economic benefit for Plaintiff to complete his probationary period as Chief Psychiatrist of SQSP.

843. Defendants knew about and intended to interfere with Plaintiff's prospective business advantage with CDCR and attorneys and courts that retained him for expert witness services.

844. It was Defendants' specific intent to interfere with Plaintiff's business relationship with CDCR and attorneys and courts that retained him to provide professional expert witness review services in the area of forensic psychiatry.

845. Defendants intentionally made false statements impugning Plaintiff with mental illness, unprofessional conduct, incompetence, and violent behavior to others, including CDCR mental health staff, prison staff, CDCR headquarters administration, which is an act substantially certain to result in interference.

846. There is a compelling public policy at stake in not allowing an individual to be wrongly accused of having a mental health disorder or exhibiting criminally deviant behavior.

847. Defendants' conduct was wrongful, malicious, and violates common decency and fair dealing.

848. Defendants' wrongful acts have caused damage to Plaintiff because the rejection from probation, and summary suspension of his privileges were wholly unjustified and directly influenced by Defendant Monthei's false and defamatory statements made to Belavich, Deems, Daye, Beard, and others within CDCR. Monthei's subordinate staff (Chen, Corrado, Van Burg,

and Whyte) also distributed false and defamatory statements about Plaintiff to Monthei and upon information and believe to other CDCR personnel at the direction of Monthei.

849.     As a proximate result of Defendant Monthei's false statements his staff, and upon information and belief, additional statements made by Monthei and Deems to SQSP personnel and CDCR administration, and the facts alleged herein, Plaintiff was further damaged by the restrictions placed on his privileges, his personnel file was tainted by false disciplinary documents (EPIP and Notice of Rejection on Probation and other adverse employment action write-ups).

850.     The conduct of Defendants as alleged herein was purposeful and intentional and was engaged in for the purpose of depriving Plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights, and was performed with fraud, oppression or malice so as to justify an award of exemplary or punitive damages against such Defendants in an amount according to proof at trial.

851.     The Defendants' acts were malicious, fraudulent, oppressive, and in bad faith, justifying an award of punitive damages so that defendants and each of them will not engage in such conduct in the future and make an example of them.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

## TWENTY-FIRST CAUSE OF ACTION

### Negligent Interference with Prospective Economic Advantage

### (Against Belavich, Monthei, Deems, Daye, Van Burg, Whyte, Chen, Corrado and DOES 1 through 50)

852.     Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

853.     Plaintiff had a valid contract and special business relationship with CDCR.

854.     Defendants wrongfully interfered with this special relationship by making false and defamatory statements about Plaintiff.

855. Defendants knew about these special relationships.

856. Defendants made false statements impugning Plaintiff with criminal behavior, mental illness, dangerousness, incompetence, and unprofessional conduct to others, including SQSP staff, CDCR administration, which were acts substantially certain to result in interference.

857. There is a compelling public policy at stake in not allowing an individual to be wrongly accused of unprofessional conduct, criminal behavior, aggressive especially behavior associated with criminally deviant behavior like Dexter.

858. Defendants failed to act with reasonable care and should have known that Plaintiff's relationship with CDCR would be disrupted if they failed to act with reasonable care.

859. Defendants' conduct was wrongful, malicious, and violates common decency and fair dealing.

860. Defendants' wrongful acts have caused damage to Plaintiff because the criminal charges against him were directly influenced by Defendants false and defamatory statements made about Plaintiff's mental health and unprofessional conduct.

861. As a direct and proximate result of Defendants' false statements to SQSP staff, CDCR administration, and the facts alleged herein, Plaintiff was further damaged by having his clinical privileges restricted, professional duties restricted and impacted, and suffered other adverse employment actions.

862. Plaintiff has suffered severe and substantial damages. These damages include lost salary, lost employee benefits, lost raises, diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

863. Plaintiff is informed and believes and based thereon alleges that the outrageous conduct of Defendants described above was done with malice, fraud and oppression and with conscious disregard for Plaintiff's rights and with the intent, design and purpose of injuring Plaintiff. Defendants, through its officers, managing agents and/or its supervisors, authorized,

condoned and/or ratified the unlawful conduct of all of the Defendants named in this action. By reason thereof, Plaintiff is entitled to punitive or exemplary damages from all Defendants in a sum according to proof at trial.

864. Defendants' wrongful conduct was a substantial factor in causing Plaintiff's harm.

865. Defendants should be prevented from making false statements about Plaintiff and his employee file should be cleansed of all false statements.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

### TWENTY-SECOND CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)
### (Against All Defendants)

866. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

867. Monthei abused his position of power as Chief of Mental Health within SQSP when he restricted Plaintiff's clinical privileges without providing Plaintiff due process.

868. Defendants' spreading of deliberately false statements that Plaintiff suffers from mental disorder and poses a danger to CDCR staff is outrageous and an abuse of power by supervisory employees.

869. Monthei, Deems and Belavich abused their positions of power when disciplining Plaintiff with the EPIP that was not only unwarranted, but included harassing and malicious language directed at Plaintiff. The Headquarters' staff authorized this document were complicit in the wrongful act and abused his or her position of power.

870. The Defendants drafting a Notice of Rejection of Plaintiff's probationary status as Chief Psychiatrist was also unwarranted and included defamatory statements about Plaintiff that negatively impacted his professional reputation and employment as a Civil Service employee. Monthei's and Deems' ordering Plaintiff to be involuntarily removed from SQSP property with,

1  under escort of officers from the Investigative Services Unit, was an abuse of their positions of
2  power within SQSP.

3      871.    Monthei's preventing Plaintiff from completing medical records for patients forced
4  Plaintiff to violate unnecessarily the Medical Practice Act, Business and Professions Code 2266.

5      872.    Publication may involve internal corporate statements (*Agarwal v. Johnson* (1979)
6  25 Cal.3d 932, 944), the court stating that internal company statements regarding the Plaintiff's
7  "*lack of job knowledge and cooperation*" were "*published.*"

8      873.    Abuse of a position that gives one the power to damage a Plaintiff's interest is
9  outrageous conduct.  (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946).

10     874.    Defendants' conduct was outrageous and so extreme as to exceed all bounds of
11  that usually tolerated in a civilized community.

12     875.    Defendants intended to cause Plaintiff emotional distress or acted with reckless
13  disregard of the probability that Plaintiff would suffer emotional distress.

14     876.    Plaintiff suffered severe emotional distress.

15     877.    The Defendants' conduct was a substantial factor in causing Plaintiff's severe
16  emotional distress.

17     878.    Defendants' conduct was wrongful, malicious, and violates common decency and
18  should not be tolerated in a civilized community.

19     879.    Defendants' wrongful acts were the actual and proximate cause of Plaintiff's
20  emotional distress.

21     880.    Defendants' wrongful acts have caused damage to Plaintiff.

22     881.    Plaintiff received the following poor treatment by Defendants: harassment and
23  derogatory language containing verbatim EC-reasonable accommodations, restrictions imposed
24  upon his clinical privileges, Plaintiff's escort off SQSP property by custody staff, having his gate
25  access restricted, being required to turn in all state-issued equipment, distributing
26  communications broadly to purposely disseminate misperceptions of Plaintiff's cognitive
27  capabilities to his colleagues, increased surveillance by supervisory colleagues, all created a

hostile work environment that all reasonable employees would have considered to be retaliatory harassment.  These wrongful acts have caused highly unpleasant emotional reactions, including, fright, shock, nervousness, anxiety, worry, grief, humiliation, embarrassment, indignity, and fear that no reasonable person in our society should be expected to endure.

882.    Plaintiff alleges that the statements complained of were made to cause Plaintiff to suffer emotional distress and caused Plaintiff humiliation, mental anguish and emotional and physical distress.

883.    The conduct of Defendants as alleged herein was purposeful and intentional and was engaged in for the purpose of causing Plaintiff emotional distress, and was despicable conduct that subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights, and was performed with fraud, oppression or malice so as to justify an award of exemplary or punitive damages against such Defendants in an amount according to proof at trial.

884.    Plaintiff alleges that defendant persisted in the described conduct even after Plaintiff informed defendant that the statements were false.

885.    The Defendants' acts were malicious, fraudulent, oppressive,  and in bad faith, justifying an award of punitive damages so that defendants and each of them will not engage in such conduct in the future and make an example of them.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.


### TWENTY-THIRD CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

### (Against All Defendants)

886.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

887.    Defendants owed a duty as a matter of law not to make false statements about Plaintiff to CDCR staff regarding alleged improper behavior on the part of Plaintiff, unprofessional conduct, mental disorder, and other conduct which was false and did not occur.

888. Defendants owed a duty as a matter of law not to make false statements about Plaintiff's job performance in the EPIP and especially in the Notice of Probation.

889. Defendants providing false statements to CDCR personnel is presumed to be negligence per se because it violates California law.

890. Defendants owed a duty to each other out of a preexisting relationship as colleagues and co-workers of CDCR not to make false defamatory statements to CDCR employees.

891. Defendants breached this duty owed to Plaintiff.

892. Plaintiff suffered serious emotional distress as a consequence to Defendant's wrongful acts.

893. Defendants' negligence was a substantial factor in causing Plaintiff's serious emotional distress.

894. As a direct and proximate result of the Defendants' violations of Plaintiff's constitutional rights, Plaintiff has suffered severe and substantial damages.

895. These damages include litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.


## TWENTY-FOURTH CAUSE OF ACTION

### Witness Tampering and Intimidation

### 18 U.S. Code § 1512 et seq. and California Penal Code § 136 et seq., and 14th Amendment

### (Against Monthei)

896. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

897. Plaintiff is informed and thereupon alleges that Monthei knowingly and corruptly persuaded or attempted to persuade subordinate state employees to conceal material facts and

make false statements with the intent to hinder, delay or prevent accurate information being provided to investigators of the Department of Fair Employment and Housing; California Department of Corrections (CDCR), Office of Civil Rights; Special Agents of the CDCR Office of Internal Affairs, the *Plata* federal receiver appointed by the United States District Court, Northern District of California, the federally appointed Special Master overseeing remedial efforts of *Coleman v. Brown* filed in the United States District Court Eastern District of California related to unconstitutional Eighth Amendment violations found in CDCR's provision of mental health treatment to inmates.

898. Plaintiff is informed and believes, and thereupon alleges that Monthei held a staff meeting with SQSP mental health supervisors and managers and in that meeting told attendees that Plaintiff was filing various complaints and appeals arising out of the actions taken by Defendants, and each of them.

899. Plaintiff is informed, and thereupon alleges, that Monthei told the participants that he expected them to support the management team (the named defendants) and be "team players" in their interviews or testimony if and when called.

900. Plaintiff is informed and thereupon alleges that some participants in the meeting were concerned that Monthei was ordering the participants to engage in unlawful activity, specifically to provide false and misleading testimony to Special Agents (peace officer investigators) of CDCR investigating allegations of misconduct, which may include criminal activity and other violations of state and federal law, and were reluctant to engage in the requested activity.

901. Plaintiff is informed and thereupon alleges that some participants in the aforementioned staff meeting told other SQSP medical and mental health staff about Monthei's comments and the meaning they perceived – that is to say nothing to any investigator or attorney that was not in keeping with the actions that defendants had taken against Plaintiff. Plaintiff is informed and thereupon allege that the staff who divulged Monthei's comment did so in an effort

to shield them from being accused of engaging in criminal conduct that would likely hinder and conceal true facts ultimately from the court.

902.    Plaintiff is informed and thereupon alleges that the participants in the staff meeting know of Monthei's reputation for vindictiveness and felt pressured to comply with his carefully crafted request to be "team players," or face some adverse employment action.

903.    Further, the afore alleged actions of Monthei in soliciting subordinate employees to conceal material facts and make false statements with the intent to hinder, delay or prevent accurate information being provided to investigators deprived Plaintiff of his right to procedural due process protected by the Fourteenth Amendment by having witnesses who may be called to testify provide false and misleading testimony under threat by Monthei that if they did not support the allegations made by Defendants, and each of them, the subordinate employee would likely face an adverse employment action.

904.    As a direct and proximate result of the Defendants' violations of Plaintiff's rights, Plaintiff has suffered severe and substantial damages.

905.    Defendant's acts were malicious, fraudulent, oppressive, and in bad faith, justifying an award of punitive damages to deter this Defendant and others from engaging in similar, wrongful actions in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.

### TWENTY-FIFTH CAUSE OF ACTION

### Witness Tampering and Intimidation

### 18 U.S. Code § 1512 and California Penal Code § 136 *et seq*.

### (Against Monthei and Deems)

906.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

907.    Defendant Monthei knowingly and corruptly persuaded or attempted to persuade Plaintiff to conceal material facts and make false statements with the intent to hinder, delay and

prevent the communication to the United States District Court, Eastern District of California *Coleman* Special Master overseeing implementation of *Coleman v. Brown*, and his experts information relating to the commission of an unconstitutional Eighth Amendment violations related to mental health treatment at San Quentin State Prison.

908.     Plaintiff alleges that Monthei, with the knowledge and assent of Defendant Deems, ordered Plaintiff to have no communication with other people in the CDCR except through him.

909.     Twenty minutes after Monthei received Plaintiff's memorandum on March 23, 2014, he drafted an email to Undersecretary Toche, Belavich, and CDCR's Chief of Field Operations Nathan Stanley at 6:16pm.  In this email, Monthei wrote, "*As the aforementioned [memorandum] is likely to become the subject matter of a future discovery motion; I will work more closely with Dr. Wadsworth on understanding the commitments of CDCR beyond SQSP.*"  The following morning, Monthei angrily ordered Plaintiff to "*get the fuck out*" of San Quentin State Prison.

910.     Plaintiff alleges that Monthei told him that *Coleman v. Brown* plaintiffs' counsel has direct access to any emails related to the *Coleman* case that were transmitted to CDCR Headquarters and that their receipt of the memorandum Plaintiff drafted on March 23, 2014 could jeopardize their relationship with CDCR, San Quentin and specifically defendant's relationship with the U.S. District Court, Eastern District of California, *Coleman* Special Master, and *Coleman* plaintiffs' counsel.

911.     Plaintiff alleges further that he was ordered to stay away from San Quentin during such time that the *Coleman* Special Master and *Coleman* plaintiffs' counsel would be at San Quentin conducting a review of mental health operations.

912.     Plaintiff alleges that Defendants Monthei and Deems ordering Plaintiff to stay away from San Quentin while the *Coleman* Special Master and plaintiffs' counsel were present was done for the purpose of making Plaintiff, who would ordinarily have contact with the Special Master and plaintiffs' counsel in Plaintiff's role as Chief Psychiatrist, deliberately unavailable. Thus, preventing Plaintiff from reporting of data related to the appropriate mental health

treatment, as ordered by the court, which at the time of their visit in April 2014, was below

constitutional standards as a result of the deficient plan put in place by Monthei, which was the

subject of Plaintiff's March 23, 2014 memorandum.

913.    Deliberately making a witness unavailable and/or ordering an employee to

withhold relevant information from the court, through the court-appointed Special Master

undermines the proper administration of justice.

914.    As a direct and proximate result of the Defendants' violations of Plaintiff's

constitutional rights, Plaintiff has suffered severe and substantial damages.

915.    Defendants acts were malicious, fraudulent, oppressive, and in bad faith, justifying

an award of punitive damages to deter these Defendants and others from engaging in similar,

wrongful actions in the future.

WHEREFORE, Plaintiff prays for judgment as set forth herein below.


## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, Christopher Wadsworth, M.D., requests judgment against

Defendants as follows:

1.    For appropriate declaratory relief regarding the unlawful and unconstitutional acts

and practices of Defendants;

2.    Award compensatory and special damages according to proof;

3.    Award punitive damages according to proof;

4.    Issue a declaration that Defendants' actions, inaction, and conduct complained of

herein:  (i) infringed on Plaintiff's rights to due process and fair procedure in violation of the Fifth

and Fourteenth Amendments to the United States Constitution; (ii) infringed on Plaintiff's

protected free speech rights in violation of the First and Fourteenth Amendments to the United

States Constitution; (iii) violated several state whistleblower laws; (iv) have deprived Plaintiff of

rights secured under the United States Constitution and Constitution of the State of California;

and (v) constituted retaliation against Plaintiff for protected acts of disclosing violations of law and for refusing to participate in violating the law;

5. For appropriate equitable relief against all Defendants as allowed by the Civil Rights Act of 1871, 42 U.S.C. § 1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of the unconstitutional and unlawful employment practices are eliminated and do not continue to affect Plaintiff's, or others; and to order CDCR to remove all false information from Plaintiff's employee personnel file;

6. For an award of reasonable attorneys' fees and his costs on his behalf expended as to such Defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, Health and Safety Code § 1278.5, California Civil Code § 52.1(h), and Business and Professions Code § 809.9;

7. For such other and further relief to which Plaintiff may show himself justly entitled; and

8. Award such other and further relief, in law and/or equity, as this Court deems just and appropriate.

Respectfully Submitted,

Dated: June 3, 2015

MARVIN FIRESTONE, MD, JD & ASSOCIATES

By: ___/s/ Marvin H. Firestone_____
　　　　　　　Marvin H. Firestone

LAW OFFICE OF EDWARD J. CADEN
EDWARD J. CADEN

Attorneys for Plaintiff Christopher Wadsworth, M.D.

**<u>VERIFICATION</u>**

STATE OF CALIFORNIA   )
                                 ) SS.
COUNTY OF MARIN        )


I, Christopher Wadsworth, M.D., am the Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Marin County, California, 94964.

Executed on June 3, 2015, at 12:30 pm.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
Christopher Wadsworth, M.D.